UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



In re Application of Bloomfield Investment
Resources Corp. for an Order Directing Discovery
from Elliot Daniloff, ED Capital, LLC and ED
Capital Management LLC Pursuant to 28 U.S.C. §
1782

Index No.

Declaration of Richard T. Marooney in
support of Ex Parte Petition for
Assistance in Aid of a Foreign
Proceeding Pursuant to 28 U.S.C. §
1782

**15 MISC 220**

I, Richard T. Marooney, declare as follows:

    1.    I am an attorney duly admitted to practice in New York and before this Court.  I

am a partner at the law firm of King & Spalding LLP, attorneys of record for Bloomfield

Resources Investment Corp. ("Petitioner") in this matter.

    2.    I submit this declaration in support of Petitioner's Ex Parte Petition for Assistance

in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Petition").

    3.    Attached as Exhibit A is a copy of the Private Placement Memorandum issued by

Synergy Hybrid Feeder Fund Ltd. to Petitioner effective January 2012.

    4.    Attached as Exhibit B is a copy of the order of the Rotterdam District Court of

June 17, 2015 granting Petitioner's request for prejudgment attachment of the funds in a bank

account of United Meat Group ("UMG") in Demir-Halk Bank with a certified English

translation.

    5.    Attached as Exhibit C is a copy of the petition filed by UMG with the Rotterdam

District Court on July 2, 2015, seeking to lift the attachment ordered by that court on June 17,

2015 with a certified English translation.

6.    Attached as Exhibit D is a copy of the order of July 15, 2015 rendered by the

Rotterdam District Court with a certified English translation.

7.    Attached as Exhibit E is a copy of the order of the Netherlands court authorizing

Bloomfield to file its plenary action by August 12, 2015 with a certified English translation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 22, 2015.

Richard T. Marooney

DMSLIBRARY01\23483\045001\26095465.v1-7/3/15

# EXHIBIT A

FOR THE EXCLUSIVE USE OF: <u>Bloomfield Investment Resources Corp</u>   COPY NO. __2__

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

Relating to the private offering of Shares in

# SYNERGY HYBRID FEEDER FUND LTD.

A CAYMAN ISLANDS EXEMPTED COMPANY

**ED CAPITAL MANAGEMENT, LLC**
INVESTMENT MANAGER

**ED CAPITAL, LLC**
INVESTMENT ADVISER

**ADMINISTRATOR**
APEX FUND SERVICES LTD.
3RD FLOOR, 31 REID STREET
HAMILTON HM12, BERMUDA
TEL: + 1 441 292 2739
FAX: +1 441 292 1884

**Effective January 2012**

---

THE LIMITED VOTING, PARTICIPATING, REDEEMABLE SHARES ("SHARES") IN SYNERGY HYBRID FEEDER FUND LTD. ("FUND") ARE NOT REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT"), IN RELIANCE ON THE PROVISIONS OF REGULATIONS S AND D UNDER THE 1933 ACT. THE SHARES ARE SUBJECT TO RESTRICTIONS ON RESALE AND GENERALLY MAY NOT BE RESOLD TO U.S. PERSONS EXCEPT AS PERMITTED UNDER THE 1933 ACT AND APPLICABLE U.S. STATE SECURITIES LAWS, PURSUANT TO REGISTRATION THEREUNDER OR EXEMPTION THEREFROM, AND AS PERMITTED IN THE FUND'S MEMORANDUM AND ARTICLES OF ASSOCIATION ("ARTICLES OF ASSOCIATION"). HEDGING TRANSACTIONS INVOLVING THE SALE OF SHARES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE 1933 ACT. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE FUND FOR AN INDEFINITE PERIOD OF TIME.

PROSPECTIVE INVESTORS IN THE FUND SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR RESIDENCE AND DOMICILE FOR THE ACQUISITION, HOLDING AND DISPOSAL OF SHARES AND ANY FOREIGN EXCHANGE RESTRICTIONS THAT MAY BE RELEVANT TO THEM. IF YOU ARE IN DOUBT ABOUT THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM"), YOU SHOULD CONSULT YOUR ATTORNEY, ACCOUNTANT OR OTHER FINANCIAL ADVISER.

---

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  APART FROM THE FOREGOING, THIS MEMORANDUM HAS NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY OTHER STATE OR FEDERAL GOVERNMENTAL AGENCY OR ANY U.S. NATIONAL SECURITIES EXCHANGE OR ANY GOVERNMENTAL AGENCY OR EXCHANGE OF ANY OTHER JURISDICTION.  NEITHER THE SEC NOR ANY SUCH AGENCY OR EXCHANGE OF ANY JURISDICTION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE SHARES.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NEITHER THE FUND NOR THE MASTER FUND ARE CURRENTLY REQUIRED TO REGISTER AS A "MUTUAL FUND" UNDER THE MUTUAL FUNDS LAW (AS AMENDED) OF THE CAYMAN ISLANDS (THE "MUTUAL FUNDS LAW") BECAUSE NEITHER THE FUND NOR THE MASTER FUND HAVE MORE THAN 15 INVESTORS, AND A MAJORITY OF INVESTORS OF THE FUND AND THE MASTER FUND ARE ENTITLED TO APPOINT AND REMOVE THEIR DIRECTORS.  THE FUND AND THE MASTER FUND MAY DETERMINE TO ACCEPT MORE THAN 15 INVESTORS.  IN THAT EVENT, THE FUND AND THE MASTER FUND WOULD REGISTER AS A MUTUAL FUND WITH THE CAYMAN ISLANDS MONETARY AUTHORITY ( "CIMA") PURSUANT TO §4(3) OF THE MUTUAL FUNDS LAW. HOWEVER, NO CAYMAN ISLANDS OR OTHER REGULATORY AUTHORITY WILL PASS UPON OR ENDORSE THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.

SHARES IN THE FUND ARE SUITABLE ONLY FOR SOPHISTICATED INVESTORS FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT STRATEGY. THE FUND INTENDS TO INVEST ALL OR A SUBSTANTIAL PORTION OF ITS ASSETS IN SYNERGY HYBRID FUND, LTD. (THE "MASTER FUND").  THE FUND'S INVESTMENT PRACTICES, BY THEIR NATURE, MAY BE CONSIDERED TO INVOLVE A HIGH DEGREE OF RISK.  SEE "INVESTMENT OBJECTIVE AND STRATEGIES" AND "RISK FACTORS."

THE TERMS OF THIS MEMORANDUM ARE QUALIFIED IN THEIR ENTIRETY BY THE ARTICLES OF ASSOCIATION.   NO  PERSON  OTHER  THAN  ED  CAPITAL MANAGEMENT, LLC (THE "INVESTMENT MANAGER") OR ED CAPITAL LLC (THE "INVESTMENT   ADVISER")   HAS   BEEN   AUTHORIZED   TO   MAKE   ANY REPRESENTATION, OR GIVE ANY INFORMATION, WITH RESPECT TO THE FUND, EXCEPT THE INFORMATION CONTAINED HEREIN AND IN OTHER DOCUMENTS DISTRIBUTED   BY   THE   INVESTMENT   MANAGER,   AND   ANY   SUCH REPRESENTATIONS OR INFORMATION, IF GIVEN, MAY NOT BE RELIED UPON.

THE CONTENTS OF THIS MEMORANDUM SHOULD NOT BE CONSIDERED TO BE LEGAL OR TAX ADVICE, AND PROSPECTIVE SHAREHOLDERS SHOULD CONSULT WITH THEIR OWN COUNSEL AND ADVISERS AS TO ALL MATTERS CONCERNING AN INVESTMENT IN SHARES.  THIS MEMORANDUM, INCLUDING ALL EXHIBITS, IS CONFIDENTIAL AND MAY NOT BE DUPLICATED OR REPRODUCED IN ANY FASHION. THE CONTENTS OF THIS MEMORANDUM ARE QUALIFIED IN THEIR ENTIRETY BY THE MEMORANDUM AND ARTICLES OF ASSOCIATION OF THE FUND AND THE MASTER FUND.

EACH PROSPECTIVE INVESTOR IS INVITED TO MEET WITH REPRESENTATIVES OF THE FUND AND THE INVESTMENT MANAGER TO DISCUSS WITH THEM, AND TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THEM, CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF SHARES, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THAT ANY OF THOSE PERSONS POSSESSES THAT INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

NO OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY THE SHARES IS BEING MADE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

**PURSUANT TO AN EXEMPTION FROM THE U.S. COMMODITY FUTURES TRADING COMMISSION (THE "CFTC"), NEITHER THE INVESTMENT MANAGER NOR THE INVESTMENT ADVISER IS REQUIRED TO REGISTER, AND THEY ARE NOT REGISTERED, WITH THE CFTC AS COMMODITY POOL OPERATORS OR AS COMMODITY TRADING ADVISORS.  AS A RESULT, NEITHER THE INVESTMENT MANAGER NOR THE INVESTMENT ADVISER IS, AMONG OTHER THINGS, REQUIRED TO PROVIDE PROSPECTIVE POOL PARTICIPANTS WITH A DISCLOSURE DOCUMENT CONTAINING SPECIFIED INFORMATION OR TO PROVIDE CERTIFIED ANNUAL REPORTS TO PARTICIPANTS IN THE FUND.**

**THE INVESTMENT MANAGER'S AND THE INVESTMENT ADVISER'S ELIGIBILITY FOR THE REGISTRATION EXEMPTIONS SET FORTH ABOVE IS BASED ON THE FACT THAT: (I) THE SHARES ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ARE NOT AND WILL NOT BE MARKETED TO THE PUBLIC IN THE UNITED STATES AS OR IN A VEHICLE FOR TRADING IN THE COMMODITY FUTURES OR COMMODITY OPTIONS MARKETS; AND (II) THE INVESTORS IN THE FUND ARE LIMITED TO "ACCREDITED INVESTORS" AS SUCH TERM IS DEFINED IN THE SECURITIES ACT AND THE REGULATIONS PROMULGATED THEREUNDER AND "QUALIFIED PURCHASERS" AS SUCH TERM IS DEFINED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT") AND REGULATIONS PROMULGATED THEREUNDER.**

THE FUND IS NOT REGISTERED AS AN INVESTMENT COMPANY UNDER THE 1940 ACT IN RELIANCE ON THE EXEMPTION PROVIDED IN SECTION 3(C)(7) OF THAT ACT.

THERE WILL BE NO PUBLIC OFFERING OF THE SHARES.  NO OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY THE SHARES IS BEING MADE IN ANY JURISDICTION IN WHICH THAT OFFER OR SOLICITATION WOULD BE UNLAWFUL.

THE DIRECTORS MAY REQUIRE THE FUND TO REDEEM ALL OR PART OF ANY SHAREHOLDER'S SHARES IN CERTAIN CIRCUMSTANCES.

<u>NOTICE TO RESIDENTS OF FLORIDA</u>

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE 1940 ACT, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE 1933 ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF SHARES TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE FUND, OR AN AGENT OF THE FUND, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

<u>NOTICE TO RESIDENTS IN THE CAYMAN ISLANDS</u>

SHARES MAY NOT BE OFFERED TO THE PUBLIC IN THE CAYMAN ISLANDS.  THIS RESTRICTION DOES NOT INCLUDE EXEMPTED OR ORDINARY NON-RESIDENT CAYMAN ISLANDS COMPANIES.

## Table of Contents

**Page**

SUMMARY ...................................................................................................... 2
DIRECTORY .................................................................................................... 20
INVESTMENT OBJECTIVES AND STRATEGIES ..................................................... 22
RISK FACTORS ............................................................................................... 26
POTENTIAL CONFLICTS OF INTEREST ................................................................ 53
PLAN OF DISTRIBUTION; SUITABILITY STANDARDS ............................................ 56
MANAGEMENT ............................................................................................... 59
EXECUTION OF PORTFOLIO TRANSACTIONS ....................................................... 65
DETERMINATION OF NET ASSET VALUE ........................................................... 68
REDEMPTION OF SHARES ................................................................................ 71
CERTAIN PROVISIONS OF THE ARTICLES OF ASSOCIATION .................................. 73
REPORTS ....................................................................................................... 83
TAXATION ..................................................................................................... 83
ERISA CONSIDERATIONS ................................................................................ 91
ACCOUNTING ................................................................................................ 91
ADDITIONAL INFORMATION ............................................................................. 95

EXHIBIT A—MEMORANDUM AND ARTICLES OF ASSOCIATION OF SYNERGY HYBRID FEEDER FUND LTD.

EXHIBIT B—SUBSCRIPTION AGREEMENT

EXHIBIT C—MEMORANDUM AND ARTICLES OF ASSOCIATION OF SYNERGY HYBRID FUND, LTD.

i

**SUMMARY**

The following summary is qualified in its entirety by the more detailed information contained elsewhere in this Private Placement Memorandum ("Memorandum"). For definitions of certain capitalized terms used in this Memorandum, see the Fund's Memorandum and Articles of Association, a copy of which is attached as <u>Exhibit A</u> the Memorandum and Articles of Association of Synergy Hybrid Fund, Ltd. ("Master Fund Articles"), a copy of which is attached as <u>Exhibit C</u> to this Memorandum ("Articles of Association"). This Memorandum is qualified in its entirety by the Fund Articles and the Master Fund Articles.

| | |
|---|---|
| **The Fund, the Master Fund and their Investment Objective** | Shares are intended to be offered by Synergy Hybrid Fund Feeder Ltd. (the "Fund"), a Cayman Islands exempted company.  The investment manager to the Fund is ED Capital Management, LLC (the "Investment Manager"), a Delaware limited liability company and the investment adviser to the fund is ED Capital, LLC (the "Investment Adviser"), a Delaware limited liability company. |
| | The Fund expects to invest all or a substantial portion of its assets in Synergy Hybrid Fund Ltd. (the "Master Fund"), also a Cayman Islands exempted company.  The Fund may, however, in certain circumstances, invest directly in financial assets, in accordance with the policies and strategies described below, rather than invest in the Master Fund.  The Investment Manager is also the investment adviser to the Master Fund. |
| | The Fund's and the Master Fund's investment objective is to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities, as well as securities of companies located in the Commonwealth of Independent States (the "CIS"). |
| | In addition to publicly traded debt and equity securities, the securities in which the Fund and the Master Fund invest may include private or restricted securities or investments.  Certain of such private or restricted securities will be determined by the Investment Manager to be "Special Investments."  Special Investments are private or restricted or other securities (as determined by the Investment |

Manager in its sole discretion) that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.   The Fund may invest in Special Investments which may include securities that arise from corporate buy-outs, management buy-outs, leveraged buy-outs, IP portfolios, private equity investments, venture capital investments, other pooled investment vehicles, limited partnership interests, preferred stock, options, warrants, real estate related securities or other investments in privately held companies, restructurings, recapitalizations or similar events or securities of established public companies or private companies that are purchased in private placements.   These Special Investments will generally carry significant or complete restrictions on transfer prior to the occurrence of specified events, which may be outside of the control of the Fund and the Master Fund.  Accordingly, the Fund and the Master Fund may be required to hold Special Investments for several years before any disposition can be effected.   Special Investments may represent a material and substantial portion of the Fund's and the Master Fund's portfolio.

There can be no assurances that the Fund and the Master Fund will achieve their investment objectives.

**Management and Service Providers**

Under the Fund Articles and the Master Fund Articles, the directors of the Fund and the Master Fund, as applicable (the ("Directors" or the "Board of Directors"), are primarily responsible for the general management of the Fund and/or the Master Fund (as appropriate).   The Fund's and the Master Fund's Boards of Directors consist of Elliot Daniloff, Peter Hughes and Alric J. Lindsay.   All of the Directors act in a non-executive capacity.  See "*Management – Directors.*"

The Fund's Articles and the Master Fund's Articles permits the Fund's and the Master Fund's Directors to delegate certain duties.  The Directors have delegated duties relating to the implementation of the Fund's and the Master Fund's investment strategy and certain administrative functions to the Investment Manager and the Investment Adviser, pursuant to an Investment Advisory Agreement among the Fund, the Master Fund, the Investment Manager and the Investment Adviser (the "Advisory Agreement").   The Investment Manager and the Investment Adviser may resign as investment manager and investment adviser, respectively, on 30 days' prior written notice to the Fund and the Master Fund.  See "*Management – The Investment Manager and the*

2

*Investment Adviser*."  The sole principal of the Investment Manager and the Investment Adviser is Elliot Daniloff.  Mr. Daniloff's biography appears under *"Management – The Investment Manager and The Investment Adviser"* below. The Investment Manager is primarily responsible for the implementation of the Fund's investment strategy and the Investment Adviser assists the Investment Manager with certain research and administrative responsibilities.

The Fund and the Master Fund have entered into an administration agreement with Apex Fund Services Ltd. (the "Administrator"), requiring the Administrator to provide certain administrative services to the Fund and the Master Fund, including calculating the Fund's and the Master Fund's Net Asset Value in accordance with this Memorandum and the Fund's and the Master Fund's Articles of Association.  The Fund and the Master Fund will pay the Administrator a fee based on its standard schedule of fees charged by the Administrator for similar services as provided for in the Administration Agreement.

ING Bank Eurasia (ZAO), Moscow, Russia, acts as the Master Fund's custodian (the "Custodian").

BDO Tortuga, Cayman Islands, acts as the auditor of the Fund and the Master Fund.

**The Offering**

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each and 1,000 voting, non-participating, non-redeemable shares of US$0.001 par value each.  In addition, in order to implement the "Performance Allocation," the Master Fund will also issue "Allocation Class Shares" (as such term is defined the Master Fund Articles of Association).  The Allocation Class Shares will be held solely by the Investment Adviser and will be allocated the Performance Allocation.  In order to accomplish the foregoing, at the end of each Fiscal Year, the Master Fund will allocate to the Allocation Class Shares of the Investment Adviser from each Series of each Class of Shares an amount equal to the Performance Allocation payable for such Fiscal Year.

The Shares in the Fund are primarily offered in two classes – class A ("Class A") and class B ("Class B") (each, a "Class").

3

Class B Shares will be available to qualified investors that are "Restricted Persons" (as defined in the FINRA Rule 5130 and as further described in the subscription agreement to be executed by each investor ("Subscription Agreement")) and Class A Shares are available only to other qualified investors; the rights and obligations of the classes are identical except with respect to their participation (through this investment in the Fund) in "new issues" (*i.e.*, equity securities that are issued in an initial public offering). Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Master Fund.

In addition, the Fund will issue class R ("Class R") and class S ("Class S") Shares in respect of Special Investments made by the Master Fund.  If the Master Fund purchases Special Investments, those holders of the Fund's shares (the "Shareholders") who are Shareholders on the date the particular Special Investment is purchased will participate in that Special Investment by having the relevant number of Class B or Class A Shares (as the case may be) redeemed and by being issued with a corresponding number of Class R or Class S Shares (as the case may be), as further explained under *"Certain Provisions of the Articles of Association – Share Capital."*

The Fund may issue additional Classes from time to time. See *"Certain Provisions of the Articles of Association – Share Capital."*

Shares in each Class will be offered in series ("Series"). Each investor may receive a separate Series with respect to each investment in the Fund.  The Fund may, as of the close of business on the last Business Day of each Fiscal Year (as hereinafter defined), convert the Shares of any Series of a Class into Shares of the Initial Series (as hereinafter defined) of such Class.  See *"Certain Provisions of the Articles of Association – Share Capital,"* in conjunction *with "Compensation of The Investment Manager and The Investment Adviser."*

All Shares in the Fund are offered at the price of US$1,000 per Share.  The Master Fund commenced operations on July 1, 2011.

Shareholders may be admitted in the Fund as of the opening of business (9 a.m. Eastern Time) on the first Business Day

4

of a month at the subscription price per Share of each Series of US$1,000 (each, the "Initial Series").  "Business Day" means a day on which banks are open for normal banking business in New York and the Cayman Islands and Bermuda (Administrator's location), except as the Directors may specify otherwise in their sole and absolute discretion. Proceeds received by the Fund from the sale of Shares will be used by the Fund in its investment program.  The Fund reserves the right to discontinue accepting any initial or additional subscription from its existing or new investors at any time.

Any issued and outstanding Series of a Class (other than those Shares of the Initial Series of each Class) may be redesignated and converted by way of reissue and redemption into the Initial Series of Shares of a Class (after accrual or allocation of any Performance Allocation (as hereinafter defined)) at the end of each calendar year, or at such other time as the Directors in their sole and absolute discretion see fit, at the prevailing Net Asset Value per Share of the Initial Series of the relevant Class.  See *"Certain Provisions of the Articles of Association – Share Capital."*

Class R and/or Class S Shares will, from time to time, be issued by the Fund to existing Shareholders in exchange for their Class B and Class A Shares (respectively).  Upon the designation of an investment (at the time acquisition or at any time thereafter) by the Investment Manager as a "Special Investment", a pro-rata portion of each current Shareholder's Class B or Class A Shares having an aggregate Net Asset Value equal to the value (generally, the fair market value) of the Special Investment will be redesignated and converted by way of compulsory redemption of the relevant Shares and reissue of Class R or Class S Shares (respectively) to the Shareholder whose Shares were compulsorily redeemed. The Shares so redeemed will be cancelled and the Directors will effect all adjustments necessary to give effect to the foregoing including allocating the value (generally, the fair market value) of the applicable Special Investment to the Class R and/or Class S Shares (as appropriate).  No compulsory redemption of Class B or Class A Shares pursuant to the designation of an investment as a Special Investment will require prior notice to be given to Shareholders.  Upon a complete or partial disposition or a deemed disposition (by the Master Fund) of a Special Investment, the Class R and/or Class S Shares of each holder thereof shall be redesignated as and converted (by way of

compulsory redemption and the issue of the relevant class of Shares to the Shareholder) to Class B or Class A Shares (respectively) at the Net Asset Value of the respective classes of Shares so redeemed and issued.  No compulsory redemption of Class R and/or Class S Shares pursuant hereto will require prior notice to be given to Shareholders.

Additionally, the Fund may, as determined by the Directors, offer shares of different classes having different rights and obligations and/or paying fees different from the Shares offered hereby.

The Master Fund will issue shares in series that correspond to the portion of each series of Share Classes issued by the Fund that is invested in the Master Fund.  In addition, to facilitate the assessment of the Investment Adviser's Performance Allocation and to ensure that Performance Allocation is equitably assessed among Shareholders, as allocated at the Master Fund level, on a per-investor basis, a separate Series of Master Fund shares attributable to the Fund will be issued at each subscription date.  Any issued and outstanding Series of Shares and the Master Fund shares of a Class attributable to the Fund, other than those Shares and the Master Fund shares of the first Series or the oldest Series that is subject to a Performance Allocation (as appropriate) of that Class issued by the Fund or the Master Fund (each, the "Initial Series"), may be redesignated and converted by way of redemption and reissue into the Initial Series of Shares or the Master Fund shares of a Class (after payment of any Performance Allocation) at the end of each Fiscal Year, or at such other time as the Directors and the Master Fund's directors in their sole and absolute discretion see fit, at the prevailing Net Asset Value per Share or the Master Fund share of the Initial Series of the relevant Class.

The Master Fund will maintain separate investment accounts that correspond to the portion of each Series of Shares issued by the Fund that is invested in the Master Fund.  The Net Asset Value of each Master Fund investment account shall be generally equal to the Net Asset Value per Series of the portion of the corresponding Series of Shares that is invested in the Master Fund. The investment accounts of the Master Fund replicate the accounting of the Fund as to the Performance Allocation and ensure that each Shareholder in the Fund is treated as though it were a shareholder in the

Master Fund with respect to the Performance Allocation.

A subscriber will be required to provide at least two Business Days' notice to the Fund of its interest to purchase Shares (unless such notice is waived by the Fund).  See *"Net Asset Value"* for a description of how the Fund's Net Asset Value and the Net Asset Value per Share of each Class and Series are determined.  A subscriber for Shares is referred to as a "Subscriber."

The minimum subscription is US$1 million for initial investments in the Fund and US$500,000 for additional investments in the Fund (whether made at the time of initial investment or thereafter).  The Fund may accept subscriptions for lesser amounts in the sole and absolute discretion of the Directors; however, in no event will the minimum initial subscription amount be less than US$100,000.  For additional information pertaining to the subscription procedure see *"Plan of Distribution; Suitability Standards"* herein.

No certificates will be issued for Shares in the Fund. Investors will, however, receive written confirmation of their holdings.

Each investor in the Fund that is a "United States person" (as defined in the Internal Revenue Code of 1986, as amended ("Code")) must be an "accredited investor," as defined in Regulation D under the Securities Act of 1933, as amended (the "1933 Act") and a "qualified purchaser", as defined in the Investment Company Act of 1940, as amended (the "1940 Act").

Each other investor (1) must be a "Non-United States person" within the meaning of Commodity Futures Trading Commission Rule 4.7 and (2) must not be a "U.S. person," as defined in Regulation S under the 1933 Act or a "United States person" as defined in the Code (a "Non-U.S. Shareholder").  See *"Plan of Distribution; Suitability Standards."*

The Shares will not be registered under the 1933 Act or the securities laws of any state or any other jurisdiction, nor is any such registration contemplated.  The Fund will not be registered as an investment company under the 1940 Act, in reliance on Section 3(c)(7) thereof.

Each prospective investor in the Fund will be required to execute a revocable Subscription Agreement pursuant to which the investor will make certain representations to the Fund.

The Directors and the Administrator may reject a subscription for Shares for any reason in their sole and absolute discretion. If a subscription is rejected, the payment remitted by the Subscriber will be returned without interest.

**Limitation of Liability and Indemnification**

The Fund's Articles of Association limit the Directors' liability and provide for their indemnification in certain circumstances. The Advisory Agreement will limit the Investment Manager's and the Investment Adviser's liability and provides for indemnification of the Investment Manager and the Investment Adviser in certain circumstances. See *"Certain Provisions of the Articles of Association – Directors' Liability; Indemnification"* and *"Management – The Investment Manager and The Investment Adviser."*

**Fiscal Year**

The Fund's "Fiscal Year" is the calendar year.

**Redemption of Shares**

Except with respect to Shares representing Special Investments, Shareholders will have the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period (see "*Lock-Up Period*" below), and (ii) on any other date determined by the Directors in their sole and absolute discretion (each, a "Redemption Date"), at the Redemption Price per Share of the appropriate Series of the appropriate Class. All redemption fees will be payable to the Fund. Redemption requests must be received by the Fund in writing at least 90 calendar days prior to the Redemption Date specified in the redemption request unless such notice is waived by the Directors.

Shares relating to Special Investments may not be redeemed until such investments have been liquidated or disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments). A "disposition" of a Special Investment shall include a complete or partial disposition of a Special Investment or an earlier determination by the Investment Manager in its sole discretion that such Special Investment has a readily

ascertainable market value.

If the Fund in its discretion permits a Shareholder to redeem capital other than on a Redemption Date, the Fund may impose an additional administrative fee to cover the legal, accounting, administrative, brokerage, and any other costs and expenses associated with such redemption.

Redemption Price per Share means in respect of a Series of a Class an amount calculated by dividing (a) the difference between (i) the value of the Investment Account (as hereinafter defined) relating to that Series (after making any adjustments thereto referred as discussed herein) on the Redemption Date as of which the redemption is effective and (ii) the amount of any Management Fees, Performance Allocations or expenses not otherwise reflected in the Investment Account by (b) the number of Shares of that Series in issue at that time (including shares of that Series that are to be redeemed at that time). For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series that are to be redeemed on the relevant Redemption Date shall be deemed to be in issue until and including the close of business on the applicable Redemption Date.

Each redemption request must be in the minimum amount of US$100,000 or for all of such Shareholder's Shares, if less, and a Shareholder may not make a redemption request for a partial redemption if, after implementation thereof, it would hold Shares having an aggregate Net Asset Value of less than US$1 million (although the Directors may, in their sole and absolute discretion, permit a smaller redemption or waive the latter requirement).

Once sent, a redemption request cannot be revoked without the Directors' consent, which may be withheld in their sole and absolute discretion, unless redemptions are suspended. Payment of redemption proceeds, under normal circumstances, will generally be made in the following installments: (i) 90% of the estimated Redemption Price with respect to all Shares that are being redeemed will be paid within 30 calendar days after the Redemption Date or, in any event, as soon as practicable, upon completion of the computation of the Fund's Net Asset Value by the Administrator and (ii) the balance of the Redemption Price shall be paid, without interest, as soon as practicable upon

completion of the Fund's annual audit.

The Fund may, in the Directors' sole and absolute discretion, pay a redemption (in whole or in part) in securities held by the Fund ("Redemption-In-Kind Securities") on a *pro rata* basis.   The amount and type of Redemption-In-Kind Securities will be selected by the Directors in their sole and absolute discretion.  If a redemption is paid in Redemption-In-Kind Securities, the redeeming Shareholder will bear transaction costs if and when it sells such Redemption-In-Kind Securities.  See *"Certain Provisions of the Articles of Association – Redemption of Shares."*

The Directors may, in consultation with the Investment Manager but otherwise in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part.  In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors determine.  See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

The Directors, in their sole and absolute discretion, may cause the Fund to redeem a Shareholder's Shares, in whole or in part, by giving the Shareholder written notice at least two days before the effective redemption date determined by the Directors.

**Determination of Net Asset Value**

The Administrator is responsible for calculation of the Fund's and the Master Fund's Net Asset Value under the ultimate supervision of the Directors of the Fund and the Master Fund.  The "Net Asset Value" of each of the Fund and/or the Master Fund (as appropriate)  is calculated by adding the value of its investments, cash, and other assets and subtracting its accrued liabilities and expenses, all determined  in  accordance  with  generally  accepted

accounting principles, consistently applied, in the United States ("GAAP"), except that the Fund's and/or the Master Fund's start-up and organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's and the Master Fund's operations.  The Fund and the Master Fund believe that such treatment is more equitable than expensing the entire amount of the Fund's and the Master Fund's organizational expenses in the Fund's and the Master Fund's first year of operation, as required by GAAP. Notwithstanding the foregoing, the Fund and the Master Fund will limit the amount of start-up and organizational expenses that it amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund will establish a separate investment account ("Investment Account") for each Class and Series.  The amount of each Investment Account will be calculated by allocating to the Investment Account (which will initially consist of the aggregate subscription amounts for Shares of the appropriate Class or Series) its share of income, expenditures, assets and accrued liabilities attributable to the Class or Series.  The "Net Asset Value per Series" or "Net Asset Value of a Series" means the amount in its Investment Account.  The Net Asset Value per Share of a Series of a Class will be calculated by dividing the Net Asset Value of that Series by the number of Shares of that Series issued and outstanding as of the date of the calculation.  See "*Net Asset Value.*"

| | |
|---|---|
| **Limited Transferability of Shares** | A Shareholder may not transfer or pledge its Shares without the prior written consent of the Directors, the granting of which is in the Directors' sole and absolute discretion.  See *"Plan of Distribution; Suitability Standards – Suitability Standards"* and *"Certain Provisions of the Articles of Association – Transferability of Shares."* |
| **Lock-Up Period** | Each initial and additional investment by a Shareholder shall separately be subject to a one year "lock-up" period during which such investment may not be redeemed by the Shareholder (the "Lock-Up Period").   In addition, the Directors may issue further classes or sub-classes of Shares with different lock-up periods and related fee or other arrangements. |
| **Fees and Expenses;** | *Performance Allocation*.  The Master Fund will allocate to the Allocation Class Shares (as defined below) held by the |

**Performance Allocation**

Investment Adviser a performance allocation (the "Performance Allocation") for each Series of each Class of Master Fund shares attributable to the Fund. The Performance Allocation for a Series of Master Fund shares for a Fiscal Year is equal to 20% of the increase in Net Asset Value per Series of Master Fund shares for that Fiscal Year, after taking into account any loss carryforwards applicable to each of such Series and Classes of Master Fund shares (i.e., after losses from all prior fiscal periods have been recouped). The Performance Allocation will be calculated and paid subject to a "high water mark" as described immediately below. No Performance Allocation shall be made to the Investment Adviser with respect to Special Investments until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments.

To facilitate the assessment of the Investment Adviser's Performance Allocation and to ensure that Performance Allocation is equitably assessed among Shareholders, as allocated at the Master Fund level, on a per-investor basis, Shares and the Master Fund shares issued at different times will be issued in Series, a different Series being issued on each subscription date (which is generally expected to be monthly). "Series One Shares" within each Class of Shares and the Master Fund shares will be issued on the first subscription date in each Fiscal Year and the remaining Series (in numerical sequence) of Shares and the Master Fund shares will be issued on any other subscription dates during the Fiscal Year. At the end of each Fiscal Year, all such Series of Shares and the Master Fund shares will be re-designated and converted into the Initial Series Shares and the Master Fund shares of the same Class by way of redemption and re-issue, so that at the beginning of the following Fiscal Year, all of Shares and the Master Fund shares will be the Initial Series Shares unless a loss carryforward attributable to such other Series or to the Initial Series remains outstanding. Any Series which is not converted at the end of a Fiscal Year will remain in existence as a separate Series of Shares and the Master Fund shares until the relevant loss carryforward has been recovered, in which event such Series will be re-designated and converted to the Initial Series of Shares and the Master Fund shares in accordance with the foregoing provisions. Each Series of Shares and the Master Fund shares has a *pari passu* interest in all the assets and liabilities of the Fund, a Class (as applicable) or the Master Fund attributable to the Fund, and

12

the reason for the different Series is solely to reflect equitably the differing Performance Allocations attributable to Shares and the Master Fund shares of each Class issued on different dates throughout the Fiscal Year.  The actual Performance Allocation as determined in accordance with the calculation methods described above may vary over time.

If a Shareholder redeems all or part of its Shares of a Series of a Class other than as of the close of business on the last Business Day of a Fiscal Year, the date of such redemption will be treated as the last Business Day of the Fiscal Year for those Shares in such Series.  Accordingly, a Performance Allocation will be calculated on the Shares and the Master Fund shares to be redeemed and the redemption proceeds payable to such Shareholder will be reduced by the amount of the Performance Allocation payable on such Shares and the Master Fund shares, as well as by the accrued Management Fee payable on such Shares.  If a Shareholder redeems all or part of its Shares of more than one Series, the redemption proceeds from each Series of Shares and the Master Fund shares will be reduced in the same manner, on a per Series basis.  See *"Management – Compensation of the Investment Adviser."*

The Performance Allocation will be made at the Master Fund level and will be implemented by the issuance of special allocation class shares of US$0.001 par value per share (the "Allocation Class Shares") by the Master Fund to the Investment Adviser.  The Performance Allocation will be allocated to the Allocation Class Shares.  Such Allocation Class Shares shall participate in the profits and losses of the Master Fund and shall not be subject to the Management Fee or Performance Allocation set forth in this Memorandum.

The Allocation Class Shares will be issued initially at US$0.001 par value per share and any subsequent subscriptions of such Allocation Class Shares may at the discretion of the Directors be issued in separate Series at par value per share, each subject to such other price as determined by the Directors in their sole and absolute discretion.  The Performance Allocation attributable to the Allocation Class Shares will remain at risk in the Master Fund.  Such Allocation Class Shares may be redeemed at the option of the Investment Adviser or the Directors may pay dividends in respect of the Allocation Class Shares as determined by the Directors in their sole and absolute discretion.

13

The Master Fund may, with Investment Adviser's consent, waive all or any portion of the Performance Allocation with respect to any Shares and the Master Fund shares in whole or in part, including, but not limited to, with respect to Shares and the Master Fund shares held by employees of the Investment Adviser.  No performance fee or allocation will be paid by Shareholders on the Fund level.

The Investment Adviser may redeem all or a portion of its Allocation Class Shares as of the last Business Day of each Fiscal Year or such other day as determined by the Directors in their sole and absolute discretion.  In the event that the Investment Adviser ceases to act as investment manager or a redemption of all of Investment Adviser's Allocation Class Shares is made prior to the last Business Day of a Fiscal Year, the Performance Allocation will be computed as though the termination date or redemption date were the last Business Day of the Fiscal Year.
See *"Management – Compensation of The Investment Manager and The Investment Adviser."*

*Management Fee*.  The Investment Manager will receive a quarterly Management Fee (the "Management Fee") equal to 0.5% (2%, annually) of the Fund's Net Asset Value of Shares adjusted for subscriptions made during the calendar quarter.

No management fee will be paid by Shareholders on the Master Fund level.

The Special Investments shall generally be included in the Fund's Net Asset Value and shall be valued at the fair market value until they are disposed of or are deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments) for the purposes of calculating the Management Fee.

The Directors may, in their sole and absolute discretion, but with the consent of the Investment Manager, waive the payment of all or part of the Management Fee payable with respect to any Shareholder for any quarter the Directors determine is appropriate, including with respect to Shareholders who are employees of the Investment Manager.

See *"Management – Compensation of The Investment*

14

*Manager and the Investment Adviser."*

*Expenses.* The Fund will pay its own start-up, offering and organizational expenses, such as the cost of preparing the Fund's Articles of Association, the expenses incurred in offering and selling Shares, and other legal, accounting, and administrative, government filing and printing and mailing fees and expenses related thereto. On an ongoing basis, the Fund will bear its ongoing transaction (*e.g.*, brokerage commissions and custody expenses), investment (including any direct or indirect costs of investing potential investments or maximizing return on existing investments), consulting, research and statistical services, administrative, legal, tax preparation, compliance and accounting fees and expenses, expenses related to the purchase and sale of Special Investments, any extraordinary expenses (*e.g.*, litigation expenses) and any expenses for services that the Shareholders require the Directors and/or the Investment Manager to obtain. The Fund will also pay the fees and expenses of its prime brokers and the Administrator. The Investment Manager will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.

The Fund will be allocated its *pro rata* portion of any expenses of the Master Fund.

The Investment Manager and the Investment Adviser (if applicable) will be reimbursed for any expenses it bears on the Fund's behalf as soon as reasonably practicable. See *"Management – Fund Expenses."*

**Placement Agent**

The Directors may select one or more placement agents for the Fund from time to time and determine fees or compensation to such agents as appropriate. See *"Plan of Distribution; Suitability Standards."*

**Dividends**

The Fund does not expect to pay dividends with respect to Shares, although the Directors may, in their sole and absolute discretion, declare dividends in relation to one or more Classes of Shares at any time. Therefore, a Shareholder will need to redeem its Shares to realize the value of its investment. See *"Certain Provisions of the Articles of Association – Dividends."*

| | |
|---|---|
| **Risk Factors** | The Fund is subject to substantial risks, in particular because the Shareholders will not be able to redeem all or any portion of Special Investments (which are likely to represent a material and substantial portion of the Fund's portfolio)_until their disposition or deemed disposition. You could lose all or most of your investment in the Fund. The Fund is suitable only for a limited portion of your investment portfolio. It is not a complete investment program. |
| **Conflicts of Interest** | The Fund will be subject to certain actual and potential conflicts of interest. |
| **Tax Considerations** | The Government of the Cayman Islands, will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the Shareholders. The Cayman Islands are not party to any double taxation treaties. |
| | The Fund has applied for and can expect to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund. The Master Fund has applied for and can expect to receive a similar undertaking. |
| | The Fund expects to be classified for federal income tax purposes as a corporation. As such, any of the Fund's income that is subject to U.S. federal income tax will be taxable at the entity level. The Master Fund, however, has elected to be treated as a partnership for U.S. federal income tax purposes. As a partnership, the Master Fund will not be subject to U.S. federal income tax. Instead, each partner thereof, including the Fund, will be required to take into account its distributive share of the Master Fund's items of income, gain, loss and deduction substantially as though |

16

such items had been realized directly by the partner. Unless the Fund (directly or indirectly through the Master Fund) engages in a trade or business within the United States, none of the income it earns (except as noted below) or gains it realizes will be subject to U.S. federal income tax. However, payments to the Fund of any U.S.-source dividends and interest (and the Fund's share of such payments to the Master Fund), including interest on cash held in trading accounts, that is not either paid with respect to an obligation with an original maturity of 183 days or less or "portfolio interest" (as described under *"Taxation – U.S. Federal Income Taxation – Taxation of the Fund"*) will be subject to a 30% U.S. federal withholding tax. That withholding tax will reduce the total return to the Fund and its Shareholders. Each of the Fund and the Master Fund expects that substantially all its income from U.S. sources will be portfolio interest or gains from the sale of stock and other securities, or from the purchase or sale of options or futures contracts.

A Non-U.S. Shareholder will not be subject to U.S. federal income tax on dividends, if any, the Fund pays on its Shares or on gains the Shareholder recognizes on the sale, exchange or redemption of its Shares. Special rules may apply to a Non-U.S. Shareholder that (1) has an office or other fixed place of business in the United States to which such a dividend or gain is attributable, (2) is a former citizen or resident of the United States, a controlled foreign corporation of U.S. persons, a foreign insurance company that holds Shares in connection with its U.S. business, a passive foreign investment company, or a corporation that accumulates earnings to avoid U.S. federal income tax or (3) in the case of an individual, is present in the United States for 183 days or more in the year of such sale, exchange or redemption and certain other requirements are met. These persons in particular are urged to consult their U.S. tax advisors before investing in the Fund.

A Tax-Exempt U.S. Shareholder generally will not be subject to U.S. federal income tax on dividends, if any, the Fund pays on its Shares and on gains the Shareholder recognizes on the sale, exchange or redemption of its Shares. A Tax-Exempt U.S. Shareholder will be subject to U.S. federal income tax, however, on those dividends or gains to the extent they constitute unrelated business taxable income ("UBTI") for it under the Code. Because the Fund will be classified for federal tax purposes as an association (taxable

as a corporation) rather than as a partnership, those dividends and gains should not constitute UBTI for a Tax-Exempt U.S. Shareholder unless it incurs debt to acquire its Shares, thus making the Shares "debt-financed property."

**PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN LEGAL AND TAX ADVISERS REGARDING THE TAX CONSEQUENCES TO THEM OF AN INVESTMENT IN THE FUND.**

**Employee Benefit Plan Considerations**

An authorized fiduciary of an employee benefit plan proposing to invest in the Fund should consider whether that investment is consistent with the terms of the plan's governing documents and applicable law.  As discussed in greater detail below, the Investment Manager has the right, in its sole discretion, to permit or restrict investments in the Fund and the Master Fund by "benefit plan investors," as that term is defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The Investment Manager presently intends to restrict investments in the Fund and the Master Fund by benefit plan investors. Consequently, it is not expected that the assets of the Fund or the Master Fund will be treated as "plan assets" of such benefit plan investors for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA and the parallel prohibited transaction excise tax provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code").  See "*Employee Benefit Plan Considerations*."

**Reports**

Each Shareholder will receive the following: (i) annual financial statements of the Fund audited by an independent certified public accounting firm generally within 120 days of (or as promptly as reasonably possible after) the end of the Fund's Fiscal Year, (ii) in the discretion of the Investment Manager, a monthly letter from the Investment Manager discussing the results of the Fund for the previous month, and (iii) other reports as determined by the Investment Manager in its sole discretion.

**Additional Information**

Each prospective investor is invited to meet with representatives of the Fund and the Investment Manager to discuss with them, and to ask questions of and receive answers from them, concerning the terms and conditions of this offering of Shares, and to obtain any additional information, to the extent that any of those persons possesses that information or can acquire it without unreasonable effort

|  | or expense, necessary to verify the information contained herein. |
|---|---|
| **Legal Counsel** | K&L Gates LLP acts as United States legal counsel to the Investment Manager, the Investment Adviser, the Fund and the Master Fund in connection with the offering of Shares and other ongoing matters and does not represent the Shareholders. |
|  | Turner & Roulstone, Attorneys-at-Law acts as Cayman Islands legal counsel to the Investment Manager, the Investment Adviser, the Fund and the Master Fund in connection with the offering of Shares and other ongoing matters and does not represent the Shareholders. |

**DIRECTORY**

**The Master Fund**

    Synergy Hybrid Fund Ltd.
c/o Apex Fund Services (Cayman)
Limited
P.O. Box MP10085, Unit 5-202
Governor's Square,
West Bay Road
Grand Cayman KY1-1001
Cayman Islands

    The Fund
Synergy Hybrid Feeder Fund, Ltd.
c/o Apex Fund Services (Cayman)
Limited
P.O. Box MP10085, Unit 5-202
Governor's Square,
West Bay Road
Grand Cayman KY1-1001
Cayman Islands

**Investment Manager**

    ED Capital Management, LLC
825 Third Avenue, 2nd Floor
New York, NY 10022
 USA

**Custodian**

    ING Bank Eurasia (ZAO)
36 Krasnoproletarskaya Street
Moscow 127473
Russia

**Investment Adviser**

    ED Capital, LLC
825 Third Avenue, 2nd Floor
New York, NY 10022
 USA

**Administrator**

    Apex Fund Services Ltd.
3rd   Floor,   31   Reid   Street
Hamilton HM12
Bermuda

**Auditors**

    BDO Tortuga
P.O. Box 31118
5th Floor Zephyr House
Mary Street
Grand Cayman KY1-1205
Cayman Islands

**U.S. Legal Counsel**

    K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
USA

**Cayman Islands Legal Counsel**

Turner & Roulstone, Attorneys-At-Law
Strathvale House
PO Box 2636 GT
George Town
Grand Cayman, Cayman Islands

**Directors of the Fund**

Elliot Daniloff                              Peter Hughes
825 Third Avenue, 2nd Floor             c/o Apex Fund Services Ltd.
New York, NY 10022                           3rd Floor, 31 Reid Street
USA                                          Hamilton HM12
                                             Bermuda

Alric J. Lindsay
Centennial Towers
West Bay Road
PO Box 11371
Grand Cayman KY1-1008
Cayman Islands

## INVESTMENT OBJECTIVES AND STRATEGIES

### Investment Objective

The Fund's and the Master Fund's investment objective is to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities, as well as securities of companies located in the Commonwealth of Independent States (the "CIS").

In addition to publicly traded debt and equity securities, the securities in which the Fund and the Master Fund invests may include private or restricted securities or investments.  Certain of such private or restricted securities will be determined by the Investment Manager to be "Special Investments."  Special Investments are private, or restricted or other securities (as determined by the Investment Manager in its sole discretion) that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.  The Fund and the Master Fund may invest in Special Investments which may include securities that arise from corporate buy-outs, management buy-outs, leveraged buy-outs, IP portfolios, private equity investments, venture capital investments, other pooled investment vehicles, limited partnership interests, preferred stock, options, warrants, real estate related securities or other investments in privately held companies, restructurings, recapitalizations or similar events or securities of established public companies or private companies that are purchased in private placements.  These Special Investments will generally carry significant or complete restrictions on transfer prior to the occurrence of specified events, which may be outside of the control of the Fund and the Master Fund.  Accordingly, the Fund and the Master Fund may be required to hold Special Investments for several years before any disposition can be effected.  Special Investments may represent a material and substantial portion of the Fund's and the Master Fund's portfolio.

There can be no assurances that the Fund and the Master Fund will achieve their investment objectives.

### Investment Rationale

The Investment Manager believes that the Russian economy has been managed very prudently since the beginning of the 21st century and a large percentage of Russia's massive oil revenues has been preserved. In this way, the Russian government has intended to stimulate growth in non-energy-related industries, and, as a result, GDP and employment have grown fast and steadily, with the main impetus coming from domestic demand. The Federal budget has been in surplus every year since 2000. The Russian government is now beginning to spend more of its wealth on a program to rehabilitate Russia's infrastructure, and that program, together with continuing growth in consumer spending and other investment, is expected to support the continued growth of the economy. In this strong economic environment, many companies, including companies that are privately held, are likely to continue to grow their profitability. Some other CIS countries are also experiencing strong growth, and may also offer attractive opportunities to the Fund.

## Investment Strategy

The Investment Manager will seek to identify attractive investment targets taking into consideration the likely or possible exits.  The Investment Manager has the intention of meeting the companies in which it aims to invest, however, it will also make investments in companies never visited. While fundamental and asset-based valuations will be considered, investment decisions will ultimately be based on an understanding of how to realize value from the company, rather than on pure fundamental valuation.

Although the Fund and the Master Fund generally expects to hold minority positions, it may hold a majority stake in any company, group or issuer either at the time of investment or as a consequence of a change in the ownership structure of an invested company.

The Fund and the Master Fund intends to make long-term investments in securities which the Investment Manager believes increases significantly in value. The Fund and the Master Fund will in general not trade on a short-term basis or take advantage of short-term volatility. However, if a situation arises in which the Investment Manager believes a short-term trade is warranted, the Fund and the Master Fund may seek to profit from such situation.

The Fund and the Master Fund may also hold Russian and CIS countries securities in the form of American Depository Receipts ("ADRs"), European Depository Receipts ("EDRs"), Global Depository Receipts ("GDRs") and instruments similar to depository receipts which are transferable securities or other securities convertible into securities of eligible issuers. Generally, ADRs in registered form are designed for use in US securities markets and EDRs, GDRs and other similar global instruments in bearer form are designed for use in non-US securities markets.

In implementing the Fund's and the Master Fund's investment strategies, the Investment Manager may hedge foreign exchange risk by the purchase of out-of-the money put options enabling the Fund and the Master Fund to buy U.S. dollars, designed to provide partial downside protection for investors in the event that these currencies experience a major appreciation. In the case of rouble-denominated assets, the underlying assets can be sold forward for U.S. dollars, so that the rouble/dollar foreign exchange risk is hedged much more closely, on the upside as well as the downside. An analogous procedure can be applied to the proceeds of any assets which are denominated in currencies other than the rouble.

The Investment Manager anticipates that the Fund's and the Master Fund's portfolio will also include cash or cash-equivalent instruments, pending investment, for defensive purposes, to meet the expense needs of the Fund and the Master Fund or to fund redemptions.  Such cash balances of the Fund and the Master Fund may be held temporarily in shares of money market mutual funds.  The Fund's and the Master Fund's investment strategy may also include leverage, fixed-income securities, event-driven investments and private placements as described above.

## Investment Policies

*Geographic parameters.*  The Fund's and the Master Fund's investments are intended to be made in corporate securities of issuers in Russia and other CIS countries or companies of other countries that do business in Russia or CIS.

*Diversification guidelines*.  The Fund and the Master Fund has no set limit on asset allocation with respect to its underlying investments including with respect to Special Investments.

*Leverage*.  The Fund and the Master Fund may use leverage in both its securities and derivatives trading.  In such cases, the Fund and the Master Fund will incur borrowing expenses, which will reduce the return to investors.  The use of leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund and the Master Fund, which may subject the Shareholders to substantial risk of loss.  There is no limit on the amount of leverage that the Fund and the Master Fund may incur.

*Derivatives*.  The Fund and the Master Fund may use derivatives and enter into short positions, either as a vehicle to implement an underlying investment strategy or for hedging purposes.

*Investments in Other Investment Vehicles*.  The Investment Manager may allocate a portion of the Fund's and the Master Fund's assets to other investment managers of other pooled vehicles or separate accounts whose strategies are consistent with the Fund's and the Master Fund's objectives.  In connection with such investments, the Investment Manager will endeavor to select strategies that are best suited to the Fund's and the Master Fund's goals, to research and select the most suitable managers, and to monitor and review their ongoing performance.

**Description of Investment Process**

*Investment Identification*.  The Investment Manager's investment ideas will likely be generated from a wide variety of sources including industry contacts, trade and financial publications, trade shows, investment conferences and stock screens.  Company analyses will generally begin with review of public filings (10-K's, 10-Q's, 8-K's, 13-G's, etc.), if applicable, and relevant research analyst or other reports. Particular attention will be paid to sales and earnings history and outlook, historical and expected cash flows, comparison with competing and related companies and general investor sentiment.

*Relationship with Portfolio Companies*.  Although the Investment Manager does not take an active role in the affairs of the companies in which the Fund and the Master Fund have a position, it is intended to be the policy of the Fund and the Master Fund to take such steps as are necessary to protect their economic interests.  The Investment Manager reserves the option to accept a role on the board of directors of any company in which the Fund holds securities, if the opportunity presents itself.

*Portfolio Evaluation*.  Once an investment opportunity is determined to be attractive as a stand-alone investment or as part of a pair, the Investment Manager will evaluate the effect of adding that investment to the Fund's and the Master Fund's portfolio.  In doing so, the Investment Manager will seek to minimize the market-related portfolio volatility as well as the risk of a capital loss.

*Investment and Portfolio Monitoring*.  The Investment Manager intends to monitor the Fund's and the Master Fund's positions to ensure that the investment thesis behind each is intact.  The Investment Manager intends to also monitor trading prices so that profits can be taken as trading and intrinsic values converge or losses can be minimized in the event of a significant shift in an investment's fundamental premise.   The Investment Manager intends to further monitor

investment positions in view of the portfolio as a whole in order to manage risk.  The Fund and the Master Fund may also utilize third party risk management and portfolio management services to monitor the Fund's and the Master Fund's portfolio exposure to the market.

*Development and Risks of Investment Manager's Investment Strategy*.  The development of an investment strategy is a continuous process and the Fund's and the Master Fund's investment strategy and methods may therefore be modified from time to time.  The Fund's and the Master Fund's trading and investment methods are confidential and the descriptions of them in this Memorandum are not exhaustive.  The Fund's and the Master Fund's trading and investment strategies may differ from those used by the Investment Manager and its affiliates with respect to other accounts or investment vehicles they manage.  Trading or investment decisions require the exercise of judgment by the Investment Manager.  The Investment Manager may, at times, decide not to make certain investments, thereby foregoing participation in price movements which would have yielded profits or avoided losses.  Shareholders cannot be assured that the strategies or methods utilized by the Investment Manager will result in profitable investments for the Fund and the Master Fund.

**Other Strategies**

The Investment Manager may make investments in certain other foreign countries, including emerging market countries.

The Fund and the Master Fund may also invest in "new issues," as defined in Rule 5130 of the Financial Industry Regulatory Authority, Inc. ("FINRA").  Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Fund and the Master Fund.

The Fund and the Master Fund may invest in futures contracts and options on futures contracts in reliance on Commodity Futures Trading Commission ("CFTC") Rules 4.13(a)(3) and 4.14(a)(5). These rules allow the Investment Manager to invest the Fund's and the Master Fund's assets in futures contracts and options on futures contracts without registering as a commodity pool operator ("CPO") or a commodity trading advisor ("CTA") so long as each investor in the Fund and the Master Fund is an "accredited investor" (within the meaning of Regulation D under the 1933 Act) and a "qualified purchaser" as defined under the 1940 Act.  In such case, Shareholders would not receive the disclosure document and certified annual report that registered CPOs are ordinarily required to provide to commodity pool investors.  However, Shareholders will receive certain annual and periodic reports.  See *"Reports."*

THE FUND'S AND THE MASTER FUND'S INVESTMENT PROGRAM ENTAILS SUBSTANTIAL RISKS AND THERE CAN BE NO ASSURANCE THAT THEIR INVESTMENT OBJECTIVES WILL BE ACHIEVED.  THE PRACTICES OF OPTIONS TRADING, SHORT SELLING, USE OF LEVERAGE, PRIVATE PLACEMENT INVESTING AND OTHER INVESTMENT TECHNIQUES EMPLOYED BY THE FUND AND THE MASTER FUND CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH THE FUND'S INVESTMENT PORTFOLIO MAY BE SUBJECT.  AN INVESTOR SHOULD NOT MAKE AN INVESTMENT IN THE FUND WITH THE EXPECTATION OF SHELTERING INCOME OR RECEIVING CASH DISTRIBUTIONS.

INVESTORS ARE URGED TO CONSULT WITH THEIR PERSONAL ADVISERS IN CONNECTION WITH ANY INVESTMENT IN THE FUND.

## RISK FACTORS

*Investing in the Fund and the Master Fund involves various risks. In addition to the matters set forth elsewhere in this Memorandum, investors should consider the following factors before purchasing Shares.*

**Investment Risks**

*Limited Operating History.* The Fund and the Master Fund have no or limited operating histories. There is no assurance that the Fund and the Master Fund will achieve their investment objective or that the Fund and the Master Fund will maintain a cumulative profit during the period of their existence. The past investment performance of the Investment Manager, its principals, or entities with which they have been associated should not be construed as an indication of the future results of an investment in the Fund.

*Investment Strategies.* The Fund's and the Master Fund's success depends on the Investment Manager's ability to select individual securities, to correctly interpret market data, predict future market movements and otherwise implement its investment strategy. The Fund and the Master Fund are not market-neutral funds and may underperform the broader markets. Any factor that would make it more difficult to execute more timely trades, such as a significant lessening of liquidity in a particular market, may also be detrimental to profitability. No assurance can be given that the investment strategies to be used by the Fund and the Master Fund will be successful under all or any market conditions.

*Dependence upon the Investment Manager and Elliot Daniloff.* The Fund's and the Master Fund's success will depend on the management of the Investment Manager and on the skill and acumen of Elliot Daniloff, the Investment Manager's primary portfolio manager for the Fund and the Master Fund. If Elliot Daniloff should die, become incompetent or disabled or otherwise cease to participate in the Fund's and the Master Fund's business, the Fund's and the Master Fund's ability to select attractive investments and manage their portfolio could be severely impaired.

As a Shareholder, you should be aware that you will have no right to participate in the management of the Fund and the Master Fund, and you will have no opportunity to select or evaluate any of the Fund's and the Master Fund's investments or strategies. Accordingly, you should not invest in the Fund and the Master Fund unless you are willing to entrust all aspects of the management of the Fund and the Master Fund and its investments to the discretion of the Investment Manager. Although Mr. Daniloff intends to devote a substantial part of his time to the business of the Fund and the Master Fund, he may not devote all of his time.

*Changes in Investment Strategies.* The Directors and the Investment Manager (or any other entity the Directors choose to serve as the Fund's and the Master Fund's investment adviser) have broad discretion to expand, revise or contract the Fund's and the Master Fund's business without the consent of its Shareholders. The Fund's and the Master Fund's investment strategies

may be altered without prior approval by its Shareholders.  Any such decision to engage in a new activity or alter the Fund's and the Master Fund's existing investment strategies could result in the exposure of the Fund's and the Master Fund's capital to additional risks that may be substantial.

*Investment Risks in General.*  The Fund and the Master Fund will engage in highly speculative investment strategies. A potential investor in the Fund and the Master Fund should note that the prices of securities and derivatives instruments in which the Fund and the Master Fund invest may be volatile.  Market movements are difficult to predict and are influenced by, among other things, government trade, fiscal, monetary and exchange control programs and policies; changing supply and demand relationships; national and international political and economic events; changes in interest rates; and the inherent volatility of the marketplace.  In addition, governments from time to time intervene, directly and by regulation, in certain markets, often with the intent to influence prices directly.   The effects of governmental intervention may be particularly significant at certain times in the financial instrument and currency markets, and such intervention (as well as other factors) may cause these markets and related investments to move rapidly.

*Illiquid Investments.*  A significant and material portion of the securities and other instruments in which the Fund and the Master Fund invest may be thinly traded and relatively illiquid or may cease to be traded after the Fund and the Master Fund invest, including the investments that may be classified by the Investment Manager as Special Investments.  The Fund and the Master Fund may not be able to liquidate its investments, in particular, Special Investments promptly if the need should arise.  In addition, the Fund's and the Master Fund's sales of thinly traded securities or other investments could depress the market value of such investments and thereby reduce the Fund's and the Master Fund's profitability or increase its losses.  Such circumstances or events could affect materially and adversely the amount of gain or loss the Fund and the Master Fund may realize.   In addition, the Fund and the Master Fund may have difficulty selling illiquid securities and other investments, perhaps causing the Fund and the Master Fund to have difficulty in meeting redemptions.  No assurance may be given that the Fund and the Master Fund will be able to satisfy its Shareholders' redemption requests as of each applicable redemption date.

*Restricted Securities.*  The Fund and the Master Fund may invest a substantial and material portion of its assets in restricted securities that are subject to substantial holding periods or that are not traded in public markets.  Restricted securities generally are difficult or impossible to sell at prices comparable to the market prices of similar securities that are publicly traded.  No assurance can be given that any such restricted securities will be eligible to be traded on a public market even if a public market for securities of the same class were to develop.  It is highly speculative as to whether and when an issuer will be able to register its securities so that they become eligible for trading in public markets.

*Equity Securities.*  Investment in equity securities offers the potential for substantial capital appreciation.  However, such investment also involves certain risks, including issuer, industry, market and general economic related risks.  The Fund and the Master Fund may attempt to reduce these risks; however, adverse developments or perceived adverse developments in one or

more of these areas could cause a substantial decline in the value of equity securities owned by the Fund and the Master Fund.

*Debt and Other Income Securities.*  The Fund and the Master Fund may invest in fixed-income and adjustable rate securities.  Income securities are subject to interest rate, market and credit risk.  Interest rate risk relates to changes in a security's value as a result of changes in interest rates generally.  Even though such instruments are investments that may promise a stable stream of income, the prices of such securities are inversely affected by changes in interest rates and, therefore, are subject to the risk of market price fluctuations.  In general, the values of fixed income securities increase when prevailing interest rates fall and decrease when interest rates rise.  Because of the resetting of interest rates, adjustable rate securities are less likely than non-adjustable rate securities of comparable quality and maturity to increase or decrease significantly in value when market interest rates fall or rise, respectively.  Market risk relates to the changes in the risk or perceived risk of an issuer, country or region.  Credit risk relates to the ability of the issuer to make payments of principal and interest. The values of income securities may be affected by changes in the credit rating or financial condition of the issuing entities.  Income securities denominated in non-U.S. currencies are also subject to the risk of a decline in the value of the denominating currency relative to the U.S. dollar.

*Region and Country Investing.*  The Fund and the Master Fund may focus its investments in particular regions and/or in certain foreign countries.  Focusing its investments in such a manner will subject the Fund and the Master Fund, to a greater extent than if its investments in those regions or countries were more limited, to the risks of adverse securities markets, exchange rates and social, political or economic developments that may occur in those regions or countries.

*Concentration and Nondiversification Risks.*  The Fund and the Master Fund may be considered nondiversified if it invests a relatively high percentage of its assets in a few companies and/or sectors.  Such companies and/or sectors may be uncorrelated and/or overly correlated with the broader markets.  Accordingly, the Fund and the Master Fund may be subject to nondiversification risk, which is the possibility that the Fund's and the Master Fund's performance may be hurt disproportionately by the poor performance of relatively few stocks or even a single stock.  In the event the Fund and the Master Fund invest a large proportion of their assets in the particular industry or related industries, the Fund's and the Master Fund's performance will largely depend on the overall condition of those industries.  Accordingly, the Fund and the Master Fund may also be subject to industry concentration risk, which is the possibility that there will be overall problems affecting a particular industry.

*Effectiveness of Risk Reduction Techniques*.  The Fund and the Master Fund may employ various risk reduction strategies designed to minimize the risk of its trading positions.  A substantial risk remains, nonetheless, that such strategies will not always be possible to implement and when possible will not always be effective in limiting losses.  If the Investment Manager analyzes market conditions incorrectly, or employs a risk reduction strategy that does not correlate well with the Fund's and the Master Fund's investments, such risk reduction techniques could result in a loss, regardless of whether the intent was to reduce risk or increase return.  These risk reduction techniques may also increase the volatility of the Fund and the Master Fund and/or result in a loss if the counterparty to the transaction does not perform as promised.

*Hedging Transactions.*  The Fund and the Master Fund may utilize financial instruments such as forward contracts, options and interest rate swaps, caps and floors to seek to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, certain changes in the equity markets and changes in interest rates.  Hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value.  Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase.  Moreover, it may not be possible for the Fund and the Master Fund to hedge against a fluctuation at a price sufficient to protect the Fund's and the Master Fund's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations.  For example, the cost of options is related, in part, to the degree of volatility of the underlying securities. Accordingly options on highly volatile securities may be more expensive than options on other securities and of limited utility in hedging against fluctuations in those securities.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so.  To the extent that hedging transactions are effected, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

*Short Sales.*  The Fund and the Master Fund may sell securities short.  Short selling involves the sale of a security that the Fund and the Master Fund does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price.  In order to make delivery to its purchaser, the Fund and the Master Fund must borrow securities from a third party lender.  The Fund and the Master Fund subsequently returns the borrowed securities to the lender by delivering to the lender the securities it receives in the transaction or by purchasing securities in the open market.  The Fund and the Master Fund must generally pledge cash with the lender equal to the market price of the borrowed securities.  This deposit may be increased or decreased in accordance with changes in the market price of the borrowed securities.  During the period in which the securities are borrowed, the lender typically retains his right to receive interest and dividends accruing to the securities.  In exchange, in addition to lending the securities, the lender generally pays the Fund and the Master Fund a fee for the use of the Fund's and the Master Fund's cash.  This fee is based on prevailing interest rates, the availability of the particular security for borrowing and other market factors.

Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed.  In addition, the supply of securities that can be borrowed fluctuates from time to time.  The Fund and the Master Fund may be subject to losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

*Accuracy of Public Information.*  The Investment Manager selects investments for the Fund and the Master Fund, in part, on the basis of information and data filed by issuers with various government regulators or made directly available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager evaluates all such information and data and ordinarily seeks independent corroboration when the Investment

Manager considers it is appropriate and reasonably available, the Investment Manager is not in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.

*Leverage.*   When deemed appropriate by the Investment Manager and subject to applicable regulations, the Fund and the Master Fund may use leverage in its investment program, including the use of borrowed funds and investments in certain types of options, such as puts, calls and warrants, which may be purchased for a fraction of the price of the underlying securities while giving the purchaser the full benefit of movement in the market of those underlying securities. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss.  To the extent the Fund and the Master Fund purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used.  The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Fund and the Master Fund.   If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Fund's and the Master Fund's use of leverage would result in a lower rate of return than if the Fund and the Master Fund were not leveraged.

If the amount of borrowings which the Fund and the Master Fund may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Fund's portfolios will have disproportionately large effects in relation to the Fund's and the Master Fund's capital and the possibilities for profit and the risk of loss will therefore be increased.  Any investment gains made with the additional monies borrowed will generally cause the Net Asset Value of the Fund and the Master Fund to rise more rapidly than would otherwise be the case.  Conversely, if the investment performance of the additional moneys borrowed fails to cover their cost to the Fund and the Master Fund, the Net Asset Value of the Fund and the Master Fund will generally decline faster than would otherwise be the case.

Certain of the Fund's and the Master Fund's trading and investment activities may be subject to FRB margin requirements which are computed each day.  At present, the FRB's Regulation T permits a broker to lend no more than 50% of the purchase price of "margin stock" bought by a customer. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made.  If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customers' position may be closed out.   In the event of a precipitous drop in the value of the assets managed by the Fund and the Master Fund, the Fund and the Master Fund might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Fund's and the Master Fund's trading activities, the Fund and the Master Fund, and not the Shareholders personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.  Investors should be aware that an investment program utilizing leverage is inherently more speculative, with a greater potential for losses, than a program that does not utilize leverage.

*Repurchase Agreements.*  The Fund and the Master Fund may enter into repurchase agreements and reverse repurchase agreements, both of which are subject to interest rate risk and credit risk. Interest rate risk relates to changes in a security's value as a result of changes in interest rates. The value of repurchase agreements is inversely affected by changes in interest rates.  Credit risk refers to the fact that the other party to the agreement may be unable to complete the transaction.

*Securities Lending Risk.*   The Fund and the Master Fund may lend securities from their portfolio to brokers, dealers and other financial institutions needing to borrow securities to complete certain transactions.   The Fund and the Master Fund might experience risk of loss if the institution with which they have engaged in a portfolio loan transaction breaches its agreement with the Fund and the Master Fund.

*Convertible Securities*.  Convertible securities ("Convertibles") are generally debt securities or preferred stocks that may be converted into common stock.  Convertibles typically pay current income as either interest (debt security convertibles) or dividends (preferred stocks).  A Convertible's value usually reflects both the stream of current income payments and the value of the underlying common stock.  The market value of a Convertible performs like that of a regular debt security; that is, if market interest rates rise, the value of a Convertible usually falls.  Since it is convertible into common stock, the Convertible generally has the same types of market and issuer risk as the underlying common stock.  Convertibles that are debt securities are also subject to the normal risks associated with debt securities, such as interest rate risks, credit spread expansion and ultimately default risk, as discussed below.  Convertibles are also prone to liquidity risk as demand can dry up periodically, and bid/ask spreads on bonds can widen significantly.

An issuer may be more likely to fail to make regular payments on a Convertible than on its other debt because other debt securities may have a prior claim on the issuer's assets, particularly if the Convertible is preferred stock. However, Convertibles usually have a claim prior to the issuer's common stock.

In addition, for some Convertibles, the issuer can choose when to convert to common stock, or can "call" (redeem) the Convertible.  An issuer may convert or call a Convertible when it is disadvantageous for the Fund and the Master Fund, causing the Fund and the Master Fund to lose an opportunity for gain.  For other Convertibles, the Fund and the Master Fund can choose when to convert the security to common stock or to put (sell) the Convertible back to the issuer.

Because convertible arbitrage also involves the short sale of underlying common stock, the strategy is also subject to stock-borrow risk, which is the risk that the Fund and the Master Fund will be unable to sustain the short position in the underlying common shares.

*Derivatives*.  Derivatives are financial contracts whose value depends on, or is derived from, an underlying product, such as the value of a securities index.  Among the types of derivatives that may be used by the Fund and the Master Fund are futures, options and swaps.  The risks generally associated with derivatives include the risks that: (1) the value of the derivative will change in a manner detrimental to the Fund and the Master Fund; (2) before purchasing the derivative, the Fund and the Master Fund will not have the opportunity to observe its performance under all market conditions; (3) another party to the derivative may fail to comply

with the terms of the derivative contract; (4) the derivative may be difficult to purchase or sell; and (5) the derivative may involve indebtedness or economic leverage, such that adverse changes in the value of the underlying asset could result in a loss substantially greater than the amount invested in the derivative itself or in heightened price sensitivity to market fluctuations.  The Fund and the Master Fund will often be required to pledge all or a part of its assets to the counterparty in a derivatives transaction.

The Fund and the Master Fund may also invest in non-U.S.-traded derivatives.  When traded outside the United States, derivatives may not be regulated as rigorously as in the United States, may not involve a clearing mechanism and related guarantees, and will be subject to the risk of government actions affecting trading in, or the prices of, foreign securities and other instruments.  The value of positions taken as part of non-U.S. derivatives also could be adversely affected by: (1) other complex foreign political, legal and economic factors, (2) lesser availability of data on which to make trading decisions than in the United States, (3) delays in the Fund's ability to act upon economic events occurring in foreign markets during non-business hours in the United States, (4) the imposition of different exercise and settlement terms and procedures and margin requirements than in the United States and (5) lower trading volume and liquidity.

*Swap Agreements.*  The Investment Manager may enter into equity, interest rate, index, currency rate swap and other agreements on behalf of the Fund and the Master Fund.  These transactions are entered into in an attempt to obtain a particular return when it is considered desirable to do so, possibly at a lower cost than if the Fund and the Master Fund had invested directly in the asset that yielded the desired return.  The Investment Manager anticipates that the risk of loss with respect to most swaps the Fund and the Master Fund would enter into would be limited to the net amount of payments that the Fund and the Master Fund are contractually obligated to make.  If the other party to a swap defaults, the risk of loss of the Fund and the Master Fund consists of the net amount of payments that the Fund and the Master Fund contractually are entitled to receive.

*Investment Selection.*  The Investment Manager may select investments for the Fund and the Master Fund in part on the basis of information and data filed by the issuers of such securities with various government regulators or made directly available to the Investment Manager by the issuers of securities or through sources other than the issuers.  Although the Investment Manager will evaluate all such information and data and seek independent corroboration when the Investment Manager considers it appropriate and when it is reasonably available, the Investment Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information will not be readily available.

The Fund and the Master Fund will acquire investment assets that have not yet been identified.  Accordingly, prospective investors will not have an opportunity to review the terms upon which any assets will be acquired prior to investing in the Fund and the Master Fund.  The likelihood that Shareholders will realize income or gain depends on the skill and expertise of the Investment Manager.

*Non-U.S. Exchanges and Markets.*  The Fund and the Master Fund may engage in trading on non-U.S. exchanges and markets.  Trading on such exchanges and markets may involve certain

risks not applicable to trading on U.S. exchanges and is frequently less regulated. For example, certain of those exchanges may not provide the same assurances of the integrity (financial and otherwise) of the marketplace and its participants, as do U.S. exchanges. There also may be less regulatory oversight and supervision by the exchanges themselves over transactions and participants in such transactions on those exchanges. Some non-U.S. exchanges, in contrast to U.S. exchanges, are "principals' markets" in which performance is the responsibility only of the individual member with whom the trader has dealt and is not the responsibility of an exchange or clearing association. Furthermore, trading on certain non-U.S. exchanges may be conducted in such a manner that all participants are not afforded an equal opportunity to execute certain trades and may also be subject to a variety of political influences and the possibility of direct government intervention. Investment in non-U.S. markets would also be subject to the risk of fluctuations in the exchange rate between the local currency and the dollar and to the possibility of exchange controls. Foreign brokerage commissions and other fees are also generally higher than in the United States.

*Investments in Non-U.S. Securities.*  The Fund and the Master Fund invest and trade a major portion of their assets in non-U.S. securities, which give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and foreign issuers and markets are subject:

> ➤ These risks may include political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.

> ➤ Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.

> ➤ Foreign securities often trade in currencies other than the U.S. dollar, and the Fund and the Master Fund may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts. Changes in currency exchange rates will affect the Fund's and the Master Fund's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of securities. An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Fund's and the Master Fund's investments to decline. Some foreign currencies are particularly volatile. Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Fund's and the Master Fund's foreign currency holdings. If the Fund and the Master Fund enter into forward foreign currency exchange contracts for hedging purposes, they may lose the benefits of advantageous changes in exchange rates. On the other hand, if the Fund and the Master Fund enter forward contracts for the purpose of increasing return, it may sustain losses.

> ➤ Non-U.S. securities markets may be less liquid, more volatile and less closely supervised by the government than in the United States. Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about their operations.

*Investments in Undervalued Securities.*    The Fund and the Master Fund may invest in undervalued securities.  The identification of investment opportunities in undervalued securities is a difficult task, and there are no assurances that such opportunities will be successfully recognized or acquired.  While investments in undervalued securities offer the opportunities for above-average capital appreciation, these investments involve a high degree of financial risk and can result in substantial losses.  Returns generated from the Fund's and the Master Fund's investments may not adequately compensate for the business and financial risks assumed.

The Fund and the Master Fund may invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities.  It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities.  In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

The Fund and the Master Fund may make certain speculative investments in securities which the Investment Manager believes to be undervalued, however, there are no assurances that the securities purchased will in fact be undervalued.  In addition, the Fund and the Master Fund may be required to hold such securities for a substantial period of time before realizing their anticipated value.  During this period, a portion of the Fund's and the Master Fund's funds would be committed to the securities purchased, thus possibly preventing the Fund and the Master Fund from investing in other opportunities.

*Small Companies.*    The Fund and the Master Fund may invest a portion of its assets in small and/or unseasoned companies with small market capitalizations.  While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification, and competitive strength of larger companies.  In addition, in many instances, the frequency and volume of their trading may be substantially less than is typical of larger companies.  As a result, the securities of smaller companies may be subject to wider price fluctuations.  When making large sales, the Fund and the Master Fund may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the lower trading volume of smaller company securities.

*Real Estate Industry Considerations.*  The Fund and the Master Fund may invest in real estate related securities.  Therefore, an investment in the Fund is subject to certain risks associated with the direct ownership of real estate and with the real estate industry in general.  These risks include, among others: possible declines in the value of real estate; risks related to general and local economic conditions; possible lack of availability of mortgage funds; overbuilding; extended vacancies of properties; increases in competition, property taxes and operating expenses; changes in zoning laws; costs resulting from the clean-up of, and liability to third parties for damages resulting from, environmental problems; casualty or condemnation losses; uninsured damages from floods, earthquakes or other natural disasters; limitations on and variations in rents; and changes in interest rates.  To the extent that assets underlying the Fund's and the Master Fund's investments are concentrated geographically, by property type or in

34

certain other respects, the Fund and the Master Fund may be subject to certain of the foregoing risks to a greater extent.

*Currency Risk.*  The value of the Fund's and the Master Fund's assets may be affected favorably or unfavorably by the changes in currency rates and exchange control regulations.  Some currency exchange costs may be incurred when the Fund and the Master Fund changes investments from one country to another.  Currency exchange rates may fluctuate significantly over short periods of time.  They generally are determined by the forces of supply and demand in the respective markets and the relative merits of investments in different countries, actual or perceived changes in interest rates and other complex factors, as seen from an international perspective.  Currency exchange rates can also be affected unpredictably by intervention by governments or central banks (or the failure to intervene) or by currency controls or political developments.  The Fund and the Master Fund may or may not seek to mitigate the risk of currency exchange fluctuation.

*Turnover.*  The Fund's and the Master Fund's trading activities may be made on the basis of short-term market considerations.  The Fund's and the Master Fund's portfolio turnover rate may be significant, involving substantial brokerage commissions and fees.  The Fund and the Master Fund will be responsible for the payment of all of the trading expenses incurred in connection with its trading activities, which will ultimately affect the return achieved by the Fund and the Master Fund.

*Call and Put Options on Indices.*  The Fund and the Master Fund may purchase and sell call and put options on indices listed on national securities exchanges or traded in the over-the-counter market for hedging purposes and non-hedging purposes to pursue its investment objective.  The successful use of options on stock indexes requires different skills and techniques than predicting changes in the price of individual stocks.

*Use of Warrants & Rights.*  Warrants permit, but do not obligate, the holder to subscribe for other securities or commodities.  Rights are similar to warrants, but normally have a shorter duration and are offered or distributed to shareholders of a company.  Warrants and rights may be considered more speculative than certain other types of equity-like securities because they do not carry with them rights to dividends or voting rights and they do not represent any rights in the assets of the issuer.  These instruments cease to have value if they are not exercised prior to their expiration dates.  The market for warrants and rights can become very illiquid.  Changes in liquidity may significantly impact the price for warrants and rights.

*Use of When-Issued & Forward Commitment Securities.*  The Fund and the Master Fund may purchase securities on a "when-issued" basis.  These transactions involve a commitment by the Fund and the Master Fund to purchase or sell securities at a future date (ordinarily one or two months later).  No income accrues on securities that have been purchased on a when-issued basis prior to delivery to the Fund and the Master Fund.  When-issued securities may be sold prior to the settlement date.  If the Fund and the Master Fund disposes of the right to acquire a when-issued security prior to its acquisition, it may incur a gain or loss.  There is a risk that securities purchased on a when-issued basis may not be delivered.  In such cases, the Fund and the Master Fund may incur a loss.

*Securities of Financially Distressed Companies.*  The Fund and the Master Fund may purchase securities and other obligations of companies that are experiencing significant financial or business distress, including companies involved in bankruptcy or other reorganization and liquidation proceedings.  Although such purchases may result in significant returns, they involve a substantial degree of risk and may not show any return for a considerable period of time, if ever.  In fact, many of these securities and investments ordinarily remain unpaid unless and until the company reorganizes and/or emerges from bankruptcy proceedings and, as a result, may have to be held for an extended period of time.  The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial distress is unusually high.  There is no assurance that the Investment Manager will correctly evaluate the nature and magnitude of the various factors that could affect the prospect for a successful reorganization or similar action.  In any reorganization or liquidation proceeding relating to a company in which the Fund and the Master Fund invest, the Fund and the Master Fund may lose its entire investment or maybe required to accept cash or securities with a value less than the Fund's and the Master Fund's original investment.

*Trading in Indices and Related Financial Instruments.*  The Fund and the Master Fund may trade indices and related financial instruments.  The effect of governmental intervention may be particularly significant at certain times in indices and related financial instruments' futures and options markets and such intervention (as well as other factors) may cause all these markets to move rapidly in the same direction because of, among other things, interest rate fluctuations.

*Futures Contracts and Options on Futures Contracts.*  In entering into futures contracts and options on futures contracts, there is a credit risk that a counterparty will not be able to meet its obligations to the Fund and the Master Fund.  The counterparty for futures contracts and options on futures contracts traded in the United States and on most foreign futures exchanges is the clearinghouse associated with such exchange.  In general, clearinghouses are backed by the corporate members of the clearinghouse who are required to share any financial burden resulting from the non-performance by one of its members and, as such, should significantly reduce this credit risk.  In cases where the clearinghouse is not backed by the clearing members (*i.e.*, some foreign exchanges), it is normally backed by a consortium of banks or other financial institutions.  There can be no assurance that any counterparty, clearing member or clearinghouse will be able to meet its obligations to the Fund and the Master Fund.

In addition, under the CEA, futures commission merchants are required to maintain customers' assets in a segregated account.  If the Fund and the Master Fund engages in futures and options contract trading and the futures commission merchants with whom the Fund and the Master Fund maintains accounts fail to so segregate the Fund's and the Master Fund's assets or are not required to do so, the Fund and the Master Fund will be subject to a risk of loss in the event of the bankruptcy of any of its futures commission merchants.  Even where customers' funds are properly segregated, the Fund and the Master Fund might be able to recover only a *pro rata* share of its property pursuant to a distribution of a bankrupt futures commission merchant's assets.

*Futures Cash Flow.*  Futures contracts gains and losses are marked-to-market daily for purposes of determining margin requirements.  Option positions generally are not, although short option positions will require additional margin if the market moves against the position.  Due to these differences in margin treatment between futures and options, there may be periods in which positions on both sides must be closed down prematurely due to short-term cash flow needs. Were this to occur during an adverse move in the spread or straddle relationships, a substantial loss could occur.

Most United States futures exchanges limit fluctuations in certain commodity interest contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." During a single trading day, no trades may be executed at prices beyond the daily limits. Once the price of a particular contract has increased or decreased by an amount equal to the daily limit, positions in the contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. Contract prices have occasionally moved to the daily limit for several consecutive days with little or no trading. Similar occurrences could prevent the Investment Manager from promptly liquidating unfavorable positions and subject the Fund to substantial losses, which could exceed the margin initially committed to such trades.

Each exchange on which futures are traded typically has the right to suspend or limit trading in the contracts listed on such exchange.  The CFTC also has the right to suspend or limit trading in futures contracts.  Such a suspension or limitation could render it impossible for the Fund to liquidate its positions and thereby expose it to losses. In addition, there is no guarantee that exchange and other secondary markets will always remain liquid enough for the Investment Manager to close out existing futures positions. It is also possible that an exchange or the CFTC could order the immediate liquidation and settlement of a particular contract, or order that trading in a particular contract be conducted for liquidation only.

*Option Transactions.*  The purchase or sale of an option by the Fund and the Master Fund involves the payment or receipt of a premium payment and the corresponding right or obligation, as the case may be, to either purchase or sell the underlying security or other instrument for a specific price at a certain time or during a certain period.  Purchasing options involves the risk that the underlying instrument does not change price in the manner expected, so that the option expires worthless and the investor loses its premium.  Selling options, on the other hand, involves potentially greater risk because the investor is exposed to the extent of the actual price movement in the underlying security or other instrument in excess of the premium payment received.

*Yield Curve Risk.*  The Fund and the Master Fund may purchase a bond, a future contract or receive in an interest rate swap of a given maturity.  At the same time the Fund and the Master Fund may sell a bond, a future contract or pay on an interest rate swap of a different maturity.  In this situation, there is yield curve risk.  There are numerous factors that will affect the shape of the yield curve that are beyond the control of the Fund and the Master Fund.

*Inflation Risk.*  Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power.  For example, if the Fund and the Master Fund purchase a 5 year bond in which it can realize a coupon rate of 5 percent, but the rate of inflation is 6 percent, then the purchasing power of the cash flow has declined. For all but

inflation linked bonds, adjustable bonds or floating rate bonds, the Fund and the Master Fund are exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security.  To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Investments in New Issues.*  The Fund and the Master Fund may, directly or indirectly, invest in "new issues," as such term is defined in FINRA Rule 5130.  Those Shareholders that are categorized by the Fund and the Master Fund as "restricted persons" as defined by FINRA may generally participate in the receipt of new issues only to the extent that such restricted persons' aggregate beneficial ownership of the Fund and the Master Fund does not exceed 10% of the Fund's and the Master Fund's assets.  In addition, investors will be subject to further limitations under FINRA Rule 5131.  To the extent that a Shareholder or a potential investor is a "restricted" person, its investment in the Fund and the Master Fund may not yield the same performance results as the Shareholders who are entitled to participate in all of the Fund's and the Master Fund's new issues.

*Failure of Custodian, Broker-Dealers.*  Institutions, such as brokerage firms or banks, may hold certain of the Fund's and the Master Fund's assets in "street name."  Bankruptcy or fraud at one of these institutions, in particular, the Master Fund's Custodian, which would hold the majority of the Master Fund's assets, could impair the operational capabilities or the capital position of the Fund and the Master Fund.

In addition, as the Fund and the Master Fund may borrow money or securities or utilize operational leverage with respect to their assets, the Fund and the Master Fund will post certain of their assets as collateral securing the obligations or leverage ("Margin Securities").  The Fund's and the Master Fund's Custodian and brokers generally hold the Margin Securities on a commingled basis with margin securities of their other customers and may use certain of the Margin Securities to generate cash to fund the Fund's and the Master Fund's leverage, including pledging such Margin Securities.  Some or all of the Margin Securities may be available to creditors of the Fund's and the Master Fund's Custodian and brokers in the event of their insolvency.  The Fund's and the Master Fund's Custodian and brokers have netting and set off rights over all the assets held by them (which may indirectly include amounts held for the Fund's and the Master Fund's benefit in the special segregated bank account) to satisfy the Fund's and the Master Fund's obligations under their agreements with the Fund's and the Master Fund's Custodian and brokers, including obligations relating to any margin or short positions.

*Over-the-Counter ("OTC") Transactions.*  The Fund and the Master Fund may deal in forward foreign exchange contracts between currencies of the different countries and multi-national currency units and options on currencies for hedging or speculation.  With respect to forward currency contracts, this is accomplished through contractual agreements generally to purchase or sell one specified currency for another currency at a specified future date and price determined at the inception of the contract. The Fund and the Master Fund may engage in other OTC transactions, such as options not traded on an exchange, swaps, caps, floors, and collars.

In general, there is less governmental regulation and supervision in the OTC markets than of transactions entered into on an organized exchange.  In addition, many of the protections afforded to participants on some organized exchanges, such as the performance guarantee of an

exchange clearinghouse, will not be available in connection with OTC transactions. This exposes the Fund and the Master Fund to the risks that a counterparty will not settle a transaction because of a credit or liquidity problem or because of disputes over the terms of the contract. The Fund and the Master Fund are not restricted from concentrating transactions with one counterparty. The Fund and the Master Fund, therefore, will be exposed to greater risk of loss through default than if they confined its trading to regulated exchanges.

The Fund and the Master Fund will be subject to the risk of the inability of counterparties to perform with respect to transactions, whether due to insolvency, bankruptcy, governmental prohibition or other causes, which could subject the Fund and the Master Fund to substantial losses.

*Risks of Non-Controlling Investments; Control Person Liability.*  The Fund and the Master Fund may take minority shareholdings in certain investee companies and, as a result, may be unable to protect its interests effectively. Such investments may involve risk not present in the Fund's and the Master Fund's investments where a third party is not involved, including the risk that a co-investor might at any time have economic or business interests or goals that are inconsistent with those of the Fund and the Master Fund or may be in a position to take action contrary to the Fund's and the Master Fund's investment objectives. Conversely, the Fund and the Master Fund may acquire controlling interests in certain investee companies. The exercise of control over an investee company may impose additional risks of liability for environmental damage, product defects, failure to supervise management, violation of governmental regulations or other types of liability in which the limited liability generally characteristic of business ownership may be ignored. If these liabilities were to arise, the Fund and the Master Fund might suffer a significant loss.

*Start-Up Periods.*  The Fund and the Master Fund may encounter start-up periods during which it will incur certain risks relating to the initial investment of newly contributed assets. Moreover, the start-up periods also represent a special risk in that the level of diversification of the Fund's and the Master Fund's portfolio may be lower than in a fully invested portfolio. Finally, the Fund and the Master Fund will be subject to business and operational risks applicable to all newly established entities, such as the risks of failure or malfunction of the telephone and data network, technical telephone equipment, cable service, computer equipment and other infrastructure.

*Trading Errors.*  Though the Investment Manager will attempt to correct trading errors as soon as they are discovered, it may not be responsible for poor executions or trading errors committed by the brokers with which it transacts or the Investment Manager itself, unless, in the case of the Investment Manager, such errors resulted from the Investment Manager's Gross Negligence (as defined below) or willful misconduct. The term "Gross Negligence," whenever used herein, shall have the meaning given to such term under the laws of the State of Delaware, United States of America.

*Valuation of Fund Investments.*  The Administrator shall calculate the Net Asset Value of the Fund and the Master Fund with the assistance of the Investment Manager and under the supervision of the Directors. Valuation of the Fund's and the Master Fund's investments, including the Special Investments (which will indirectly determine the amount of the

Management Fee and the Performance Allocation) may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the Shareholders could be adversely affected.  Independent pricing information may not at times be available with respect to certain of the Fund's and the Master Fund's securities and other investments.  Accordingly, while the Directors, the Investment Manager and the Administrator will use their best efforts to value and/or calculate (as applicable) all investments in the Fund and the Master Fund fairly, certain investments may be difficult to value and may be subject to varying interpretations of value.

*Money Market Instruments.*  For temporary defensive purposes or in order to earn a return on available cash balances pending investment or reinvestment, the Fund and the Master Fund may invest its assets in short-term debt securities of U.S. or foreign companies, foreign governments or the U.S. government or their agencies or instrumentalities, as well as in other money market instruments.  In the event the Fund's and the Master Fund's assets are invested in such instruments for a significant period of time, the Fund's and the Master Fund's performance may be negatively affected.

*Future Regulatory Change is Impossible to Predict.*  The securities and derivatives markets are subject to comprehensive statutes, regulations and margin requirements.  In addition, the SEC and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading.  The regulation of securities and derivatives both inside and outside the United States is a rapidly changing area of law and is subject to modification by government and judicial action.  The effect of any future regulatory change on hedge funds, in general, and the Fund and the Master Fund, in particular, is impossible to predict, but could be substantial and adverse.

*Competition.*  The Fund and the Master Fund will engage in investment activities which may become competitive with other investment programs such as those of other financial institutions, mutual funds, investment banks, broker-dealers, commercial banks, insurance companies and pension funds, as well as private investors, all of whom may have investment objectives similar to those of the Fund and the Master Fund.  These competitors may have substantially greater resources than the Fund and the Master Fund and may have greater experience than the Investment Manager and its affiliates.  Substantial capital suddenly deployed in the asset classes in which the Fund and the Master Fund invests to take advantage of the opportunities present in the sector can also reduce available investment and potential returns of the Fund and the Master Fund.

*Cross-Class Liability.*  The Fund and the Master Fund will have at least two Classes of Shares and are likely to have at least four Classes of Shares.  Notwithstanding the fact that the Fund and the Master Fund may issue Shares in more than one Class, each the Fund and the Master Fund is a single legal entity.  Thus, all the assets of the Fund and the Master Fund may be available to meet all of the liabilities of the Fund and the Master Fund, respectively.  In practice, cross-class liability will usually only arise where any Class becomes insolvent or exhausts its assets and is unable to meet its liabilities.  In this case, all of the assets of each of the Fund and the Master Fund respectively, attributable to the other Classes may be applied to cover the liabilities of the insolvent Class.

**Risks Related to Investments in Other Funds and Investment Vehicles**

*Compensation Arrangements with Fund Managers.*  The Fund and the Master Fund may enter into arrangements with certain managers of investment funds or vehicles ("Managers") which provide that such Managers be compensated, in whole or in part, based on the appreciation in value (including unrealized appreciation) of the account during specific measuring periods.  In other cases, Managers may be paid a fee based on appreciation during the specific period without taking into account losses occurring in prior periods.  Such fee arrangements may create an incentive for such Managers to make investments that are riskier or more speculative than would be the case in the absence of such performance based compensation arrangements.  Due to the fees and expenses charged by the Managers, the Fund and the Master Fund are subject to layering of administrative expenses and management fees, as well as of incentive compensation.  In addition, the Fund and the Master Fund may be required to make an incentive allocation to certain Managers who make a profit for the Fund in a particular fiscal year even though the Fund and the Master Fund may in the aggregate incur a net loss for such fiscal year.  The Fund and the Master Fund may also be subject to misallocations of the incentive compensation assessed on the Fund's and the Master Fund's investments with Managers.

*Valuation, Reporting and Independence of Managers.*  In certain cases, the Fund and the Master Fund may be dependent on financial information provided by Managers or administrators in computing the Fund's and the Master Fund's Net Asset Value.  Such financial information could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Fund's and the Master Fund's investments.  Although the Investment Manager will normally receive periodic reports on investments made by a Manager, the Investment Manager may not always be provided with detailed information regarding all the investments made by a Manager because certain of this information may be considered proprietary.  This potential lack of access to information may make it more difficult for the Investment Manager to select, allocate amongst and evaluate certain Managers.  In general, the Fund and the Master Fund does not and will not control any of the Managers, their choice of investments and other investment decisions, all of which are entirely within the control of such Managers.

**Product Risk**

*ADRs, EDRs and GDRs.*  Investments in ADRs, EDRs and GDRs and similar instruments will be deemed to be investments in the underlying equity securities of the issuers. The Fund and the Master Fund may acquire depository receipts from banks that do not have a contractual relationship with the issuer of the security underlying the depository receipt.  To the extent the Fund and the Master Fund invest in such depository receipts there may be a possibility that the Fund and the Master Fund may not become aware of events affecting the underlying security and thus the value of the related depository receipt.  In addition, certain benefits (*i.e.*, rights offerings) which may be associated with the security underlying the depository receipt may not inure to the benefit of the holder of such depository receipt.

*Synthetic Product Risk.*  The synthetic products in which the Fund and the Master Fund may invest are subject to the following counterparty and regulatory risks.  The counterparty risk lies with each party with whom the Fund and the Master Fund contracts for the purpose of making

investments (the counterparty) and, where relevant, the entity in Russia and the CIS with whom the counterparty has made arrangements to ensure an on-shore presence in Russia and the CIS. The Fund and the Master Fund may not be entitled to assert any rights against the entity in Russia and the CIS with whom it does not have a contractual relationship.  The Fund and the Master Fund may not be able to procure that the counterparty asserts its own rights, if any, against the on-shore entity in Russia and the CIS with whom it has made arrangements.  In the event of the counterparty's insolvency, the Fund and the Master Fund will only rank as an unsecured creditor.  In the event of the insolvency of any entity in Russia and the CIS with whom the Fund and the Master Fund do not have a direct contractual relationship, it is likely that the Fund and the Master Fund will lose their entire investment. The effectiveness and legality of the synthetic product structure, and in particular the ability of the Fund's and the Master Fund's counterparty to invest efficiently in Russia and the CIS from off-shore, is subject to the intervention by the relevant regional authorities, their re-interpretation of law and current commercial and tax efficient practice and legislation, as well as to changes in relevant laws and regulations.  As a result, the Fund and the Master Fund may not get back all or any part of its investment in the synthetic products in which it invests or it may find that the proceeds of its investment are not repatriable.  It may not be possible for the Fund and the Master Fund to negotiate favorable terms for its investment in synthetic products.  In some cases the Fund and the Master Fund may be obliged to hold harmless and indemnify its counterparty from and against all losses resulting from a breach of Fund's and the Master Fund's obligations or in respect of all costs and expenses incurred by the counterparty in relation to its arrangements with the on-shore entity.  In the event that the underlying investment remains unpaid or is rescheduled (including being the subject of a moratorium, debt substitution, exchange or similar event) the Fund and the Master Fund could lose part or the whole of its investment.  Similarly, if the underlying investment or the synthetic product structure is re-characterized, the Fund and the Master Fund may be forced to terminate its investment in the synthetic product earlier than had been anticipated and at a loss to part or all of the investment.

**Risk Factors Relating to Russia and CIS**

Described below are certain risk factors peculiar to investing in Russia and CIS which require consideration of matters not usually associated with investing in securities of issuers in more developed capital markets. Russia and CIS present different economic and political conditions from those in Western markets, and less social, political and economic stability.  The absence, until relatively recently, of any move towards capital markets structures or to a free-market economy means investing in these countries is more risky than investing in Western markets.  Information on Russia and CIS is to be treated with particular care due to the limited availability and reliability of such information.

*Political and Economic Risks.*  Under the Communists, Russia had a centrally planned, socialist economy and a totalitarian system of government.  Since the break-up of the Soviet Union at the end of 1991, Russia and other countries within the CIS have undergone substantial political and social upheaval.  Though the transition from a centrally controlled, command system to a market-oriented, democratic model is taking place, the terms on which this will occur are still not entirely clear and may be affected by further fears of inflation.  The consequences, however, are profound, and investors should take into account the unpredictability of their eventual outcome. The economies of Russia and the CIS may differ significantly from the economies of Western

Europe, North America and Japan in such respects as the rate of inflation, currency depreciation, capital reinvestment, structural unemployment and balance of payments position. The value of the Fund and the Master Fund may therefore be affected by uncertainties such as political or diplomatic developments, social and religious instability, changes in government policies, taxation and interest rates, currency repatriation and other political and economic developments in law or regulations in Russia and the CIS and, in particular, the risks of expropriation, nationalism and confiscation of assets and changes in legislation relating to the level of foreign ownership. Russia's economy and markets remain highly sensitive to oil prices. According to direct revenue estimates, Russia's budget surplus would be reduced by US$ 1 billion, or 0.2% of GDP, for each US$ 1/bbl drop in oil price. Additionally, a sharp fall in the oil price might cause enterprises to delay investment plans, thus growth could slow, leading to a greater negative impact on the overall federal budget.

*Regulatory Risk.* Enterprises in which the Fund and the Master Fund invest may be or become subject to unduly burdensome and restrictive regulation affecting the commercial freedom of the investee company, thereby diminishing the value of the Fund's and the Master Fund's investment in it. Restrictive or overregulation may therefore be a form of indirect nationalization.

*Lack of Market Economy.* Businesses in Russia have only a very recent history of operating within a market oriented economy. In general, relative to companies operating in Western economies, companies in Russia are characterized by a lack of experienced management; modern technology; and sufficient capital base with which to develop and expand their operations. It is unclear what will be the effect on companies in Russia, if any, of attempts to move towards a more market-oriented economy.

*Settlement Risk.* Because of the relatively underdeveloped securities markets, banking and telecommunications systems concerns arise in relation to settlement, clearing and registration of transactions in securities. Furthermore, due to the local postal and banking systems, no guarantee can be given that all entitlements attaching to securities acquired by the Fund and the Master Fund, including in relation to dividends, can be realized. However, none of the Fund and the Master Fund, the Custodian, the Administrator, the Investment Manager or the Investment Adviser or any of their agents makes any representation or warranty about, or any guarantee of, the operation, performance or settlement, clearing and registration of transactions dealing in securities in Russia.

*Registration Risk in Russia.* Currently, evidence of legal title to shares in Russia is typically maintained in "bookentry" form. In order to be recognized as the registered owner of a company's shares, a purchaser or a purchaser's representative must physically visit the registrar of the company ("Regional Registrar") and open an account with the Regional Registrar (which, in certain cases, requires the payment of an account opening fee). Thereafter, each time that purchaser purchases additional shares in the company, the purchaser's representative must present to the Regional Registrar powers of attorney from the purchaser and the vendor of such shares, along with evidence of such purchase, at which time the Regional Registrar will debit such purchased shares from the vendor's account maintained on the register and credit such purchased shares to the purchaser's account maintained on the register. The role of the Regional Registrar in the custodial and registration process is crucial. Although the Russian Federal

Securities Commission has published regulations governing activities of registrars the effectiveness of government supervision of registrars is questionable and it is possible for the Fund and the Master Fund to lose their registration in one or more securities through fraud, negligence or mere oversight.  Furthermore, while companies with more than 500 shareholders are required under Russian law to maintain independent Regional Registrars that meet certain statutory criteria, in practice this regulation has not historically always been strictly enforced. Because of the lack of independence, the management of a company can potentially exert significant influence over the make-up of that company's shareholders.  If a Regional Registrar were to suffer a fire or other catastrophe, the consequence of which were to be the destruction or mutilation of the Register, the Fund's and the Master Fund's holdings of the relevant shares of the related company could be substantially impaired or, in certain cases, erased.  The Regional Registrars typically do not maintain insurance against such occurrence, nor are they likely to have assets sufficient to compensate the Fund and the Master Fund as a result thereof.  While the Regional Registrar and the company may be legally obliged to remedy such loss, there is no guarantee that either of them would do so, nor is there any guarantee that the Fund and the Master Fund would be able to successfully bring a claim against them as a result of any such loss.  In addition to the possibility of a Regional Registrar suffering a catastrophic loss, a Regional Registrar or the relevant company could willfully refuse to recognize the Fund and the Master Fund as the registered owner of shares previously purchased by the Fund and the Master Fund.  None of the Fund, the Master Fund, the Investment Manager, the Investment Adviser, the Administrator, the Custodian or any of their agents makes any representation or warranty about, or any guarantee of, any Regional Registrar's operations or performance.

*Title to Shares.*  Although the Russian Civil Code does provide for the concept of a "good faith purchaser", such a purchaser is not protected to the extent that would be the case in most Western jurisdictions.  As a result, under Russian law, a purchaser of securities (other than cash and bearer instruments) takes such securities subject to any laws in title and ownership that may have existed in the seller thereof or any of such seller's predecessors in title.  Consequently, at the present time, it is possible that the Fund's and the Master Fund's ownership of shares could be challenged by a prior owner from whom the shares were acquired, in which case the value of the Fund's and the Master Fund's assets would possibly be impaired.

*Custody Risk.*  Custody services in Russia and the CIS remain undeveloped and, although the Fund and the Master Fund will endeavor to put into place control mechanisms, including the selection of agents to register securities on behalf of the Fund and the Master Fund, and, where appropriate, regular reconciliations of entries on relevant securities registers to ensure that the Fund's and the Master Fund's interests continue to be recorded, there is a transaction and custody risk of dealing in these securities.  The Custodian and Sub-custodian are empowered by the Master Fund to delegate all or any of their functions and duties to local sub-custodians ("Correspondents") in Russia and the CIS.  The Custodian and Sub-Custodian will exercise due skill, care and diligence in the selection, appointment and monitoring of such Correspondents and will maintain an appropriate level of supervision over such Correspondents and make appropriate periodic enquiries to confirm that the obligations of such Correspondents continue to be competently discharged.  The Custodian retains responsibility for the acts and omissions of its Correspondents in developed markets, but is not liable for any loss directly or indirectly arising as a result of the acts or omissions of its Correspondents in certain emerging markets countries (as referred to in the Custodian Agreement, and including Russia and the majority of CIS

countries).  The Custodian shall for the duration of any agreement with such Correspondent satisfy itself as to the ongoing suitability of that Correspondent to provide custodial services to the Master Fund.  The Custodian will not be liable for any losses suffered by the Master Fund as a result of the bankruptcy or insolvency of any Correspondent.  The Custodian is not responsible for the safekeeping of assets deposited with brokers.  The fees of any Correspondent (other than an affiliate of the Custodian) appointed by the Custodian shall be paid by the Master Fund. The fees and other costs of any Correspondent shall be borne by the Master Fund.

*Possible Business Failures.*  The insolvency or other business failure of any one or more of the Fund's and the Master Fund's investments could have an adverse effect on the Fund's and the Master Fund's performance and ability to achieve its objectives.  Russia has enacted a law on the insolvency of enterprises, but there is as yet no significant level of experience as to how this law will be implemented and applied in practice.  The lack of generally available enhancing alternatives for companies in Russia and other CIS countries increases the risk of business failure.

*Accounting Practice.*   Accounting standards in Russia and the CIS do not correspond to accounting principles generally accepted in the United States of America in all material respects. In addition, auditing requirements and standards differ from those generally accepted in the international capital markets and consequently information available to investors in developed capital markets is not always obtainable in respect of companies in Russia and the CIS. The Fund's and the Master Fund's own financial statements will conform to accounting principles generally accepted in the United States of America.

*Quality of Information.*  Investors in Russia and the CIS generally have access to less reliable or less detailed information, including both general economic data and information concerning the operations, financial results, capitalization and financial obligations, earnings and securities of specific enterprises.  The quality and reliability of information available to the Fund and the Master Fund will, therefore, be less than in respect of investments in Western countries. Obligations on companies to publish information are also more limited, thus further restricting opportunities for the Fund and the Master Fund to carry out due diligence.  At present, the Fund and the Master Fund will be obliged to make investment decisions and investment valuations on the basis of financial information that will be less complete and reliable than that customarily available in the West. Also, the quality and reliability of official data published by the government and government agencies of Russia and the CIS is generally not equivalent to that of more developed Western countries.

*Uncertain Legal and Regulatory Environment.*  The laws and regulations in Russia and the CIS affecting Western investment and business continue to evolve in an unpredictable manner.  Laws and regulations, particularly those involving taxation, currency regulation, foreign investment, trade and transfer of title to securities and other property applicable to the Fund's and the Master Fund's activities are relatively new and can change quickly and unpredictably.  Although basic commercial laws are in place, they are often unclear and untested and subject to varying interpretation, and may at any time be amended, modified, repealed or replaced in a manner adverse to the interests of the Fund and the Master Fund.  Enterprises in which the Fund and the Master Fund invests may be or may become subject to unduly burdensome and restrictive regulation, including, in particular, price controls and restrictions on export.  Such regulations

may affect the commercial freedom of such enterprises and thereby diminish the value of the Fund's and the Master Fund's investment in such enterprises.

*Taxation.*  Tax law and practice in Russia and the CIS is not as clearly established as that of the Western nations. It is possible, therefore, that the current interpretation of the law or understanding of practice may change or, indeed, that the law may be changed with retrospective effect.  Accordingly, it is possible that the Fund and the Master Fund could become subject to taxation in Russia and the CIS that is not anticipated either at the date of this document or when investments are made, valued or disposed of.  In addition, in some of these countries the domestic tax burden is high and the discretion of local authorities to create new forms of taxation has resulted in a proliferation of taxes, in some cases imposed or interpreted retrospectively. Penalties on the late payment of tax (even when it is imposed retrospectively) can be substantial.

*Repatriation Restrictions.*  The foreign investment legislation of Russia currently provides general assurances of the rights of foreign investors to remit profits and dividends from their investments in Russia.  In some cases, however, these rights are subject to currency, tax and export restrictions and no guarantee can be given that all the proceeds of investments will be capable of being remitted.

*Exchange and Currency Risk.*  Russia's currency has in the past experienced steady devaluation relative to convertible currencies, such as the US dollar.

The value of an investment in the Fund and the Master Fund, whose Shares are denominated in US dollars, will be affected by fluctuations in the value of the underlying currency of denomination of the Fund's and the Master Fund's investments against the US dollar or by changes in exchange control regulations, tax laws, withholding taxes, and economic or monetary policies.  Adverse fluctuations in currency exchange rates can result in a decrease in net return and in a loss of capital.  Accordingly, investors must recognize that the value of Shares can fall as well as rise for this reason.

The Fund and the Master Fund may attempt to mitigate the risks associated with currency fluctuations by entering into forward and options contracts to purchase or sell the currency of denomination of any investment held by the Fund and the Master Fund and any other currencies held by the Fund and the Master Fund, to the extent such contracts are available on terms acceptable to the Fund and the Master Fund, although there is no assurance that any such hedging will take place nor as to its efficacy.

*Amendments to Russian Currency Legislation.*  Russian currency control legislation, particularly Federal Law No. 173-FZ "On Currency Regulation and Currency Control" dated 10 December 2003 (the "Law"), has recently undergone substantial changes. The amendments were to be enacted in two steps: the reservation requirement would be abolished starting July 1, 2006, and the obligation to use special accounts for currency transactions and most other restrictions would be abolished starting January 1, 2007.

However, the liberalization took place earlier than planned. On May 29, 2006, the Central Bank by its directive No. 1688-U abolished the requirement to use special accounts and to sell a portion of the currency revenue. On July 27, 2006, the first batch of amendments to the Law

46

came into force (they retroactively applied to the relations since July 1, 2006). Therefore, the most important currency restrictions including the reservation requirement, the special accounts requirement and the requirement to sell a portion of currency proceeds, have been abolished as of mid 2006.

On January 1, 2007, as planned, the second batch of amendments to the Law came into force. The amendments abolished most of the remaining currency restrictions. The cumulative amendments to the currency control legislation, which include the amendments effective as of July 1, 2006, and January 1, 2007, include the following:

- Mandatory reservation requirements are no longer applicable.  These requirements could be triggered in case of export of goods, acquisition of shares in legal entities and simple partnerships and other operations with securities, loans between residents and non-residents, foreign bank account operations, and in certain other cases;

- Residents and non-residents are no longer required to use special accounts for currency transactions (such as obtaining loans and performing operations with securities);

- Non-residents are no longer required to secure performance of their obligations in case of advance payments by residents or deferred payments by non-residents;

- Non-residents are no longer required to obtain ruble denominated loans from residents only through bank accounts with authorized Russian banks;

- Residents and non-residents are no longer required to use rubles as the currency of payment for Russian securities;

- Residents are no longer required to obtain prior registration of their bank accounts with foreign banks; and

- Residents can no longer be required to sell part of their currency proceeds.

The State Duma adopted certain technical amendments to the Law, which became effective on December 31, 2006 and which apply to the relations arising since January 1, 2007. The amendments extended the number of:

- ways of crediting of funds to residents' foreign accounts;

- exempted currency operations between residents;

- currency operations which can be performed by residents without the use of accounts with authorized banks; and

- cases when residents are exempted from the obligation to repatriate currency proceeds received from commercial operations abroad.

Despite significant liberalization of currency operations, certain currency law restrictions continue to apply, including the following:

- Currency operations between residents are still prohibited. This does not apply to a limited number of operations specifically mentioned in the Law;

- Residents are still required to notify tax authorities of opening of foreign bank accounts, which can be opened only in OECD and FATF member countries, and to provide to tax authorities updates on the status of such accounts, and the ways to credit funds to such accounts are still limited;

- Residents are still required, with a number of exceptions, to ensure that payments due to them from non-residents are credited to their bank accounts with authorized Russian banks, and that funds paid to non-residents for goods and services that have not been provided to the residents are credited back to their bank accounts with authorized Russian banks;

- Residents are still required to prepare and file with their banks transaction passports for certain types of currency operations;

- Residents are required, with a number of exceptions, to conduct payments upon execution of currency operations through accounts opened with Russian authorized banks or with the use of funds credited to accounts with foreign banks opened in accordance with the Law;

- Individuals (residents and non-residents) going abroad can carry foreign or Russian currency in the amount of up to US $ 10,000 in cash at a time (except for the cash which was previously brought to Russia by such individuals) subject to customs declaration;

- Foreign currency and cheques (including travel cheques) denominated in foreign currency can be sold and purchased in Russia only through authorized banks;

- Operations in foreign currency or in Russian rubles between non-residents on the Russian territory must be conducted only through accounts with authorized banks;

- Currency operations in Russian rubles between non-residents outside the Russian territory are not allowed; and

- Bank transfers of Russian rubles abroad by non-residents and residents are not generally possible.

*The Banking System.* In addition to being ill-developed, the banking system in Russia and the CIS is subject to two main risks: first, the insolvency of a bank due to concentrated debtor risk and, second, the effect of inefficiency and fraud in bank transfers. In addition, banks have not developed the infrastructure to channel domestic savings to companies in need of finance who thereby can experience difficulty in obtaining working capital.

*Criminality.* Diverse criminal groups often succeed in extorting protection money from companies. Fraud, particularly when coupled with significant bad debtors, may be the cause of

business failure. A company's management may be bribed or otherwise pressurized into defrauding their company.

**Management Risks**

*Use of Outside Consultants.* The Investment Manager may engage outside consultants to assist it in its research activities. Such consultants may act as consultants for other managers, funds and accounts and, accordingly, may have conflicts of interest in allocating their time and activity between the Fund and other entities. Additionally, some of the outside consultants may be employed by or hold senior level executive positions at companies or in industries in which the Fund and the Master Fund may invest or may be involved in trials relating to such companies. Such outside consultants may be also be subject to confidentiality obligations to their employers or trial sponsors and may violate such obligations if they elect to consult the Investment Manager on issues relating to such companies, industries or trials. As such, the Investment Manager will undertake its best efforts to avoid any discussions with such outside consultants that might give rise to such consultants' violations of their contractual and fiduciary obligations to their clients or employers or other impropriety or the appearance of impropriety. Finally, the performance of the Fund and the Master Fund may be negatively affected in the event any of the outside consultants upon which the Investment Manager relies in making its investment decisions for the Fund and the Master Fund or any service providers that employ outside consultants terminate their arrangements with the Fund and the Master Fund or are otherwise unavailable.

*Limitations on the Directors' and The Investment Manager's Liability and Indemnification.* Pursuant to the Fund's Articles of Association, all current and former Directors will be indemnified out of the assets of the Fund from and against all actions, proceedings, costs, charges, losses, damages and expenses which they or any of them shall or may incur or sustain by reason of any act done or omitted in or about the execution of their duties provided that such Director acted honestly and in good faith with a view to the best interests of the Fund and had no reasonable cause to believe that his conduct was unlawful.

The U.S. federal and state securities laws and ERISA impose liabilities under certain circumstances on persons who act in good faith and therefore nothing in the Articles of Association will waive or limit any rights the Fund may have against the Investment Manager under such laws.

The Advisory Agreement contains similar provisions with respect to the liability of the Investment Manager and the Investment Adviser to the Fund and the Master Fund and with respect to indemnification. See *"Certain Provisions of the Articles of Association – Directors' Liability; Indemnification"* and *"Management – The Investment Manager and The Investment Adviser ."*

*Management Fee and Performance Allocations.* The Fund pays the Investment Manager a quarterly Management Fee and the Investment Adviser will be allocated an annual Performance Allocation by the Master Fund. See *"Management – Compensation of The Investment Manager and the Investment Adviser."*

As a result of these fees, the returns realized by the Shareholders from the Fund's activities may be substantially less than the returns the Shareholders would realize from engaging in the same activities directly, if they were able to make such investments directly without investing in the Fund. The Performance Allocation also may create an incentive for the Investment Manager, an affiliate of the Investment Adviser, to make investments that are riskier or more speculative than would be the case in the absence of a financial incentive to the Investment Adviser based on performance of the Fund.

*No Dividends*. The Fund does not intend to pay any dividends to the Shareholders, but intends to reinvest substantially all of the Fund's income and gain. Cash that might otherwise be available for distribution is also reduced by payment of Fund obligations and expenses (including fees and expense reimbursements payable to the Investment Manager), and establishment of appropriate reserves. See *"Certain Provisions of the Articles of Association – Dividends."*

*Limited Ability to Liquidate an Investment in the Shares.* There are significant restrictions on a Shareholder's right to redeem all or part of its Shares, transfer its Shares and pledge or otherwise encumber its Shares, especially in connection with the Fund's investments in the Special Investments. Special Investments, which may represent a substantial portion of the Fund's assets, cannot be redeemed by Shareholders until they are disposed of or are deemed to have been disposed of by the Fund (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments). Except with respect to Shares representing Special Investments, each Shareholder has the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period, and (ii) on any other date determined by the Directors in their sole and absolute discretion. Requests for redemptions, which are irrevocable without the approval of the Directors, must be received by the Fund in writing at least 90 calendar days before the proposed Redemption Date. The Directors, in their sole and absolute discretion, may waive these requirements. Net Asset Values at a Redemption Date may vary significantly from those at the time an irrevocable redemption request is submitted; a Shareholder will bear the risk of that variance. See *"Redemption of Shares."*

In addition, Shares may not be transferred or pledged except in compliance with significant restrictions on transfer as required by federal and state securities laws and as provided in the Articles of Association. The Articles of Association do not permit a Shareholder to transfer or pledge all or any part of its Shares to any person without the prior written consent of the Directors, the granting of which is in the Directors' sole and absolute discretion. See *"Certain Provisions of the Articles of Association – Transferability of Shares."*

The Fund also has the discretion to deliver redemption proceeds in securities rather than cash. These limitations, taken together, will significantly limit a Shareholder's ability to liquidate an investment in the Fund quickly. As a result, an investment in the Fund would not be suitable for an investor who needs liquidity. See *"Redemption of Shares."*

*Suspension of Redemption and Deferment of Redemption Proceeds.* The Directors may, in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the valuation of the Fund's property or Shares or the redemption of Shares, in whole or in part.

In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors, in their sole and absolute discretion, determine.  See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

*Effect of Substantial Redemptions.*  Substantial redemptions by Shareholders within a short period of time could require the Fund to liquidate its investments more rapidly than would otherwise be desirable, possibly reducing the value of the Shareholders' assets and/or disrupting the Fund's investment strategies.  Reduction in the Fund's size could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

*Regulatory Risks of Hedge Funds.*  The regulatory environment for hedge funds is evolving and changes therein may adversely affect the ability of the Fund and the Master Fund to obtain the leverage it might otherwise obtain or to pursue its investment strategies. In addition, the regulatory or tax environment for derivative and related instruments is evolving and may be subject to modification by government or judicial action which may adversely affect the value of the investments held by the Fund and the Master Fund.  The effect of any future regulatory or tax change on the Fund, the Master Fund and the Investment Manager is impossible to predict.

In particular, the European Parliament and the Council of the European Union (the "EU") have approved a Directive (the "AIFM Directive") on alternative investment fund managers ("AIFM") which, it is currently anticipated, will be transposed into the laws of the EU Member States no later than mid-2013.  The AIFM Directive will regulate AIFM based in the EU and prohibit such AIFM from managing any alternative investment fund ("AIF") or marketing shares in AIF to investors in the EU unless authorisation is granted to the AIFM.   In order to obtain such authorisation, and to be able to manage an AIF, an AIFM will need to comply with various obligations in relation to the AIF which may create significant additional compliance costs that may be passed to shareholders in the AIF.  Furthermore, unless the AIFM is authorised and, in the case of an AIF (such as the Fund and the Master Fund) domiciled outside the EU, unless certain other conditions relating to the domicile of the AIF are met, the marketing of shares in the AIF to investors in the EU will not be permitted.  Because many of the provisions of the AIFM Directive require the adoption of delegated acts and regulatory technical standards, as well as the establishment of guidelines, before becoming fully effective, it is difficult to predict the precise impact of the AIFM Directive on the Fund, the Master Fund or the Investment Manager. Any regulatory changes arising from the transposition of the AIFM Directive into English law that impair the ability of the Investment Manager to manage the investments of the Fund and the Master Fund, or limit its ability to market Shares in the future, may materially adversely affect the Fund's and the Master Fund's ability to carry out its investment program and achieve their investment objective.

In addition, the recently enacted Dodd Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), may impact the Fund, the Master Fund and the Investment Manager.

51

However, as many provisions of the Dodd-Frank Act require rulemaking by the applicable regulators before becoming fully effective, it is difficult to predict the impact of the Dodd-Frank Act on the Investment Manager, the Fund, the Master Fund and the markets in which they trade and invest.  The Dodd-Frank Act could result in certain investment strategies in which the Fund and the Master Fund engage or may have otherwise engaged becoming non-viable or non-economic to implement.  The Dodd-Frank Act and regulations adopted pursuant to the act could have a material adverse impact on the profit potential of the Fund and the Master Fund.  In particular, the Dodd-Frank Act dramatically steps up regulation of U.S. and non-U.S. private fund advisers, provided certain jurisdictional and other tests are met, and promises to make major changes in the world of securities enforcement and regulation, including in derivatives markets which are widely credited with contributing uniquely to the credit crisis and because of the sense of many that the resuscitation of robust derivatives and securities markets is one of the key predicates to an economic recovery.  For example, Title VII of the Dodd-Frank Act provides for numerous amendments to the Commodity Exchange Act that include a grant to the CFTC of significant authority to impose CDS and other swap clearing and exchange trading requirements.  Title VII also grants the SEC authority to impose aggregate position limits across security-based swaps that may be held by any person, including positions in any security-based swap and any security or group or index of securities, the price, yield, value, or volatility of which, or of which any interest therein, is the basis for a material term of such security-based swap.  Title VII includes registration, record keeping and various other requirements that affect virtually every stage of the CDS and OTC derivatives life cycle.

**United States Tax Risks**

*General.*  Tax laws are subject to change, and tax liabilities could be incurred by investors as a result of changes thereto.  Therefore, investors should consult their own tax advisers to determine the tax consequences of an investment in the Fund, especially in light of their particular financial situations.

*Taxation of the Fund.*  Unless the Fund (directly or indirectly through the Master Fund) engages in a trade or business within the United States, none of the income it earns (except as noted below) or gains it realizes will be subject to U.S. federal income tax.  The Investment Manager does not intend to have the Fund engage (directly or indirectly) in a trade or business, or enter into any relationship that would be deemed to be a trade or business, within the United States.  However, payments to the Fund from U.S. sources of any dividends and of any interest (and the Fund's share of such payments to the Master Fund), including interest on cash held in trading accounts, that is not "portfolio interest" (as described under *"Taxation — U.S. Federal Income Taxation — Taxation of the Fund"*) will be subject to a 30% U.S. federal withholding tax.  That tax will reduce the total return to the Fund and its Shareholders.  The Fund expects that substantially all of its income from U.S. sources will be portfolio interest or gains from the sale of property.

*Unrelated Business Taxable Income.*  A tax-exempt U.S. Shareholder will not be subject to U.S. federal income tax on its share of the Fund's income or gains such Shareholder recognizes on the sale, exchange or redemption of its Shares, unless that income or those gains constitute UBTI.  Because the Fund is classified for federal tax purposes as an association (taxable as a corporation) rather than as a partnership, those dividends and gain should not constitute UBTI to

52

a Tax-Exempt U.S. Shareholder unless it incurs debt to acquire its Shares, thus making the Shares "debt-financed property." See *"Taxation — U.S. Federal Income Taxation — Taxation of Tax-Exempt U.S. Shareholders."*

*Taxation of Non-U.S. Shareholders.* A Non-U.S. Shareholder will not be subject to U.S. federal income tax on dividends, if any, the Fund pays on its Shares or on gains the Shareholder recognizes on the sale, exchange or redemption of its Shares. Special rules may apply to a Non-U.S. Shareholder that (1) has an office or other fixed place of business in the United States to which such a dividend or gain is attributable, (2) is a former citizen or resident of the United States, a controlled foreign corporation, a foreign insurance company that holds Shares in connection with its U.S. business, a passive foreign investment company, or a corporation that accumulates earnings to avoid U.S. federal income tax or (3) in the case of an individual, is present in the United States for 183 days or more in the year of such sale, exchange or redemption and certain other requirements are met. These persons in particular are urged to consult their U.S. tax advisors before investing in the Fund. See *"Taxation – U.S. Federal Income Taxation — Taxation of Non-U.S. Shareholders."*

*U.S. Federal Taxation of Taxable U.S. Shareholders.* A Taxable U.S. Shareholder is likely to be subject to significant U.S. federal tax on dividends, if any, the Fund pays on its Shares and on gains the Shareholder recognizes on the sale, exchange or redemption of its Shares, including the possible payment of the highest marginal tax rate on gains recognized upon the sale, exchange or redemption of Shares. Taxable U.S. Shareholders will also be subject to complex reporting requirements. See *"Taxation — U.S. Federal Income Taxation — Taxation of Taxable U.S. Shareholders."*

**THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THE FUND. OFFEREES SHOULD READ THE ENTIRE MEMORANDUM AND CONSULT WITH THEIR OWN ADVISORS BEFORE DECIDING TO PURCHASE SHARES.**

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager and the Investment Adviser are accountable to the Fund and the Master Fund as fiduciaries and, consequently, must exercise good faith and integrity in handling the business of the Fund and the Master Fund. Nevertheless, in the conduct of such business, conflicts may arise between the interests of the Investment Manager and the Investment Adviser and those of investors, and you should be aware of these conflicts of interest before investing. The Investment Manager, the Investment Adviser, the Administrator, the Custodian and their respective affiliates, which shall be deemed to include, in each case, their respective officers, directors, employees and entities owned by any of the aforementioned parties may face certain actual or potential conflicts of interests in relation to the Fund and the Master Fund. These conflicts include, but are not limited to, the following:

*No Obligation of Full-Time Service.* Neither the Investment Manager, the Investment Adviser, nor Mr. Daniloff has any obligation to devote their full time to the business of the Fund and the Master Fund. They are only required to devote such time and attention to the affairs of the Fund

and the Master Fund as they decide is appropriate and they may engage in other activities or ventures, including competing ventures and/or unrelated employment, which result in various conflicts of interest between such persons and the Fund and the Master Fund.  In particular, Mr. Daniloff devotes a portion of his time to his responsibilities to the Investment Manager and the Investment Adviser and other investment vehicles managed by the Investment Manager.

*Other trading by the Investment Manager and the Investment Adviser.*  The Investment Manager and the Investment Adviser and their members, partners, shareholders, officers, employees, agents and affiliates (collectively referred to herein as the "Affiliated Parties") may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Fund and the Master Fund.  Without limiting the generality of the foregoing, any of the Affiliated Parties may act as investment adviser or investment manager for others, may manage funds, separate accounts or capital for others and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms, all of which may have substantially similar investment programs and methods of operation to those of the Fund and the Master Fund.  Such other entities or accounts may also have investment objectives or may implement investment strategies similar or different to those of the Fund and the Master Fund, but the performance of such entities and accounts may diverge from that of the Fund and the Master Fund.  In addition, such entities and accounts may have negotiated different engagement (including liquidity) terms with the Investment Manager or its affiliates and may have access to additional trading information and supporting analytics as relating to the Investment Manager's investment strategies, which could affect their performance.

The Affiliated Parties may, through other investments, including other investment funds, have interests in the securities in which the Fund and the Master Fund invest as well as interests in investments in which the Fund and the Master Fund do not invest.  The Affiliated Parties may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Fund and the Master Fund.

*Trade Allocation.*  To the extent legally permissible, the Affiliated Parties are authorized to combine purchase or sale orders on behalf of the Fund and the Master Fund together with orders for other funds and accounts managed by the Affiliated Parties and allocate the securities or other assets so purchased or sold, on an average price basis, among such accounts.  To the extent a particular investment is suitable for the Fund and the Master Fund and other clients of the Affiliated Parties, such investments will be allocated among the Fund and the Master Fund the other clients of the Affiliated Parties *pro rata* based on assets under management and/or the objectives and investment guidelines thereof, or in some other manner that the Affiliated Parties determine is fair and equitable under the circumstances to all clients, including the Fund and the Master Fund.  There may be instances (such as when orders are placed with more than one broker, or, if an order cannot be fully executed under prevailing market conditions), that make it impossible for the Affiliated Parties to average the prices paid.  In this case, the Affiliated Parties will allocate the filled orders in an equitable manner.  In these circumstances, each account (including the Fund and the Master Fund) may pay, in connection with the acquisition of securities by more than one account, the average price per unit acquired, which may be higher than if it had acted alone.

*Lack of arms-length negotiation.*  The fees payable by the Fund and the Master Fund to the Investment Manager and the Investment Adviser were determined by the Investment Manager and the Investment Adviser and were not arrived at by "arms-length" negotiation.

*Other activities of Directors, Administrator, Custodian and brokers.*  The Directors, the Administrator, the Custodian and any broker appointed by the Fund and the Master Fund, may from time to time also act as director, administrator, custodian or prime broker to, or be otherwise involved in, other collective investment schemes which have similar investment objectives to those of the Fund and the Master Fund or may otherwise provide discretionary fund management or ancillary administration, or brokerage services to investors with similar investment objectives to those of the Fund and the Master Fund.  It is, therefore, possible that any of them may, in the course of their business, have potential conflicts of interests with the Fund and the Master Fund.  The Directors believe that each will at all times have regard in such event to its obligations to act in the best interests of the Shareholders of the Fund and the Master Fund so far as practicable, having regard to its obligations to other clients, when undertaking any investments where conflicts of interests may arise and they will endeavor to resolve such conflicts fairly.  In addition, members, principals, employees or affiliates of the Investment Manager and the Investment Adviser may serve and receive compensation as directors of companies in which the Fund and the Master Fund may invest.  The Fund and the Master Fund will not be entitled to receive any portion of such director compensation paid to members, principals, employees or affiliates of the Investment Manager and the Investment Adviser, which may give rise to conflicts of interests in allocating the Fund's and the Master Fund's assets to companies for which members, principals, employees or affiliates of the Investment Manager and the Investment Adviser act as directors.

*Personal Trading by the Investment Manager, the Investment Adviser and Affiliates.*  The Investment Manager, the Investment Adviser and their principals and affiliates may make trades and investments for their own accounts.  In these accounts, they may use trading and investment methods that are similar to, or substantially different from, the methods used by them to direct the Fund's and the Master Fund's accounts.  The records of these personal accounts will not be made available to Shareholders.

*Allocation of management time and services.*  The Fund and the Master Fund will not have independent management or employees and will rely on the Investment Manager for investment management.  The Investment Manager believes it has sufficient resources to discharge its responsibilities to the Fund and the Master Fund.  However, conflicts of interest may arise in allocating management time, services or functions between the Fund and the Master Fund and other entities to which the Investment Manager provides services.  The principals of the Investment Manager and its affiliates will devote such time to the Fund and the Master Fund as the Investment Manager determines appropriate.

*Directors affiliated with Investment Manager and the Administrator.*  Elliot Daniloff is a Director of the Fund and the Master Fund and also a principal of the Investment Manager and the Investment Adviser and Peter Hughes is a Director of the Fund and the Master Fund and is also affiliated with the Administrator.  Thus, they may have a conflict between their duties as Directors and their financial interest in the Investment Manager and the Investment Adviser or the Administrator.  The Directors will be involved in various other ventures and might have similar conflicts.  Other than as disclosed herein, there are no existing or proposed service

contracts between any Director and the Fund or the Master Fund.  If a conflict of interest arises, the Directors will endeavor to ensure that the conflict is resolved fairly.

*Use of Third Party Marketers.*  The Investment Manager and the Investment Adviser may enter into fee sharing arrangements with third party marketers or solicitors who refer investors to the Fund or the Master Fund.  Such third party marketers may have a conflict of interest in advising prospective investors whether to purchase or redeem Shares.

*Soft Dollars and Directed Brokerage.*  The Investment Manager may be offered non-monetary benefits or "soft dollars" by brokers to induce the Investment Manager to engage such brokers to execute securities transactions on behalf of the Fund or the Master Fund.  These soft dollars may take the form of research and other services and may be available for use by the Investment Manager, the Investment Adviser or their affiliates in connection with transactions in which the Fund and the Master Fund do not participate.  Brokers may also solicit or refer investors to invest in the Fund and the Master Fund.  The availability of these benefits may influence the Investment Manager to select one broker rather than another to perform services for the Fund and the Master Fund.  The Investment Manager intends to use its best efforts to assure either that the fees and costs for services provided to the Fund and the Master Fund by such brokers are reasonable in relation to the fees and costs charged by other equally capable brokers not offering such services or that the Fund and the Master Fund also will benefit from the services.

*Diverse Shareholders.*  The Shareholders may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions.  As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager that may be more beneficial for one type of Shareholder.  In making such decisions, the Investment Manager intends to consider the investment objectives of the Fund as a whole, not the investment objectives of any Shareholder individually.

*No independent counsel.*  K&L Gates LLP and Turner & Roulstone represent the Investment Manager, the Investment Adviser, the Fund and the Master Fund.  Neither the Fund nor the Master Fund have counsel separate and independent from counsel to the Investment Manager and the Investment Adviser.  The Investment Manager and the Investment Adviser may, in the future, retain additional counsel for certain matters separate from counsel to the Fund and/or the Master Fund.  Neither K&L Gates LLP nor Turner & Roulstone represents investors in the Fund.  No independent counsel has been retained to represent investors in the Fund.

## PLAN OF DISTRIBUTION; SUITABILITY STANDARDS

### Plan of Distribution

The Shares being offered hereby will not be registered under the 1933 Act in reliance on the exemption from registration provided by either Regulation D or Regulation S.

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each and 1,000 voting, non-participating, non-redeemable shares of US$0.001 par value ("Founder Shares").  The Founder Shares are held by the Investment Manager.  In addition, in order to implement the "Performance Allocation," the Master Fund will also issue "Allocation Class Shares."  The Allocation Class

Shares will be held solely by the Investment Adviser and will be allocated the Performance Allocation.  In order to accomplish the foregoing, at the end of each Fiscal Year, the Master Fund will allocate to the Allocation Class Shares of the Investment Adviser from each Series of each Class of Shares an amount equal to the  Performance Allocation payable for such Fiscal Year.

The Shares in the Fund are primarily offered in two classes – Class A and Class B.

Class B Shares are available to qualified investors that are Restricted Persons and Class A Shares are available only to other qualified investors; the rights and obligations of the Classes are identical except with respect to their participation (through their investment in the Fund) in "new issues" (*i.e.*, equity securities that are issued in an initial public offering).  Unless an exemption is available, Shares in the Restricted Class (Class B) will not participate in any new issue investment made by the Fund.

In addition, the Fund will issue Class R and Class S Shares in respect of Special Investments.  If the Fund and the Master Fund purchase Special Investments, those Shareholders who are Shareholders on the date the particular Special Investment is purchased will participate in that Special Investment by having the relevant number of Class B or Class A Shares (as the case may be) redeemed and by being issued with a corresponding number of Class R or Class S Shares (as the case may be), as further detailed under *"Certain Provisions of the Articles of Association – Share Capital"* below.  "Special Investments" are private or restricted or other securities (as determined by the Investment Manager in its sole discretion) that carry substantial risks, the value of which are not readily or reliably ascertainable and/or which have a long-term investment horizon.

Within each Class, Shares are offered in Series.  A new Series of Shares of each Class may be issued to each investor on each date that Shares are purchased.  Shareholders in the Fund may be admitted as of the opening of business (9 a.m. Eastern Time) on the first day of a month at the subscription price per Share of each Series of $1,000.  The Fund reserves the right to discontinue accepting any initial or additional subscription from its existing or new investors at any time. Proceeds received by the Fund from the sale of Shares will be used by the Fund in its investment program.

Each initial and additional investment by a Shareholder shall separately be subject to a one year "lock-up" period during which such investment may not be redeemed by the Shareholder (the "Lock-Up Period").  In addition, the Directors may issue further classes or sub-classes of Shares with different lock-up periods and related fee or other arrangements.

The Fund may issue additional Classes from time to time.

To purchase Shares in the Fund, a Subscriber with the proper qualifications (including those for participating in the Fund's Un-Restricted Series or Restricted Series) should date, complete and sign the Subscription Agreement.  The Subscription Agreement requires the Subscriber to indicate the amount of its subscription, which must be at least US$1 million.  The Directors may, in their sole and absolute discretion, accept a smaller amount; however, in no event will the minimum initial subscription amount be less than US$100,000.  Each subsequent investment by

a Shareholder must be made in the minimum amount of US$500,000 although the Directors may, in their sole and absolute discretion, accept a smaller amount.  The Subscription Agreement also requests information from the Subscriber to determine whether the investor meets the Fund's suitability standards.  See *"Suitability Standards."*

A Subscriber must return a completed copy of the Subscription Agreement, with all signature pages executed, and will be required to provide at least two Business Days' notice to the Fund of its intent to purchase Shares (unless such notice is waived by the Fund).

Subscription Agreements may be sent by facsimile at the investor's risk.  If a Subscription Agreement is sent by facsimile, the original Subscription Agreement must also be sent by mail or internationally recognized courier.  Failure to provide the original Subscription Agreement or failure to complete fully the Subscription Agreement may, in the Directors' sole and absolute discretion, result in the cancellation of an investor's subscription.

Because of money laundering concerns, the Fund will not accept investments made in cash.  For this purpose, cash includes currency, cashier's checks, bank drafts, travelers checks, and money orders.  An investor should deliver the full amount of its subscription by wire transfer of immediately available funds in U.S. dollars to the Fund's account as set forth in the Subscription Agreement or as otherwise agreed to by the Directors.  Upon the Fund's and the Administrator's acceptance of the subscription by the execution of the signature pages of the Subscriber's Subscription Agreement and entry of the Subscriber into the register of members of the Fund, the Subscriber will become a Shareholder.

The Subscription Agreement is irrevocable but is conditional upon acceptance by the Fund and the Administrator. The Directors have the full right to accept or reject a subscription in their sole and absolute discretion and to reduce the minimum subscription amount.  The Directors also have the right to cease accepting subscriptions at any time without notice.  If an investor's subscription is rejected, the Fund will promptly return any funds provided by the investor, without interest, by check or by wire transfer to the account designated from which it came.

## Suitability Standards

The Shares have not been registered under the 1933 Act and, therefore, cannot be sold unless they are subsequently registered under the 1933 Act or an exemption from registration is available.  The Articles of Association also place substantial limits on the transfer of Shares, including that the Shares may not be sold or transferred without the consent of the Directors (which they may grant or deny in their sole and absolute discretion), and substantially limit the ability of Shareholders to redeem their Shares (in particular, with respect to Special Investments which may represent a material and substantial portion of the Fund's portfolio).  See *"Certain Provisions of the Articles of Association – Transferability of Shares."*  Therefore, each Shareholder must bear the economic risk of its investment in the Fund for an indefinite period of time.  It is not contemplated that any registration under the 1933 Act will ever be effected or that certain exemptions provided by rules promulgated under the 1933 Act will be available.

Each Subscriber will be required to represent that the Shares are being acquired for its own account, for investment, and not with a view to resale or distribution.  The Shares are suitable

investments only for sophisticated investors for whom an investment in the Fund does not constitute a complete investment program, who fully understand and are willing to assume the risks involved in the Fund's specialized investment strategy, and who have the financial resources necessary to bear the potential loss of their entire investment in the Shares.

Each investor in the Fund that is a "United States person"  (as defined in the Code) must be an "accredited investor," as defined in Regulation D under the 1933 Act and a "qualified purchaser," as defined under the 1940 Act.

Each other investor (1) must be a "Non-United States person" within the meaning of CFTC Rule 4.7 and (2) must not be a "U.S. person," as defined in Regulation S under the 1933 Act or a "United States person" as defined in the Code.  Detailed definitions of "accredited investor," "qualified purchaser" and "United States person" are contained in the Subscription Agreement.

The Fund is not registered as an investment company under the 1940 Act in reliance on Section 3(c)(7) of the 1940 Act.  Accordingly, the provisions of the 1940 Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Shareholders.

Each Subscriber is urged to consult with its own advisers to determine the suitability of an investment in Shares, and the relationship of such an investment to the Subscriber's overall investment program and financial and tax position.  Each Subscriber will be required to represent that, after all necessary advice and analysis, its investment in Shares is suitable and appropriate in light of the foregoing considerations.

**Placement Agents and Placement Fee**

The Directors may select one or more placement agents for the Fund from time to time and determine fees or compensation to such agents as appropriate.  The Investment Manager and the Investment Adviser may pay a portion or all of the Management Fees and Performance Allocations, respectively, it receives from the Fund to a placement agent, its affiliates or its registered representatives.

## MANAGEMENT

**The Investment Manager and The Investment Adviser**

The Fund's investment manager is ED Capital Management, LLC, a Delaware limited liability company.

ED Capital, LLC (the "Investment Adviser"), a Delaware limited liability company, is the investment adviser to the Fund.  While the Investment Manager will be primarily responsible for the implementation of the Fund's investment strategy, the Investment Adviser will assist the Investment Manager with certain research and administrative responsibilities.

Pursuant to an Advisory Agreement with the Fund, the Master Fund and the Investment Adviser, the Investment Manager implements the Fund's investment strategy.

The Advisory Agreement provides that, to the fullest extent permitted by applicable law, including ERISA, the Investment Manager, the Investment Adviser and their officers, members, employees, affiliates and agents will not be liable to any of the Shareholders or the Fund or the Master Fund for any act or omission performed or omitted by such persons in good faith on behalf of the Fund or the Master Fund and in a manner reasonably believed by such persons to be within the scope of the authority granted to such persons by the Advisory Agreement, except for acts or omissions constituting bad faith, Gross Negligence, willful misconduct or reckless disregard of such persons' obligations and duties to the Fund.  In addition, the Advisory Agreement provides that, to the fullest extent permitted by law, including ERISA, the Investment Manager, the Investment Adviser, their officers, members, employees, affiliates and agents will be indemnified against and held harmless from any and all liabilities, judgments, obligations, losses, damages, claims, actions, suits, or other proceedings (whether under the 1933 Act, the CEA, or otherwise, civil or criminal, pending or threatened, before any court or administrative or legislative body, and as the same are accrued, in which such persons may be or may have been involved as a party or otherwise or with which it, he, or she may be or may have been threatened, while in office or thereafter) and reasonable costs, expenses, and disbursements (including legal and accounting fees and expenses) of any kind and nature whatsoever (collectively, "Losses") that may be imposed on, incurred by, or asserted at any time against such person (whether or not indemnified against by other parties) in any way related to or arising out of the Advisory Agreement, the administration of the Fund's or the Master Fund's property, or the action or inaction of such person under the Advisory Agreement.  However, no such person is entitled to indemnity for Losses with respect to any matter as to which such person is finally adjudicated in any such action, suit, or other proceeding, or otherwise by a court of competent jurisdiction, to have committed an act or omission involving his, her or its own bad faith, willful misconduct, Gross Negligence, or reckless disregard of his, her or its obligations and duties under the Advisory Agreement.  The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in the Advisory Agreement waives or limits any right the Fund or the Master Fund may have against the Investment Manager and the Investment Adviser under those laws.  No Shareholder will have or incur any personal liability for any indemnity provided such persons under either Advisory Agreement.

The Advisory Agreement will continue until the earliest of such time as (1) the Fund or the Master Fund is liquidated, (2) the parties mutually agree to terminate the Advisory Agreement or (3) the Fund, the Master Fund, the Investment Manager or the Investment Adviser terminates the Advisory Agreement upon 30 days' prior written notice to the other parties.

The sole principal of the Investment Manager and the Investment Adviser is Elliot Daniloff.

The biographies of the principal and officer of the Investment Manager and the Investment Adviser are set forth below:

*Elliot Daniloff.*  Elliot Daniloff is the founder and the managing partner of the Investment Manager, a New York based capital management firm, specializing in Russian and CIS equity and real estate markets and a director of the Investment Adviser.   Prior to founding the

Investment Manager, Mr. Daniloff held a sales/trading position at a New York office of CentreInvest, a Russian-based brokerage firm.  Before that he was employed by several major brokerage firms in New York, including Salomon Smith Barney, UBS-Painewebber and Morgan Stanley.  At these companies Mr. Daniloff worked on various desks where he gained experience trading different strategies in fixed income, equity and convertible securities, as well as derivatives instruments.

Mr. Daniloff received a Bachelor of Business Administration in Finance from the Lubin School of Business at Pace University in New York, NY, in 1999.  During the summer of 1998, Mr. Daniloff attended Richmond University in London, England.

**Compensation of The Investment Manager and The Investment Adviser**

*Performance Allocation.*  The Master Fund will allocate to the Allocation Class Shares held by the Investment Adviser a performance allocation (the "Performance Allocation") for each Series of each Class of Master Fund shares attributable to the Fund.  The Performance Allocation for a Series of Master Fund shares for a Fiscal Year is equal to 20% of the increase in Net Asset Value per Series of Master Fund shares for that Fiscal Year, after taking into account any loss carryforwards applicable to each of such Series and Classes of Master Fund shares (i.e., after losses from all prior fiscal periods have been recouped).  The Performance Allocation will be calculated and paid subject to a "high water mark" as described immediately below.  No Performance Allocation shall be made to the Investment Adviser with respect to Special Investments until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments.

To facilitate the assessment of the Investment Adviser's Performance Allocation and to ensure that Performance Allocation is equitably assessed among Shareholders, as allocated at the Master Fund level, on a per-investor basis, Shares and the Master Fund shares issued at different times will be issued in Series, a different Series being issued on each subscription date (which is generally expected to be monthly).  "Series One Shares" within each Class of Shares and the Master Fund shares will be issued on the first subscription date in each Fiscal Year and the remaining Series (in numerical sequence) of Shares and the Master Fund shares will be issued on any other subscription dates during the Fiscal Year.  At the end of each Fiscal Year, all such Series of Shares and the Master Fund shares will be re-designated and converted into the Initial Series Shares and the Master Fund shares of the same Class by way of redemption and re-issue, so that at the beginning of the following Fiscal Year, all of Shares and the Master Fund shares will be the Initial Series Shares unless a loss carryforward attributable to such other Series or to the Initial Series Shares remains outstanding.  Any Series which is not converted at the end of a Fiscal Year will remain in existence as a separate Series of Shares and the Master Fund shares until the relevant loss carryforward has been recovered, in which event such Series will be re-designated and converted to the Initial Series of Shares and the Master Fund shares in accordance with the foregoing provisions.  Each Series of Shares and the Master Fund shares has a *pari passu* interest in all the assets and liabilities of the Fund, a Class (as applicable) or the Master Fund attributable to the Fund, and the reason for the different Series is solely to reflect equitably the differing Performance Allocations attributable to Shares and the Master Fund shares of each Class issued on different dates throughout the Fiscal Year.  The actual Performance Allocation as determined in accordance with the calculation methods described above may vary over time.

If a Shareholder redeems all or part of its Shares of a Series of a Class other than as of the close of business on the last Business Day of a Fiscal Year, the date of such redemption will be treated as the last Business Day of the Fiscal Year for those Shares in such Series.  Accordingly, a Performance Allocation will be calculated on the Shares and the Master Fund shares to be redeemed and the redemption proceeds payable to such Shareholder will be reduced by the amount of the Performance Allocation payable on such Shares and the Master Fund shares, as well as by the accrued Management Fee payable on such Shares.  If a Shareholder redeems all or part of its Shares of more than one Series, the redemption proceeds from each Series of Shares and the Master Fund shares will be reduced in the same manner, on a per Series basis.  See *"Management – Compensation of the Investment Adviser."*

The Performance Allocation will be made at the Master Fund level and will be implemented by the issuance of special allocation class shares of US$0.001 par value per share (the "Allocation Class Shares") by the Master Fund to the Investment Adviser.  The Performance Allocation will be allocated to the Allocation Class Shares.  Such Allocation Class Shares shall participate in the profits and losses of the Master Fund and shall not be subject to the Management Fee or Performance Allocation set forth in this Memorandum.

The Allocation Class Shares will be issued initially at US$0.001 par value per share and any subsequent subscriptions of such Allocation Class Shares may at the discretion of the Directors be issued in separate Series at par value per share, each subject to such other price as determined by the Directors in their sole and absolute discretion.  The Performance Allocation attributable to the Allocation Class Shares will remain at risk in the Master Fund.  Such Allocation Class Shares may be redeemed at the option of the Investment Adviser or the Directors may pay dividends in respect of the Allocation Class Shares as determined by the Directors in their sole and absolute discretion.

The Master Fund may, with Investment Adviser's consent, waive all or any portion of the Performance Allocation with respect to any Shares and the Master Fund shares in whole or in part, including, but not limited to, with respect to Shares and the Master Fund shares held by employees of the Investment Adviser.  No performance fee or allocation will be paid by Shareholders on the Fund level.

The Investment Adviser may redeem all or a portion of its Allocation Class Shares as of the last Business Day of each Fiscal Year or such other day as determined by the Directors in their sole and absolute discretion.  In the event that the Investment Adviser ceases to act as investment manager or a redemption of all of Investment Adviser's Allocation Class Shares is made prior to the last Business Day of a Fiscal Year, the Performance Allocation will be computed as though the termination date or redemption date were the last Business Day of the Fiscal Year.

*Management Fee*.  The Investment Manager will receive a quarterly Management Fee  equal to 0.5% (2%, annually) of the Net Asset Value of Shares, adjusted for subscriptions made during the calendar quarter.  The Management Fee shall be payable by the Fund quarterly and in advance, calculated as of the first day of each quarter. A pro rata Management Fee will be charged to Shareholders on any amounts permitted to be invested during any quarter.  The

Management Fee will be paid before deduction of any Performance Allocation allocable for the year and regardless of whether any profits are achieved.

The Class R and Class S Shares related to Special Investments shall generally be included in the Net Asset Value of the Fund and shall be valued at the fair market value for the purposes of the Management Fee calculation, other than those Class R and Class S Shares held by a Shareholder who has otherwise redeemed all of its Class B and/or Class A Shares in the Fund, which will be excluded from the Net Asset Value of the Fund for this purpose and with respect to which no Performance Allocation will be allocated until their disposition or other determination by the Investment Manager, in its sole discretion, that the underlying investments no longer constitute Special Investments; however, at the sole discretion of the Board of Directors a reserve could be withheld from the Redemption Price of the Class B and/or Class A Shares redeemed in order to pay the Management Fees with respect to the Class R and/or Class S Shares that remain with the Fund.

The Directors may, in their sole and absolute discretion, but with the consent of the Investment Manager, waive the payment of all or part of the Management Fee payable with respect to any Shareholder for any quarter the Directors determine is appropriate, including with respect to Shareholders who are employees of the Investment Manager, either through the issuance of a separate Class or through a rebate of the Management Fee.

**Fund Expenses**

The Fund will pay its own start-up, offering and organizational expenses, such as the cost of preparing the Fund's Articles of Association, the expenses incurred in offering and selling Shares, and other legal, accounting, and administrative, government filing and printing and mailing fees and expenses related thereto.  On an ongoing basis, the Fund will bear its ongoing transaction (*e.g.*, brokerage commissions and custody expenses), investment (including any direct or indirect costs of investing potential investments or maximizing return on existing investments), consulting, research and statistical services, administrative, legal, tax preparation, compliance and accounting fees and expenses, expenses related to the purchase and sale of Special Investments, any extraordinary expenses (*e.g.*, litigation expenses) and any expenses for services that the Shareholders require the Directors and/or the Investment Manager to obtain.  The Fund will also pay the fees and expenses of its prime brokers and the Administrator.  It should be noted that any Fund expense relating specifically to a particular Special Investment will be charged solely to the Series of Class R and/or Class S Shares relating thereto, as determined by the Fund, in its discretion.

The Fund will also be allocated its *pro rata* portion of any expenses of the Master Fund which will be similar to the Fund expenses described above.

The Investment Manager will be responsible for and will pay all overhead expenses of an ordinary and recurring nature such as rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, employee insurance, payroll taxes and compensation of employees.

The Investment Manager and the Investment Adviser (if applicable) will be reimbursed for any expenses it bears on the Fund's behalf as soon as reasonably practicable.

63

**Directors**

Each Fund and the Master Fund has a Board of Directors, consisting of Elliot Daniloff, Alric J. Lindsay and Peter Hughes, all of whom act in a non-executive capacity. Mr. Daniloff's biography is provided above at *"Management – The Investment Manager and The Investment Adviser"* and Messrs. Hughes's and Lindsay's biographies are as follows:

*Peter Hughes.* Peter Hughes is the Managing Director of Apex Fund Services Ltd., the Administrator, a specialist Management and Administration company which provides management services to the finance industry, specializing in the administration of collective investment schemes and investment holding companies founded in 2003. He qualified as a chartered accountant in 1994 and is a fellow of the Institute of Chartered Accountants in England in Wales. Between 2000 and 2003 he was Chief Financial Officer of FMG Fund Managers Limited and is currently a Board member of FMG Fund Managers Limited. During 1999 he was a financial analyst with Cazenove Fund Management in London and prior to this a group manager with Hemisphere Management Limited in Bermuda.

*Alric J. Lindsay.* Alric J. Lindsay is an independent fund director and an attorney specialising in a broad range of fund products including mutual funds, hedge funds and private equity funds. Prior to being an independent fund director, Mr. Lindsay worked as an investment funds attorney with offshore law firms Maples and Calder and Ogier. Mr. Lindsay has also worked as a senior compliance analyst with the Cayman Islands Monetary Authority. Mr. Lindsay previously qualified as a certified public accountant and was employed by Coopers & Lybrand (now PricewaterhouseCoopers) in the Cayman Islands as an auditor. Mr. Lindsay has also passed the Canadian Securities Course with honours. Mr. Lindsay is a member of the Institute of Directors in the United Kingdom, the Cayman Islands Directors Association, Cayman Islands Law Society, the Caymanian Bar Association and holds an Accredited Director designation from the Institute of Chartered Secretaries (Canada). He is also an alumnus of Stetson University in Florida and the College of Law of England and Wales in London.

**The Administrator**

The Fund and the Master Fund have appointed Apex Fund Services Ltd. as the Fund's and the Master Fund's Administrator, registrar and transfer agent, under an Administration Agreement. The Administrator will provide the Fund and the Master Fund with certain administrative and clerical services, including processing subscription and redemption documents, communicating with Shareholders, providing periodic reports, accepting subscription payments and remitting redemption proceeds, payment of the Fund's and the Master Fund's expenses, and other day-to-day administrative tasks. The Administrator will also maintain the accounting records of the Fund and the Master Fund and will be responsible for the calculation of the Fund's and the Master Fund's Net Asset Value and Net Asset Value per Share.

Under the Administration Agreement, the Fund and the Master Fund have agreed to indemnify the Administrator and its officers, directors, employees and agents from and against any and all liabilities and expenses whatsoever arising out of the actions of the Administrator or such persons pursuant to the Administration Agreement, other than liability and expense arising out of their willful misfeasance, bad faith or Gross Negligence. The Administration Agreement

provides that the Fund, the Master Fund or the Administrator can terminate the agreement: (i) on giving not less than 90 days' written notice; and (ii) at any time if the Fund, the Master Fund or the Administrator goes into liquidation.

**Custodian**

The Master Fund has appointed ING Bank Eurasia (ZAO) as its main custodian (the "Custodian") pursuant to a custody agreement between the Master Fund and the Custodian (the "Custody Agreement"). The Custodian generally acts as the main custodian of the Master Fund's securities. Fees under the Custody Agreement are charged separately. In certain instances other brokers who execute transactions for the Master Fund may maintain custody of the Fund's and the Master Fund's assets. The Fund and the Master Fund may appoint additional custodians of a particular investment or investments of the Fund and the Master Fund, should it deem such appointment appropriate.

The Custodian is part of a group of companies which forms the largest financial institution group ING Group NV registered in the Netherlands. Its overseas branch network provides banking services by offering a full range of products such as deposits, loans, trade finance, foreign exchange and money market activities, custody services, etc. The Custodian has served clients in Russia since November 1993, and received its full banking license from the Central Bank of Russia on September 13, 1994. As a fully licensed commercial bank, the Custodian offers a wide range of services to institutional investors, including foreign exchange, short-term financing and cash management. Currently, the Custodian is by far the largest custodian with over US$73 billion of assets under custody which services more than 550 foreign and domestic clients. The clientele of the Custodian consists of most global custodians and world wide financial institutions present in the market as well as largest local brokers and companies dealing with securities.

The Master Fund may also utilize the Custodian, its affiliates and other brokers and dealers for the purpose of executing transactions for the Master Fund. Accordingly, under a separate agreement, the Custodian may receive brokerage commissions and/or margin interest related to the securities transactions of the Master Fund. The Master Fund is not committed to continue its brokerage and custodial relationship with the Custodian for any minimum period, and may enter into brokerage and custodial relationships with other custodians or brokers.

Through this arrangement, the Custodian will provide, among other things, the following clearing, custodial and record keeping services: (i) settlement of transactions; (ii) the transfer of record ownership of securities; (iii) the receipt and delivery of securities purchased, sold; (iv) custody of securities and funds; (v) participating in tender offers, mergers or other corporate reorganizations; and (vi) maintenance of accounts and records for each transaction.

## EXECUTION OF PORTFOLIO TRANSACTIONS

**Brokerage Arrangements**

The Investment Manager is responsible for the placement of the portfolio transactions of the Fund and the Master Fund and the negotiation of any commissions paid on such transactions. Portfolio securities normally are purchased through brokers on securities' exchanges or directly

from the issuer or from an underwriter or market maker for the securities. Purchases of portfolio instruments through brokers involve a commission to the broker. Purchases of portfolio securities from dealers serving as market makers include the spread between the bid and the asked price. The Investment Manager will not commit to provide any level of brokerage business to any broker. The Investment Manager may utilize the services of one or more introducing brokers who will execute the Fund's and the Master Fund's brokerage transactions through the broker and custodian who will clear the Fund's and the Master Fund's transactions. See *"Management – Custodian"* above.

Securities transactions for the Fund and the Master Fund may be executed through brokers selected by the Investment Manager in its sole discretion and without the consent of the Fund and the Master Fund. In placing portfolio transactions, the Investment Manager will seek to obtain the best execution for the Fund and the Master Fund, taking into account the following factors: the ability to effect prompt and reliable executions at favorable prices (including the applicable dealer spread or commission, if any); the operational efficiency with which transactions are effected, taking into account the size of order and difficulty of execution; the financial strength, integrity and stability of the broker; the firm's risk in positioning a block of securities; the quality, comprehensiveness and frequency of available research services considered to be of value; and the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.

The Investment Manager is authorized to pay higher prices for the purchase of securities from or accept lower prices for the sale of securities to brokerage firms that provide it with such investment and research information or to pay higher commissions to such firms if the Investment Manager determines such prices or commissions are reasonable in relation to the overall services provided. Research services furnished by brokers may include written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; statistics and pricing or appraisal services; discussions with research personnel; and invitations to attend conferences or meetings with management or industry consultants. The Investment Manager is not required to weigh any of these factors equally. Information so received is in addition to and not in lieu of services required to be performed by the Investment Manager, and the Management Fee to be received by the Investment Manager and the Performance Allocation to be received by the Investment Adviser, an affiliate of the Investment Manager, are not reduced as a consequence of the receipt of such supplemental research information. Research services provided by broker-dealers used by the Fund may be utilized by the Investment Manager, the Investment Adviser and their affiliates in connection with their investment services for other clients and, likewise, research services provided by broker-dealers used for transactions of other clients may be utilized by the Investment Manager and the Investment Adviser in performing its services for the Fund and the Master Fund. Since commission rates are negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may at times result in higher transaction costs than would otherwise be obtainable.

**Soft Dollar Arrangements**

The term "soft dollars" refers to the receipt by an investment manager of products and services provided by brokers, without any cash payment by the investment manager, based on the volume

of brokerage commission revenues generated from securities transactions executed through those brokers on behalf of the investment manager's clients.

In addition to research services, the Investment Manager may be offered other non-monetary benefits by broker-dealers that it may engage to execute securities transactions on behalf of the Fund and the Master Fund.  These benefits may take the form of special execution capabilities, clearance, settlement, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, order of call, online access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, recommendations, general reports, efficiency of execution and error resolution, the availability of stocks to borrow for short trades, custody, travel, record keeping and similar services.  These other services may also include payment of all or a portion of the Fund's, the Master Fund's or the Investment Manager's and the Investment Adviser administrative costs and expenses of operation, such as computer hardware and software charges; newswire and quotation equipment and services (*e.g.*, Reuters, Bloomberg, Bridge, First Call, etc.); data processing charges; periodical subscription fees (*e.g.*, The Financial Times, The Wall Street Journal, The New York Times, Investors Business Daily, etc.); computer equipment used for brokerage or research purposes (*e.g.*, computer hardware, software, PDAs, LANs, etc.) and related technical support, repair and maintenance; telephone and facsimile lines and charges and related equipment, installation, repair and maintenance costs; television and cable services used for research purposes; account record-keeping and related clerical services; printing services; messenger services; postal and courier expenses; car service; expenses incurred in connection with investigating and researching issuers of securities and attending research conferences (*e.g.*, airfare, car rentals, taxi fares, conference fees and related expenses, hotel accommodations and meals); economic consulting services; placement fees and other marketing costs; legal and accounting fees; office rent; office equipment (including rental and repair costs) and supplies; utilities (*e.g.*, electricity, gas, oil, water, etc.); taxes; storage; employee compensation and benefits (including medical, dental and worker's compensation insurance); temporary help; employee recruiting services; and other reasonable expenses as determined by the Investment Manager.

The foregoing benefits may be available for use by the Investment Manager and the Investment Adviser in connection with transactions in which the Fund and the Master Fund will not participate.  The availability of these benefits may influence the Investment Manager to select one broker rather than another to perform services for the Fund and the Master Fund. Nevertheless, the Investment Manager's decision on which brokers to utilize will be driven by a concerted striving for "best execution."  Also, the Investment Manager will attempt to assure either that the fees and costs for services provided to the Fund and the Master Fund by brokers offering these benefits are reasonable in relation to the fees and costs charged by other equally capable brokers not offering such services or that the and the Master Fund also will benefit from the services.

The Investment Manager has the option to use "soft dollars" generated by the Fund and the Master Fund to pay for the research and non-research related services described above.  The products and services available from brokers include both internally generated items (such as research reports prepared by employees of the broker) as well as items acquired by the broker

from third parties (such as quotation equipment).  Section 28(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), provides a "safe harbor" to investment managers who use soft dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the investment manager in the performance of investment decision-making responsibilities.  In the event the Investment Manager elects to use its soft dollars for payment of all or a portion of the Investment Manager's administrative costs and expenses of operation, as more fully described above, such uses of soft dollars are not within the safe harbor afforded by Section 28(e) of the Exchange Act.  Each Shareholder, by signing the Fund's Subscription Agreement, will be deemed to acknowledge and agree to the Investment Adviser's use of products and services as set forth above when signing the Subscription Agreement.

The use of brokerage commissions to obtain investment research services and to pay for the administrative costs and expenses of the Investment Manager creates a conflict of interest between the Investment Manager and the Fund and the Master Fund, because the Fund and the Master Fund pays for such products and services that are not exclusively for the benefit of the Fund and the Master Fund and that may be primarily or exclusively for the benefit of the Investment Manager or its affiliates.  To the extent that the Investment Manager is able to acquire these products and services without expending its own resources (including Management Fees paid by the Fund), the Investment Manager's use of soft-dollars would tend to increase the Investment Manager's profitability.

Nonetheless, the Investment Manager believes that such soft dollar items may provide the Fund and the Master Fund with benefits by supplementing the research and services otherwise unavailable to the Fund and the Master Fund.

## DETERMINATION OF NET ASSET VALUE

The Net Asset Value of the Fund and the Master Fund is calculated by adding the value of its investments, cash, and other assets and subtracting its accrued liabilities and expenses, all determined in accordance with GAAP, except that the Fund's and the Master Fund's start-up and organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's and the Master Fund's operations.  The Fund and the Master Fund believe that such treatment is more equitable than expensing the entire amount of the Fund's and the Master Fund's organizational expenses in the Fund's and the Master Fund's first year of operation, as required by GAAP.  Notwithstanding the foregoing, the Fund and the Master Fund will limit the amount of start-up and organizational expenses that they amortize so that the audit opinion issued with respect to the Fund's and the Master Fund's financial statements will not be qualified.

The Fund's and the Master Fund's liabilities and expenses include reimbursements for expenses of the Director(s), the Investment Manager and the Investment Adviser (if applicable), and accrued Management Fees payable by the Fund.  See *"Management - Compensation of The Investment Manager and The Investment Adviser."*

Each class of Class R and/or Class S Shares shall be valued at the fair market value for the purposes of calculating the Management Fee until such time as the Special Investments relating

to such class shall have been liquidated or disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments), after which time, depending upon whether the Class R and/or Class S Shareholder still owns Class B or Class A Shares in the Fund, the (i) proceeds shall be distributed to the Shareholder (net of fees and expenses) or (ii) Class R and Class S Shares shall be exchanged for Class B or Class A Shares, respectively.

The Administrator will calculate the Net Asset Value of the Fund and the Master Fund and the Net Asset Value of the Shares in each Series thereof as of each Valuation Time.  "Valuation Time" means the close of business on (1) the last Business Day of a calendar month, (2) any Redemption Date (as hereinafter defined) and (3) each other date selected by the Directors in their sole and absolute discretion as of which the Fund's and the Master Fund's Net Asset Value is determined.

The Fund and the Master Fund will establish a separate Investment Account for each Class and Series.  The amount of each Investment Account will be calculated by allocating, for accounting purposes, to the Investment Account (which will initially consist of the aggregate Subscription Amounts for Shares of the appropriate Class or Series) its share of income, expenditures, assets and liabilities attributable to the Class or Series, including Performance Allocations and Management Fees.  The Net Asset Value per Series of each Series will be equal to the amount in its Investment Account.  The Net Asset Value per Share of a Series will be calculated by dividing the Net Asset Value per Series of that Series by the number of Shares of that Series issued and outstanding as of the date of the calculation.  See *Certain Provisions of the Articles of Association – Investment Accounts."*

The following general guidelines apply to the determination of the value of the Fund's and the Master Fund's investments:

(i)     the value of any cash on hand, on loan, on deposit or on call, bills, demand notes, accounts receivable, prepaid expenses, cash dividends and interest declared or accrued and not yet received shall be deemed to be the full amount thereof unless the Directors shall have determined that any such deposit, bill, demand note or account receivable is not worth the full amount thereof in which event the value shall be deemed to be such value as the Directors consider to be the reasonable value;

(ii)    except in the case of any interest in a managed fund to which paragraph (iii) applies and subject as provided in paragraphs (iv) and (v) below, all calculations based on the value of investments quoted, listed, traded or dealt in on any stock exchange, commodities exchange, futures exchange or over-the-counter market shall be made by reference to the mid-price, which is the mean between the last available bid and ask price on the principal stock exchange for such investments as at the close of business in such place on the day as of which such calculation is to be made. Where there is no stock exchange, commodities exchange, futures exchange or over-the-counter market all calculations based on the value of investments quoted by any person, firm or institution making a market in that investment (and if there shall be more than one such market maker then such particular market maker as the Directors may designate) shall be made by reference to the mean of the latest bid and asked price quoted thereon, provided always that if the Directors in their discretion consider that the prices ruling on a stock exchange other

69

than the principal stock exchange provide in all the circumstances a good faith estimate of fair value in relation to any such investment, they may adopt such prices;

(iii)  subject as provided in paragraph (iv) and (v) below, the value of each interest in any open-ended unit trust or corporation, open-ended investment company or other similar open-ended investment vehicle (a "managed fund") shall be the last published net asset value per unit, share or other interest in such managed fund (where available) or (if the same is not available) a price calculated by aggregating the last published bid price and the last published offer price therefore (excluding any preliminary or initial charge included in such offer price) and dividing the result by two;

(iv)  if no net asset value, bid and offer prices or price quotations are available as provided in paragraphs (ii) or (iii) above (including in respect of Special Investments), the value of the relevant asset shall be determined from time to time in such manner as the Directors shall determine or as required by applicable law;

(vii)  notwithstanding the foregoing, the Directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation is a good faith estimate of fair value;

(viii)  any value (whether of a security or cash) otherwise than in US dollars shall be converted into US dollars at the rate (whether official or otherwise) which the Directors shall in their absolute discretion deem appropriate to the circumstances having regard, inter alia, to any premium or discount which they consider may be relevant, and to costs of exchange; and

(ix)  where pricing information regarding the underlying investments of the mutual fund is provided to the person calculating the net asset value by any member of the mutual fund family the person calculating the net asset value shall have an independent verification of such pricing information.

If the Directors resolve that the Fund and the Master Fund shall issue further classes or series of Shares it is possible that the method of calculating the net asset value may differ for those other classes or series of Shares.

In performing these calculations, the Directors, the Investment Manager, the Investment Adviser, the Administrator and any of their officers, directors, agents or employees shall be entitled to rely on unaudited valuations and reports received from third parties; shall not be responsible for verifying either the contents or veracity of such valuations and reports; and in no event shall incur any liability or responsibility for any determination made or other action taken or omitted by them in good faith.

The Fund and the Master Fund may temporarily suspend the valuation of its property and, in connection therewith, the redemption of Shares or the Master Fund shares in certain circumstances.   See "*Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions.*"

## REDEMPTION OF SHARES

Except with respect to Shares representing Special Investments, each Shareholder has the right to redeem all or a portion of its Shares (i) as of the close of business on the last Business Day of each calendar quarter following the expiration (or the waiver by the Fund, in accordance with the terms hereof) of the Lock-Up Period, and (ii) on any other date determined by the Directors in their sole and absolute discretion (each, a "Redemption Date"), at the Redemption Price per Share of the appropriate Series of the appropriate Class.  All redemption fees will be payable to the Fund.  Requests for redemption must be received by the Fund in writing at least 90 calendar days prior to the Redemption Date specified in the redemption request unless such notice is waived by the Directors.

No redemptions will be permitted with respect to any Class R and Class S Shares until the Special Investments relating thereto have been disposed of or are otherwise deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments).  Furthermore, a Shareholder who has had all of its Class B and Class A Shares, as applicable, redeemed by the Fund shall nonetheless continue to participate in any Class R and Class S Shares it owns relating to Special Investments not yet disposed of or otherwise deemed to have been disposed of (including if, in the sole discretion of the Investment Manager, they no longer qualify as Special Investments); provided, however, that upon such liquidation or disposal, the Shareholder will be paid the proceeds thereof less the payment and/or allocation of (i) the Performance Allocation, if any, owed thereon to the Investment Adviser and (ii) any applicable expenses relating to such Special Investment from the date of the redemption of such Shareholder's last Class A and/or Class B Shares to the date of liquidation or disposal of such Special Investment, including its *pro rata* share of the Fund's operating expenses and the Management Fee.

Redemption Price per Share means in respect of a Series of a Class an amount calculated by dividing (a) the difference between (i) the value of the Investment Account relating to that Series (after making any adjustments thereto referred as discussed herein) on the Redemption Date as of which the redemption is effective and (ii) the amount of any Management Fees, Performance Allocations or expenses not otherwise reflected in the Investment Account by (b) the number of Shares of that Series in issue at that time (including shares of that Series that are to be redeemed at that time).  For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series that are to be redeemed on the relevant Redemption Date shall be deemed to be in issue until and including the close of business on the applicable Redemption Date.

Each redemption request must be in the minimum amount of US$100,000 or for all of such Shareholder's Shares, if less, and a Shareholder may not make a redemption request for a partial redemption if, after implementation thereof, it would hold Shares having an aggregate Net Asset Value of less than US$1 million (although the Directors may, in their sole and absolute discretion, permit a smaller redemption or waive the latter requirement).  A redemption request must be in the form attached to the Fund's Subscription Agreement or such other form as is acceptable to the Directors and any request received after 5:00 p.m. (Bermuda time) shall treated as if it was received on the next Business Day.

Once sent, a redemption request cannot be revoked without the Directors' consent, which may be withheld in their sole and absolute discretion, unless redemptions are suspended.  Payment of redemption proceeds, under normal circumstances, will generally be made in the following installments:  (i) 90% of the estimated Redemption Price with respect to all Shares that are being redeemed will be paid within 30 calendar days after the Redemption Date or, in any event, as soon as practicable, upon completion of the computation of the Fund's Net Asset Value by the Administrator and (ii) the balance of the Redemption Price shall be paid, without interest, as soon as practicable upon completion of the Fund's annual audit.

The Fund may, in the Directors' sole and absolute discretion, pay a redemption (in whole or in part) in Redemption-In-Kind Securities held by the Fund on a *pro rata* basis.  The amount and type of Redemption-In-Kind Securities will be selected by the Directors in their sole and absolute discretion.  If a redemption is paid in Redemption-In-Kind Securities, the redeeming Shareholder will bear transaction costs if and when it sells such Redemption-In-Kind Securities.

The Directors may, in consultation with the Investment Manager but otherwise in their sole and absolute discretion, in certain circumstances declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part.  In addition, if redemption requests in respect of a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors determine.  See *"Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."*

The Directors, in their sole and absolute discretion, may cause the Fund to redeem a Shareholder's Shares, in whole or in part, by giving the Shareholder written notice at least two days before the effective redemption date determined by the Directors.

The Directors have the sole and absolute discretion to withhold or limit the amount of any redemption proceeds payable to a Shareholder if the Directors determine that the Fund is unable to effect such distribution in accordance with the terms of the Articles of Association or that it is required to retain any amount under applicable law or the rules of the SEC or any securities association or self-regulatory organization.

The Directors, in consultation with the Investment Manager, also have the sole and absolute discretion as to (1) the extent to which investments held by the Fund are to be sold to pay any redemption price and (2) which investments are to be sold for such purpose.  The Fund and its Directors will not be liable to a Shareholder for interest on the proceeds of any redemption.

The Directors may, in their sole and absolute discretion, permit redemptions to be made as of any date other than a Redemption Date and/or waive any other redemption requirements contained herein.

## CERTAIN PROVISIONS OF THE ARTICLES OF ASSOCIATION

Set forth below is a summary discussion of certain provisions of the Fund Articles and the Master Fund's Articles of Association (the "Master Fund Articles"). This discussion is qualified in its entirety by the provisions of the Fund Articles, a copy of which is attached hereto as Exhibit A, and the Master Fund Articles, a copy of which is attached as Exhibit C. (Reference is made to the Fund Articles and the Master Fund Articles for the definitions of capitalized terms used below that are not otherwise defined herein.)

Each of the Fund Articles and the Master Fund Articles contain the regulations relating to the internal management of each company and establish the rights and obligations of the holders of shares in those companies, in their capacities as such. Each of the Fund's Memorandum of Association and the Master Fund's Memorandum of Association provides that the objects for which each company has been established are unrestricted and each company has full power and authority to carry out any object not prohibited by any law.

The holders of the Shares in the Fund will be admitted as Shareholders thereof by entry of such holders in the Fund's Register of Shareholders and shall be entitled to all the rights as Shareholders under the terms of the Articles of Association. The Articles of Association are the governing instruments that contain the rules under which the Fund will be operated and establish the rights and obligations of the holders of the Shares, in their capacities as such.

Upon acceptance of the subscription by the Fund by execution of the signature pages of a Subscriber's Subscription Agreement and entry into the register of members of the Fund, the Subscriber will become a Shareholder. See *"Plan of Distribution; Suitability Standards – Plan of Distribution."*

### Dividends

The Fund does not intend to pay dividends with respect to any of its Shares, although the Directors may, in their sole and absolute discretion, declare dividends in relation to one or more Classes of Shares at any time. Therefore, a Shareholder will need to redeem all or a portion of its Shares to realize any cash proceeds from its investment. See *"Redemption of Shares"* above. The Directors when paying dividends to the Shareholders may make such payment either in cash or in specie.

Except for the Allocation Class Shares, the Master Fund does not intend to make distributions from the Master Fund although the Directors of the Master Fund may, in their sole and absolute discretion, make distributions at any time, which distributions may be made either in cash or in specie.

### Registered Office

The Fund's registered office is located at c/o Apex Fund Services (Cayman) Limited, P.O. Box MP 10085, Grand Cayman KY1-1101, Cayman Islands.

### Share Capital- the Fund

The Fund has an authorized share capital of US$50,000 divided into 49,999,000 redeemable, participating, limited voting Shares of US$0.001 par value each, and 1,000 voting, non-participating, non-redeemable shares of US$0.001 par value each. Shares are redeemable at the

option of the holder in accordance with the terms set out in this Memorandum and the Articles of Association and are subject to compulsory redemption in certain circumstances.  The Founder Shares are held by the Investment Manager.

Subject to the terms of the Articles of Association, Shares may be issued at the sole and absolute discretion of the Directors and there are no preemption rights on the issue of additional Shares or any other Class.

The Fund may increase or reduce (with the approval of the Cayman Islands Courts, in certain circumstances) its authorized share capital.  The Fund may from time to time issue additional Classes of Shares.  The specific terms of any such classes may be set forth in a supplement or supplements to this Memorandum.   Classes of Shares may differ in terms of permitted subscription and redemption dates and notice periods, minimum and maximum aggregate subscription amount, types of investment strategies utilized, Management and Performance Allocations (including no fees), functional currency, hedging of currency risk, investor eligibility requirements and in other respects.

Shares will be issued in Classes, with separate Series within each Class.  A new Series may be issued to each investor on each date that Shares of a Class are purchased and designated by the investor, month and year of purchase.  The Fund is currently offering for subscription its Class A and Class B Shares.  Class S and/or Class R Shares will, from time to time, be issued by the Fund to existing Shareholders in exchange for their Class A and Class B Shares (respectively).  Upon the designation of an investment (at the time acquisition or at any time thereafter) by the Investment Manager as a "Special Investment", a pro-rata portion of each current Shareholder's Class A or Class B Shares having an aggregate Net Asset Value equal to the value (generally, the fair market value) of the Special Investment will be redesignated and converted by way of compulsory redemption of the relevant Shares and reissue of Class S or Class R Shares (as appropriate) to the Shareholder whose Shares were compulsorily redeemed.  The Shares so redeemed will be cancelled and the Directors will effect all adjustments necessary to give effect to the foregoing including allocating the value (generally, the fair market value) of the applicable Special Investment to the Class R and/or Class S Shares (as appropriate).  No compulsory redemption of Class B or Class A Shares pursuant to the designation of an investment as a Special Investment will require prior notice to be given to Shareholders.  Upon a complete or partial disposition or a deemed disposition (by the Fund) of a Special Investment, the Class R and/or Class S Shares of each holder thereof shall be redesignated as and converted (by way of compulsory redemption and the issue of the relevant class of Shares to the Shareholder) to Class B or Class A Shares (respectively) at the Net Asset Value of the respective classes of Shares so redeemed and issued.  No compulsory redemption of Class R and/or Class S Shares pursuant hereto will require prior notice to be given to Shareholders.

Additionally, the Fund may, as determined by the Directors, offer shares of different classes having different rights and obligations and/or paying fees different from the Shares offered hereby.

Any issued and outstanding Series of a Class (other than those Shares of the Initial Series of each Class) may be redesignated and converted by way of reissue and redemption into the Initial Series of Shares of a Class (after accrual or allocation of any Performance Allocation, as

described under *"Compensation of The Investment Manager and The Investment Adviser"*) at the end of each calendar year, or at such other time as the Directors in their sole and absolute discretion see fit, at the prevailing Net Asset Value per Share of the Initial Series of the relevant Class.  However, no redesignation and conversion, by way of redemption and reissue, will occur with respect to a Series of a Class if, at the end of the calendar year, either:

(a)     the Net Asset Value of such Series is below its Prior High NAV; or

(b)     the Net Asset Value of the Initial Series of the relevant Class is below its Prior High NAV.

"Prior High NAV" means, with respect to any Series of any Class, the Net Asset Value of that Series as of the first Business Day immediately following the date as of which the last Performance Allocation with respect to such Series was allocated (or, if no Performance Allocation has yet been allocated with respect to such Shares, the Net Asset Value of such Series immediately following the initial offering of such Shares).

The Directors may also adopt additional resolutions that allow for the equalization of Shares.

None of the Shares of the Fund are under option, or agreed, conditionally or unconditionally to be put under option.

## Share Capital – the Master Fund

The Master Fund has an authorized share capital of US$50,000 divided into 49,999,000 non-voting, participating, redeemable shares, of US$0.001 par value each (the "Master Fund Shares") and 100 voting, non-participating founder shares of $1.00 par value per share (the "Master Fund Founder Shares").  Master Fund Founder Shares are issued for the purpose of enabling all the Master Fund Shares to be redeemed without liquidating the Master Fund.  A Master Fund Founder Share was initially allotted and issued to the subscriber to the memorandum of association of the Master Fund.  The remaining Master Fund Founder Shares have been allotted and issued at par and are fully paid.  All of the Master Fund Founder Shares are currently held by the Administrator.

In addition, in order to implement the "Performance Allocation," the Master Fund will also issue "Allocation Class Shares."  The Allocation Class Shares will be held solely by the Investment Adviser and will be allocated the Performance Allocation.  In order to accomplish the foregoing, at the end of each Fiscal Year, the Master Fund will allocate to the Allocation Class Shares of the Investment Adviser from each Series of each Class of Shares an amount equal to the Performance Allocation payable for such Fiscal Year.

The Master Fund may, by Ordinary Resolution:

(a)     increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)    by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

Subject to the provisions of the Statute and the provisions of the Master Fund Articles as regards the matters to be dealt with by Ordinary Resolution the Master Fund may, by Special Resolution:

(a)    change its name;

(b)    alter or add to the Master Fund Articles;

(c)    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)    reduce its share capital or any capital redemption reserve fund.

**Investment Accounts**

There will be established for each Class and Series of Shares a separate Investment Account in the books and records of the Fund, or of an administrator, custodian or prime or principal broker to the Fund, to which the following provisions will apply:

(1)    Until the allotment of any Class or Series of Shares subsequent to the initial Class or Series, the Investment Account will comprise all assets and liabilities of the Fund; and thereafter

(2)    The proceeds from the allotment and issuance of Shares of a particular Class or Series and the assets and liabilities and income and expenditure attributable to that Class or Series of Shares will be applied to the Investment Account established for such Class or Series of Shares subject to the provisions of the Articles of Association;

(3)    In the case of an asset which the Directors do not consider is attributable to a particular Investment Account, the Directors will have the sole and absolute discretion to determine the basis upon which any such asset will be allocated between Investment Accounts and the Directors will have the sole and absolute discretion and power at any time and from time to time to vary such allocation;

(4)    Where assets not attributable to any Investment Account give rise to any net profits, the Directors may in their sole and absolute discretion allocate the assets representing such net profits to any Investment Account;

(5)    Where assets are attributable to a specific Investment Account and any asset is derived from another asset (whether cash or otherwise), such derivative asset will

be applied to the Investment Account from which the related asset was derived and on each revaluation of an investment the increase or diminution in the value thereof (or the relevant portion of such increase or diminution in value) will be applied to the relevant Investment Account;

(6)     The Directors will have the sole and absolute discretion to determine the basis upon which any liability including expenses will be allocated between or among Investment Accounts (including conditions as to subsequent re-allocation thereof if circumstances so permit or require) and will have power at any time and from time to time to vary such basis and charge expenses of the Fund against either revenue or the capital of any Investment Account;

(7)     The Directors may make debits or credits of assets to any Investment Account if, as a result of a creditor proceeding against certain of the assets of the Fund or otherwise, a liability would be borne in a different manner from that in which it would have been borne under paragraph (6) above, or in any similar circumstances;

(8)     In the event that the Fund, in the sole and absolute discretion of the Directors, participates in new issues, any profits and losses from such new issues will be allocated to Investment Accounts only in accordance with the rules of FINRA. The Directors shall have the discretion to debit from the Investment Account(s) maintained in respect of the new issues investments a use of funds charge in respect of new issue investments and credit such amount to each Investment Account *pro rata* based on the Net Asset Values of each Investment Account for the applicable accounting period; and

(9)     Save as otherwise provided in the Articles of Association, the assets allocated to an Investment Account will be applied solely in respect of the Shares of the Class or Series to which such Investment Account relates and no holder of Shares of that Class or Series will have any claim or right to any asset allocated to any other Investment Account.

The determination of the value of an Investment Account can be suspended.  See "Certain Provisions of the Articles of Association – Suspension of Determination of Net Asset Value, Subscriptions and Redemptions."

The Master Fund Articles contain similar provisions concerning investment accounts.

**Variation of Rights**

Rights attached to any Class or Series (unless otherwise determined by the terms of issue of the Shares of that Class or Series) may, whether or not the Fund is being liquidated only be materially varied or abrogated with the consent in writing of the holders of two-thirds of the issued Shares of that Class or Series, or with the sanction of a resolution passed by Shareholders holding at least two-thirds of all the Shares of that Class or Series then in issue at a separate meeting of the holders of the Shares of that Class or Series.  The rights conferred upon the holders of the Shares of any Class or Series shall not, unless otherwise expressly provided by the terms of issue of the Shares of that Class or Series, be deemed varied or abrogated by the following:

77

(1)    the creation, allotment or issue of further shares ranking *pari passu* with the Shares or subsequent to the Shares;

(2)    the redemption or repurchase of any Shares; or

(3)    the passing of a Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to any Class, any modification of the fees payable to any service provider to the Fund, or any transparency available to Shareholders, any change to the minimum investment in Shares of that Class or Series, or any change to a Valuation Time.

The Master Fund Articles contain similar provisions concerning the variation of shareholder rights.

### Suspension of Determination of Net Asset Value, Subscriptions and Redemptions

The Directors may, in consultation with the Investment Manager, but otherwise in their sole and absolute discretion when they deem appropriate, declare a suspension of the determination of the value of an Investment Account, the Redemption Price per Share of a Series of a Class, the redemption of any Series of Shares of a Class (including the right to receive redemption proceeds), the subscription for any Series of Shares of a Class and/or extend the period for payment on redemption, in whole or in part, upon the occurrence of any of the following circumstances, and in each case for the whole or any part of a period:

(1)    when any exchange or OTC or other market on which any of the Fund's or the Master Fund's investments is quoted, traded, or dealt in is closed (other than for holidays or customary weekends) or trading thereon has been restricted or suspended;

(2)    when, as a result of events, conditions, or circumstances, disposal of the Fund's or the Master Fund's assets or other transactions in the ordinary course of the Fund's or the Master Fund's business involving the sale, transfer, delivery, or withdrawal of the Fund's or the Master Fund's securities and other investments and financial instruments is not in the Directors' sole and absolute discretion considered reasonably practicable, and/or if the Directors do not, in their sole and absolute discretion, believe that any such sale, transfer, delivery, or withdrawal is generally in the best interests of the Shareholders of that particular Class or Series;

(3)    when there has been a breakdown in any of the means employed in determining the price or value of any of the Fund's or the Master Fund's investments or when for any other reason the value of any of the Fund's or the Master Fund's investments or other assets in the Directors' opinion cannot be reasonably or fairly be ascertained and when the use of such means has been restricted or suspended for whatever reason;

(4)    when the Fund, the Master Fund, the Administrator, one of its prime brokers, its custodian, or the Investment Manager is unable for any reason to repatriate funds

required for the purpose of making payments on redemption or during which any transfer of funds involved in the realization or acquisition of assets or when payments due on redemption of Shares cannot in the opinion of the Directors be effected on normal conditions;

(5)     when proceeds of any sale or redemption of Shares cannot be transmitted to or from the Fund's or the Master Fund's accounts for any reason; and/or

(6)     if the Fund or the Master Fund is dissolved.

In addition, if redemption requests with respect to the Fund on a particular Redemption Date exceed 12.5% of the Fund's Net Asset Value or such other (smaller or larger) amount that the Directors, in their sole and absolute discretion, determine would cause a material adverse effect on the Fund, the Directors may suspend or limit such redemptions in such manner and for such period as the Directors in their sole and absolute discretion determine.  The Fund will withhold payment of redemption proceeds to any Shareholder some or all of whose Shares have been tendered for redemption until after any suspension has been lifted.  Notice of any suspension will be given to any Shareholder who has tendered some or all of its Shares for redemption and to whom full payment of the redemption proceeds has not yet been remitted.  If a Shareholder does not withdraw a redemption request following notification of a suspension, the redemption will be effected as of the next Redemption Date after such suspension is ended, unless the Directors determine otherwise in their sole and absolute discretion, on the basis of the Redemption Price per Share as of that Redemption Date.

**Dissolution and Liquidation**

The Fund will be liquidated upon the happening of any of the following events:

(1)     the passing of a Special Resolution to that effect, passed by the holders of the Founder Shares;

(2)     the bankruptcy or insolvency of the Fund; or

(3)     as otherwise provided by Cayman Islands law.

Upon the liquidation of the Fund, the Directors or the persons appointed by the Shareholders to wind up the Fund's affairs ("Liquidator") will take account of the Fund's assets and liabilities. Generally, the assets will be liquidated as promptly as is consistent with obtaining their fair market value, and their proceeds, to the extent sufficient, will be applied and distributed in the following order:

(1)     to the payment of the Fund's debts and liabilities to creditors, including Shareholders who are creditors, to the extent otherwise permitted by law, other than liabilities for which reasonable provision for payment has been made and liabilities for dividends to Shareholders, and of the expenses of liquidation;

(2)     to the establishment of any reserves that the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Fund arising out of or in connection with the Fund;

(3)     to Shareholders in satisfaction of liabilities for dividends under the law of the Cayman Islands; and

(4)     any balance then remaining will be distributed to each Shareholder *pari passu* according to the amount such Shares would receive on a redemption pursuant to the Articles of Association on the Redemption Date immediately preceding the date of liquidation or winding up.

The Master Fund Articles contain similar provisions concerning the dissolution and liquidation of the Master Fund.

### Reorganization into a Master Feeder Structure

The Fund may, without the Shareholders' consent, (i) invest all or a portion of the Fund's property in interests or shares issued by an entity formed to serve as a master fund or (ii) cause the Fund, if organized in a master/feeder fund structure, to withdraw or redeem its property from the master fund and cause the Fund to invest in property directly in securities and other financial instruments or in another master fund. In addition, the Fund may make various elections for federal income tax purposes that could result in certain items of income, gain, loss and deduction being treated differently for tax and accounting purposes, in particular, the Fund may make an election to treat the Fund or such master fund may make an election to treat the master fund as either a partnership or an association taxable as a corporation for U.S. tax purposes.

### Books and Records; Fiscal Year

The Fund will keep books and records of account in accordance with GAAP, except that the Fund's organizational expenses may be amortized over a period of not more than five years from the commencement of the Fund's operations. The Fund's books and records will be maintained at the offices of the Administrator, at Apex Fund Services, Ltd., 3rd Floor, 31 Reid Street, Hamilton HM12, Bermuda. The Directors will have access to all books and records maintained by the Administrator and will maintain copies of the same.

The Fund's "Fiscal Year" is the calendar year. However, the Fund's last Fiscal Year will end on the date its affairs are wound up.

### Directors' Liability; Indemnification

Pursuant to the Fund's Articles of Association, all current and former Directors will be indemnified out of the assets of the Fund from and against all actions, proceedings, costs, charges, losses, damages and expenses which they or any of them shall or may incur or sustain by reason of any act done or omitted in or about the execution of their duties provided that such Director acted honestly and in good faith with a view to the best interests of the Fund and had no reasonable cause to believe that his conduct was unlawful.

The U.S. federal and state securities laws and ERISA impose liabilities under certain circumstances on persons who act in good faith and therefore nothing in the Articles of Association will waive or limit any rights the Fund may have against the Investment Manager under such laws.

The Advisory Agreement contains similar provisions with respect to the liability of the Investment Manager and the Investment Adviser and with respect to indemnification.

The Master Fund Articles contain similar provisions with respect to the liability of the Investment Manager and other covered persons to the Master Fund and with respect to indemnification.

**Transferability of Shares**

A Shareholder may not transfer or pledge all or any of its Shares without the Directors' prior written consent, the granting of which is in the Directors' sole and absolute discretion.  The Shares have not been, and are not expected to be, registered under non-U.S. or U.S. federal or state securities laws.  Any purported transfer of a Share or Shares that is not in compliance with the foregoing will be void and of no effect.  The Fund and its agents will not be entitled or required to recognize any legal, equitable, or other claim or interest in the Fund on the part of any such purported transferee, whether or not any of them has express or other notice of such claim or interest.

The registration of transfers may be suspended at such times and for such periods as the Directors may, from time to time in their sole and absolute discretion determine.

**Cayman Islands Mutual Funds Law**

A Cayman Islands open-ended investment fund is exempted from the ambit of the Mutual Funds Law if its participating shares are held by not more than fifteen investors, the majority of whom are capable of appointing or removing the directors of the fund.  The Fund is not currently required to register as a "mutual fund" under the Mutual Funds Law because the Fund does not have more than 15 investors, and a majority of investors of the Fund is entitled to appoint and remove the directors.

The Fund may determine to accept more than 15 investors.  In that event, the Fund  and the Master Fund would register as a "mutual fund" with the Cayman Islands Monetary Authority ("CIMA") pursuant to section 4(3) of the Mutual Funds Law and thereupon become subject to, among other things, the following obligations: (a) to file with CIMA prescribed details of the Fund's offering document and any changes to it, (b) to file annually with CIMA accounts audited by an approved auditor and a Fund Annual Return and (c) to pay a prescribed initial and annual registration fee, which is currently CI$3,000 (currently US$ 3,658) for the Fund and CI$2,500 (currently US$3,049) for the Master Fund.

If the Fund and the Master Fund should register with CIMA as a "mutual fund," they would be subject to the supervision of CIMA, which could at any time instruct the Fund and the Master

Fund to have its accounts audited and to submit the results to CIMA within such time as it specifies.  In addition, CIMA could ask the Directors to give CIMA such information or explanation in respect of the Fund as CIMA may reasonably require to enable it to carry out its duties under the Mutual Funds Law.  The Directors would be required to give CIMA access to or provide at any reasonable time all records relating to the Fund and the Master Fund, and CIMA could copy or take an extract of a record to which it is given access.  Failure to comply with these requests from CIMA could result in substantial fines being imposed on the Directors, and in CIMA applying to the court to have the Fund and the Master Fund wound up. Notwithstanding the foregoing, registration of the Fund and the Master Fund as a "mutual fund" would not imply that CIMA has passed upon or approved this Memorandum or the offering of Shares hereunder.

CIMA is prohibited by the Monetary Authority Law (as amended)  of the Cayman Islands from disclosing any information relating to the affairs of a mutual fund other than disclosure required for the effective regulation of a mutual fund or when required to do so by law or by a court. CIMA may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  CIMA's powers include the power to require the substitution of directors, to appoint a person to advise a mutual fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of a mutual fund.  There are other remedies available to CIMA including the ability to apply to the court for approval of other actions.

**Anti-Money Laundering Regulations**

As part of the Fund's and the Administrator's responsibility for the prevention of money laundering, the Fund and the Administrator (including its affiliates, subsidiaries or associates) will require a detailed verification of the applicant's identity and the source of payment. Depending on the circumstances of each application, a detailed verification might not be required where:

> (a)     the applicant is a recognized financial institution which is regulated by a recognized regulatory authority and carries on business in a country listed in Schedule 3 of the Money Laundering Regulations (as amended) of the Cayman Islands (a "Schedule 3 Country"); or

> (b)     the application is made through a recognized intermediary which is regulated by a recognized regulatory authority and carries on business in a Schedule 3 Country.  In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

> (c)     the subscription payment is remitted from an account (or joint account) held in the applicant's name at a bank in the Cayman Islands or a bank regulated in a Schedule 3 Country.  In this situation the Fund may require evidence identifying the branch or office of the bank from which the monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details.

The Fund and the Administrator reserve the right to request such information as is necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator will refuse to accept the application and the subscription monies relating thereto.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or money laundering or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of their business then that person will be required to report such belief or suspicion to either the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2008 if the disclosure relates to criminal conduct or money laundering or to a police officer of the rank of constable or higher if the disclosure relates to involvement with terrorism or terrorist property, pursuant to the Terrorism Law (2011 Revision). Such report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

By subscribing, Shareholders consent to the disclosure by the Fund and the Administrator of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

## REPORTS

Each Shareholder will receive the following: (i) annual financial statements of the Fund audited by an independent certified public accounting firm generally within 120 days of (or as promptly as reasonably possible after) the end of the Fund's Fiscal Year, (ii) in the discretion of the Investment Manager, a monthly letter from the Investment Manager discussing the results of the Fund and the Master Fund for the previous month, and (iii) other reports as determined by the Investment Manager in its sole discretion.

## TAXATION

***This discussion was written to support the promotion or marketing of the transactions or matters addressed herein.  It is not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on a taxpayer. A taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.***

### General

Shareholders should consult their own tax advisers as to the consequences of an investment in the Fund under the tax laws of the United States, or any other country of which a Shareholder is a resident or citizen, including the consequences of the receipt of dividends from the Fund and the sale, redemption, or exchange of Shares.

The following discussion summarizes certain, although not all, U.S. federal income tax and Cayman Islands tax considerations relating to an investment in the Fund.  This summary provides only a general discussion and does not represent a complete analysis of all consequences, many of which may depend on individual circumstances, such as the residence or

domicile of a Shareholder.  The summary of U.S. federal income tax considerations is based on the Code, the regulations thereunder ("Regulations"), and judicial and administrative interpretations thereof, all as of the date of this Memorandum.  No assurance can be given that future legislation, Regulations, administrative pronouncements, and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein.  Any such change, even though made after a Shareholder has invested in the Fund, could be applied retroactively.  Moreover, the effects of any state or local, or foreign tax law (other than certain provisions of Cayman Islands tax law), or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("Service") or any other federal, state, or local agency with respect to the U.S. federal income tax matters discussed below.  This summary does not in any way either bind the Service or the courts or constitute an assurance that the income tax consequences discussed herein will be accepted by the Service, any other U.S. federal, state, or local agency, or the courts.

**THIS SUMMARY IS INCLUDED FOR GENERAL INFORMATION ONLY.  NOTHING HEREIN IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY INVESTOR.  ACCORDINGLY, EACH PERSON CONSIDERING AN INVESTMENT IN THE FUND SHOULD CONSULT HIS, HER, OR ITS OWN TAX ADVISER TO UNDERSTAND FULLY THE POSSIBLE FEDERAL INCOME AND OTHER TAX CONSEQUENCES TO IT OF SUCH AN INVESTMENT.**

### Cayman Islands Taxation

There is no direct taxation of the Fund in effect in the Cayman Islands and, therefore, interest, dividends and gains received, revised, accumulated and made by the Fund will not be subject to any tax in the Cayman Islands.  The Fund and the Master Fund are exempted companies under Cayman Islands law.  The Fund and the Master Fund have applied for and obtained from the Governor-in-Council of the Cayman Islands an undertaking that, in accordance with Section 6 of the Tax Concessions Law (as amended) of the Cayman Islands, for a period of 20 years from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any tax or duty to be levied on profits, income, gains or appreciation will apply to the Fund and the Master Fund or their operations.  No capital or stamp duties are levied in the Cayman Islands on the issue, transfer or redemption of Shares.  The Fund and the Master Fund will be required to pay an annual charge payable to the Registrar of Companies calculated on the nominal amount of the  authorized share capital of the Fund, which charge is currently approximately US $732 per annum.

### U.S. Federal Income Taxation

### Introduction

The tax aspects of an investment in the Fund are complicated, and the Investment Manager strongly recommends that prior to any decision to invest therein each investor consult with professional advisers familiar with the investor's tax situation and the tax laws and regulations

applicable to investment in partnerships.  The Fund is not intended and should not be expected to provide any tax shelter.

The following discussion summarizes certain, although not all, federal income tax considerations relating to an investment in the Fund. This summary provides only a general discussion and does not represent a complete analysis of all income tax consequences of an investment in the Fund, many of which may depend on individual circumstances, such as the residence or domicile of a Shareholder.  It is based on the Internal Revenue Code of 1986, as amended ("Code"), the regulations thereunder ("Regulations") and judicial and administrative interpretations thereof, all as of the date of this Memorandum.  No assurance can be given that future legislation, Regulations, administrative pronouncements and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein.  Any such change, even though made after a Shareholder has invested in the Fund, could be applied retroactively. Moreover, the effects of any state (other than certain aspects of Georgia tax laws), local or foreign tax law, or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the Internal Revenue Service ("Service") or any other federal, state or local agency with respect to the matters discussed below, nor has the Investment Manager asked its counsel to render any legal opinions regarding any of the matters discussed below.  This summary does not in any way either bind the Service or the courts or constitute an assurance that the income tax consequences discussed herein will be accepted by the Service, any other federal, state or local agency or the courts.

THIS DISCUSSION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN. IT IS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER. A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Taxation of the Fund**

The Fund has elected to be treated as a partnership for U.S. federal income tax purposes.   As such, any of the Fund's income that is subject to U.S. federal income tax will be taxable at the entity level.  The Master Fund, however, has elected to be treated as a partnership for U.S. federal income tax purposes and does not expect to be treated as a publicly traded partnership taxable as a corporation.  As a partnership, the Master Fund will not be subject to U.S. federal income tax.  Instead, each partner thereof, including the Fund, will be required to take into account its distributive share of the Master Fund's items of income, gain, loss and deduction substantially as though such items had been realized directly by the partner.

Unless the Fund (directly or indirectly through the Master Fund) engages in a trade or business within the United States, none of the income it earns (except as noted below) or gains it realizes will be subject to U.S. federal income tax.  The Investment Manager does not intend to have the Fund engage (directly or indirectly) in a trade or business, or enter into any relationship that

would be deemed to be a trade or business, within the United States.  The Fund's trading in stocks, securities or commodities for its own account will not constitute engaging in a U.S. trade or business (unless it is deemed to be a dealer in stocks, securities or commodities).  As a result, the Fund anticipates, although there can be no assurance, that its net income and gains will not be subject to U.S. federal income tax.  If the Fund was considered to be engaged in a U.S. trade or business, its income that was treated as effectively connected with that U.S. trade or business would be subject to U.S. federal income tax, which would reduce the Fund's, and thus the Shareholders', total return.

Payments to the Fund from U.S. sources of any dividends and any interest (and the Fund's share of such payments to the Master Fund), including interest on cash held in trading accounts, that is not either paid with respect to an obligation with an original maturity of 183 days or less or "portfolio interest" (see the following paragraph) will be subject to 30% U.S. federal withholding tax.  That tax will reduce the Fund's total return and thus the total return of its Shareholders.  The Fund expects that substantially all its income from U.S. sources will be portfolio interest or gain from the sale of stock, securities or commodities not subject to this withholding tax.

Interest on a debt obligation in registered form issued by a U.S. person generally will not be subject to U.S. federal withholding tax, provided that, (1) in the case of debt issued by a corporation, the person receiving the interest does not actually or constructively own 10% or more of the total combined voting power of all classes of the issuer's stock that are entitled to vote, (2) in the case of debt issued by a partnership, that person does not actually or constructively own a 10% or more capital or profits interest in the issuer, and (3) the payor of the interest is provided certain documentation regarding that person's non-U.S. status, including IRS Form W-8BEN or a suitable substitute therefor.  Accordingly, the Fund's interest earned on registered debt obligations of U.S. issuers generally will not be subject to that tax if the Fund furnishes the payor with the proper documentation.  Interest described in this paragraph is referred to herein as "portfolio interest."

Under U.S. legislation enacted on March 18, 2010, commonly referred to as the Foreign Account Tax Compliance Act or "FATCA", and Treasury guidance implementing such legislation, starting in 2014, the Master Fund will be subject to a 30% U.S. withholding tax on the income it receives beginning January 1, 2014, from certain of its assets, and on the proceeds it receives beginning January 1, 2015, from the sale of certain of its assets, unless the Master Fund agrees to collect and provide substantial information regarding its "United States accounts" to the Service on an annual basis or an exception applies. The Master Fund may also be required to withhold on a portion of payments it makes to the Fund if the Fund does not enter into such an agreement. For this purpose, a United States account includes a debt or equity interest issued by a foreign investment entity such as the Fund that is held by certain United States persons or foreign entities with sufficient ownership by such persons. The agreement also will require the Fund to withhold amounts from Shareholders that do not provide the required information, or that are "foreign financial institutions" and have not entered into their own agreements with the U.S. Treasury Department.  Although the Fund and Master Fund intend to structure their operations so that they is not subject to this 30% U.S. withholding tax, the form of the agreement that they will be required to enter into with the U.S. Treasury Department has not yet been issued, and it is

uncertain whether the Fund and Master Fund will be able to satisfy its obligations under any such agreement.

## Taxation of Non-U.S. Shareholders

A Non-U.S. Shareholder will not be subject to U.S. federal income tax on dividends, if any, the Fund pays on its Shares or on gains the Shareholder recognizes on the sale, exchange or redemption of its Shares.  Special rules may apply to a Non-U.S. Shareholder that (1) has an office or other fixed place of business in the United States to which such a dividend or gain is attributable, (2) is a former citizen or resident of the United States, a controlled foreign corporation, a foreign insurance company that holds Shares in connection with its U.S. business, a passive foreign investment company, or a corporation that accumulates earnings to avoid U.S. federal income tax or (3) in the case of an individual, is present in the United States for 183 days or more in the year of such sale, exchange or redemption and certain other requirements are met.

Non-U.S. Shareholders may be subject to income or other taxes, reporting requirements and other obligations as a result of investing in the Fund.

Accordingly, non-U.S. Shareholders, in particular, are urged to consult their U.S. and local tax advisers before investing in the Fund.

## Taxation of Tax-Exempt U.S. Shareholders

A Tax-Exempt U.S. Shareholder will not be subject to U.S. federal income tax on dividends, if any, the Fund pays on its Shares or gains such Shareholder recognizes on the sale, exchange, or redemption of its Shares, unless those dividends or gains constitute UBTI.  Because the Fund will be classified for federal tax purposes as an association (taxable as a corporation) rather than as a partnership, those dividends and gains should not constitute UBTI to a Tax-Exempt U.S. Shareholder unless it incurred debt to acquire its Shares, thus making the Shares "debt-financed property."

## Taxation of Taxable U.S. Shareholders

It is expected that the Fund will be a passive foreign investment company ("PFIC").   A PFIC is any foreign corporation (with certain exceptions) that, in general, meets either of the following tests: (1) at least 75% of its gross income is passive or (2) an average of at least 50% of its assets produce, or are held for the production of, passive income. PFIC distributions are not eligible for the 15% maximum federal income tax rate applicable to "qualified dividend income" of noncorporate taxpayers.  In addition, a Taxable U.S. Shareholder is generally subject to federal income tax on any "excess distribution" that it receives on the stock of a PFIC or of any gain it realizes on disposition of Shares as if the distribution was received or the gain was realized over the Taxable U.S. Shareholder's entire holding period for the Shares.  Amounts allocated to the current year are treated as ordinary income rather than (if applicable) capital gain, and federal income tax is payable on amounts allocated to each prior taxable year at the highest rate in effect for each such taxable year, plus interest on the tax "due" for each prior taxable year. If a Taxable U.S. Shareholder elects to treat the Fund as a "qualified electing fund" ("QEF"), then in lieu of

the foregoing tax and interest obligation, the Taxable U.S. Shareholder would be required to include in income each year its pro rata share of the Fund's annual ordinary earnings and net capital gain even if the Fund did not distribute those earnings and gain to the Taxable U.S. Shareholder.  Fund losses, however, will not flow through on a current basis to Taxable U.S. Shareholders making a QEF election for the Fund.

In addition, a Taxable U.S. Shareholder may elect to mark-to-market "marketable" stock in a PFIC.  However, the mark to market election will not be available to Taxable U.S. Shareholders because the Shares will not be actively traded on an established securities market and will thus not be "marketable."

To make and maintain the QEF election, a Taxable U.S. Shareholder must each year obtain an annual information statement from the Fund.  The Fund may, but does not commit to, provide such an information statement to its Taxable U.S. Shareholders each year.  Accordingly, Taxable U.S. Shareholder may not be able to make or maintain a QEF election with respect to the Fund.

Whether or not a QEF election or mark to market election is made, all Taxable U.S. Shareholders generally will be required to report annually to the Service certain information with respect to their ownership of Shares, whether or not Shares are disposed of, or the Taxable U.S. Shareholder receives an excess distribution from the Fund.  Form 8621 is used for this purpose and must be attached to the tax returns of such Taxable U.S. Shareholders.  In addition to any other returns required by U.S. tax laws, all U.S. Shareholders (whether taxable or tax-exempt) who become owners of 10% or more of the outstanding stock of a foreign corporation are required to file certain informational returns with the Service (including Form 5471).  The PFIC provisions discussed above do not affect Tax-Exempt U.S. Shareholders, unless such a shareholder's income from the Fund is treated as UBTI.

A Taxable U.S. Shareholder that is a "United States Shareholder" (as defined below) of the Fund will generally be subject to another special set of tax rules in any period when the Fund is a "controlled foreign corporation" ("CFC").  In general, a Taxable U.S. Shareholder that is a United States Shareholder must include in income currently its pro rata share of, among other things, the CFC's "Subpart F income," whether or not currently distributed to such Shareholder. "Subpart F income" includes the various types of passive income, including dividends, interest, gains from the sale of stock or securities, gains from certain futures transactions in commodities and certain sales and services income. A "United States Shareholder" is generally defined as any U.S. person that owns (or, after the application of certain constructive stock ownership rules, is deemed to own) 10% or more of the total combined voting power of all classes of stock entitled to vote of the foreign corporation. A foreign corporation will be treated as a CFC if more than 50% of the stock of such foreign corporation, determined by reference to either vote or value, is owned (or, after the application of certain constructive stock ownership rules, is deemed to be owned) by "United States Shareholders." "Subpart F income" of a CFC that is currently taxed to a "U.S. Shareholder" is not subject to tax again in its hands when actually distributed to such Shareholder. Where there is an overlap of income inclusion under the Subpart F rules and the QEF rules, the Subpart F rules take precedence and such income is in any event taxed only once. In addition, a corporation will not be treated with respect to a shareholder as a PFIC during the "qualified portion" of such shareholder's holding period with respect to stock in such

corporation. Generally, the term "qualified portion" means the portion of the shareholder's holding period during which the shareholder is a "United States Shareholder" and the corporation is a CFC.

**Tax Shelter Regulations**

Certain rules require taxpayers to disclose on their federal income tax returns and, under certain circumstances, separately to the Office of Tax Shelter Analysis their participation in "reportable transactions" and require "material advisors" to maintain investor lists with respect thereto. These rules apply to a broad range of transactions that would not ordinarily be viewed as tax shelters, and to indirect participation in a reportable transaction (such as through a partnership). Prospective investors are urged to consult with their own tax advisers with respect to these rules' effect on an investment in the Fund.

**Certain Reporting Requirements with Respect to Foreign Corporations**

A Taxable or Tax-Exempt U.S. Shareholder will be subject to certain U.S. tax reporting requirements in respect of the Fund, the filing Shareholder, and other Shareholders if such person owns 10% or more of the Shares of the Fund (by vote or value)  or in respect of certain transfers of cash or securities to the Fund.   Failure to comply with such tax reporting obligations may subject such a Shareholder to penalties.

Taxable U.S. Shareholders who are individuals will be subject to reporting obligations with respect to their Shares if they do not hold their Shares in an account maintained by a financial institution and the aggregate value of their Shares and certain other "specified foreign financial assets" exceeds $50,000. Significant penalties can apply if a Taxable U.S. Shareholders is required to disclose its Shares under these rules and fails to do so.

A Taxable or Tax-Exempt U.S. Shareholders may be required to file Form TD F 90-22.1, a so-called "FBAR Form," each year with respect to its Shares if the Shareholders is treated as owning more than 50% of the total value or voting power of the Fund's outstanding equity.

**United Kingdom taxation of the Fund**

It is intended that the affairs of the Fund will be conducted so that it will be resident for taxation purposes outside the United Kingdom and will not be liable to United Kingdom taxation on its worldwide profits and gains.

**Indirect taxation of the Fund**

The Fund may invest and trade in various countries, in which the Fund may be subject to withholding, capital gains, income or other taxation at the Fund level.

**Shareholders of the Fund**

Because the Shareholders will likely be resident for tax purposes in various countries, no attempt is made herein to summarize the tax consequences for every Shareholder.   The foregoing discussion is only a summary of certain tax considerations relating to the Fund.  It does not purport to be a comprehensive description of all the tax considerations that may be relevant to any particular Shareholder.   There can be no assurance the views expressed herein will be accepted by the relevant tax authorities.  The discussion does not address the U.S. federal income tax consequences applicable to tax-exempt investors, insurance companies or others subject to special rules, and does not address any aspect of state or local taxation.  The discussion is based on current law, which may be subject to change, possibly with retroactive effect.

**EU Savings Directive**

Dividends and other distributions of income made by the Fund, together with payment of the proceeds of sale and/or redemption of Shares in the Fund, may in the future (depending on the investment portfolio of the Fund) be subject to the withholding tax and/or information providing regime imposed by EU Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments, where payment is made to a Shareholder who is an individual resident for tax purposes in a Member State of the European Community (or a "residual entity" established in a Member State)  by a paying agent resident in another such Member State.   Certain other jurisdictions (including Switzerland) have, or are proposing to introduce, an equivalent withholding tax and/or information providing regime in respect of payments made through a paying agent established in such jurisdictions.

**Russian Taxation of the Fund**

Provided that the Fund does not carry out any activity in Russia through a permanent establishment, it will be taxable in Russia only in respect of income that is considered Russian source income which in itself is subject to Russian withholding tax. However, there can be no assurance that the Fund in the future will be treated as if not having a permanent establishment in Russia. Laws or the interpretation of the law in Russia might be changed which might force the Fund to be subject for tax in Russia as a Russian resident.  Buying Russian local shares by non-residents is not currently treated as a commercial activity in the territory of the Russian Federation.   In the event of retroactive changes to Russian tax laws which affect the value of the Fund's portfolio, no restatement of the Net Asset Value will occur. The Fund will use its reasonable efforts to mitigate any residual risk of being regarded as having a permanent establishment in Russia.

Under the provisions of the "Profit Tax Chapter" of the Tax Code of the Russian Federation, any dividends payable by a Russian company direct are subject to a 15% withholding tax. The 15% tax rate is applicable to all passive income, which also includes coupon payments for bonds.  The rate can be reduced if a client is domiciled in a country having a Double Taxation Treaty with Russia.

Any gains derived by the Fund on the disposal of shares in a Russian company or derivatives of such shares will not be subject to Russian withholding tax provided that no more than 50% of the Russian company's assets consists of immovable property in Russia. Gains derived by the Fund

on the disposal of shares or derivatives of such shares in a Russian company where more than 50% of the assets are represented by immovable property in Russia would be subject of a Russian withholding tax of either 20% on the proceeds from the sale of such investment or 24% of the proceeds less certain expenses. In this case the withholding tax cannot be reduced by any double tax treaty. In the absence of double tax treaty protection, if the shares are sold to another foreign legal entity having no registered presence in Russia, there is no mechanism for such legal entity to withhold the Russian tax.

Any gains derived by the Fund on the disposal of securities other than shares or their derivatives should not be subject to Russian withholding taxes. However, there is a risk, due to lack of clarity on the current legislation, that such gains could be *prima facie* treated as subject to Russian withholding tax of 20%.

## EMPLOYEE BENEFIT PLAN CONSIDERATIONS

**THIS DISCUSSION WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN.  IT IS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER.  A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### General

The fiduciary responsibility standards and prohibited transaction restrictions of ERISA apply to most employee retirement and welfare benefit plans maintained by private corporate employers (hereinafter sometimes referred to as "ERISA plans").  Although ERISA does not (with certain exceptions) apply to certain types of plans, such as individual retirement accounts, plans covering only self-employed individuals (i.e., sole proprietors and partners) and their respective spouses, or corporate plans covering only a corporation's sole shareholder and his or her spouse, these plans (as well as most ERISA plans) are subject to the prohibited transaction excise tax provisions of Section 4975 of the Code, which are substantially similar to the prohibited transaction restrictions of ERISA.  Neither ERISA nor Section 4975 of the Code applies to employee benefit plans established or maintained by government entities, plans established and maintained by churches or certain entities associated with churches, plans maintained outside the U.S. primarily for the benefit of nonresident aliens, and certain other plans excluded by statute. However, certain employee benefit plans may be subject to laws or regulations that are substantially similar to ERISA or Section 4975 of the Code ("Similar Laws").  An investing employee benefit plan that is not a "benefit plan investor" will be required to represent whether or not such plan is subject to Similar Laws.

The following summary of certain aspects of ERISA and Section 4975 of the Code is based upon the statutes, judicial decisions, and regulations and rulings of the U.S. Department of Labor ("DOL") in existence on the date hereof.  This summary is general in nature and does not address every issue under ERISA or Section 4975 of the Code that may be applicable to the Fund, the

Master Fund, or a particular investor. Accordingly, each prospective investor should consult with its own counsel in order to understand such issues affecting the Fund or the Shareholders.

**Investment Considerations**

The assets of the Fund (and the Master Fund) will be invested in accordance with the investment policies and objectives described in this Memorandum. Accordingly, an authorized fiduciary of an employee benefit plan proposing to invest in the Fund should, in consultation with its advisors, consider whether the investment would be consistent with the terms of the plan's governing documents and applicable law. The fiduciary of an ERISA plan, for example, should give appropriate consideration to the role that an investment in the Shares would play in the plan's portfolio, taking into consideration whether the investment is designed reasonably to further the plan's purposes, the risk and return factors associated with the investment, the composition of the plan's total investment portfolio with regard to diversification, the liquidity and current return of the plan's portfolio relative to its anticipated cash flow needs, and the projected return of the plan's portfolio relative to its objectives. Whether or not the plan is subject to ERISA, the Fiduciary also should consider, among other things, (i) the fact that investors in the Fund and the Master Fund may consist of a diverse group of investors (possibly including taxable and tax-exempt entities) and that the Investment Manager necessarily will not take the investment objectives of any particular Shareholder that are not consistent with those of the Master Fund into account in managing Master Fund investments, (ii) limitations on the plan's right to redeem or transfer Shares, (iii) the implications arising from whether or not the assets of the Fund or the Master Fund are treated as "plan assets" for purposes of ERISA and Section 4975 of the Code, and (iv) the tax effects of an investment in the Shares.

As described elsewhere in this Memorandum, the Investment Adviser will be entitled to receive a Performance Allocation based on the Fund's investment in the Master Fund. The appropriate fiduciary of an investing plan should satisfy itself that it understands the Performance Allocation and the risks associated with it and that an investment in the Fund is prudent and in the interests of the plan, taking the Performance Allocation into account. The fiduciary of an investing plan will be required to represent, among other things, that it understands and agrees to the fee arrangements described in the Memorandum, including the Management Fee and the Performance Allocation, and has obtained information (and has had the opportunity to request additional information) regarding the Performance Allocation and the associated risks, as necessary to enable the fiduciary to conclude that the Performance Allocation arrangements are reasonable and consistent with the interests of the plan.

**NONE OF THE INVESTMENT MANAGER, THE INVESTMENT ADVISER, THE FUND OR THE MASTER FUND IS RESPONSIBLE FOR DETERMINING, AND NONE OF THEM MAKES ANY REPRESENTATION REGARDING, WHETHER A PURCHASE OF SHARES IS A PRUDENT OR SUITABLE INVESTMENT FOR ANY EMPLOYEE BENEFIT PLAN.**

**Prohibited Transactions**

A purchase of Shares by an employee benefit plan having a relationship with the Investment Manager or any of its affiliates outside the Fund could, under certain circumstances, be

considered a transaction prohibited under ERISA or Section 4975 of the Code or under a Similar Law or other federal, state, local, foreign or other law.  In addition, the prohibited transaction restrictions of ERISA prohibit a fiduciary of a plan from causing the plan to engage in a transaction if the fiduciary knows or should know the transaction would involve a "party in interest" of the plan.  "Parties in interest" of an ERISA plan include, among others, persons providing services to the plan and certain affiliates of such persons.  Transactions between ERISA plans and parties in interest that are prohibited include, among others, any direct or indirect sale or exchange of property between the plan and a party in interest and any transfer of plan assets to, or use of plan assets by or for the benefit of, a party in interest.  Section 4975 of the Code prohibits substantially similar transactions between plans subject to that Section and "disqualified persons" of such plans, defined to include substantially the same persons as parties in interest for ERISA purposes.  Although the Investment Manager believes that the Fund itself should not be considered a party in interest (or disqualified person) with respect to investing plans subject to ERISA or Section 4975 of the Code, the application of ERISA, Section 4975 of the Code, or applicable state laws depends upon the particular facts and circumstances of each situation.

If the Investment Manager or any of its affiliates serves as a fiduciary for a prospective investor that is an employee benefit plan subject to ERISA or Section 4975 of the Code or a fund or other entity whose assets are deemed to include "plan assets" of such plans (see "Plan Assets" below), a fiduciary for that plan or entity who is independent of the Investment Manager and its affiliates must make the decision to invest in the Fund (without reliance on any investment advice provided by the Investment Manager) and must execute the Subscription Agreement on behalf of the plan or entity.   In this connection such fiduciary will be required to represent that neither the Investment Manager nor any of its affiliates, agents, or employees (i) exercises any authority or control with respect to the management or disposition of assets of the plan used to purchase the Shares, (ii) renders investment advice for a fee (pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions and that such advice will be based on the particular investment needs of the plan), with respect to such assets of the plan, or has the authority to do so, or (iii) is an employer maintaining or contributing to, or any of whose employees are covered by, the plan.  In addition, an authorized fiduciary of such plan may be required to represent, among other things, that the plan's purchase and holding of Shares will not constitute a non-exempt prohibited transaction under ERISA or Section 4975 of the Code or under any Similar Law or other federal, state, local, foreign or other law applicable to the plan and its investments.

**"Plan Assets"**

ERISA and regulations issued by the DOL indicate that, if a plan subject to ERISA or  Section 4975 of the Code acquires an "equity interest" (such as the Shares) in a private investment fund or similar entity (such as the Fund or the Master Fund), and if benefit plan investors in the aggregate hold 25% or more of the value of any class of equity interests in the fund, the fund's assets will be treated as "plan assets" for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA and the parallel prohibited transaction excise tax provisions of Section 4975 of the Code.  In such case, each investing plan subject to ERISA or Section 4975 of the Code will be considered to hold an undivided interest in each of the fund's underlying assets and, consequently, each investment the fund may make and each transaction in

which the fund may engage will be treated as if the investment or transaction is made directly by or for each of the investing plans.

ERISA defines the term "benefit plan investor" for purposes of the 25% computation described above to include employee benefit and other plans subject to ERISA and/or Section 4975 of the Code, as well as private investment funds and other entities whose underlying assets are treated as "plan assets" of such plans.   (In addition, assets of the general account of an insurance company may, in certain circumstances, be considered "plan assets.")   ERISA and the regulations require that any equity interests held by a person having discretionary authority or control over the assets of the entity or providing investment advice for a fee with respect to such assets or any affiliate of such person (as defined in the DOL regulations), other than interests held by such person through a benefit plan investor, be disregarded in making the 25% computation.

The Investment Manager has the right, in its sole discretion, to permit or restrict investments in the Fund or the Master Fund by benefit plan investors.   The Investment Manager presently intends to restrict investments by benefit plan investors so that the assets of the Fund and the assets of the Master Fund will not be treated as "plan assets" for purposes of ERISA or Section 4975 of the Code.   Because the 25% limit described above (which excludes Shares held by the Investment Manager or certain affiliates of the Investment Manager, also as described above is ongoing, not only may initial or additional investments by benefit plan investors be restricted, but existing benefit plan investors may be required to redeem Shares if other investors redeem their Shares.   Such rejections or mandatory redemptions will be effected in such manner as the Directors, in their sole discretion, determine to be reasonable and appropriate under the circumstances.

**Certain ERISA Considerations if Fund Assets are "Plan Assets"**

Although it is not anticipated that the assets of the Fund or the assets of the Master Fund will be treated as "plan assets," the Investment Manager, in its discretion, may choose not to restrict investments in the Fund or the Master Fund.   If at any time benefit plan investors are permitted to acquire 25% or more of the value of any class of Shares in the Fund or the Master Fund, respectively, the Investment Manager and any other person exercising discretionary over the Fund or its assets or the Master Fund or its assets, respectively, would be a "fiduciary" (as defined by ERISA) with respect to investing plans subject to ERISA and will be subject to the obligations and liabilities imposed on fiduciaries by ERISA.   The Investment Manager also would be subject to certain restrictions on self-dealing and conflicts of interest and would be required to avoid causing the Fund or the Master Fund, respectively, to engage in transactions with parties in interest of investing ERISA plans and disqualified persons of investing plans subject to Section 4975 of the Code, unless an exemption applies.   If and during any such time as the assets of the Fund or the Master Fund are treated as "plan assets," the Investment Manager will use commercially reasonable best efforts to discharge its duties consistent with applicable requirements of ERISA and Section 4975 of the Code.

**Considerations for Non-Plan Shareholders**

Prospective investors should note that this summary does not include a discussion of any laws, regulations, or statutes that may apply to prospective investors that are not employee benefit plans or that impose fiduciary responsibility requirements in connection with the investment of assets of governmental plans and other plans not subject to ERISA or Section 4975 of the Code. Such investors should consult their own professional advisers about these matters.

**FIDUCIARIES OF EMPLOYEE BENEFIT PLANS SHOULD CONSULT THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA, SECTION 4975 OF THE CODE, OR OTHER APPLICABLE LAW OF AN INVESTMENT IN THE FUND.**

**THE SALE OF SHARES TO AN EMPLOYEE BENEFIT PLAN IS IN NO RESPECT A REPRESENTATION BY THE FUND, THE MASTER FUND, THE DIRECTORS OR THE INVESTMENT MANAGER THAT AN INVESTMENT IN THE SHARES MEETS APPLICABLE LEGAL REQUIREMENTS WITH RESPECT TO INVESTMENTS BY EMPLOYEE BENEFIT PLANS GENERALLY OR ANY EMPLOYEE BENEFIT PLAN IN PARTICULAR.**

## ACCOUNTING

The Fund has retained BDO Tortuga, Cayman Islands, as its auditors.

## ADDITIONAL INFORMATION

Each prospective investor is invited to meet with representatives of the Fund and the Investment Manager to discuss with them, and to ask questions of and receive answers from them, concerning the terms and conditions of this offering of Shares, and to obtain any additional information, to the extent that any of those persons possesses that information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

# EXHIBIT B

1

To the Judge in Preliminary Relief Proceedings

of the Rotterdam District Court, Rotterdam location

---

**APPLICATION TO BE GRANTED LEAVE TO LEVY PREJUDGMENT ATTACHMENT BY GARNISHMENT PURSUANT TO ARTICLES 700 ET SEQ. IN CONJUNCTION WITH ARTICLES 718-723 DCCP**

The applicant is:

**BLOOMFIELD INVESTMENT RESOURCES CORP.** ("**Bloomfield**"), a legal entity incorporated and existing under the laws of the British Virgin Islands, registration number 1668690, wih registered office in Wickham's Cay II, Coastal building, Road Town, Tortola, British Virgin Islands, electing domicile for the purpose hereof in (1075 BC) Amsterdam, at Prins Hendriklaan 16, at the office of the law firm of Lemstra Van der Korst N.V., where I. Wassenaar LLM will act as its counsel and in that capacity will file and sign this application.

The respondent is:

**OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP"**, a legal entity incorporated and existing under the laws of the Russian Federation, with registration number (OGRN) 1097746821655 with registered office in Belorechenskaya Street, building 36-3, 109387, Moscow, Russian Federation ("**UMG**").

---

The applicant requests this Court to be granted leave to levy prejudgment by garnishment on the following grounds.



## 1.   THE PARTIES

1.1.   Bloomfield is an investment company forming part of the Reuben Brothers group ("**Reuben Brothers**"). Reuben Brothers is a major player in private equity, real estate investment and development, and venture capital. Its investments include data centers, airports, technology and media (www.reubenbrothers.com). The founders of the group are the British businessmen and philanthropists David and Simon Reuben.

1.2.   Elliot Daniloff ("**Daniloff**") is a director of the Cayman Islands-based investment company Synergy Hybrid Feeder Fund Ltd. ("**SH Feeder Fund**"). SH Feeder Fund aims at long-term capital growth through investments in, mainly, Russia and the Commonwealth of Independent States. By way of the companies ED Capital Management LLC and ED Capital LLC (jointly "**ED Capital**") Daniloff is also the investment manager and investment advisor of SH Feeder Fund.

1.3.   SH Feeder Fund is a majority shareholder of Synergy Hybrid Fund Ltd. ("**SH Fund**"). SH Fund in its turn is the sole shareholder in UMG: a holding company of Russian companies engaged in the production of poultry, grain and animal feed (www.unitedmeat.ru). Gennady Zalko ("**Zalko**") is General Director of UMG, as well as an employee of ED Capital.

1.4.   Bloomfield has engaged the services of RB Capital Ltd. ("**RB Capital**") in order to be advised by it and have its interests represented in the dispute with Daniloff or SH Feeder Fund, SH Fund and UMG, as the case may be.

## 2.   FACTS AND BACKGROUND

2.1.   Halfway 2011 Arkadiy Orkin – a stable business partner of Reuben Brothers – introduced Daniloff to David Reuben ("**Reuben**"). Daniloff was looking for lenders or participants, as the case may be, in his investment company SH Feeder Fund. By way of UMG Daniloff intended to invest in the Russian poultry trade.

2.2.   Reuben was not interested in, either directly or indirectly, making an investment in SH Feeder Fund. However, he was prepared to make USD 25 million available to Daniloff (the "**Deposit**"). The idea behind this was that it would become easier for Daniloff to find funds or participants, as the case may be, for SH Feeder Fund the moment he was supported, or financially supported, by a respected businessman like Reuben. The amount in question would remain in an account, or blocked account, which could not be accessed by Daniloff. By way of an

example Bloomfield submits two e-mails from Reuben, showing the main outlines of the agreement with Daniloff (**Annexes 1 and 2**).

2.3.  On 9 November 2011 the Deposit was made availble to Daniloff by Bloomfield, and the money was transferred by Bloomfield to an account in the name of SH Fund (**Annex 3**).

2.4.  The term of the Deposit was two years, meaning that it had to be repaid on 9 November 2013 (the "**Due Date**"). No interest was payable on the amount on Deposit. Instead Bloomfield would (upon repayment) acquire a total of 25% of the shares in SH Feeder Fund.

2.5.  To secure repayment of the amount on Deposit, Bloomfield was given 50% of the shares in SH Feeder Fund. Acquisition of the shares by Bloomfield was set down in the Subscription Agreement of 3 November 2011 (**Annex 4**).

2.6.  The Deposit was not set down in a formal agreement. Bloomfield being given 50% of the shares in SH Feeder Fund was enough for Reuben, as was the faith he had in Daniloff, who after all had been introduced by Arkadiy Orkin, an old and trusted business relation of Reuben Brothers. The Deposit being Bloomfield's is, however, an established fact, nor is this denied by Daniloff, as *inter alia* appears from the e-mail correspondence between the parties involved.

2.7.  Daniloff did not repay the amount on Deposit on the Due Date. Reuben or Bloomfield, as the case may be, have on several occasions requested and demanded - both by e-mail and orally - that Daniloff return the Deposit, but all this to no avail. By way of an example Bloomfield submits as **Annex 5** an e-mail correspondence between Reuben and Daniloff dating from June 2014.

2.8.  Despite an agreement with Reuben or Bloomfield, as the case may be, to keep the USD 25 million in Deposit, Daniloff lent the money on to UMG, which company is controlled by Daniloff. As far as Bloomfield is aware, UMG has used, or partly used, the funds for purposes other than the repayment of the Loan.

2.9.  Despite the fact that Daniloff refused to repay the amount on Deposit, the parties involved started talks with a view to reaching a solution after all. In the beginning of October 2014 these talks resulted in a proposal, whereby - briefly put - it was agreed that UMG would repay the USD 25 million before 31 December 2014 and that by way of security Bloomfield would acquire 50% of the shares in UMG direct (so no longer by way of SH Feeder Fund), plus a right

4

of pledge on the remaining 50% of the shares in UMG. The main outlines of this proposal were set down in an e-mail from Mehmet Saydam (on behalf of RB Capital, hereinafter "**Saydam**") dated 10 October 2014 (**Annex 6**). Daniloff confirmed these agreements on 16 October 2014 (**Annex 7**). However, the proposal has neither been formalised nor implemented, due to the fact that Daniloff refused to cooperate in this.

2.10. The parties involved continued their talks, within which context the following two options were discussed: (i) partial repayment of USD 15 million by UMG at short notice and repayment of the other USD 10 million at a later date, or (ii) the sale by Bloomfield of its interest in SH Feeder Fund for an amount of USD 25 million (**Annex 8**). The parties chose the first option, as appears from the e-mail exchange between Saydam and Daniloff (**Annex 9**).

2.11. The outlines of this proposal were discussed at a meeting in Moscow on 26 November 2014, which was attended by, among others, Daniloff, Orkin and Saydam. The parties involved approved the main outlines of the proposal (**Annex 10**). Saydam described these main outlines in an e-mail of 26 November 2014 (**Annex 11**).

2.12. Briefly put, these main outlines state that an amount of USD 15 million will be deposited in an account with Demir-Halk Bank (the Netherlands) N.V. ("**DHB**") in the name of UMG. This amount will serve as security for a loan to be provided by a third party to a company yet to be incorporated ("special purpose vehicle" or "SPV"). The SPV will use the loan to take over the shares from Bloomfield in SH Feeder Fund, for the purpose of repaying the amount on Deposit.

2.13. The account with DHB in the name of UMG (the "**Account**") was opened on 23 December 2014 (**Annex 12**). The agreed amount of USD 15 million was transferred to the Account in February 2015.

2.14. Towards the end of January the parties involved in joint consultation made an amendment to the agreement with DHB. To prevent UMG from withdrawing funds from the Account against the will of Bloomfield, it was agreed that as from that moment transactions required two signatures: one from a representative of UMG and one from a representative on behalf of Bloomfield (**Annex 13**).

2.15. This amendment required a resolution by the general meeting of UMG. On 29 January 2015 the general meeting of UMG (read: the sole shareholder of HS Fund) adopted a resolution der

that purpose (**Annex 14**), as a result of which the two-signature system could be implemented. On behalf of Bloomfield (or RB Capital as the case may be) Patrick O'Driscoll ("**O'Driscoll**") became the person authorized to sign.

2.16.   By e-mail of 30 January 2015 Zalko (on behalf of UMG) informed DHB to this effect and submitted the resolution of the general meeting of UMG (**Annex 15**). As from that moment two signatures were required to transfer funds from the Account.

2.17.   In May 2015 a part of the amount on Deposit, namely USD 2 million, was repaid through the sale by Bloomfield of a part of its shares in SH Feeder Fund to a company affiliated with Daniloff. Accordingly the remaining amount on Deposit is currently USD 23 million.

2.18.   On 2 June 2015 Zalko (on behalf of UMG) requested DHB to end the two-signature system (**Annex 16**). UMG did not consult Bloomfield regarding this request, let alone that Bloomfield gave its permission for this request. Bloomfield understands that more or less at the same time UMG requested DHB to transfer USD 2.9 million from the Account.

2.19.   In view of the above, Bloomfield has legitimate fears that UMG is trying to withdraw the amount of USD 15 million from the Account. Accordingly, Bloomfield by letter of 10 June 2015 requested DHB not to terminate the two-signature system and/or transfer any amount from the Account (**Annex 17**). Subsequently DHB, pending the outcome of its own investigation, froze all actions regarding the Account (**Annex 18**).

**3.       THE CLAIM**

3.1.   As appears from the above, UMG, despite several demands for payment, keeps failing to perform the agreements of 26 November 2014 regarding the repayment of the amount on Deposit. By one-sidedly changing the two-signature system and causing DHB to perform transfers on the basis of one signature only, UMG not only acts in breach of the agreements of 26 November 2014, but at the same time acts unlawfully towards Bloomfield by depriving it of the repayment of the amount on Deposit, or the entire amount on Deposit.

3.2.   Bloomfield is considering taking legal action against Daniloff, ED Capital, SH Feeder Fund and SH Fund side by side with UMG, with a view to getting back the full amount of USD 23 million made available by it.

3.3.  The Dutch court has jurisdiction with regard to Bloomfield's claim against UMG on the basis of article 6 (a) DCCP. The agreement (as described in Saydam's e-mail of 26 November 2014, annex 11) between Bloomfield and (among others) UMG should be executed in the Netherlands: UMG must keep USD 15 million in the Account in order to carry out the agreed transactions or, as the case may be, repay the amount on Deposit to Bloomfield. To the extent that no jurisdiction is conferred on the Dutch court by article 6 (a) DCCP, jurisdiction is conferred on it by article 6 (e) or article 10 in conjunction with article 767 DCCP.

## 4.  NO KNOWN DEFENCES UMG ET AL.

Bloomfield is not aware of any material defences on the part of UMG and/or Daniloff, SH Feeder Fund and SH Fund against the claims described above. All that Bloomfield has learned is that UMG wants to use the funds that have been parked in the Account for paying off debts owed to third parties. Doing so would be in breach of the agreements between the parties, which is precisely what Bloomfield wishes to prevent with this attachment.

## 5.  ESTIMATE OF THE CLAIM

For the above reasons Bloomfield is entitled to and has an interest in levying prejudgment attachment by garnishment, estimating the amount in respect of which leave is granted at EUR 22,826,933.75, being the principal of EUR 20,451,757.95 plus a surcharge as referred to in the Attachment Syllabus, based on the exchange rate of the Dollar on 16 June 2015 (EUR 0.889207 – www.xe.com).

## 6.  PROPERTY TO BE ATTACHED

The request to be granted leave seeks to attach before judgment UMG's property in the hands of:

the public company with limited liability Demir-Halk Bank (Nederland) N.V. ("**DHB**"), with registered office and principal place of business in (3016 BB) Rotterdam at Parklaan 8,

namely all property owned by UMG, being

- cash and/or cash equivalents entrusted to DHB,
- any funds owed to UMG by DHB,
- items of movable property, not being property subject to registration, entrusted to DHB,

as well as all that will directly be owed to UMG by DHB under an existing legal relationship,

in particular, but expressly not limited thereto, the receivables administered in the account(s) maintained with DHB by UMG, one of these being the account with number **074.43.64.175**.

## 7.   NO ALTERNATIVES FOR THE ATTACHMENT TO BE LEVIED

7.1.   Given the amount of Bloomfield's claim and the unexplained refusal of UMG to perform the commitments of 26 November 2014, the attachment to be levied is necessary and proportionate.

7.2.   To this should be added that Bloomfield has indications that UMG – in breach of the agreements – is trying to withdraw funds from the Account, as a result of which Bloomfield will sustain harm (see above in 2.18).

7.3.   Bloomfield furthermore knows of several debts that have been undertaken by UMG. Bloomfield has legitimate fears that UMG (at short notice) will pay off these debts with funds from the Account, or that these third parties will attach the Account. This too causes Bloomfield to be sufficiently entitled to and have a sufficient interest in levying the aforementioned attachment.

## 8.   TERM FOR BRINGING THE CLAIM IN THE PRINCIPAL ACTION

8.1.   Bloomfield requests this Court to set the term for bringing the claim in the principal action at 28 days. As appears from the above, the body of facts and the grounds argued are not simple. To this should be added that the claims are extensive and far-reaching. Bloomfield will not be able to confine itself to a simple summons, limited in size. Bloomfield is furthermore considering, in addition to UMG, to also start legal proceedings against the other persons and entities involved in the unlawful actions. Moreover, the contacts at Bloomfield are domiciled abroad and have no command of the Dutch language. Consequently the summons – as well as the other documents (which may be voluminous) – will have to be translated, which will cause a delay. In view of all this, drafting the summons will require more than the usual preparation time.

8.2.   Lastly Bloomfield also requests an extended term, in order to provide the parties with sufficient time to discuss the possibilities of reaching an out-of-court settlement before the matter is taken to court.



9.    **ENFORCEABLE WITH IMMEDIATE EFFECT**

Bloomfield request this Court to declare the decision to be given by it enforceable with immediate effect. It is true that no appeal lies against leave that is granted, but a provision corresponding with article 350 (2) DCCP is absent where the application procedure, or attachment application procedure, is concerned, so that Bloomfield, even if an appeal were filed, has an interest in being able to enforce the decision, or have it enforced. See also the Attachment Syllabus, version of August 2014, page 11, paragraph 14.

10.   **JURISDICTION DISTRICT COURT**

The Judge in Preliminary Relief Proceedings of the Rotterdam District Court, Rotterdam location, has territorial jurisdiction in the matter, because the third party against which Bloomfield wishes to levy attachment is domiciled, or in part domiciled, in Rotterdam (article 700 (1) DCCP).

**FOR WHICH REASONS:**

Bloomfield You, the Judge in Preliminary Relief Proceedings, respectfully requesting You, by provisionally enforceable judgment:

(a)    to grant leave to levy the attachment referred to in paragraph 6 of this application;

(b)    to set the amount in respect of which the leave regarding Bloomfield is granted, including the interest and costs which UMG may be ordered to pay, at EUR 22,826,933.75;

(c)    to set the term referred to in article 700 (3) DCCP at 28 days from the date of the attachment, or first attachment.

Amsterdam, 16 June 2015

(signature)

Attorney-at-law

This case is handled by I. Wassenaar and T.Salemink, Lemstra Van der Korst N.V.

Phone 020 2050 567 | Fax 020 2050 560 | E-mail i.wassenaar@lvdk.com and  t.salemink@lvdk.com



9

Granted as requested, estimating Bloomfield's claim against UMG, including interest and costs, at:
EUR *22,826,933.75* [in handwriting]

(in words: *twenty-two million eight hundred and twenty-six thousand nine hundred and thirty-three euros and seventy-five eurocents.* [in handwriting]),

ordering that (to the extent necessary) the claim in the principal action has to be brought within *28 (in words: twenty-eight* [in handwriting] days from the attachment, or first attachment, with the proviso that, if the last day of that period is a Sunday or Public Holiday as referred to in the General Extension of Time Limits Act (in Dutch: Algemene Termijnenwet), the term will be extended as provided in that act.

Rotterdam, *17* [in handwriting] June 2015

The Judge in Preliminary Relief Proceedings,

[name judge]

[signature]

The Clerk of the Court

CERTIFIED AS A TRUE BAILIFF'S COPY
Issued to *I. Wassenaar*

The clerk of the court
(signature)



## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the document "**VERZOEK TOT HET VERLENEN VAN VERLOF VOOR HET LEGGEN VAN CONSERVATOIR DERDENBESLAG EX ARTT. 700 E.V. JO 718-723 RV**", which was written in Dutch.

Amstelveen, 16 July 2015.

Jouke van der Meij, sworn translator for the English language

Strandvliet 20

1181 ML AMSTELVEEN

THE NETHERLANDS



Zaak 478543

15-1166

# Lemstra <sup>van</sup><sub>der</sub> Korst

**IN NAAM DES KONINGS**
Rechtbank Rotterdam

Informatie aan de

Aan de Voorzieningenrechter
van de rechtbank Rotterdam, locatie Rotterdam

Ingekomen     **1 7 JUNI 2015**

~~voormiddag :~~

namiddag   :

**VERZOEK TOT HET VERLENEN VAN VERLOF VOOR HET LEGGEN VAN CONSERVATOIR DERDENBESLAG EX. ARTT. 700 E.V. JO. 718-723 RV**

Verzoekster is:

de rechtspersoon naar het recht van de Britse Maagdeneilanden **BLOOMFIELD INVESTMENT RESOURCES CORP.** ("Bloomfield"), met registratienummer 1668690, gevestigd te Wickham's Cay II, Coastal gebouw, Road Town, Tortola, Britse Maagdeneilanden, voor deze zaak woonplaats kiezende in (1075 BC) Amsterdam, aan de Prins Hendriklaan 16, ten kantore van Lemstra Van der Korst N.V., waar mr. I. Wassenaar deze zaak als haar advocaat behandelt en dit verzoekschrift als zodanig indient en ondertekent.

Gerekwestreerde is:

de rechtspersoon naar het recht van de Russische Federatie **OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP"**, met registratienummer (OGRN) 1097746821655 gevestigd te Belorechenskaya straat, gebouw 36-3, 109387, Moskou, Russische Federatie ("UMG").

Verzoekster verzoekt U Edelachtbare verlof te verlenen tot het leggen van conservatoir derdenbeslag op de volgende gronden.

# Lemstra van der Korst

**1.     PARTIJEN**

1.1.    Bloomfield is een investeringsmaatschappij en maakt onderdeel uit van de Reuben Brothers-groep ("**Reuben Brothers**"). Reuben Brothers is een belangrijke speler in private equity, vastgoedinvesteringen en -ontwikkeling, en durfkapitaal. Zij investeert onder meer in data centra, vliegvelden, techniek en media (www.reubenbrothers.com). Grondleggers van de groep zijn de Britse zakenmannen en filantropen David en Simon Reuben.

1.2.    Elliot Daniloff ("**Daniloff**") is bestuurder van het op de Caymaneilanden gevestigde investeringsmaatschappij Synergy Hybrid Feeder Fund Ltd. ("**SH Feeder Fund**"). SH Feeder Fund beoogt vermogensgroei op de lange termijn door middel van investeringen in voornamelijk Rusland en het Gemenebest van Onafhankelijke Staten. Daniloff is via de vennootschappen ED Capital Management LLC en ED Capital LLC (gezamenlijk "**ED Capital**") tevens de *investment manager* en *investment advisor* van SH Feeder Fund.

1.3.    SH Feeder Fund is meerderheidsaandeelhouder van Synergy Hybrid Fund Ltd. ("**SH Fund**"). SH Fund is op haar beurt enig aandeelhouder in UMG: een houdstermaatschappij van Russische vennootschappen gericht op de productie van pluimvee, graan en diervoeding (www.unitedmeat.ru). Gennady Zalko ("**Zalko**") is de *General Director* van UMG en tevens werknemer van ED Capital.

1.4.    Bloomfield heeft RB Capital Ltd. ("**RB Capital**") ingeschakeld om haar te adviseren en om haar belangen te vertegenwoordigen in het geschil met Daniloff c.q. SH Feeder Fund, SH Fund en UMG.

**2.     FEITEN EN ACHTERGROND**

2.1.    Medio 2011 heeft Arkadiy Orkin – een bestendige zakenpartner van Reuben Brothers – Daniloff geïntroduceerd bij David Reuben ("**Reuben**"). Daniloff was op zoek naar financiers c.q. deelnemers voor zijn investeringsmaatschappij SH Feeder Fund. Daniloff beoogde via UMG te investeren in de Russische pluimveehandel.

2.2.    Reuben had geen interesse om (direct) te investeren in SH Feeder Fund. Wel was hij bereid om Daniloff USD 25 miljoen ter beschikking te stellen (het "**Depot**"). De idee was dat Daniloff eenvoudiger financiering c.q. deelnemers voor SH Feeder Fund zou kunnen vinden op het moment dat hij (financieel) werd ondersteund door een gerespecteerde zakenman

# Lemstra <sup>van</sup><sub>der</sub> Korst

als Reuben. Daarbij zou het bedrag op een (geblokkeerde) rekening blijven staan, waarover Daniloff niet zou kunnen beschikken. Bij wijze van voorbeeld legt Bloomfield twee e-mails over van Reuben waaruit de hoofdlijnen van de afspraak met Daniloff blijken (**Bijlagen 1 en 2**).

2.3.    Het Depot is op 9 november 2011 ter beschikking gesteld door Bloomfield aan Daniloff, waarbij Bloomfield het bedrag heeft overgemaakt naar een rekening op naam van SH Fund (**Bijlage 3**).

2.4.    De looptijd van het Depot bedroeg twee jaar en diende op 9 november 2013 (de "Vervaldatum") te worden terugbetaald. Over het bedrag in Depot was geen rente verschuldigd. In plaats daarvan zou Bloomfield (bij terugbetaling) in totaal 25% van de aandelen in SH Feeder Fund verkrijgen.

2.5.    Ter zekerheid van terugbetaling van het bedrag in Depot verkreeg Bloomfield 50% van de aandelen in SH Feeder Fund. De verkrijging van de aandelen door Bloomfield is vastgelegd in de *Subscription Agreement* van 3 november 2011 (**Bijlage 4**).

2.6.    Het Depot is niet in een formele overeenkomst vastgelegd. Voor Reuben was het voldoende dat Bloomfield 50% van de aandelen in SH Feeder Fund verkreeg, als ook het vertrouwen in Daniloff die immers was geïntroduceerd door Arkadiy Orkin, een langdurige en vertrouwde zakenrelatie van Reuben Brothers. Dat het Depot toekomt aan Bloomfield, staat evenwel vast en wordt ook niet ontkend door Daniloff, hetgeen onder meer blijkt uit de emailcorrespondentie tussen betrokken partijen.

2.7.    Daniloff heeft het bedrag in Depot niet terugbetaald op de Vervaldatum. Reuben c.q. Bloomfield hebben Daniloff verschillende keren – zowel per e-mail als mondeling – verzocht en gesommeerd het Depot terug te storten. Dit alles zonder resultaat. Bij wijze van voorbeeld legt Bloomfield als **Bijlage 5** een emailcorrespondentie tussen Reuben en Daniloff uit juni 2014 over.

2.8.    Daniloff heeft de USD 25 miljoen – tegen de afspraken met Reuben c.q. Bloomfield in deze in Depot te houden – doorgeleend aan UMG, welke vennootschap wordt gecontroleerd Daniloff. UMG heeft het bedrag voor zover Bloomfield kan overzien (deels) aangewend voor andere doelen dan terugbetaling.

# Lemstra van der Korst

2.9. Ondanks het feit dat Daniloff het bedrag in Depot weigerde terug te betalen, zijn de betrokken partijen in gesprek gegaan om alsnog tot een oplossing te komen. Deze gesprekken hebben begin oktober 2014 tot een voorstel geleid, waarbij – kortweg – werd afgesproken dat UMG de USD 25 miljoen zou terugbetalen voor 31 december 2014 en Bloomfield ter zekerheid hiervan direct 50% van de aandelen in UMG zou verkrijgen (dus niet langer indirect via SH Feeder Fund) als ook een pandrecht op de overige 50% van de aandelen in UMG. De hoofdlijnen van dit voorstel zijn vastgelegd in een e-mail van Mehmet Saydam (namens RB Capital, hierna "Saydam") van 10 oktober 2014 (Bijlage 6). Daniloff heeft deze afspraken op 16 oktober 2014 bevestigd (Bijlage 7). Het voorstel is echter niet geformaliseerd en uitgevoerd, omdat Daniloff weigerde zijn medewerking te verlenen.

2.10. De betrokken partijen zijn in gesprek gebleven, waarbij de volgende twee opties zijn besproken: (i) gedeeltelijke terugbetaling van USD 15 miljoen door UMG op korte termijn en de terugbetaling van de overige USD 10 miljoen op een later moment, of (ii) de verkoop van Bloomfield van haar belang in SH Feeder Fund voor USD 25 miljoen (Bijlage 8). Partijen hebben de eerste optie gekozen, zoals blijkt uit de e-mailwisseling tussen Saydam en Daniloff (Bijlage 9).

2.11. De contouren voor dit voorstel zijn besproken tijdens een bijeenkomst in Moskou op 26 november 2014, waarbij onder andere Daniloff, Orkin en Saydam aanwezig waren. De betrokkenen hebben het voorstel op hoofdlijnen geaccordeerd (Bijlage 10). Saydam heeft de hoofdlijnen omschreven in een e-mail van 26 november 2014 (Bijlage 11).

2.12. Deze hoofdlijnen komen er – kortweg – op neer dat een bedrag van USD 15 miljoen op een rekening bij de Demir-Halk Bank (Nederland) N.V. ("DHB") ten name van UMG zal worden geplaatst. Dit bedrag zal dienen als zekerheid voor een bij een derde te verkrijgen lening aan een nog op te richten vennootschap ("special purpose vehicle" of "SPV"). De SPV zal de lening gebruiken om de aandelen van Bloomfield in SH Feeder Fund over te nemen met als doel terugbetaling van het bedrag in Depot.

2.13. De rekening bij DHB op naam van UMG (de "Account") is op 23 december 2014 geopend (Bijlage 12). Het afgesproken bedrag van USD 15 miljoen is in februari 2015 naar de Account overgemaakt.

# Lemstra <sup>van</sup>der Korst

**3.     DE VORDERING**

3.1.    Zoals uit het voorgaande blijkt, blijft UMG ondanks diverse aanmaningen in gebreke met de nakoming van de op 26 november 2014 gemaakte afspraken strekkende tot terugbetaling van het bedrag in Depot. Door het twee handtekeningenstelsel eenzijdig te wijzigen en DHB op basis van slechts haar handtekening overboekingen te laten doen, handelt UMG niet alleen in strijd met de op 26 november 2014 gemaakte afspraken, maar handelt zij tegelijkertijd onrechtmatig jegens Bloomfield door haar verstoken te laten van terugbetaling van het (gehele) bedrag in Depot.

3.2.    Bloomfield overweegt Daniloff, ED Capital, SH Feeder Fund en SH Fund naast UMG in rechte te betrekken om het volledige ter beschikking gestelde bedrag van USD 23 miljoen terug te krijgen.

3.3.    De Nederlandse rechter heeft rechtsmacht ten aanzien van de vordering van Bloomfield op UMG op grond van art. 6 sub a Rv. De overeenkomst (zoals beschreven in de e-mail van Saydam van 26 november 2014, bijlage 11) tussen Bloomfield en (onder andere) UMG dient in Nederland te worden uitgevoerd: UMG moet USD 15 miljoen op de Account aan houden ter uitvoering van de overeengekomen transacties c.q. terugbetaling van het bedrag in Depot aan Bloomfield. Voor zover de Nederlandse rechter geen rechtsmacht heeft op grond van art. 6 sub a Rv, heeft zij deze bevoegdheid op grond van art. 6 sub e Rv dan wel art. 10 jo. 767 Rv.

**4.     GEEN BEKENDE VERWEREN UMG C.S.**

Bloomfield is niet bekend met enig materieel verweer van UMG en/of Daniloff, SH Feeder Fund en SH Fund tegen de hiervoor beschreven vorderingen. Bloomfield heeft slechts vernomen dat UMG de op de Account geparkeerde gelden wil aanwenden om schulden aan derden te voldoen. Dit zou in strijd komen met de gemaakte afspraken en dit is juist hetgeen Bloomfield door middel van dit beslag wenst te voorkomen.

# Lemstra van der Korst

**5.    BEGROTING VORDERING**

Op grond van het voorgaande heeft Bloomfield recht op en belang bij het doen leggen van het conservatoir derdenbeslag, met begroting van het bedrag waarvoor verlof wordt verleend op EUR 22.826.933,75 zijnde de hoofdsom van EUR 20.451.757,95, vermeerderd met de opslag zoals vermeld in de Beslagsyllabus, waarbij is gerekend met de dagkoers van de US Dollar op 16 juni 2015 (EUR 0,889207 – www.xe.com).

**6.    BESLAGOBJECT**

Het verzoek om verlof strekt tot het leggen van conservatoir derdenbeslag ten laste van UMG onder:

de naamloze vennootschap Demir-Halk Bank (Nederland) N.V. ("DHB"), gevestigd en kantoorhoudende in (3016 BB) Rotterdam aan het adres Parklaan 8,

en wel op alle goederen van UMG, zijnde

- gelden en/of geldswaarden die DHB onder zich heeft,

- vorderingen die UMG op DHB heeft,

- roerende zaken die DHB onder zich heeft en geen registergoederen zijn,

alsmede op die vorderingen die UMG op DHB uit een bestaande rechtsverhouding rechtstreeks zal verkrijgen,

in het bijzonder, doch uitdrukkelijk niet daartoe beperkt, de vorderingen geadministreerd op de door UMG bij DHB aangehouden geldrekening(en), onder andere met nummer **074.43.64.175**.

**7.    GEEN ALTERNATIEVEN VOOR HET TE LEGGEN BESLAG**

**7.1.**   Gelet op de hoogte van de vordering van Bloomfield en de niet-toegelichte weigering van UMG om de op 26 november 2014 gemaakte afspraken na te komen, is het te leggen beslag noodzakelijk en proportioneel.

**7.2.**   Daarbij komt bovendien dat Bloomfield aanwijzingen heeft dat UMG – in strijd met de gemaakte afspraken – probeert gelden aan de Account te onttrekken, waardoor Bloomfield benadeeld zal worden (hiervoor onder 2.18).

# Lemstra van der Korst

**7.3.** Voorts is Bloomfield op de hoogte van verschillende schulden die UMG is aangegaan. Bloomfield heeft gegronde vrees dat UMG (op korte termijn) deze schulden met gelden van de Account aan derden zal voldoen, dan wel dat deze derden op de Account beslag leggen. Ook dat geeft Bloomfield voldoende recht en belang om genoemde beslag te leggen.

## 8. TERMIJN VOOR HET AANHANGIG MAKEN VAN DE EIS IN DE HOOFDZAAK

**8.1.** Bloomfield verzoekt U Edelachtbare de termijn voor het instellen van de eis in de hoofdzaak te bepalen op 28 dagen. Zoals uit het voorgaande blijkt, zijn het feitencomplex en de gestelde grondslagen niet eenvoudig. Bovendien zijn de vorderingen omvangrijk en ingrijpend van aard. Bloomfield zal niet kunnen volstaan met een eenvoudig, in omvang beperkte dagvaarding. Bloomfield overweegt voorts om naast UMG de overige bij de onrechtmatige handelingen betrokken personen en entiteiten eveneens in rechte te betrekken. Verder zijn de contactpersonen bij Bloomfield woonachtig in het buitenland en de Nederlandse taal niet machtig. De dagvaarding – als ook andere (mogelijk omvangrijke) stukken – moeten dan ook worden vertaald, hetgeen voor vertraging zal zorgen. Het concipiëren van de dagvaarding zal gelet op dit alles meer dan de gebruikelijke voorbereidingstijd vergen.

**8.2.** Tot slot verzoekt Bloomfield ook om een verlengde termijn om partijen voldoende tijd te bieden om te spreken over de mogelijkheden om te komen tot een buitengerechtelijk vergelijk voordat de hoofdzaken aanhangig worden gemaakt.

## 9. UITVOERBAAR BIJ VOORRAADVERKLARING

Bloomfield verzoekt U Edelachtbare de te geven beschikking uitvoerbaar bij voorraad te verklaren. Tegen verleend verlof staat weliswaar geen hoger beroep open, maar een met art. 350 lid 2 Rv corresponderende bepaling ontbreekt voor de (beslag)rekestprocedure, zodat Bloomfield er belang bij heeft dat zij, ook indien appel zou worden ingesteld, de beschikking ten uitvoer kunnen (doen) leggen. Zie ook de Beslagsyllabus, versie augustus 2014, pag. 11, punt 14.

# Lemstra van der Korst

**10.   BEVOEGDHEID RECHTBANK**

De Voorzieningenrechter van de Rechtbank Rotterdam, locatie Rotterdam, is relatief bevoegd in deze, omdat de derde waaronder Bloomfield beslag wenst te leggen (mede) woonplaats heeft in Rotterdam (art. 700 lid 1 Rv).

**REDENEN WAAROM:**

Bloomfield zich wendt tot U Edelachtbare Voorzieningenrechter met het eerbiedig verzoek, bij beschikking uitvoerbaar bij voorraad:

(a)    haar verlof te verlenen het in paragraaf 6 van dit verzoekschrift bedoelde beslag te doen leggen;

(b)    het bedrag waarvoor het verlof ten aanzien van Bloomfield wordt verleend, met inbegrip van de rente en kosten waarin UMG zal kunnen worden veroordeeld, vast te stellen op EUR 22.826.933,75;

(c)    de termijn als bedoeld in artikel 700 lid 3 Rv te bepalen op 28 dagen na het (eerst gelegde) beslag.

Amsterdam, 16 juni 2015



Advocaat

# Lemstra <sup>van</sup> der Korst

Zaak 478543
Rolgestnr. 15-1166

Toegestaan als verzocht met begroting van de vordering van Bloomfield op UMG, inclusief rente en kosten, op: EUR _22.026.933,75_

(zegge: _tweeëntwintigmiljoen achthonderdzesentwintigduizend negenhonderddrieёndertig euro_ ✱

en met bepaling (voor zoveel nodig) dat de eis in de hoofdzaak binnen _28_ (✱zegge: achtentwintig) dagen na het (eerst gelegde) beslag dient te worden ingesteld, met dien verstande dat, indien de laatste dag van de termijn op een zon- of feestdag als bedoeld in de Algemene Termijnenwet valt, de termijn wordt verlengd op de wijze als in die wet bepaald.

✱ en vijfenzeventig eurocent)

Rotterdam, 17 juni 2015

De Voorzieningenrechter,

Mr J W. van den Hurk

De Griffier

Voor EERSTE GROSSE uitgegeven aan
Mr I. Wassenaar
advocaat,

De griffier.

# EXHIBIT C

[...]

On this day, the                                    of July two thousand fifteen,

following a request of the legal entity under Russian Federation law <u>OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP"</u>, situated in Moscow in the Russian Federation ("UMG"), with choice of domicile in these proceedings in (3016 BG) Rotterdam on the Van Vollenhovenstraat 29, at the offices of BASE Advocaten B.V., from this office, the applicant has appointed Mr. R.A.W.J. van Eijck and Mr. V.R.M. Appelman as lawyers, who will act on its behalf in this capacity;

I HAVE

pursuant to verbal mandate of the Preliminary Relief Judge of the District Court of Rotterdam;

SUMMONED IN PRELIMINARY RELIEF PROCEEDINGS

The legal entity under British Virgin Islands law <u>BLOOMFIELD INVESTMENT RESOURCES CORP.</u>, situated in Tortola, the British Virgin Islands ("Bloomfield"), with last known choice of domicile in (1075 BC) Amsterdam, on the Prins Hendriklaan 16, for (*the attention of*) Mr. I. Wassenaar, serving my writ of summons at this address and providing a copy of this writ, pursuant to Article 63 paragraph 2 CPC icw.705 paragraph 3 CPC, to:

TO

appear, on [                    ] July two thousand fifteen at [        ] o'clock, in person or represented by a lawyer at the hearing which will be held in the Wilhelminaplein courthouse, no. 100-125, before the Preliminary Relief Judge of the District Court of Rotterdam passing judgment in preliminary relief proceedings;

## WITH NOTICE

that:

a.      if the defendant fails to appoint counsel nor appears in person at the hearing, and if the prescribed terms and formalities were observed, the Court will issue default judgement against the defendant and will sustain the claim described below, unless this would be deemed unlawful or unfounded;

b.      upon the defendant's appearance before the Court, a court registry fee will be charged, to be paid within four weeks counting from the time of appearance;

c.      the level of the court registry fees is mentioned in the most recent appendix of the Court Registry Fees Act in civil proceedings, which can be found on the website www.kbvg.nl/griffierechtentabel, for example.

d.      any insolvent individual will be charged a court registry fee for insolvent persons pursuant to the law, if he, at the point in time when the court registry fee is levied, has submitted:

1, a copy of the admittance decision, as stated in Article 29 of the Legal Assistance Act, or if this is impossible due to circumstances for which he cannot reasonably be held accountable, a copy of the request as stated in Article 24, second paragraph, of the Legal Assistance Act, or

2, a statement from the Legal Assistance Supervisory Board as mentioned in Article 7, third paragraph, section e, of the Legal Assistance Act which

shows that his income is not more than the income of the Order in Council pursuant to Article 35, second paragraph, of this Act;

**IN ORDER TO**

hear it claimed and concluded on behalf of the applicant as claimant, against it as defendant, as follows:

**1.**   **TABLE OF CONTENTS**

1.      Table of contents

2.      The Main Dispute

3.      Facts and Conclusion

4.      Legal Framework

**2.**   **THE MAIN DISPUTE**

1.      These preliminary relief proceedings aim to release the conservatory attachment against UMG by Bloomfield on assets held by Demir-Halk Bank (the Netherlands) N.V. ("DHB").

**3.**   **FACTS AND CONCLUSION**

Parties

1. ·     Bloomfield is an investment company and is part of the Reuben Brothers-Groep ("**Reuben Brothers**"). Reuben Brothers is a well-known and important (global) player in private equity, real estate investments and development and venture capital (see www.reubenbrothers.com).

2.      Elliot Daniloff ("**Daniloff**") is a director of Synergy Hybrid Feeder Fund Ltd ("**SH Feeder Fund**"). SH Feeder Fund's aim is to provide long-term asset growth through investments in primarily Russia and the Commonwealth of Independent States. Through the companies ED Capital Management LCC and ED Capital LCC (jointly: "**ED Capital**") Daniloff is also the investment manager and investment advisor of the SH Feeder Fund.

3.        SH Feeder Fund owns the majority of the shares in Synergy Hybrid Fund Ltd ("SH Fund"). SH Fund in turn owns all shares of UMG. UMG is a holding company of Russian companies, focused on the production of poultry, cereals and animal feed (www.unitedmeat.ru).

Bloomfield's investment in SH Fund in 2011

4.        On 3 November 2011, upon signing the subscription agreement (the "**Subscription Agreement**") (**exhibit 1**), Bloomfield subscribed to USD 25,000,000.- worth of shares in SH Fund. Doing so, Bloomfield also stated its agreement with the Private Placement Memorandum applied to SH Fund from June 2010 onward ("**Memorandum SH Fund**") (**exhibit 2**).

5.        The purchase price of the shares in SH Fund subscribed to by Bloomfield pursuant to the Subscription Agreement had to be paid to bank account number 010-825297-501 held by SH Fund with the Bank of Bermuda, Hamilton (see among others Appendix A of the Subscription Agreement).

6.        In order to meet this requirement, on 9 November 2011 Reuben Brothers deposited an amount of USD 25,000,000.- on the aforementioned bank account on behalf of Bloomfield (**exhibit 3**). The description ("Payment Details") of this transfer explicitly mentions: "*Bloomfield Investment Resources Corp Subscription*". Hence, it is beyond doubt that the payment of USD 25,000,000.- was made in execution of Bloomfield's subscription of shares - and so, as an investment.

7.        In 2012, Bloomfield, just like the other shareholders in SH Fund, became a shareholder in SH Feeder Fund (referred to as "*the Fund*" from that point onward) following a restructuring of the fund in a so-called Master/Feeder structure, with Bloomfield's consent. SH Feeder Fund, in turn, held the majority of the shares in SH Fund (from that point onward known as "*the Master Fund*"). Prior to this restructuring, all shareholders were informed by letter dated 1 March 2012 (**exhibit 4**) about this restructuring and among others, the modified Memorandum (in force as of January 2012) was sent (**exhibit 5**) ("**Memorandum SH Feeder Fund**"). All shareholders, including Bloomfield, agreed to this transition to SH Fee-

der Fund. In its request dated 16 June 2015 **(exhibit 6)** (the "Request"), in marginal 2.5, final sentence, Bloomfield itself indicated that it became a shareholder in SH Feeder Fund pursuant to the subscription agreement provided as exhibit 4.

8.      Bloomfield holds just under 50% of the shares in SH Feeder Fund. SH Feeder Fund holds about 92% of SH Fund, which in turn holds 100% of the shares of UMG. Through its shares in SH Feeder Fund Bloomfield thus indirectly holds approximately 45% of UMG's shares.

9.      As stated in the letter of 1 March 2012, nothing materially changed regarding the rights and obligations of shareholders. Furthermore, in particular the Investment Manager remained the same and the fund would continue to make all its investments in accordance with the original investment goals and strategies.

10.     In this context, the Memorandum SH Feeder Fund determined that the SH Feeder Fund *"expects to invest all or a substantial portion of its assets in Synergy Hybrid Fund Ltd (the: "Master Fund") [....]*

and a little further below:

> *"The Fund's and the Master Fund's investment objective is to achieve long term capital appreciation by investing primarily, but not exclusively, in Russian public and privately held equity and debt securities, as well as securities of companies located in the Commonwealth of Independent States (the "CIS').*

(Note: the same *"investment objective"* was also stated in the Memorandum SH Fund)

11.     Therefore, as correctly stated by Bloomfield under no. 1.2 of its Request, the SH Feeder Fund's aim is to provide long-term asset growth through investments in primarily Russia and the Commonwealth of Independent States. In this case, SH Feeder Fund did so by holding the majority of shares in SH Fund and investing in this way, while SH Fund in turn invested in UMG in which it held (and still holds) all the shares. UMG is a holding company of Russian companies, focused on the production

of poultry, cereals and animal feed (www.unitedmeat.ru). It is also accurate that Mr Gennady Zalko **("Zalko")** is UMG's General Director.

12.    So, Reuben Brothers, one of the largest, most professional and well-known investors in the world, became a shareholder in SH Feeder Fund through its investment vehicle Bloomfield, by an investment of USD 25,000,000 under the terms contained in the Subscription Agreements and the Memorandum SH Fund and the Memorandum SH Feeder Fund. An investment in shares in an investment fund, and not a so-called "loan" or even "deposit".

13.    Bloomfield falsely informed the Preliminary Relief Judge in a fundamental manner already in the Request, whereby it - contrary to the above - purports that

–    Reuben did not have any interest to invest (directly) in SH Feeder Fund;

–    That Reuben was willing to provide Daniloff USD 25,000,000 (the "Deposit");

–    That the idea was that it would be easier for Daniloff to find funding or participants for SH Feeder Fund as soon as he received (financial) backing from a respected businessman like Reuben;

–    That the amount would remain on a (blocked) account inaccessible by Daniloff,

–    That the duration of the so-called Deposit would be two years and allegedly be repaid on 9 November 2013;

–    That the USD 25,000,000 amount was not interest-bearing, but that Bloomfield (in case of repayment) would receive 25% of the shares in SH Feeder Fund in total and;

–    That Bloomfield received 50% of the shares in SH Feeder Fund to guarantee the repayment of the so-called amount in escrow.

14.    How did Bloomfield arrive to these statements? Not only are they inaccurate, but arguably contradicting the Subscription Agreements and the Memorandum SH Fund and the Memorandum SH Feeder Fund. There was never any "loan" or "Deposit". For its investment of USD 25,000,000

Bloomfield received shares in SH Fund initially which were converted later on into shares in SH Feeder Fund. No more and no less.

15.     Bloomfield's whole "*story*" in marginals 2.2 through 2.6 (in short, that this counted as a loan or deposit) allegedly stems from Appendices 1 and 2 of the Request. That's two internal emails, allegedly exchanged on 14 July 2011 and 24 August 2011 between David Reuben and Alexander Bushaev, Bloomfield's director. This email exchange indicates that David Reuben's enthusiasm to make the investment was clearly brought about by one Arkadiy Orkin who mentions to Reuben that "*time is important we must not to waste it as such a big money making opportunity here*". Whatever these individuals may or may not have promised each other is not part of Daniloff, SH Feeder Fund, SH Fund or UMG, who were not involved in this email exchange. The proposition presented to Bloomfield and that Bloomfield subsequently entered into is crystal clear: to invest in a mutual fund.

<u>2011 to 2014</u>

16.     After Bloomfield was on-boarded as an investor in 2011, nothing happened for years. Of particular interest is that Bloomfield, in the years that followed, did not make use of the right included in the memoranda of a shareholder to full or partial "*redemption of Shares*"; see page 62ff of the Memorandum SH Fund and page 71ff of the Memorandum SH Feeder Fund. Apparently that was not an interesting path for Bloomfield.

<u>The bonds: issued by UMG Finance B.V. and guaranteed by UMG</u>

17.     On 9 December 2013, a 100% subsidiary of UMG, UMG Finance B.V., raised capital on the market by issuing so-called Notes/Eurobonds (which are bonds that investors can subscribe to). In the framework of this issue, UMG acted as guarantor for the fulfilment of UMG Finance B.V.'s obligations towards the bondholders, for example, the interest and repayment obligations <u>(exhibit 7)</u> ("Terms & Conditions"). The way this works is as follows. UMG Finance B.V. receives money from the bondholders, which they in turn lend to UMG. UMG Finance B.V. is obliged to meet the interest and repayment obligations to the bondholders

and it can only do so if UMG in turn fulfils its payment obligations to UMG Finance B.V..

18.      All this was subject to the express consent of Bloomfield. This is evident from the letter of Bloomfield of 6 March 2014 (**exhibit 8**) in which it explicitly confirmed to the Board of SH Feeder Fund that Bloomfield, as an investor in the SH Feeder Fund, agreed to attracting market-based funding by issuing so-called Eurobonds/Notes USD 100,000,000 in order to enable the implementation of existing projects and preparatory fund work for future projects. To make that possible, in the same letter, Bloomfield also stated its agreement to establish a pledge on the shares held by SH Fund in UMG.

> *"Dear Directors:*
>
> *Please take this letter as a confirmation that we, the <u>investor</u> to the Synergy Hybrid Feeder Fund Ltd (the Fund), are fully aware of the decision of the UMG Finance B. V. corporate management, a wholly owned subsidiary of the United Meat Group (the UMG) to issue a Eurobond to finance completion of ongoing projects and fund preparation work to future projects (total amount is USD 100.000.000). We express our consent to the pledge of the UMG shares owned by the Synergy Hybrid Fund Ltd. either in part or in full to support this transaction, if necessary. We are satisfied with information on this issue provided by the UMG corporate management and the Fund's Investment Manager, and support this development.*
>
> *Please feel free to contact the undersigned with further questions.*
>
> *Sincerely,*
>
> *Name: Alexander Bushaev*
>
> *Title: Director"*

19.      On the same day, 6 March 2014, the shares held by SH Fund in UMG were pledged to UMG Finance B.V. (**exhibit 9**).

20.      Based on the Terms & Conditions in conjunction with the pledge, below is a brief description of what the main payment commitments are and the consequences if these are not met:

- The bonds must be repaid on 20 December 2017 (see Article 2.5 of the Terms & Conditions);

- Interest is payable semi-annually on 20 December and 20 June each year. Note: This year, 2015, June 20 fell on a Saturday and because that is not a business day, the interest payment was due on 22 June 2015, the first working day after 20 June (see Article 2.5 of the Terms & Conditions;

- The obligations arising from the bonds are guaranteed (1) by UMG and (2) by a pledge on all shares held by SH Fund in UMG (see Article 2.6 of the Terms & Conditions);

- Late payment leads to default and as a consequence, to the principal amount of the bonds plus interest becoming fully due and payable on the thirtieth day following the default (see page 19 of the Terms & Conditions under "Events of Default");

- All this means that if the attachment against UMG by Bloomfield is not lifted by July 17, UMG will be unable to meet its obligations toward UMG Finance B.V., and that UMG Finance B.V. cannot pay its bondholders on time. As a result, the full principal amount of the bonds plus interest shall become due and payable all at once, and UMG will be summoned by the bondholders to meet its payment obligations under the guarantee and/or the pledge can be exercised on UMG's shares, leading to the potential loss of all SH Fund's shares in UMG, so that all investors in the fund may also lose their investments.

<u>June 2014 Crisis in Ukraine, MH-17, falling oil prices; the Rouble crash</u>

21.     The free fall in the second half of 2014 of the Rouble, losing almost 50% of its value as a result of the crisis in Ukraine, economic sanctions and falling oil prices, caused David Reuben to panic. Using increasingly powerful statements, he suddenly requested that (1) UMG's funds be removed from any Russian banks (because he is afraid these will collapse) and (2) that "his" (to be read as: Bloomfield's) investment of USD 25,000,000 be repaid. To strengthen his desires, Reuben and Mehmet Saydam (who works for RB Capital, apparently hired by Bloomfield to, as in the Request states in marginal 1.4 *"advise*

him and represent his interests in the dispute with Daniloff/SH Feeder Fund/SH Fund and UMG") truly sent a barrage of emails in 2014. The gist is always that he only provided a loan (and that the money would be held in escrow) and that the money would be repaid within two years. That this is not the case has been established (given the above), but a vivid example of such an email is the email submitted as exhibit 5 of the Request from David Reuben to Daniloff dated 26 June 2014.

22.     The sudden payment demand by Rueben does not, nor did not, have any legal basis. Although it is simulated in the Request that the June 2014 emails from Reuben/Saydam (removed from their context) are allegedly the logical consequence of agreements made at the time of the investment in 2011, the above sufficiently indicates that this is not the case. After all, a loan or a deposit was never discussed, only professional investments in shares. So there is no causal link between the sudden actions of Reuben from mid-2014 and the grounds for the investment in 2011. Reuben's arrangement was purely caused by panic over the situation in Russia.

23.     The only thing that Daniloff did in response to the persistent and insistent requests from Reuben and his cronies, is, taking into account the interests of all investors of the Fund (whether shareholders or bondholders), to think about a possible workable solution in a constructive manner as much as possible that, if this would lead to a final agreement being reached, could lead to Reuben's desired repayment of his investment. Not because that obligation existed. In his email of 8 January 2015 (**exhibit 10**) to David Reuben, Daniloff reflects on the previous period and wrote:

> "Dear David,
>
> I am very disappointed and disturbed for the emails received recently where I am being accused or wrong doing. I do everything I can and should to grow, develop and protect the business.
>
> I am reaching out to you with questions and still do not get clear answers. I would ask you to answer in email reply before we proceed with the transaction [...]
>
> I have mentioned several times already if there are mistrust and misunderstanding between partners, the partners should split up. There are several ways to do it 1) to sell the company, return initial investments of the part-

*ners and distribute remaining amount if any left proportionally between partners 2) to agree on valuation of the company and one side should buy the other at that valuation. Or 3) to keep funds in the company, proceed with the developing of the project, stay calm and united, raise 150mm in equity as planned in 2015, repay initial investment of partners and stay in business.*

*In addition, I observe in the emails that none one appreciates the work we do and no credit is given for it. Please understand that Money were never an issue. There are more money out there than investments. The reason I agreed to work with you be I was seeing in you and Arkady solid partners who can always back me up.*

*I would want to know that everything I get in life comes to me with hard work and I can't give it out easily <u>and obviously can't favor one partner over another. I must protect interests of all investors whether equity ore note holders without prejudice</u>"*

<u>No agreement on 26 November 2014</u>

24.     The point is that an agreement on a transaction that would lead to the desired result for Reuben was simply never reached.

25.     The exhibits 6 and 7 of the Request are completely removed from their context. What these exhibits show is that Daniloff and Ruben et al. discussed the possibility to establish a new SPV (special purpose vehicle) in Dubai as a way Bloomfield could recover its investment in the fund. The proposal that was discussed pertained to shares of UMG being transferred to the SPV in Dubai (through contribution-in-kind and subject to agreement by the other investors in the fund). Because no agreement was reached, this transaction did not take place. The assertion of Bloomfield that "*the proposal was not formalized and executed because Daniloff refused to cooperate*", hence, is not correct.

26.     Based on what is claimed below, ultimately no agreement was reached on a structure that would lead to the desired result, let alone that UMG would have committed to an unconditional payment obligation towards Bloomfield.

27.     Specifically, Bloomfield, according to its Request, bases its alleged claim against UMG on the proposition that UMG would have defaulted "*in the fulfilment of the agreements reached on 26 November 2014 seeking repayment of the amount in Escrow.*" Below, it is shown that this claim is invalid.

28.     That on 26 November 2014, no definitive arrangements were made is (precisely) apparent based on exhibits 8, 9, 10 and 11 submitted with the Request. These exhibits are removed from their context.

29.     In the first place, it does not follow from exhibit 8 that discussions took place about UMG "*paying back*" the investment in Bloomfield in the short term. What follows from exhibit 8 is that Daniloff confirms to Reuben that he, Reuben, has presented two acceptable options for him (so, for Reuben) and that one of those options could include the transfer of USD 15,000,000 to an escrow account in full control of RB Capital and Alex Bushaev (of Bloomfield). Base on a previous email dated 7 November 2014 by Mehmet Saydam/RB Capital to Daniloff, including a full article on the financial crisis titled "*Plunging rouble raises spectre of fresh financial crisis for Russia*", it follows that the reason for the proposed option by Reuben is based on the fear of collapse of smaller Russian banks due to the crisis and the massive devaluation of the rouble (<u>exhibit 11</u>)

> "*Whilst weak RUB is good for exporters and probably egg/chicken producers, it definitely is not good for smaller banks. For the benefit of the wider group, one of the topics agreed between David and Elliot during Elliot's trip this week was for Elliot to transfer next week USD 15 m out of the deposit to an escrow controlled by RB (or redeemed through the fund thus repaid)*

30.     Daniloff did not have any issues to transfer USD 15 million from Russia to the Netherlands, because of Reuben's concerns about Russia. But this transfer did not constitute any repayment to Bloomfield and was not paid into an escrow account controlled by RB Capital and Bloomfield (Alex Bushaev). The USD 15,000,000 was not paid on an escrow account controlled by RB Capital and Bloomfield, but simply on an account held by UMG at Demir-Halk Bank (Netherlands) N.V..

31.     In an <u>internal</u> mail submitted by Bloomfield dated 26 November 2014 by Mehmet Saydam to David Reuben et al. (not to Daniloff or UMG (Zalko), he indicates what maximum result would be "achievable?" (with a question mark!) based on the recent talks between Daniloff and Reuben, as a possible

structure/solution (see exhibit 11 to the Request). This internal mail also clarifies that the USD 15,000,000 could be used as collateral for a loan to an SPV (special purpose vehicle) in such a potential - complex - transaction, whereby the loan would be used to buy the Bloomfield's shares in SH Feeder Fund. In other words, it is apparent based on not only the personal statements of Bloomfield's adviser RB Capital, that the USD 15,000,000 did not carry any obligation on behalf of UMG to pay Bloomfield, but in addition, it is certain that the complicated SPV structure/transaction and all accompanying various agreements, arrangements, pledges, legal opinions etc., anyway still had to be agreed on.

32.      The handwritten notes taken submitted by Bloomfield as exhibit 10 to Request also explicitly shows that it was agreed that the structure/transaction discussed depended on *"terms 2B proposed and agreed"* (to be understood as: *"terms to be proposed and agreed"*). The fact that no agreement existed 26 November 2014 is clear.

33.      After 26 November 2014, further negotiations on these conditions took place and something Bloomfield does not show the Preliminary Relief Judge is that in view of the complications of the terms and conditions of this structure/transaction those negotiations did not lead to any agreement and were stranded in December 2014/January 2015. Demonstrative in this context are the following emails:

34.      By email dated 31 December 2014 (18:09) (**exhibit 12**) Zalko specifically emphasizes in his capacity as director of Daniloff Capital (the Investment Manager/Advisor in this case) the care that must be used and that there is a long road ahead:

> *"Repeatedly, I'm stressing the fact that to thoroughly review the drafts we need to have all four drafts on hands: Loan facility agreement, deposit agreement, share pledge agreement, deposit pledge agreement. Also, I believe that with Russian legal opinion on deposit pledge agreement, we need a Cayman legal opinion on share pledge and a Dutch legal opinion on the whole structure"*

35.     Based on Mehmet Saydam's response, dated 31 December 2014 (1:31 PM), it is clear at that time that parties are by no means aligned (exhibit 13) and irritated.

36.     In his subsequent email, dated 1 January 2015, Daniloff tries to keep things together by on the one hand indicating very clearly that Mehmet Saydam's position on elements is unacceptable, and on the other hand also indicating that an agreement can only be discussed if an agreement is reached on all elements of the structure discussed in Moscow (exhibit 14).

37.     When, in an email in response dated 5 January 2015 (exhibit 15) David Reuben pulls the plug on the negotiations, and reverts his old favoured theme that USD 25,000,000 must simply be paid back because this amount was allegedly paid as a *"loan or a risk-free deposit"* and that, failing payment, *"there will be serious consequences"*, this also signified the end of the (negotiations about) any possible structure discussed in November 2014.

38.     In his email dated 8 January 2015 (7:08 PM) - cited above as exhibit 10 - Daniloff writes:

> *"Dear David,*
>
> *I am very disappointed and disturbed for the emails received recently where I am being accused or wrong doing. I do everything I can and should to grow, develop and protect the business.*
>
> *I am reaching out to you with questions and still do not get clear answers. I would ask you to answer in email reply before we proceed with the transaction [...]*
>
> *I have mentioned several times already if there are mistrust and misunderstanding between partners, the partners should split up. There are several ways to do it 1) to sell the company, return initial investments of the partners and distribute remaining amount if any left proportionally between partners 2) to agree on valuation of the company and one side should buy the other at that valuation. Or 3) to keep funds in the company, proceed with the developing of the preyed, stay calm and united, raise 150mm in equity as planned in 2015, repay initial investment of partners and stay in business.*
>
> *In addition, I observe in the emails that none one appreciates the work we do and no credit is given for it. Please understand that Money were never an issue. There are more money out there than investments. The reason I agreed to work with you be I was seeing in you and Arkady solid partners who can always back me up.*

*I would want to know that everything I get in life comes to me with hard work and I can't give it out easily <u>and obviously can't favor one partner over another. I must protect interests of all investors whether equity ore note holders without prejudice"</u>*

<u>The second signature</u>

39.    Only after these negotiations failed, Daniloff, in an attempt to try to normalize the tense relations, made the gesture which resulted in two signatures being required for transactions from UMG's bank account, which meant that Mr Patrick O 'Driscoll (of RB Capital) was authorized to sign. By doing so, Daniloff hoped to restore comfort and confidence in the relationship.

40.    Of course, this does not mean that the second signature can be abused to prevent UMG from making regular payments, and certainly not from payment obligations entered into with the express consent of Bloomfield, such as the payment of interests and the repayment of the loan of UMG Finance B.V. in connection with the aforementioned bond issue.

41.    However this is exactly what Ruben did do. Despite knowing that the bondholders had to be paid by UMG Finance B.V., which in turn could only take place if UMG paid, O'Driscoll refused (at the instigation of Reuben) to consent to the payment order. That attitude prompted the shareholder of UMG, SH Fund, to withdraw Mr. O'Driscoll's authority to sign by shareholders' resolution dated 13 May 2015 (<u>exhibit 16</u>). SH Fund is the sole shareholder of UMG.

42.    After the Demir-Halk Bank was informed on 2 June 2015 of this decision, UMG and Daniloff tried to convince Reuben et al. of the urgency of the interest payment, but in vain.

43.    It is shocking to read that David Reuben, on 10 June 2015 and thus shortly before the deadline for the payment of interest, abusing the situation even explicitly writes to Daniloff (<u>exhibit 17</u>):

*"I suggest I will pay your coupon but I want you release the balance. So not to waste time, you have all docs for the 15m release and we will im-*

*mediate reimburse your coupon so you have no pressure. But ultimately I want all the money owed back asap"*

44.     Even after - it already being clear that O'Driscoll's (withdrawn) signatory authority was being abused by Reuben et al. only to enforce repayment of its investment - UMG continued to highlight towards O'Driscoll the extremely urgent importance of payment of interest due and kept asking him to cooperate, because at that time the swift execution of the payment is more important than a discussion about ending the two-signature system. See for example UMG's emails dated:

**10 June 2015 (12:57) (exhibit 18)**

*"Dear Patrick,*

*As we are close to interest payment date, please co-sign the attached payment transfer request. Also could you please to send me a scan of a co-signed document asap, the payment is urgent as we have a national holiday this week and I'd like to finalize the payment this evening";*

**15 June 2015 (14:56) (exhibit 19)**

*"Dear Patrick,*

*Unfortunately I can't get you neither by phone nor by e mail. The matter of payment is of extreme urgency. The purpose of the transfer is the Notes interest which shall be paid via our Russian account to comply with the Russian regulations of trans-border currency transfers. The term of the interest payment is from 16th of June to 18 of June depending on the tranche."*

45.     When O'Driscoll (without doubt, tacit on instruction of Reuben and surrounding himself in mystery), UMG wrote to Meymet Saydam on June 15, 2015 (**exhibit 20**):

*"I can't reach by phone neither him not you, and is left only with e-mail. If we don't receive money tomorrow the latest, the company will be in default with all respective consequences. Could you please facilitate co-signing of the payment request asap."*

46.     In response, Saydam, on the same day (18:17) (**exhibit 21**) wrote that he does not understand UMG's request and that UMG after all

has plenty of other liquid assets at other banks to meet its payment obligations on time.

47.      That this is not the case is denied by UMG in a substantiated response (**exhibit 22**):

> "*Dear Mehmet,*
>
> *That's true that UMG has deposits in the other Russian banks. However, the deposits was made in the form of medium term permissory notes to receive higher income rates. These funds are tied up until the maturity of the notes and right now can not be used directly. So we need to get our funds from DHB. Currently, there is no other possible way to pay the interest. I'm very concerned, because we are endangered by default with all possible consequences*"

48.      This is no less than Bloomfield's attempt at holding Demir-Halk Bank hostage with a liability provision (see exhibit 17 to the Request) as well as an attempt to enforce repayment of its investment. On 17 June 2015 Bloomfield purposely served a conservatory attachment on DHB.

49.      While it was already clear that UMG did not fail to fulfil any alleged agreements on 26 November 2014, now it is clear that UMG did not act unlawfully or acted illegally towards Bloomfield concerning the way in which the (pre-existing) two-signature-system was treated. Furthermore the decision to withdraw O'Driscoll's signatory power was a decision of SH Fund (and not of UMG).

Conclusion

50.      The conclusion on the basis of the foregoing is thus as follows. In 2011, Bloomfield invested in a mutual fund. There was no discussion of any "loan" or "risk-free deposit" that had to be repaid within a specified period, let alone by UMG. Then, in 2014, following the free fall of the rouble, due to persistent and insistent requests from Reuben and his men to repay this investment, Daniloff attempted to - taking into account the interests of all investors of the fund (whether shareholders or bondholders) - contribute as much as possible in a constructive manner to reach a possible workable solution that could lead to

Reuben's desired repayment of his investment. <u>Not</u> because that obligation existed, but because Daniloff wanted to see if he could voluntarily reach an agreement. Ultimately no agreement was attained, not on 26 November 2014 nor after. Moreover, it was never a part of the structure discussed that UMG would have an alleged payment obligation towards Bloomfield.

51.     It is therefore clear that the argument of Bloomfield that it has a claim against UMG because UMG is in default *"with the fulfilment of the agreements reached on 26 November 2014 seeking repayment of the sum in Deposit"* is unsound. It is also clear that UMG is beyond reproach regarding the discussion on the two-signature-system and therefore did not act unlawfully towards Bloomfield.

52.     In short, Bloomfield has no claim against UMG.


4.     LEGAL FRAMEWORK

Contrary to Article 21 CPC: independent grounds for lifting the attachment

53.     Pursuant to Article 700 paragraph 2 CPC, a request for permission to impose conservatory attachment is decided following "simple investigation". This means that the preliminary relief judge usually decides on the request without hearing the respondent. The rules and general practice dictate that the preliminary relief judge will act on the applicant's information and the evidence he provides. The summarized character of the investigation means that the applicant must provide the preliminary relief judge all facts and circumstances necessary to make a decision, whereby the preliminary relief judge must trust that the applicant fully and truthfully informs him. Parties are obliged to fully and truthfully provide facts necessary for the decision. If this obligation is not met, the judge may draw any conclusion as he deems fit, this is also valid for an attachment request.[1] Especially given decision ex parte, any deception due to insufficient information in the attachment request enables the preliminary relief judge to refuse any permission of attachment proceedings

---

[1] SC 25 March 2011, LJN B09675, NJ 2012/627; Attachment Syllabus *Beslagsyllabus*, version August 2013, p. 4, under 2.

or to adjudge a subsequent claim to rescind the attachment based on this reason alone.[2]

54.    In this case, the Preliminary Relief Judge has clearly been incorrectly and incompletely informed, so that the Preliminary Relief Judge can and must lift the attachment based on infringement of Article 21 CPC alone. If the Preliminary Relief Judge had been correctly and completely informed by Bloomfield, it must be accepted that no permission to impose attachment would have been granted.

Unsound claim and assessment of interests

55.    Based on all of the above, it is clear that Bloomfield does not have any claim against UMG. This follows in short based on the unsoundness of the legal act invoked by the attaching party at a minimum, which also leads to lifting the attachment pursuant to Article 705 paragraph 2 CPC.

56.    This also means that Bloomfield does not have any legally respectable right to maintain the attachment, while UMG precisely has a very large interest in the lifting thereof. The assessment of interest thus also argues in favour of UMG.

Urgent Interest

57.    Pursuant to Article 705 CPC, these preliminary proceedings are the only proceedings available to UMG. Urgent interest is not a requirement in this respect.[3] Notwithstanding, it holds that, given Bloomfield's utter failure to inform the Preliminary Relief Judge, infringing Article 21 CPC, it cannot and may not be expected of UMG to accept this far-reaching attachment before a decision is made concerning the claim in main proceedings. This holds even more as the immediate lifting of this attachment is necessary to avoid the default situations described in the body of this summons in connection with the issuance of bonds.

58.    If the attachment against UMG by Bloomfield is not lifted by July 17, UMG will be unable to meet its obligations toward UMG Finance B.V., and that UMG Finance B.V.

---

[2]    Court of Appeal of Amsterdam, 22 November 2011, ECU: BV7108; Court of Appeal of Amsterdam, 10 January 2012, ECU: BV0477. Confirmed recently in lower courts; District Court of The Hague, 10 September 2013, ECU: 2013/11645; District Court of Midden-Nederland, 19 July 2013, ECLI2013/3231; District Court of The Hague, 17 July 2013, ECU: 2013/9448.
[3]    District Court of Rotterdam, 11 February 2013 ECLI:NL:RBROT:2013:BZ2307; District Court of Noord-Nederland, 15 May 2013, ECLI:NL:RBNNE:2013:CA0768.

cannot pay its bondholders on time. As a result, the full principal amount of the bonds plus interest shall become due and payable all at once, and UMG will be summoned by the bondholders to meet its payment obligations under the guarantee and/or the pledge can be exercised on UMG's shares, leading to the potential loss of all SH Fund's shares in UMG, so that all investors in the fund may also lose their investments.

<u>Court Authority</u>

59.     The permission to impose attachment in this case was delivered by the preliminary relief judge of the District Court of Rotterdam. The preliminary relief judge of the District Court of Rotterdam is thus authorised to remove the attachment in preliminary relief proceedings (Article 705 paragraph 1 CPC).

<strong>THEREFORE</strong>

that it may please the Preliminary Relief Judge of the District Court of Rotterdam, passing judgment in preliminary relief proceedings, to issue provisionally enforceable judgment to the extent possible to:

1.     lift the conservatory attachment against UMG by Bloomfield on assets held by Demir-Halk Bank (the Netherlands) N.V.;

2.     prohibit Bloomfield, subject to a penalty payment of EUR 5,000,000,- per day, to impose new conservatory attachments against UMG;

3.     hold Bloomfield jointly and severally liable to pay the costs of the proceedings

Bailiff's associated expenses, EUR

**LIST OF EXHIBITS**

| Exhibit 1 | Subscription Agreement 3 November 2011 |
|---|---|
| Exhibit 2 | Memorandum SH Fund |
| Exhibit 3 | Proof of Payment 9 November 2011 |
| Exhibit 4 | SH Fund Letter to Shareholders 1 March 2012 |
| Exhibit 5 | Memorandum SH Feeder Fund |
| Exhibit 6 | Bloomfield's Request 16 June 2015 |
| Exhibit 7 | Terms & Conditions Notes/Eurobonds |
| Exhibit 8 | Bloomfield's Letter 6 March 2014 |
| Exhibit 9 | Pledge Document SH Fund in UMG 6 March 2014 |
| Exhibit 10 | E-mail Daniloff-David Reuben 8 January 2015 |
| Exhibit 11 | E-mail Saydam-Daniloff 7 November 2014 |
| Exhibit 12 | E-mail Zalko-Saydam 31 December 2014 |
| Exhibit 13 | E-mail Saydam 31 December 2014 (1:31 PM) |
| Exhibit 14 | E-mail Daniloff-Saydam 1 January 2015 |
| Exhibit 15 | E-mail David Reuben-Daniloff 5 January 2015 |
| Exhibit 16 | Shareholders' Resolution SH Fund 13 May 2014 |
| Exhibit 17 | E-mail David Reuben-Daniloff 10 June 2015 |
| Exhibit 18 | E-mail UMG-O'Driscoll 10 June 2015 |
| Exhibit 19 | E-mail UMG-O'Driscoll 15 June 2015 |
| Exhibit 20 | E-mail UMG-Saydam 15 June 2015 |
| Exhibit 21 | E-mail Saydam-UMG 15 June 2015 |
| Exhibit 22 | E-mail UMG-Saydam 15 June 2015 |

This case is being treated by Mr V.R.M. Appelman and Mr R.A.W.J. van Eijck
BASE Advocaten B.V., PO Box 23250, 3001 KG Rotterdam
Phone: 010 - 275 99 11, fax: 010 - 275 99 10

[...]

Pour traduction conforme vers l'anglais du texte original rédigé en néerlandais.
Fait à Bruxelles, le 16 juillet 2015.
Le traducteur juré près le tribunal de 1ère instance à Bruxelles, Jean-François MAGHE

For true and correct translation in English of the original drawn up in Dutch.
Made in Brussels on 16 July 2015.
The sworn translator acknowledged by the Court of 1st Instance of Brussels, Jean-François MAGHE

J-F MAGHE
TRADUCTEUR JURE PRES
LE TPI DE BRUXELLES

Heden, de                                           juli tweeduizendvijftien,


ten verzoeke van de rechtspersoon naar het recht van de Russische Federatie **OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP"**, gevestigd te Moskou, Russische Federatie (**"UMG"**), te dezer zake woonplaats kiezende te (3016 BG) Rotterdam aan de Van Vollenhovenstraat 29 ten kantore van BASE Advocaten B.V., van welk kantoor mr. R.A.W.J. van Eijck en mr. V.R.M. Appelman door verzoekster tot advocaat worden gesteld en als zodanig voor haar zullen optreden;


## HEB IK


krachtens mondelinge last van de Voorzieningenrechter van de Rechtbank te Rotterdam;


## GEDAGVAARD IN KORT GEDING

de rechtspersoon naar het recht van de Britse Maagdeneilanden **BLOOMFIELD INVESTMENT RESOURCES CORP.**, gevestigd te Tortola, Britse Maagdeneilanden (**"Bloomfield"**), laatstelijk woonplaats gekozen hebbende te (1075 BC) Amsterdam aan de Prins Hendriklaan 16, ten van mr. I. Wassenaar, aldaar op de voet van artikel 63 lid 2 Rv jo. 705 lid 3 Rv mijn exploot doende en afschrift dezes latende aan:


## OM


20150210                                                               1/21

op [          ] juli tweeduizend vijftien om [          ] uur, in persoon of verte-
genwoordigd door een advocaat, te verschijnen ter terechtzitting van de Voorzie-
ningenrechter van de Rechtbank Rotterdam, rechtdoende in kort geding, die als-
dan aldaar gehouden zal worden in het Gerechtsgebouw aan het Wilhelminaplein
100-125;


## ONDER AANZEGGING


dat:

a. indien gedaagde niet in persoon en evenmin vertegenwoordigd door een advo-
caat op de terechtzitting verschijnt en de voorgeschreven termijnen en formaliteiten
in acht zijn genomen, de rechter verstek tegen gedaagde zal verlenen en de hierna
omschreven vordering zal toewijzen, tenzij deze hem onrechtmatig of ongegrond
voorkomt;

b. bij verschijning in het geding van gedaagde een griffierecht zal worden geheven,
te voldoen binnen vier weken te rekenen vanaf het tijdstip van verschijning;

c. de hoogte van de griffierechten is vermeld in de meest recente bijlage behorend
bij de Wet griffierechten burgerlijke zaken, die onder meer is te vinden op de web-
site: www.kbvg.nl/griffierechtentabel

d. van een persoon die onvermogend is, een bij of krachtens de wet vastgesteld
griffierecht voor onvermogenden wordt geheven, indien hij op het tijdstip waarop
het griffierecht wordt geheven heeft overgelegd:

   1° een afschrift van het besluit tot toevoeging, bedoeld in artikel 29 van de
   Wet op de rechtsbijstand, of indien dit niet mogelijk is ten gevolge van om-
   standigheden die redelijkerwijs niet aan hem zijn toe te rekenen, een afschrift
   van de aanvraag, bedoeld in artikel 24, tweede lid, van de Wet op de rechts-
   bijstand, dan wel

   2° een verklaring van het bestuur van de Raad voor Rechtsbijstand, bedoeld
   in artikel 7, derde lid, onderdeel e, van de Wet op de rechtsbijstand waaruit

blijkt dat zijn inkomen niet meer bedraagt dan de inkomens bedoeld in de algemene maatregel van bestuur krachtens artikel 35, tweede lid, van die wet;

## TENEINDE

alsdan en aldaar namens mijn verzoekster als eiseres tegen zich als gedaagde als volgt te horen eis doen en concluderen:

**1.     INHOUDSOPGAVE**

1. Inhoudsopgave
2. Kern van het geschil
3. Feiten en Conclusie
4. Juridisch kader

**2.     KERN VAN HET GESCHIL**

1.    Dit kort geding strekt tot opheffing van het op 17 juni 2015 door Bloomfield ten laste van UMG onder de Demir-Halk Bank (Nederland) N.V. ("**DHB**") gelegde conservatoire derdenbeslag.

**3.     FEITEN EN CONCLUSIE**

Partijen

1.    Bloomfield is een investeringsmaatschappij en maakt onderdeel uit van de Reuben Brothers-Groep ("**Reuben Brothers**"). Reuben Brothers is (wereldwijd) een zeer gerenommeerde en belangrijke speler in private equity, vastgoed investeringen en -ontwikkeling en durfkapitaal (zie www.reubenbrothers.com)

2.    Elliot Daniloff ("**Daniloff**") is bestuurder van Synergy Hybrid Feeder Fund Ltd ("**SH Feeder Fund**"). SH Feeder Fund beoogt vermogensgroei op de lange termijn door middel van investeringen in voornamelijk Rusland en het Gemenebest van Onafhankelijke Staten. Daniloff is via de vennootschappen ED Capital Management LCC en ED Capital LCC (gezamenlijk: "**ED Capital**") tevens de investment manager en investment advisor van SH Feeder Fund.

20150210                                                                    3/21

3.  SH Feeder Fund houdt de meerderheid van de aandelen in Synergy Hybrid Fund Ltd ("**SH Fund**"). SH Fund houdt op haar beurt alle aandelen in UMG. UMG is een houdstermaatschappij van Russische vennootschappen gericht op de productie van pluimvee, graan en diervoeding ([www.unitedmeat.ru](www.unitedmeat.ru)).

De investering van Bloomfield in SH Fund in 2011

4.  Op 3 november 2011 heeft Bloomfield zich, door middel van de ondertekening van de subscription agreement (de "**Subscription Agreement**") (**productie 1**) ingeschreven om voor een bedrag van USD 25.000.000,- aandelen te verkrijgen in SH Fund. Daarmee verklaarde Bloomfield eveneens akkoord te zijn met het Private Placement Memorandum dat van toepassing was op SH Fund vanaf juni 2010 ("**Memorandum SH Fund**") (**productie 2**).

5.  De koopprijs van de aandelen in SH Fund waarop Bloomfield inschreef diende op grond van de Subscription Agreement te worden voldaan op de door SH Fund aangehouden bankrekening bij Bank of Bermuda, Hamilton met nummer 010-825297-501 (zie o.a. appendix A bij de Subscription Agreement).

6.  Ter uitvoering van deze verplichting heeft Reuben Brothers ten behoeve van Bloomfield op 9 november 2011 een bedrag van USD 25.000.000,- overgemaakt op voornoemde bankrekening (**productie 3**). Als omschrijving ("Payment Details") bij deze betaling staat expliciet vermeld: "*Bloomfield Investment Resources Corp Subscription*". Dat de betaling van USD 25.000.000,- werd gedaan ter uitvoering van Bloomfield's "subscription" op de aandelen – en dus als investering - lijdt dus geen twijfel.

7.  In 2012 werd Bloomfield, net als de overige aandeelhouders in SH Fund, als gevolg van een herstructurering van het fonds in een zogenaamde Master/Feeder constructie, met Bloomfield's instemming aandeelhouder in SH Feeder Fund (dat vanaf dat moment "*the Fund*" werd genoemd). SH Feeder Fund hield op haar beurt het merendeel van de aandelen in SH Fund (dat vanaf dat moment "*the Master Fund*" werd genoemd). Vooruitlopend op die herstructurering zijn alle aandeelhouders bij brief van 1 maart 2012 (**productie 4**) geïnformeerd over deze herstructurering en is o.a. het aangepaste Memorandum (dat vanaf januari 2012 van kracht is) toegezonden (**productie 5**) ("**Memorandum SH Feeder Fund**"). Alle aandeelhouders, inclusief Bloomfield zijn akkoord gegaan met deze transitie naar SH Fee-

der Fund. Bloomfield geeft in haar verzoekschrift van 16 juni 2015 (**pro-
ductie 6**) (het "**Verzoekschrift**"), in randnummer 2.5 laatste zin, ook zelf
aan dat zij aandeelhouder is geworden in SH Feeder Fund op grond van
de als bijlage 4 overgelegde subscription agreement.

8.   Bloomfield houdt net iets minder dan 50% van de aandelen in SH Feeder
     Fund. SH Feeder Fund houdt ongeveer 92% van SH Fund, die op haar
     beurt 100% van de aandelen in UMG houdt. Middels haar aandelen in SH
     Feeder Fund houdt Bloomfield dus indirect ongeveer 45% van de aandelen
     in UMG.

9.   Zoals in de brief van 1 maart 2012 ook is aangegeven, veranderde er voor
     de rechten en verplichtingen van de aandeelhouders in materieel opzicht
     niets. In het bijzonder gold ook dat de Investment Manager dezelfde bleef
     en dat het fonds al haar investeringen zal blijven maken in overeenstem-
     ming met de oorspronkelijke investeringsdoelen en strategieën.

10.  Het Memorandum SH Feeder Fund bepaalt in dit kader dat SH Feeder
     Fund "*expects to invest all or a substantial portion of its assets in Synergy
     Hybrid Fund Ltd (the: "Master Fund") [....]*

     en even verderop:

     > "*The Fund's and the Master Fund's investment objective is to achieve long
     > term capital appreciation by investing primarily, but not exclusively, in
     > Russian public and privately held equity and debt securities, as well as se-
     > curities of companies located in the Commonwealth of Independent States
     > (the "CIS").*

     (NB: ook in het Memorandum SH Fund stond dit zelfde "*investment objec-
     tive*")

11.  Juist is dus, zoals door Bloomfield in nr 1.2 van haar Verzoekschrift ge-
     steld, dat SH Feeder Fund vermogensgroei op de lange termijn beoogt
     door middel van investeringen in voornamelijk Rusland en het Gemene-
     best van Onafhankelijke Staten. In dit geval deed SH Feeder Fund dat dus
     door het merendeel van de aandelen te houden in SH Fund en daarin dus
     te investeren, terwijl SH Fund op haar beurt investeerde in UMG waarin zij
     alle aandelen hield (en nog steeds houdt). UMG is (inderdaad) een houd-
     stermaatschappij van Russische vennootschappen gericht op de productie

van pluimvee, graan en diervoeding (www.unitedmeat.ru). Juist is even-
eens dat de heer Gennady Zalko ("**Zalko**") General Director is van UMG.

12.     Dus, Reuben Brothers, één van de grootste en meest professionele en
        gerenommeerde investeerders ter wereld, werd via haar beleggingsvehikel
        Bloomfield, door middel van een investering/belegging van USD
        25.000.000 aandeelhouder in SH Feeder Fund op basis van de voorwaar-
        den neergelegd in de Subscription Agreements en het Memorandum SH
        Fund en het Memorandum SH Feeder Fund. Een investering in aandelen
        in een beleggingsfonds en dus geen zogenaamde "lening" of één of ander
        "depot".

13.     In het Verzoekschrift heeft Bloomfield de Voorzieningenrechter dus reeds
        aan de basis volstrekt onjuist geïnformeerd waar zij – in strijd met het
        voorgaande – de stellingen betrekt dat
        -       Reuben geen interesse had om (direct) te investeren in SH Feeder
                Fund;
        -       Dat Reuben wel bereid was om Daniloff USD 25.000.000 ter be-
                schikking te stellen ( het "Depot");
        -       Dat het idee was dat Daniloff eenvoudiger financiering c.q. deel-
                nemers voor SH Feeder Fund zou kunnen vinden op het moment
                dat hij (financieel) werd ondersteund door een gerespecteerde za-
                kenman als Reuben;
        -       Dat het bedrag op een (geblokkeerde) rekening zou blijven staan,
                waarover Daniloff niet zou kunnen beschikken;
        -       Dat de looptijd van het zogenaamde Depot twee jaar zou bedragen
                en op 9 november 2013 terugbetaald zou moeten worden;
        -       Dat over het bedrag van USD 25.000.000 geen rente verschuldigd
                was, maar dat Bloomfield (bij terugbetaling) in totaal 25% van de
                aandelen in SH Feeder Fund zou krijgen en;
        -       Dat Bloomfield 50% van de aandelen in SH Feeder Fund kreeg ter
                zekerheid van de terugbetaling van het zogenaamde bedrag in de-
                pot.

14.     Hoe komt Bloomfield hier bij? Deze stellingen zijn immers in strijd met de
        waarheid en bovendien aantoonbaar in tegenspraak met de Subscription
        Agreements en het Memorandum SH Fund en het Memorandum SH Fee-
        der Fund. Er is dus nooit sprake geweest van een "lening" of een "Depot".
        Bloomfield heeft voor zijn investering van USD 25.000.000 aanvankelijk

aandelen in SH Fund ontvangen die later zijn omgezet in aandelen in SH Feeder Fund. Niet meer en niet minder.

15. Het hele "*verhaal*" van Bloomfield in randnummers 2.2 tm 2.6 (dat kort gezegd sprake is van een lening of depot) moet kennelijk blijken uit de bijlagen 1 en 2 van het Verzoekschrift. Dat zijn twee interne emails die kennelijk op 14 juli 2011 en 24 augustus 2011 zijn gewisseld tussen David Reuben en Alexander Bushaev, directeur van Bloomfield. Uit de emailwisseling eronder blijkt dat David Reuben kennelijk enthousiast is gemaakt voor de investering door ene Arkadiy Orkin die Reuben te kennen geeft dat "*time is important we must not to waste it as such a big money making opportunity here*". Wat de heren elkaar intern wel of niet mochten hebben voorgespiegeld, Daniloff, SH Feeder Fund, SH Fund en UMG staan daar buiten en zijn ook niet bij deze deze overgelegde emailwisseling betrokken geweest. De propositie die Bloomfield is voorgelegd en die Bloomfield vervolgens ook is aangegaan is glashelder: investeren in een beleggingsfonds.

<u>2011 tot 2014</u>

16. Nadat Bloomfield in 2011 als investeerder is ingestapt is er vervolgens jarenlang niets aan de hand. Van bijzonder belang is ook dat Bloomfield in al die jaren daarna geen gebruik heeft gemaakt van het in de memoranda neergelegde recht van een aandeelhouder tot "*redemption of Shares*" (terug(ver-)koop van alle aandelen of een gedeelte daarvan; zie pagina 62. e.v van het Memorandum SH Fund en pagina 71. e.v van het Memorandum SH Feeder Fund. Kennelijk was dat voor Bloomfield geen interessante route.

<u>De obligaties: uitgegeven door UMG Finance B.V. en gegarandeerd door UMG</u>

17. Op 9 december 2013 heeft een 100% dochter van UMG, UMG Finance B.V., door middel van de uitgifte van zogenaamde Notes/Eurobonds (dat zijn obligaties waarop investeerders kunnen inschrijven) kapitaal aangetrokken uit de markt. UMG heeft zich in het kader van deze uitgifte garant gesteld voor de nakoming van UMG Finance B.V.'s verplichtingen jegens de obligatiehouders, zoals de rente- en aflossingsverplichtingen (<u>productie 7</u>) ("**Terms & Conditions**"). De manier waarop dit werkt is als volgt. UMG Finance B.V. ontvangt het geld van de obligatiehouders, welk geld zij op haar beurt doorleent aan UMG. UMG Finance B.V. is gehouden om tijdig aan haar rente-en aflossingsverplichtingen aan de obligatiehouders te

voldoen en dat kan zij alleen als UMG op haar beurt haar betalingsver-
plichtingen jegens UMG Finance B.V. nakomt.

18.     Dit alles heeft de uitdrukkelijke instemming gehad van Bloomfield. Dat blijkt
        uit de brief van Bloomfield van 6 maart 2014 (**productie 8**) waarin zij expli-
        ciet aan het bestuur van SH Feeder Fund bevestigde dat Bloomfield, als
        investeerder in het SH Feeder Fund, ermee akkoord ging om middels de
        uitgifte van zogenaamde Eurobonds/Notes USD 100.000.000 financiering
        uit de markt aan te trekken teneinde uitvoering van bestaande projecten en
        fondsvoorbereidingswerk voor toekomstige projecten mogelijk te maken.
        Om dat mogelijk te maken liet Bloomfield in dezelfde brief weten ook ak-
        koord te zijn met het vestigen van een pandrecht op de door SH Fund ge-
        houden aandelen in UMG.

> *"Dear Directors:*
> *Please take this letter as a confirmation that we, the <u>investor</u> to the Syner-*
> *gy Hybrid Feeder Fund Ltd (the Fund), are fully aware of the decision of*
> *the UMG Finance B.V. corporate management, a wholly owned subsidiary*
> *of the United Meat Group (the UMG) to issue a Eurobond to finance com-*
> *pletion of ongoing projects and fund preparation work to future projects (to-*
> *tal amount is USD 100.000.000). We express our consent to the pledge of*
> *the UMG shares owned by the Synergy Hybrid Fund Ltd. either in part or*
> *in full to support this transaction, if necessary. We are satisfied with infor-*
> *mation on this issue provided by the UMG corporate management and the*
> *Fund's Investment Manager, and support this development.*
> *Please feel free to contact the undersigned with further questions.*
>
> *Sincerely,*
> *Name: Alexander Bushaev*
> *Title: Director"*

19.     Op dezelfde dag, 6 maart 2014, zijn vervolgens de aandelen die SH Fund
        houdt in UMG verpand aan UMG Finance B.V. (**productie 9**).

20.     Op basis van de Terms & Conditions in combinatie met het pandrecht,
        staat hieronder kort uitgelegd wat de belangrijkste betalingsverplichtingen
        zijn en wat de gevolgen zijn wanneer deze niet worden nagekomen:

        • De obligaties moeten worden terugbetaald op 20 december 2017
          (zie artikel 2.5 van de Terms & Conditions);

- Rente is opeisbaar halfjaarlijks op 20 december en 20 juni van elk jaar. NB: In dit jaar 2015 viel 20 juni op een zaterdag en omdat dat geen werkdag is, was de rentebetaling om die reden opeisbaar op 22 juni 2015, de eerste werkdag na 20 juni (zie artikel 2.5 van de Terms & Conditions;
- De uit de obligaties voortvloeiende verplichtingen zijn gegarandeerd (1) door UMG en (2) door middel van een pandrecht op alle aandelen die door SH Fund in UMG worden gehouden (zie artikel 2.6 van de Terms & Conditions);
- Niet tijdige betaling lijdt tot verzuim en heeft tot gevolg dat de volledige hoofdsom van de obligaties te vermeerderen met rente volledig en ineens opeisbaar is op de dertigste dag na het dit verzuim (zie pagina 19 van de Terms & Conditions onder het kopje "Events of Default");
- Dit alles betekent dat als het door Bloomfield ten laste van UMG gelegde derdenbeslag niet uiterlijk op 17 juli is opgeheven, UMG niet tijdig aan haar betalingsverplichtingen aan UMG Finance B.V. kan voldoen zodat UMG Finance B.V. haar obligatiehouders niet tijdig kan voldoen. Als gevolg daarvan wordt de volledige hoofdsom van de obligaties te vermeerderen met rente volledig en ineens opeisbaar en zal UMG door de obligatiehouders tot betaling daarvan onder de garantie worden aangesproken en/of kan het pandrecht op de aandelen in UMG worden uitgeoefend, met als gevolg dat SH Fund al haar aandelen in UMG kan verliezen waarmee alle investeerders in het fonds ook hun investeringen kwijtraken.

<u>Juni 2014 Crisis in Oekraïne, MH-17, dalende olieprijzen: de val van de Roebel</u>

21.     Als in de tweede helft van 2014 de Roebel in een vrije val raakt en bijna 50% van zijn waarde verliest als gevolg van de crisis in Oekraïne, economische sancties en dalende olieprijzen, raakt David Reuben in paniek. Hij verlangt in steeds krachtiger bewoordingen ineens dat (1) UMG's gelden weg worden gehaald bij Russische banken (omdat hij bang is dat deze omvallen) en (2) dat "zijn" (lees: Bloomfield's) investering van USD 25.000.000 wordt terug- betaald. Om dit verlangen van Reuben kracht bij te zetten worden door hem en door Mehmet Saydam (die werkzaam is voor het door Bloomfield ingehuurde RB Capital dat kennelijk, zoals in het Verzoekschrift in randnummer 1.4 is gesteld is *"ingeschakeld om haar te*

> *adviseren en om haar belangen te vertegenwoordigen in het geschil met Daniloff/SH feeder Fund/SH Fund en UMG")* werkelijk een spervuur aan emails gestuurd in 2014. De strekking daarvan is steeds dat hij slechts een lening heeft verstrekt (en dat het geld in escrow zou worden gehouden) en dat dat geld binnen twee jaar terugbetaald zou moeten worden. Dat dat niet het geval is staat (gelet op het voorgaande) vast, maar een sprekend voorbeeld van een dergelijke email is de als productie 5 bij Verzoekschrift overgelegde email van David Reuben aan Daniloff van 26 juni 2014.

22.    Voor de door Reuben ineens gewenste betaling bestond en bestaat geen enkele juridische grondslag. Alhoewel in het Verzoekschrift wordt voorgewend alsof de (uit hun context getrokken) emails van Reuben/Saydam vanaf juni 2014 het logische gevolg zijn van de afspraken die zijn gemaakt ten tijde van de gedane investering in 2011, blijkt uit het bovenstaande reeds genoegzaam dat daarvan geen sprake is. Er is immers nooit sprake geweest van een lening of een depot maar van een professionele beleggingsinvesteringen in aandelen. Er is dus geen enkel causaal verband tussen de plotselinge gedragingen van Reuben vanaf medio 2014 en de grondslag van de investering in 2011. Reuben's opstelling werd louter veroorzaakt door paniek vanwege de situatie in Rusland.

23.    Het enige wat Daniloff naar aanleiding van de aanhoudende en indringende verzoeken van Reuben en zijn trawanten heeft gedaan, is proberen om rekening houdend met de belangen van alle investeerders van het fonds (of het nu aandeelhouders of obligatiehouders betreft) zo veel mogelijk constructief mee te denken over een mogelijke werkbare oplossing die, indien daarover definitief overeenstemming zou worden bereikt, zou kunnen leiden tot de door Reuben gewenste terugbetaling van zijn investering. Niet omdat die verplichting bestond. In zijn email van 8 januari 2015 (**productie 10**) aan David Reuben blikt Daniloff terug op de periode ervoor en schrijft:

> *"Dear David,*
>
> *I am very disappointed and disturbed for the emails received recently where I am being accused or wrong doing. I do everything I can and should to grow, develop and protect the business.*
>
> *I am reaching out to you with questions and still do not get clear answers. I would ask you to answer in email reply before we proceed with the transaction [..]*
>
> *I have mentioned several times already if there are mistrust and misunderstanding between partners, the partners should split up. There are several ways to do it 1) to sell the company, return initial investments of the part-*

*ners and distribute remaining amount if any left proportionally between partners 2) to agree on valuation of the company and one side should buy the other at that valuation. Or 3) to keep funds in the company, proceed with the developing of the project, stay calm and united, raise 150mm in equity as planned in 2015, repay initial investment of partners and stay in business.*

*In addition, I observe in the emails that none one appreciates the work we do and no credit is given for it. Please understand that Money were never an issue. There are more money out there than investments. The reason I agreed to work with you bc I was seeing in you and Arkady solid partners who can always back me up.*

*I would want to know that everything I get in life comes to me with hard work and I can't give it out easily <u>and obviously can't favor one partner over another. I must protect interests of all investors whether equity ore note holders without prejudice</u>"*

### Geen overeenkomst op 26 november 2014

24.     Het punt is dat overeenstemming over een transactie die tot het door Reuben gewenste resultaat zou leiden, nu eenmaal nimmer is bereikt.

25.     De producties 6 en 7 bij Verzoekschrift worden volledig uit hun context gehaald. Wat die producties laten zien is dat tussen Daniloff en Ruben cs is gesproken over de mogelijkheid om in Dubai een nieuwe SPV (special purpose vehicle) op te richten als een manier waarop Bloomfield haar investering in het fonds terug zou kunnen krijgen. Het voorstel dat werd besproken zou erin bestaan dat de aandelen in UMG zouden worden ingebracht in de SPV in Dubai (door middel van volstorting in natura en onder de voorwaarde dat de overige investeerders in het fonds daarmee akkoord konden gaan). Omdat hierover geen overeenstemming kon bereikt is het niet tot deze transactie gekomen. Onjuist is dus de stelling van Bloomfield dat *"het voorstel niet is geformaliseerd en uitgevoerd, omdat Daniloff weigerde zijn medewerking te verlenen"*.

26.     Uit hetgeen hieronder wordt aangevoerd blijkt dat uiteindelijk geen overeenstemming is bereikt over een constructie die tot het gewenste resultaat leidt, laat staan dat UMG zich zou hebben verbonden tot een onvoorwaardelijke betalingsverplichting jegens Bloomfield.

27.     Concreet baseert Bloomfield blijkens haar Verzoekschrift haar gepretendeerde vordering op UMG op de stelling dat UMG in gebreke zou zijn gebleven *"met de nakoming van de op 26 november 2014 gemaakte afspraken strekkende tot terugbetaling van het bedrag in Depot"*. Uit het volgende blijkt dat die vordering ondeugdelijk is.

28. Dat het op 26 november 2014 tot definitieve afspraken is gekomen blijkt (juist) niet uit de bij Verzoekschrift overgelegde producties 8, 9 10 en 11. Ook deze producties worden uit hun context getrokken.

29. In de eerste plaats geldt dat uit productie 8 niet volgt dat is gesproken over het door UMG op korte termijn "*terugbetalen*" van de investering aan Bloomfield. Wat uit productie 8 volgt is dat Daniloff aan Reuben bevestigt dat hij, Reuben dus, twee voor hem (Reuben dus) acceptabele opties heeft opgeworpen en dat één van die opties zou kunnen bestaan uit het over-maken van USD 15.000.000 naar een escrowrekening die volledig gecon-troleerd zou worden door RB Capital en Alex Bushaev (van Bloomfield). Uit een daaraan voorafgaande email van 7 november 2014 van Mehmet Say-dam/RB Capital aan Daniloff, waarbij een volledig artikel over de financiële crisis wordt bijgevoegd genaamd "*Plunging rouble raises spectre of fresh financial crisis for Russia*", volgt dat de reden voor de door Reuben voor-gestelde optie voorvloeit uit de angst voor het omvallen van kleinere Rus-sische banken als gevolg van de crisis aldaar en de enorme devaluatie van de Roebel (**productie 11**):

> "*Whilst weak RUB is good for exporters and probably egg/chicken produc-ers, it definitely is not good for smaller banks. For the benefit of the wider group, one of the topics agreed between David and Elliot during Elliot's trip this week was for Elliot to transfer next week USD 15 m out of the deposit to an escrow controlled by RB (or redeemed through the fund thus repaid)*

30. Daniloff had er geen problemen mee om USD 15.000.000 uit Rusland naar Nederland te halen, vanwege de zorgen van Reuben over Rusland. Maar deze overmaking vormde geen terugbetaling aan Bloomfield en werd ook niet gestort op een escrowaccount die door RB Capital en Bloomfield (Alex Bushaev) zou worden gecontroleerd. De USD 15.000.000 is dan ook niet betaald op een door RB Capital en Bloomfield gecontroleerde escrowreke-ning, maar gewoon op een door UMG bij Demir-Halk Bank (Nederland) N.V. aangehouden rekening.

31. In een door Bloomfield overgelegde <u>interne</u> mail d.d. 26 november 2014 van Mehmet Saydam aan David Reuben cs (en dus niet aan Daniloff of UMG (Zalko), geeft hij aan wat door hen zelf als gevolg van de laatste be-sprekingen tussen Daniloff en Reuben als maximaal "*achievable?*" ("*haal-baar*" met een vraagteken dus!) werd gezien als mogelijke construc-

tie/oplossing (zie productie 11 bij het Verzoekschrift). Uit deze interne mail wordt voorts duidelijk dat de USD 15.000.000 in een dergelijke potentiële - complexe - transactie gebruikt zou kunnen worden als zekerheid voor een lening aan een SPV (special purpose vehicle) welke lening dan gebruikt zou kunnen worden om de aandelen van Bloomfield in SH Feeder Fund te kunnen kopen. Met andere woorden, niet alleen blijkt uit de eigen stellingen van Bloomfield's adviseur RB Capital, dat de USD 15.000.000 helemaal geen verplichting voor UMG met zich zou brengen om Bloomfield daarmee te betalen, maar bovendien staat vast dat over de ingewikkelde SPV constructie/transactie en alle daarbij behorende verschillende overeenkomsten, arrangementen, pandrechten, legal opinions etc, überhaupt nog overeenstemming moest worden bereikt.

32.    Uit de handgeschreven aantekeningen die door Bloomfield als productie 10 bij Verzoekschrift zijn overgelegd blijkt ook expliciet dat overeengekomen is dat de constructie/transactie waarover men heeft gesproken afhankelijk is van "terms 2B proposed and agreed" (lees: "terms *to be* proposed and agreed"). Dat dus op 26 november 2014 nog geen overeenstemming bestond staat vast.

33.    Na 26 november 2014 is over die voorwaarden verder onderhandeld en wat Bloomfield niet aan de Voorzieningenrechter laat zien, is dat die onderhandelingen gelet op alle complicaties over de voorwaarden en condities van deze constructie/transactie ook nadien niet tot overeenstemming hebben geleid en strandden in december 2014/januari 2015. Illustratief zijn in dit kader de volgende emails.

34.    Bij email van 31 december 2014 (18:09) (productie 12) benadrukt Zalko, expliciet in zijn hoedanigheid van directeur van Daniloff Capital (de Investment Manager/Advisor in deze zaak) de zorgvuldigheid waarmee geopereerd moet worden en dat men er dus nog lang niet is:

> "Repeatedly, I'm stressing the fact that to thoroughly review the drafts we need to have all four drafts on hands: Loan facility agreement, deposit agreement, share pledge agreement, deposit pledge agreement. Also, I believe that with Russian legal opinion on deposit pledge agreement, we need a Cayman legal opinion on share pledge and a Dutch legal opionion on the whole structure"

35.   Uit het antwoord daarop van Mehmet Saydam van 31 december 2014 (1:31 P.M.) blijkt reeds dat partijen op dat moment volstrekt niet op één lijn zitten (**productie 13**) en dat de irritatie toeslaat.

36.   In zijn daarop volgende email van 1 januari 2015 probeert Daniloff de zaak nog bij elkaar te houden door enerzijds heel duidelijk aan te geven dat de positie van Mehmet Saydam op onderdelen onaanvaardbaar is, maar ook door aan te geven dat pas van een overeenkomst kan worden gesproken als overeenstemming is bereikt over alle onderdelen van de in Moskou besproken constructie (**productie 14**).

37.   Als David Reuben in antwoord daarop, bij email van 5 januari 2015 (**productie 15**) de stekker uit de onderhandelingen trekt, en weer terugvalt op zijn oude stokpaardje dat er even USD 25.000.000 moet worden terugbetaald omdat dit bedrag destijds zou zijn voldaan als "*lening of een depot zonder risico*" was en dat als er niet betaald zou worden "*there will be serious consequences*", betekent dat dus ook het einde van de (onderhandelingen over) de in november 2014 besproken mogelijke constructie.

38.   In zijn – hierboven reeds aangehaalde als <u>productie 10</u> overgelegde - email van 8 januari 2015 (7:08 PM) schrijft Daniloff dan ook:

> "*Dear David,*
>
> *I am very disappointed and disturbed for the emails received recently where I am being accused or wrong doing. I do everything I can and should to grow, develop and protect the business.*
>
> *I am reaching out to you with questions and still do not get clear answers. I would ask you to answer in email reply before we proceed with the transaction [..]*
>
> *I have mentioned several times already if there are mistrust and misunderstanding between partners, the partners should split up. There are several ways to do it 1) to sell the company, return initial investments of the partners and distribute remaining amount if any left proportionally between partners 2) to agree on valuation of the company and one side should buy the other at that valuation. Or 3) to keep funds in the company, proceed with the developing of the project, stay calm and united, raise 150mm in equity as planned in 2015, repay initial investment of partners and stay in business.*
>
> *In addition, I observe in the emails that none one appreciates the work we do and no credit is given for it. Please understand that Money were never an issue. There are more money out there than investments. The reason I agreed to work with you bc I was seeing in you and Arkady solid partners who can always back me up.*

*I would want to know that everything I get in life comes to me with hard work and I can't give it out easily and obviously can't favor one partner over another. I must protect interests of all investors whether equity ore note holders without prejudice"*

### De tweede handtekening

39.    Pas nadat deze onderhandelingen geklapt zijn heeft Daniloff, om te proberen de gespannen verhoudingen te normaliseren de geste gedaan om het ertoe te leiden dat voor transacties vanaf de bankrekening van UMG twee handtekeningen vereist waren, hetgeen ertoe heeft geleid dat ook de heer Patrick O' Driscoll (van RB Capital) tekeningsbevoegd werd. Daarmee hoopte Daniloff weer comfort en vertrouwen in de onderlinge relatie te brengen.

40.    Dit betekent natuurlijk niet dat de tweede handtekening kan worden misbruikt om te voorkomen dat UMG reguliere betalingen verricht, en al helemaal niet die betalingsverplichtingen die nota bene met uitdrukkelijke instemming van Bloomfield zijn aangegaan, zoals de betaling van rente –en aflossing op de lening van UMG Finance B.V. in het kader van de hierboven nader omschreven uitgifte van obligaties.

41.    Dit is precies wat Ruben vervolgens wél deed. Ondanks de wetenschap dat de obligatiehouders door UMG Finance B.V. betaald moesten worden, die dat op haar beurt slechts kan als UMG haar betaalt, weigerde O'Driscoll (op instigatie van Reuben) zijn instemming met die betalingsopdracht. Die houding noopte de aandeelhouder van UMG, SH Fund, dan ook tot het nemen van aandeelhoudersbesluit d.d. 13 mei 2015 tot intrekking van de tekeningsbevoegdheid de heer O'Driscoll (**productie 16**). SH Fund is enig aandeelhouder van UMG.

42.    Nadat de Demir-Halk Bank op 2 juni 2015 werd geïnformeerd over dit besluit, hebben UMG en Daniloff nog geprobeerd om Reuben cs van de urgente noodzaak van de rente-betaling te overtuigen, maar tevergeefs.

43.    Het is stuitend om te lezen dat David Reuben op 10 juni 2015 en dus kort voordat de termijn voor de rentebetaling verstrijkt, misbruik makend van de situatie zelfs expliciet aan Daniloff schrijft (**productie 17**):

*"I suggest I will pay your coupon but I want you release the balance. So not to waste time, you have all docs for the 15m release and we will im-*

*mediate reimburse your coupon so you have no pressure. But ultimately I*
*want all the money owed back asap"*

44.   Zelfs daarna – als al duidelijk is dat de (ingetrokken) tekeningsbevoegd-
      heid van O'Driscoll door Reuben en de zijnen gewoon wordt misbuikt om
      een terugbetaling van haar investering af te dwingen – blijft UMG
      O'Driscoll wijzen op het extreem urgente belang van betaling van de ver-
      schuldigde rente en blijft zij hem vragen om medewerking, omdat op dat
      moment de spoedige uitvoering van de betaling belangrijker is dan een
      discussie over het beëindigen van het tweehandtekeningenstelsel. Zie bij-
      voorbeeld de mails van UMG van:

           **10 juni 2015 (12:57 uur) (productie 18)**
           *"Dear Patrick,*
           *As we are close to interest payment date, please co-sign the attached*
           *payment transferrequest. Also could you please to send me a scan of a*
           *co-signed document asap, the payment is urgent as we have a national*
           *holliday this week and I'd like to finalize the payment this evening"*;

           **15 juni 2015 (14:56) (productie 19)**
           *"Dear Patrick,*
           *Unfortunately I can't get you neither by phone nor by e mail. The matter of*
           *payment is of extreme urgency. The purpose of the transfer is the Notes*
           *interest which shall be paid via our Russian account to comply with the*
           *Russian regulations of trans-border currency transfers. The term of the in-*
           *terest payment is from 16th of June to 18 of June depending on the*
           *tranche.*

45.   Als O' Driscoll (ongetwijfeld op instructive van Reuben en de zijnen zwijgt
      en zich in nevelen hult), schrijft UMG aan Meymet Saydam op 15 juni 2015
      het volgende (**productie 20**)

           *"I can't reach by phone neither him not you, and is left only with e-mail. If*
           *we don't receive money tomorrow the latest, the company will be in default*
           *with all respective consequences. Could you please facilitate co-signing of*
           *the payment request asap."*

46.   In antwoord daarop schrijft Saydam op dezelfde dag (18:17) (**productie
      21**) dat hij het verzoek van UMG niet begrijpt en dat UMG toch meer dan

genoeg andere liquide middelen bij andere banken zou hebben om op tijd aan haar betalingsverplichtingen te voldoen.

47. Dat daarvan geen sprake is, wordt per kerende mail door UMG gemotiveerd ontkend (**productie 22**):

> "*Dear Mehmet,*
> *That's true that UMG has deposits in the other Russian banks. However, the deposits was made in the form of medium term permissory notes to receive higher income rates. These funds are tied up until the maturity of the notes and right now can not be used directly. So we need to get our funds from DHB. Currently, there is no other possible way to pay the interest. I'm very concerned, because we are endangered by default with all possible consequences*"

48. Er gebeurt niks, anders dan dat Bloomfield enerzijds probeert de Demir-Halk Bank te gijzelen met een aansprakelijkstelling (zie productie 17 bij Verzoekschrift) en anderzijds terugbetaling van haar investering probeert af te dwingen. Op 17 juni 2015 legt Bloomfield, in de wetenschap vervolgens conservatoir beslag onder DHB.

49. Was reeds duidelijk dat UMG niet tekort is geschoten in de nakoming van zogenaamd op 26 november 2014 gemaakte afspraken, zo is nu ook duidelijk dat UMG niet onrechtmatig heeft gehandeld of kan hebben gehandeld jegens Bloomfield in verband met de wijze waarop met het (voorheen bestaande) twee handtekeningenstelsel is omgegaan. Afgezien daarvan heeft te gelden dat het besluit tot intrekking van de tekeningsbevoegdheid van O'Driscoll een besluit is van SH Fund (en dus niet van UMG).

Conclusie

50. De conclusie op grond van het voorgaande is dus als volgt. Bloomfield heeft in 2011 geïnvesteerd in een beleggingsfonds. Er is geen sprake geweest van een zogenaamde "lening" of "risicoloos depot" dat binnen een bepaalde termijn terugbetaald zou moeten worden, laat staan door UMG. Als in 2014, als gevolg van de vrije val van de roebel, door aanhoudende en indringende verzoeken van Reuben en zijn mannen wordt gevraagd om terugbetaling van deze investering, probeert Daniloff om – rekening houdend met de belangen van alle investeerders van het fonds (of het nu aandeelhouders of obligatiehouders betreft) – zo veel mogelijk constructief mee te denken over een mogelijke werkbare oplossing die zou kunnen lei-

den tot de door Reuben gewenste terugbetaling van zijn investering. <u>Niet</u> omdat die verplichting bestond, maar omdat Daniloff wilde kijken of hij daaraan onverplicht tegemoet kon komen. Daarover is uiteindelijk geen overeenstemming bereikt, niet op 26 november 2014 en niet daarna. Bovendien is onderdeel van die besproken constructie nooit geweest dat op UMG een betalingsverplichting jegens Bloomfield zou komen te rusten.

51.     Daarmee staat vast dat de stelling van Bloomfield dat zij beschikt over een vordering op UMG omdat UMG in gebreke is "*met de nakoming van de op 26 november 2014 gemaakte afspraken strekkende tot terugbetaling van het bedrag in Depot*", ondeugdelijk is. Ook staat vast dat UMG geen enkel verwijt treft ten aanzien van de discussie rondom het twee handtekeningenstelsel en dus ook niet onrechtmatig jegens Bloomfield heeft gehandeld.

52.     Kortom, Bloomfield heeft geen vordering op UMG.

4.      <u>JURIDISCH KADER</u>

<u>Strijd met artikel 21 Rv: zelfstandige grond voor opheffing van het beslag</u>

53.     Op een verzoek om verlof tot het leggen van conservatoir beslag wordt ingevolge artikel 700 lid 2 Rv beslist na 'summier onderzoek'. Dit betekent dat de voorzieningenrechter doorgaans op het verzoek beslist zonder de gerekwestreerde te horen. In de regel mag, en in de praktijk zal, de voorzieningenrechter afgaan op de mededelingen van de verzoeker en de door hem overhandigde stukken. Uit het summiere karakter van het onderzoek volgt dat de verzoeker de voorzieningenrechter van alle voor de beslissing relevante feiten en omstandigheden dient te voorzien, waarbij de voorzieningenrechter erop moet kunnen vertrouwen dat de verzoeker hem volledig en naar waarheid inlicht. Partijen zijn verplicht voor de beslissing van belang zijnde feiten volledig en naar waarheid aan te voeren. Wordt deze verplichting niet nageleefd, dan kan de rechter daaruit de gevolgtrekking maken die hij geraden acht, dat geldt ook bij een beslagrekest.[1] Zeker nu ex parte wordt beslist geeft misleiding door onvoldoende toelichting in het beslagrekest de Voorzieningenrechter reden om een beslagverlof te welge-

---

[1] HR 25 maart 2011, LJN BO9675, NJ 2012/627; Beslagsyllabus, versie augustus 2013, p. 4 sub 2.

ren of om een latere vordering tot opheffing van het beslag reeds om die reden toe te wijzen.[2]

54.   In deze zaak is de Voorzieningenrechter evident onjuist en onvolledig voorgelicht, zodat de Voorzieningenrechter het beslag reeds op grond van schendig van artikel 21 Rv kan en dient op te heffen. Indien de Voorzieningenrechter juist en volledig door Bloomfield was geïnformeerd moet worden aangenomen dat geen verlof was verleend tot het leggen van beslag.

Ondeugdelijke vordering en belangenafweging

55.   Uit al het voorgaande blijkt voorts dat Bloomfield helemaal geen vordering heeft op UMG. Zodoende blijkt, minst genomen, summierlijk van de ondeugdelijkheid van het door beslaglegger ingeroepen recht, hetgeen eveneens noopt tot opheffing van het beslag op de voet van artikel 705 lid 2 Rv dient te worden opgeheven.

56.   Dit betekent ook dat Bloomfield geen enkel rechtens te respecteren belang heeft bij handhaving van het beslag, terwijl UMG juist aantoonbaar groot belang heeft bij opheffing ervan. Ook de belangenafweging valt dus uit in het voordeel van UMG.

Spoedeisend belang

57.   Op grond van artikel 705 Rv is dit kort geding de enige rechtsingang die voor UMG open staat. Spoedeisend belang is daarbij geen vereiste.[3] Los daarvan geldt dat, nu Bloomfield zo flagrant in strijd met artikel 21 Rv de Voorzieningenrechter heeft voorgelicht, van UMG niet verwacht kan en mag worden dat zij dit verstrekkende beslag zal dulden totdat in een bodemprocedure op de vordering is beslist. Dat geldt temeer nu onmiddellijke opheffing van dit beslag noodzakelijk is ter voorkoming van de in het lichaam van deze dagvaarding omschreven defaultsituatie(s) in verband met de uitgifte van obligaties.

58.   Indien het door Bloomfield ten laste van UMG gelegde derdenbeslag niet uiterlijk op 17 juli is opgeheven, kan UMG niet tijdig aan haar betalingsverplichtingen aan UMG Finance B.V. voldoen zodat UMG Finance B.V. haar

---

[2] Gerechtshof Amsterdam, 22 november 2011, ECLI: BV7108; Gerechtshof Amsterdam, 10 januari 2012, ECLI: BV0477. Ook recent bevestigd in lagere rechtspraak; Rechtbank Den Haag, 10 september 2013, ECLI: 2013/11645; Rechtbank Midden-Nederland, 19 juli 2013, ECLI 2013/3231; Rechtbank Den Haag, 17 juli 2013, ECLI: 2013/9448.
[3] Rechtbank Rotterdam, 11 februari 2013 ECLI:NL:RBROT:2013:BZ2307; Rechtbank Noord-Nederland, 15 mei 2013, ECLI:NL:RBNNE:2013:CA0768.

obligatiehouders niet tijdig kan voldoen. Als gevolg daarvan wordt de volledige hoofdsom van de obligaties te vermeerderen met rente volledig en ineens opeisbaar en zal UMG door de obligatiehouders tot betaling daarvan onder de garantie worden aangesproken en/of kan het pandrecht op de aandelen in UMG worden uitgeoefend, met als gevolg dat SH Fund al haar aandelen in UMG kan verliezen waarmee alle investeerders in het fonds ook hun investeringen kwijtraken

Bevoegdheid rechtbank

59. Het verlof tot beslaglegging is in deze zaak afgegeven door de voorzieningenrechter van de rechtbank Rotterdam. De voorzieningenrechter van de rechtbank Rotterdam is dan ook bevoegd in kort geding het beslag op te heffen (artikel 705 lid 1 Rv).

## MITSDIEN

dat het de Voorzieningenrechter van de rechtbank Rotterdam behage om rechtdoende in kort geding, bij vonnis, voor zover mogelijk volledig uitvoerbaar bij voorraad om;

1. het op 17 juni 2015 ten laste van UMG onder Demir-Halk Bank (Nederland) N.V. gelegde conservatoire derdenbeslag op te heffen;

2. Bloomfield te verbieden, zulks op straffe van verbeurte van een dwangsom van EUR 5.000.000,- per dag, ten laste van UMG nieuwe conservatoire beslagen te leggen;

3. Bloomfield te veroordelen in de kosten van het geding

De kosten dezes zijn voor mij, deurwaarder, EUR

**PRODUCTIEOVERZICHT**

| | |
|---|---|
| **Productie 1** | Subscription Agreement 3 november 2011 |
| **Productie 2** | Memorandum SH Fund |
| **Productie 3** | Betalingsbewijs 9 november 2011 |
| **Productie 4** | Brief SH Fund aan aandeelhouders 1 maart 2012 |
| **Productie 5** | Memorandum SH Feeder Fund |
| **Productie 6** | Verzoekschrift Bloomfield 16 juni 2015 |
| **Productie 7** | Terms & Conditions Notes/Eurobonds |
| **Productie 8** | Brief Bloomfield 6 maart 2014 |
| **Productie 9** | Pandakte aandelen SH Fund in UMG 6 maart 2014 |
| **Productie 10** | E-mail Daniloff-David Reuben 8 januari 2015 |
| **Productie 11** | E-mail Saydam-Daniloff 7 november 2014 |
| **Productie 12** | E-mail Zalko-Saydam 31 december 2014 |
| **Productie 13** | E-mail Saydam 31 december 2014 (1:31 PM) |
| **Productie 14** | E-mail Daniloff-Saydam 1 januari 2015 |
| **Productie 15** | E-mail David Reuben-Daniloff 5 januari 2015 |
| **Productie 16** | Aandeelhoudersbesluit SH Fund 13 mei 2015 |
| **Productie 17** | E-mail David Reuben-Daniloff 10 juni 2015 |
| **Productie 18** | E-mail UMG-O'Driscoll 10 juni 2015 |
| **Productie 19** | E-mail UMG-O'Driscoll 15 juni 2015 |
| **Productie 20** | E-mail UMG-Saydam 15 juni 2015 |
| **Productie 21** | E-mail Saydam-UMG 15 juni 2015 |
| **Productie 22** | E-mail UMG-Saydam 15 juni 2015 |

Deze zaak wordt behandeld door mr. V.R.M. Appelman en mr. R.A.W.J. van Eijck
BASE Advocaten B.V., Postbus 23250, 3001 KG Rotterdam
tel.: 010 - 275 99 11, fax: 010 - 275 99 10

# EXHIBIT D

# Judgment

**ROTTERDAM DISTRICT COURT**

Commercial division

case number / docket number: C/10/479791 / KG ZA 15-737

Judgment in preliminary relief proceedings of 15 July 2015

in the matter of

**OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP"**,
a legal entity incorporated and existing under the laws of the Russian Federation,
with registered office in Moscow, Russian Federation,
plaintiff,
counsel: R.A.W.J. van Eijck and V.R.M. Appelman

versus:

**BLOOMFIELD INVESTMENT RESOURCES CORP**,
a legal entity incorporated and existing under the laws of the British Virgin Islands,
with registered office in Tortola, British Virgin Islands,
defendant,
counsel: I. Wassenaar and M. N. van Dam

The parties will hereinafter be referred to as UMG and Bloomfield.

## 1.     The course of the proceedings

1.1.     The course of the proceedings appears from:
- the summons of 3 July 2015;
- UMG's exhibits;
- Bloomfield's exhibits;
- the memorandum of oral pleading of R.A.W.J. van Eijck and V.R.M. Appelman;
- the memorandum of oral pleading of I. Wassenaar and M.N. van Dam;

1.2.     The parties explained their respective views at the hearing of 9 July 2015.
Finally, at date was scheduled for judgment to be rendered.

1.3.     UMG has objected against the counterclaim, which was for the first time brought by
Bloomfield on the occasion of oral pleadings and which, in breach of procedural law, had not been
brought to UMG's attention 24 hours, or at least 24 hours, before the start of the hearing.

C/10/479791 / KG ZA 15-737
15 July 2015

---

**The judge in preliminary relief proceedings allows UMG's objection and holds as follows in that respect.**

This case involves a substantial money claim (USD 15 million), which UMG should be able to properly defend itself against, and which will also require client-attorney consultations outside the hearing. This, viewed in relation to the fact that the counterclaim was not brought to UMG's attention in a timely manner by Bloomfield, i.e. at least 24 hours before the hearing, which is dictated by the rules of procedure governing preliminary relief proceedings before district courts, civil-law/family law divisions, means that UMG's interest in the proceedings would be harmed, if the counterclaim were allowed in these proceedings. Consequently the counterclaim will be disregarded by the court.

**2.      The facts**

**2.1.      Bloomfield** is an investment company forming part of the globally operating Reuben Brothers Group. Bloomfield was incorporated by Reuben Brothers as a 'special purpose vehicle' for the project referred to in 2.3 and 2.4. Reuben Brothers Group is a leading player in private equity, property investments and development and venture capital and was founded by the British brothers David and Simon Reuben. From the Reuben foundation charity initiatives are supported by David and Simon Reuben in areas such as education and health care.

**2.2.      Elliot Daniloff** (hereinafter: Daniloff) is director of the Cayman Islands-based investment company Synergy Hybrid Feeder Fund Ltd. (hereinafter: SH Feeder Fund). The objective of SH Feeder Fund is to achieve long-term capital growth through investments in mainly Russia and the Commonwealth of Independent States. SH Feeder Fund is the sole shareholder in UMG. UMG is a holding company of various Russian companies whose business activities are aimed at the production of poultry, grain and animal feed.

**2.3.      By e-mail of 14 July 2011 David Reuben** on behalf of the Reuben Foundation writes as follows to Alexander Bushaev, director and manager of Reuben Brothers SA in Geneva:
*"There is a proposal to enter into 25 pct partnership witha group by Arkadi working on a project of producing poultry in Bashkiri. The local banks and govt agrees to sell us hundreds of thousands of acres at nominal amount to creat farms to produce feed. There. Are two existing silos to store. For this they require 25m funds to show as equity altho given as a loan and any disbursements to be monitored by us.*
*I want you to meet Eliot who runs this along with arkadi perhaps visit the site come up with a realistic relationship to work under. The values shows the money will be paid back within months. We remain at 25pct and they today value project at 5 of 6 hundred million profit on completion where we stay with returns or ipo."*

**2.4.      By e-mail of 24 August 2011 David Reuben** on behalf of the Reuben Foundation writes as follows to Alexander Bushaev:
*"I have to appoint a Directoir who is in charge of an investment loan 25 Dol. The moniey is a loan, goes as equity but against which we. Will borrow and receive local cash. Theb this is returned back to us. Alex should be the director. He and arhadi will supervise the funding of the whole group."*

**2.5.      On 3 November 2011 Bloomfield** for an amount of USD 25,000,000 subscribed to the SH Fund (hereinafter referred to as the: 'subscription agreement').

Paragraph 1 of this agreement *inter alia* states as follows: *Having reviewed the Memorandum, the Subscriber hereby agrees with the Fund, subject to the Fund's acceptance, to subscribe to as many of the Fund's shares as may be purchased for U.S. $ 25m on 4th November 2011 .....The Subscriber acknowledges that this subscription is irrevocable*

**Paragraph 27 states as follows:** *This Subscription Agreement shall be governed by and construed in accordance with the law of the Cayman Islands.*
**On behalf** of Bloomfield the subscription agreement was signed by Alexander Bushaev.

**2.6.**    On 9 November 2011 Reuben Brothers Ltd. Deposited an amount of USD 25,000,000 with **Bank** of Bermuda, the beneficiary being the SH Fund. Under the heading 'Payment Details' the **account** statement mentions: "*BLOOMFIELD INVESTMENT RESOURCES CORP SUBSCRIPTION*".

**2.7.**    In 2012 Bloomfield further to a restructuring of the SH Fund agreed to a transition to **shareholder** in the SH Feeder Fund. Bloomfield has since held 50% of the shares in SH Feeder Fund.

**2.8.**    By e-mail of 10 October 2014 Mehmet Saydam on behalf of Bloomfield writes as follows to, **among** others, Daniloff, to the extent relevant here:
*"We agreed that:*
*1) RB shares in UMG will be increased to 50%*
*2) RB will receive a fully perfected (registered etc) pledge on the rest of the 50% if UMG. MS strongly insist RB to have the voting right over the pledged shares. ED contested MS view. We will relay the matter to David.*
*3) If UMG has not managed to repay RB until 31.12.2014, RB will enforce the pledge and own 100% of UMG. RB will than have sole discretion over the recovery procedure. If the recoveries exceed USD25m, the excess will be first applied to repay the accrued interest to RB (rate to be agreed) and the rest will be distributed in a manner to be agreed.*
*4) If RB is repaid before 31.12.2014, the pledge over the 50% of the shares will fall away and RB will return 25% of its shares.*

*As a preparation of the post repayment structure:*
   *a)   A BVI SPV will be established*
   *b)   SPV will own 100% of UMB, RB will own 50% of the SPV and the rest of the shares being pledged to RB.*
   *c)   We will agree to Shareholders and Management agreements. The management agreement will be in line with the currently drafted terms (incorporating the comments that MS had already provided). The Shareholder's agreement will include clauses like Tag Along etc. But a side letter among the shareholders will stipulate that such shareholder's Agreement will only become effective after RB has been repaid.*
   *d)   Before the repayment the SPV will have a board of 5 people. Rashid al Habtoor and Kirill Martinez will be on the board with symbolic representation. Their presence in the board will be to facilitate the raising of equity and debt but they will not have any power. ED, AO and MS will be the remainder board member but there will be a side agreement that will delegate all the voting rights of ED, AO and MS to RB providing effective board control to RB.*
   *e)   After the repayment the SPV board will be increased to 7 with 3 seats to the new equity investor that will own 50% of the SPV in exchange of injecting USD 150m, ED, AO and RB will each have one seat and the CEO appointed by the Shareholder's agreement will have one seat.*
   *f)   When the DIFC, Dubai company is set up, the SPV will be replaced by this DIFC company, all other terms remaining the same.*
*Please confirm/Comment my understanding of our discussion.*
*... ..."*

**2.9.**    By e-mail of 16 October 2014 Daniloff writes as follows to Bloomfield, to the extent relevant **here:**
"... ...

C/10/479791 / KG ZA 15-737
15 July 2015

---

1) *RB shares in UMG will increase to 50%*

   *Agreed*

2) *RB will receive a fully perfecter (registered etc) pledge over the rest of the 50% if UMG.*
   *MS strongly insist RB to have the voting right over the pledged shares. ED contested MS View.*
   *We will relay the matter to David.*

   *I spoke with Third Investor. He is categorically disagreeing with pledging his shares.*

3) *If UMG has not managed to repay RB until 31.12.2014, RB will enforce the pledge and own 100%*
   *of UMG. RB will than have sole discretion over the recovery procedure. If The recoveries exceed*
   *USD25m, the excess will be first applied to repay the accrued interest to RB (rate to be agreed)*
   *and the rest will be distributed in a manner to be agreed.*

   *Same as above*

4) *If RB is repaid before 31.12.2014, the pledge over the 50% of the shares will fall away and RB will*
   *return 25% of its shares.*

   *Agreed to the part of returning 25% for 25mm.*

   *As a preparation of the post repayment structure:*

a) *A BVI SPV will be established*

   *Agreed*

b) *SPV will own 100% of UMB, RB will own 50% of the SPV and the rest of the shares being*
   *pledged to RB.*

   *Agreed to al but pledging the rest of the shares to RB.*
   … …

**2.10.** On 26 November 2014 a meeting took place in Moscow, which was in any case attended by
**Daniloff**, Arkadiy Orkin and Mehmet Saydam. Subsequently the following (hand-written) document
**was** drawn up and initialled by the parties present at the meeting.
                    *"UMG – 26/11/14*

   0) *3 miljoen Bond 26 netto goes to David*
      *ETA: 15/12/14*
   1) *Do the back to back loan to repay RB*
   2) *RB to pay 13% interest for one year and 2% there after.*
   3) *We set strategy to approach all markets for raising debt,*
      *mezzine or equity (people, budget travel etc.)*
   4) *RB-SPV pledges the shares of UMG to UMG*
   5) *RB will end up with the 25% of all the current shareholders shares*
   6) *Dan 'Role: Sale/Equity Raise*
                    *Financial Control*
                    *Terms to be proposed and agreed."*

**2.11.** After having been granted leave for that purpose on 17 June 2015, Bloomfield had a



prejudgment attachment made of UMG's bank account with Demir-Halk Bank (Nederland). Under the leave granted the amount of the claim was estimated at EUR 22,826,933.75 (or USD 25,000,000), including interest and costs.

**3.      The dispute**

**3.1.**    UMG requests that it may please the Preliminary Relief Judge of the District Court of Rotterdam, passing judgment in preliminary relief proceedings, to issue provisionally enforceable judgment to the extent possible to:
1.    lift the prejudgment attachment imposed against UMG of assets held by Demir-Halk Bank (Nederland) N.V.;
2.    prohibit Bloomfield, subject to a penalty payment of EUR 5,000,000 per day, to impose new prejudgment attachments against UMG;
3.    order Bloomfield to pay the costs of the proceedings.

**3.2.**    Bloomfield has put forward a defence. To the extent relevant the parties' arguments will be addressed below.

**4.      The examination of the dispute**
**4.1.**    Bloomfield's defence that UMG does not have an urgent interest in the requested relief is dismissed. Article 705 of the Dutch Code of Civil Procedure (DCCP) offers the judgment debtor who in principle is not heard and who has no way of appealing against any leave granted, the possibility of demanding the lifting of the attachment in preliminary relief proceedings.

**4.2.**    First and foremost it should be borne in mind that in accordance with article 702 (2) DCCP a prejudgment attachment should be lifted, if there is prima facie evidence of the law relied on by the attaching party being invalid or of the attachment having been needlessly imposed, or, if the attachment has been made to collect a money claim, as is the case here, if adequate security is furnished for that claim. This implies that it is in the first place up to the party demanding the lifting of the attachment to argue convincingly, with due observance of the limitations of the preliminary relief proceedings, that the claim alleged by the attaching party is invalid or unnecessary, or that the continuation of the attachment cannot be justified for other reasons.
However, a decision will have to be made on the basis of the arguments raised by the parties and the prima facie evidence furnished in support of this.
What this boils down to is that, even if there should be doubts, but on the other hand the existence of the claim does not appear unlikely in advance, the attachment should in principle be maintained.

**4.3.**    Accordingly UMG's claim should be assessed within the context of this framework. However, this is not possible without a weighing of the respective interests, as required in such a case, within which context it should be assessed if the interest which the attaching party has in maintaining the attachment on the basis of the arguments put forward by it, should outweigh the interest which the judgment debtor has in the lifting of this attachment. In that respect it should be noted that, by its nature, the purpose of a prejudgment attachment is to make sure that, in the case of an as yet undetermined claim being allowed in proceedings on the merits, means will be available to recover the debt from, whereas, in the event of the claim being dismissed, the attaching party may be sued for compensation of the damage arising from the attachment.

**4.4**    With regard to the dispute underlying the present attachment the parties disagree on many points, or essential points, and have conducted detailed and reasoned defences in response to each other's arguments.

**4.5.** In essence UMG argues that the attachment imposed by Bloomfield should be lifted, because there is no evidence, or even prima facie evidence on the part of Bloomfield, of any right to demand payment of USD 25,000,000. According to UMG the invalidity of the claim alleged by Bloomfield appears from the 'subscription agreement' which it has submitted as exhibit 1, showing that Bloomfield had subscribed to shares in SH Fund for an amount of USD 25,000,000. In order to give effect to this obligation, Reuben Brothers Ltd. For the benefit of Bloomfield on 9 November 2011 transferred an amount of USD 25,000,000 to the bank account maintained by SH Fund with Bank of Bermuda in Hamilton. The payment in question is (*inter alia*) specified as: "*Bloomfield Investment Resources Corp Subscription*". Bloomfield has invested in an investment fund. This also appears from the Memorandum SH Fund, the contents of which are binding on Bloomfield. This therefore concerns an investment in shares in an investment fund. There was no question of this being a loan or a deposit. SH Fund was a party to this agreement, not UMG.
There were no binding agreements that UMG would repay USD 25,000,000.

**4.6.** Bloomfield has disputed the above, arguing that the USD 25,000,000 made available by it to Daniloff concerned a loan/deposit, provided to Daniloff by Bloomfield with a view to supporting him in finding lenders and/or participants in UH Feeder Fund. On 9 November 2011 the USD 25,000,000 was transferred by Bloomfield into an account maintained by SH Fund, and thus made available to Daniloff.
The term of the loan or deposit, as the case may be, was two years, which means that it had to be repaid on 9 November 2013. The amount furnished would temporarily serve as equity only, in order that borrowed capital could be raised for the realization of the UMG project. It was furthermore agreed that no interest would be due on the USD 25,000,000 and that - instead - Bloomfield would upon repayment acquire a total of 25% of the shares in SH Feeder Fund. To secure repayment Bloomfield was given 50% of the shares in SH Feeder Fund, as set forth by the parties in the 'subscription agreement' of 3 November 2011. Subsequently Daniloff relent the USD 25,000,000 to UMG.
Referring to the e-mails quoted in 2.8 and 2.9, Bloomfield furthermore argues that in the early part of October 2014 it was agreed - or further agreed - that UMG would repay the USD 25,000,000 before 31 December 2014, and that, by way of security, Bloomfield would with immediate effect acquire 50% of the shares in UMG (so no longer by way of SH Feeder Fund), plus a right of pledge on the remaining 50% of the shares in UMG. Subsequently on 26 November 2014 a meeting took place in Moscow, which was attended by, among others, Daniloff, Arkadiy Orkin and Mehmet Saydam and in which the arrangements set forth in 2.10 were made.

Within the context of these arrangements it was also agreed that an amount of USD 15 million would be deposited in an account with Demir-Halk Bank (Nederland) in the name of UMG. This amount would serve as security for a loan to be obtained from a third party to a company which was yet to be incorporated, which company would use the loan to take over Bloomfield's shares in the SH Feeder Fund, for the purpose of repaying the amount deposited by Bloomfield.
It was furthermore agreed that a two-signature system would apply to the account with Demir-Halk Bank (Nederland): transactions would require one signature from the representative of UMG and one from Bloomfield's representative. UMG one-sidedly amended this arrangement, as a result of which the required security was absent.

Daniloff for the first time adopted the position that the transaction did not involve a loan, but a regular investment with all the related risks, after Bloomfield had attached the account with Demir-Halk Bank (Nederland).

UMG is acting in breach of the agreements made with Bloomfield and is acting unlawfully by frustrating the two-signature system governing the account with DHB. To secure repayment of what is owed to it, a prejudgment attachment of the account with DHB is justified.

4.7.    The judge in preliminary relief proceedings holds as follows.

4.7.1.   Since prejudgment attachment has been imposed on one of UMG's bank account with a Rotterdam-based bank, the judge in preliminary relief proceedings considers itself the court of competent jurisdiction to examine the case.

4.7.2.   When asked about this, the parties at the hearing could not provide clarity about the law applicable to this matter. The judge in preliminary relief proceedings does not consider itself able to express his views on the merits of this issue within the context of these proceedings. The answer to this question depends on a great number of facts, about which no agreement of any kind has been reached. As an example of this the court mentions the aspect of it not being clear - on either side - which of the persons involved at which moment was acting on behalf of which company.
The judge in preliminary relief proceedings will therefore review to what extent the facts are capable of providing support to the parties' positions in the proceedings and give its decision in accordance with generally accepted Dutch standards.

4.7.3.   Given the conflicting statement of facts, it is at this moment not possible either to determine if Bloomfield has incorrectly/incompletely informed the court in the application for attachment.

4.7.4.   Bloomfield has imposed the attachment whose lifting is demanded in these proceedings to secure a claim it alleges to have against UMG, which claim - according to Bloomfield - should be estimated at EUR 22,826,933.75 (USD 25,000,000). Bloomfield takes the view that UMG has failed in the performance of the agreements that were made on 26 November 2014 regarding the repayment of the loan of EUR 25,000,000 [sic: translator] provided by Bloomfield. The statement, or witness statement, and the e-mails submitted by Bloomfield lend support to the view adopted by Bloomfield, that from the very start it had been the express intention of the parties - in the persons of Reuben and Daniloff - that the amount of USD 25,000,000 had been made available as a loan/deposit. More in particular the extensive and detailed witness statements submitted by Bloomfield point in that direction.
The report of the meeting of 26 November 2014 and the specific opening of a bank account in the Netherlands further to the agreements that had been made, into which account subsequently USD 15,000,000 was deposited, lend support to Bloomfield's view that UMG had committed itself to repaying USD 25,000,000 to Bloomfield.

4.7.5.   On the other hand that the chance that ultimately it will emerge that Bloomfield has wrongly made the attachment, because the transaction between the parties should not be regarded (not as a money loan but) as a risk-bearing investment, given the evidence submitted by UMG, in particular the 'subscription agreement', and the statement of account quoted in 2.6, is far from imaginary. What surprises the court, moreover, is that it was not explicitly documented before the USD 25,000,000 were transferred, that this transaction involved a loan/deposit.

4.7.6.   In order to be able to decide which party is right, a further review will be required, with more evidence being furnished by the parties, which will go beyond the scope of these preliminary relief proceedings. The judge in preliminary relief proceedings does not at all rule out that both the contents of the 'subscription agreement' and the verbal agreements between Reuben and Daniloff, when viewed in relation to each other, together with the agreements made at a later stage, with the

C/10/479791 / KG ZA 15-737
15 July 2015

---

the end be decisive when it comes to answering the question if UMG is under an obligation to repay USD 25,000,000.

4.8.     The above leads to the conclusion that, although it cannot be assumed with sufficient certainty in these preliminary relief proceedings that Bloomfield has a claim of USD 25,000,000 against UMG under a loan provided by it, by virtue of arrangements that were made, and/or on the basis of any unlawful actions that were performed by UMG, on the other hand it cannot be ruled out either that in proceedings on the merits its claim will prove allowable. Against the background of assessment framework set out in 4.2, this means that Bloomfield's claim against UMG cannot be qualified as being prima facie invalid.

4.9.     UMG has furthermore indicated that, if the attachment, or third party attachment, by Bloomfield of its bank account with Demir-Halk Bank (Nederland) has not been lifted by 17 July 2015 at the latest, UMG will not be able to in time meet its payment obligations to its noteholders, estimated at USD 3,300,000. As a result hereof the full principal plus interest will be due and payable with immediate effect and payment will be demanded from UMG by the noteholders under the guarantee and/or the right of pledge on the shares in UMG will be exercised. The consequence of this may be that SH Fund will lose all its shares in UMG, as a result of which all the investors in the fund will also lose their investments. At the hearing it has furthermore been argued by UMG that, if at all possible, it will require a number of months to arrange for alternative funding.
It is true that all this has been disputed by UMG [sic: translator], but the judge in preliminary relief proceedings has no reason to doubt UMG's arguments at this point.

4.10.     Under the aforementioned circumstances the judge in preliminary relief proceedings will, on the basis of a weighing of interests, lift the attachment imposed by Bloomfield against UMG for an amount of USD 3,300,000, and maintain the attachment for the remaining part. In so doing the judge in preliminary relief proceedings has taken into account that, although the claim alleged by Bloomfield in respect of which the attachment has been imposed is not prima facie invalid, the chance of Bloomfield in the end turning out to have wrongly made the attachment it is not inconceivable either, and that it has neither been argued nor become apparent that Bloomfield's chances of recovering what may be owed to it will substantially decrease as a result of the lifting of the attachment for an amount of USD 3,300,000.
It has appeared that the attachment of the account with DHB is still in place for an amount of USD 15,000,000, so that considerable security is available to Bloomfield, should its claim be allowed in part.

In the coming months UMG will have the opportunity to arrange for alternative funding.

4.11.     The above means that the relief demanded by UMG in 1 will be allowed in part, in the sense that the attachment will be lifted for an amount of USD 3,300,000, whereas it will be maintained for the remaining part.

4.12.     The relief demanded in 2 will be dismissed. These proceedings are not the right instrument for such an order pertaining to the future. The judge in preliminary relief proceedings will however order that, on the occasion of the hearing of a subsequent application for attachment, if any, in relation to the same issues which are under discussion here, Bloomfield will have to provide a copy of this judgment to the judge in preliminary relief proceedings.

4.13.     Given the fact that in these proceedings it is not possible for the court to decide which of the parties is right in the underlying dispute, the court sees reason to order the parties to pay their own costs.

C/10/479791 / KG ZA 15-737
15 July 2015

---

**5.      The decision**

The judge in preliminary relief proceedings

**5.1.**      Lifts the prejudgment attachment, or prejudgment third party attachment, imposed by Bloomfield of UMG's bank account with Demir-Halk Bank (Nederland) for an amount of USD 3,300,000;

**5.2.**      in other respects maintains the prejudgment attachment, or prejudgment third party attachment, imposed by Bloomfield of UMG's bank account with Demir-Halk Bank (Nederland);

**5.3.**      orders that, on the occasion of the filing of a subsequent application for attachment, if any, in relation to the same issues which are under discussion here, Bloomfield will have to provide a copy of this judgment to the judge in preliminary relief proceedings;

**5.4.**      orders the parties to the proceedings to pay their own costs;

**5.5.**      declares this judgment enforceable with immediate effect;

**5.6.**      dismisses all other applications;

**5.7.**      orders that the counterclaim will be disregarded.

This judgment was rendered by A.F.L. Geerdes and pronounced in open court on 15 July 2015. 1862/676

                    (signatures)



## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the document "Vonnis", which was written in Dutch.


Amstelveen, 16 July 2015.


Jouke van der Meij, sworn translator for the English language

Strandvliet 20

1181 ML AMSTELVEEN

THE NETHERLANDS



# vonnis

**RECHTBANK ROTTERDAM**

**Team Handel**

**zaaknummer / rolnummer: C/10/479791 / KG ZA 15-737**

**Vonnis in kort geding van 15 juli 2015**

in de zaak van

rechtspersoon naar het recht van de Russische Federatie
**OPEN JOINT STOCK COMPANY "UNITED MEAT GROUP",**
gevestigd te Moskou, Russische Federatie,
eiseres,
advocaten mr. R.A.W.J. van Eijck en mr. V.R.M. Appelman,

tegen

de rechtspersoon naar het recht van de Britse Maagdeneilanden
**BLOOMFIELD INVESTMENT RESOURCES CORP.,**
gevestigd te Tortola, Britse Maagdeneilanden,
gedaagde,
advocaat mr. I. van Wassenaar en mr. M.N. van Dam.

Partijen zullen hierna UMG en Bloomfield genoemd worden.

1.      **De procedure**

1.1.    Het verloop van de procedure blijkt uit:
- de dagvaarding d.d. 3 juli 2015;
- de producties van UMG;
- de producties van Bloomfield;
- de pleitnota van mr. R.A.W.J. van Eijck en mr. V.R.M. Appelman;
- de pleitnota van mr. I. Wassenaar en mr. M.N. van Dam.

1.2.    Partijen hebben de respectieve standpunten toegelicht ter zitting van 9 juli 2015.
Ten slotte is vonnis bepaald.

1.3.    UMG heeft bezwaar gemaakt tegen de door Bloomfield, voor het eerst bij pleidooi,
ingestelde reconventionele vordering, die door Bloomfield - in strijd met het proces-
reglement - niet (tenminste) 24 uur voor de zitting ter kennis van UMG is gebracht.

De voorzieningenrechter honoreert het bezwaar van UMG en overweegt dienaangaande het
volgende.

C/10/479791 / KG ZA 15-737                                                          **2**
15 juli 2015

---

Het betreft hier een omvangrijke geldvordering (15 miljoen USD), waartegen UMG zich
deugdelijk moet kunnen verweren en waarbij ook buiten de zitting overleg tussen advocaat
en cliënt nodig zal zijn. Dit, in samenhang bezien met het feit dat de reconventionele
vordering niet tijdig, binnen 24 uur vóór de terechtzitting, door Bloomfield ter kennis van
UMG is gebracht, hetgeen artikel 7.2 van het procesreglement kort gedingen rechtbanken
sector civiel/familie dwingend voorschrijft, brengt met zich dat UMG in haar procesbelang
zou worden geschaad wanneer de reconventionele vordering in onderhavig kort geding zou
worden toegelaten. Dit brengt met zich dat de reconventionele vordering buiten
beschouwing zal worden gelaten.


**2.    De feiten**

**2.1.**    Bloomfield is een investeringsmaatschappij, die onderdeel uitmaakt van de
wereldwijd opererende Reuben Brothers-Groep. Bloomfield is als 'special purpose vehicle'
voor het onder 2.3 en 2.4 bedoelde project door Reuben Brothers opgericht. Reuben
Brothers-Groep is een belangrijke speler in private equity, vastgoedinvesteringen en
-ontwikkeling en durfkapitaal en opgericht door de Britse broers David en Simon Reuben.
Vanuit de Reuben Foundation worden door David en Simon Reuben
(liefdadigheids)initiatieven ondersteund op (ondermeer) het gebied van onderwijs en
gezondheidszorg.


**2.2.**    Elliot Daniloff (hierna: Daniloff) is bestuurder van het op de Caymaneilanden
gevestigde investeringsmaatschappij Synergy Hybrid Feeder Fund Ltd. (hierna: SH Feeder
Fund). SH Feeder Fund beoogt vermogensgroei op de lange termijn door middel van
investeringen in voornamelijk Rusland en het Gemenebest van Onafhankelijke Staten.
SH Feeder Fund is meerderheidsaandeelhouder van Synergy Hybrid Fund Ltd. (hierna: SH
Fund). SH Fund is enig aandeelhouder in UMG. UMG is een holding van meerdere
Russische vennootschappen, wiens bedrijfsactiviteiten zijn gericht op de productie van
pluimvee, graan en diervoeding.


**2.3.**    Per mail d.d. 14 juli 2011 schrijft David Reuben namens de Reuben Foundation aan
Alexander Bushaev, director en manager van Reuben Brothers SA te Genève, het volgende:
*"There is a proposal to enter into 25 pct partnership with a group by Arkadi working on a project of
producing poultry in Bashkiri. The local banks and govt agrees to sell us hundreds of thousands of
acres at nominal amount to creat farms to produce feed. There. Are two existing silos to store. For
this they require 25m funds to show as equity altho given as loan and any disbursements to be
monitored by us.*
*I want you to meet Eliot who runs this along with arkadi perhaps visit the site come up with a
realistic relationship to work under. The values shows the money will be paid back within months.
We remain at 25 pct and they today value project at 5 of 6 hundred million profit on completion
where we stay with returns or ipo."*


**2.4.**    Per mail d.d. 24 augustus 2011 schrijft David Reuben namens de Reuben
Foundation aan Alexander Bushaev, het volgende:
*"I have to appoint a. Directoir who is in charge of an investment loan 25. Dol. The moniey
is a loan, goes as equity but against which we. Will borrow and receive local cash. Theb this
is returned back to us. Alex should be the director. He and arhadi will supervise the funding
of the whole group."*

C/10/479791 / KG ZA 15-737                                                              3
15 juli 2015

---

2.5.     Op 3 november 2011 heeft Bloomfield voor een bedrag van USD 25.000.000,=
ingeschreven op het SH Fund (hierna aangeduid met: 'subscription agreement').

Onder 1 hiervan staat onder meer: *Having reviewed the Memorandum, the Subscriber
hereby agrees with the Fund, subject to the Fund's acceptance, to subscribe to as many of
the Fund's Shares as may be purchased for U.S. $ 25m on 4th November 2011..... The
Subscriber acknowledges that this subscription is irrevocable*

Onder 27 staat: *This Subssciption Agreement shall be governed by and construed in
accordance with the law of the Cayman Islands.*

Namens Bloomfield is de subscription agreement ondertekend door Alexander Bushaev.

2.6.     Op 9 november 2011 heeft Reuben Brothers Ltd een bedrag van USD 25.000.000,=
gestort bij Bank of Bermuda met als begunstigde het SH Fund.
Op het rekeningafschrift staat onder 'Payment Details' vermeld: *"BLOOMFIELD
INVESTMENT RESOURCES CORP SUBSCRIPTION".*

2.7.     In 2012 is Bloomfield in verband met een herstructurering van het SH Fund
akkoord gegaan met een transitie naar aandeelhouder in het SH Feeder Fund. Bloomfield
houdt sindsdien ca. 50% van de aandelen in SH Feeder Fund.

2.8.     Per mail d.d. 10 oktober 2014 schrijft Mehmet Saydam namens Bloomfield aan
(ondermeer) Daniloff, voor zover hier relevant, het volgende:
*"We agreed that:*
   *1) RB shares in UMG will be increased to 50%*
   *2) RB will receive a fully perfected (registered etc) pledge on the rest of the 50% if
   UMG. MS strongly insist RB to have the voting right over the pledged shares. ED
   contested MS view. We will relay the matter to David.*
   *3) If UMG has not managed to repay RB until 31.12.2014, RB will enforce the pledge
   and own 100% of UMG. RB will than have sole discretion over the recovery
   procedure. If the recoveries exceed USD25m, the excess will be first applied to repay
   the accrued interest to RB (rate to be agreed) and the rest will be distributed in a
   manner to be agreed.*
   *4) If RB is repaid before 31.12.2014, the pledge over the 50% of the shares will fall away
   and RB will return 25% of its shares.*

*As a preparation of the post repayment structure:*
   *a) A BVI SPV will be established*
   *b) SPV will own 100% of UMB, RB will own 50% of the SPV and the rest of the shares
   being pledged to RB.*
   *c) We will agree to Shareholders and Management agreements. The management
   agreement will be in line with the currently drafted terms (incorporating the
   comments that MS had already provided)., The Shareholder's agreement will include
   clauses like Tag Along etc. But a side letter among the shareholders will stipulate that
   such Shareholder's Agreement will only become effective after RB has been repaid.*

C/10/479791 / KG ZA 15-737                                                            4
15 juli 2015

_____

    d)   *Before the repayment the SPV will have a board of 5 people. Rashid al Habtoor and Kirill Martinez will be on the board with symbolic representation. Their presence in the board will be to facilitate the raising of equity and debt but they will not have any power. ED, AO and MS will be the remainder board member but there will be a side agreement that will delegate all the voting rights of ED, AO and MS to RB providing effective board control to RB.*

    e)   *After the repayment the SPV board will be increased to 7 with 3 seats to the new equity investor that will own 50% of the SPV in exchange of injecting USD 150m, ED, AO and RB will each have one seat and the CEO appointed by Shareholder's agreement will have one seat.*

    f)   *When the DIFC, Dubai company is set up, the SPV will be replaced by this DIFC company, all other terms remaining the same.*

*Please Confirm/Comment my understanding of our discussion.*
*... ... "*

2.9.    Per mail d.d. 16 oktober 2014 schrijft Daniloff aan Bloomfield, voor zover hier relevant, het volgende:
"... ...

1)  *RB shares in UMG will be increase to 50%*

   *Agreed*

2)  *RB will receive a fully perfecter (registered etc) pledge on the rest of the 50% if UMG. MS strongly insist RB to have the voting right over the pledged shares. ED contested MS View. We will relay the matter to David.*

   *I spoke with Third Investor. He is categorically disagreeing with pledging his shares.*

3)  *If UMG has not managed to repay RB until 31.12.2014, RB will enforce the pledge and own 100% of UMG. RB will than have sole discretion over the recovery procedure. If The recoveries exceed USD25m, the excess will be first applied to repay the accrued interest to RB (rate to be agreed) and the rest will be distributed in a manner to be agreed.*

   *Same as above ...*

4)  *If RB is repaid before 31.12.2014, the pledge over the 50% of the shares will fall away and RB will return 25% of its shares.*

   *Agreed to the part of returning 25% for 25 mm.*

   *As a preparation of the post repayment structure:*

a)  *A BVI SPV will be established*

   *Agreed*

b)  *SPV will own 100% of UMG, RB will own 50% of the SPV and the rest of the shares*

C/10/479791 / KG ZA 15-737                                                          5
15 juli 2015

_____

*being pledged to RB.*

*Agreed to al but pledging the rest of the shares to RB.*
… …*"*

**2.10.**   Op 26 november 2014 heeft er een bespreking in Moskou plaatsgevonden, waarbij
in ieder geval Daniloff, Arkadiy Orkin en Mehmet Saydam aanwezig waren. Vervolgens is
het hiernavolgende (handgeschreven) geschrift opgesteld en door - de bij de bespreking
aanwezige partijen - geparafeerd:
    *"UMG – 26/11/14*

    *0)   3 miljoen Bond  26 netto  25 goes to David.*
         *ETA: 15/12/14*
    *1)   Do the back to back loan to repay RB*
    *2)   RB to pay 13% interest for one year and 2% there after.*
    *3)   We set strategy to approach all markets for raising debt,*
         *mezzine or equity (people, budget travel etc.)*
    *4)   RB-SPV pledges the shares of UMG to UMG.*
    *5)   RB will end up with the 25% of all the current shareholders shares.*
    *6)   Dan 'Role: Sale/Equity Raise.*
               *Financial Control.*
               *Terms to be proposed and agreed."*

**2.11.**   Bloomfield heeft, na daartoe verkregen verlof d.d. 17 juni 2015 van de
voorzieningenrechter van de rechtbank Rotterdam, ten laste van UMG conservatoir
(derden)beslag doen leggen onder de Demir-Halk Bank (Nederland) op de bankrekening
van UMG. Bij dit gegeven verlof is de vordering begroot op € 22.826.933,75 (omgerekend
USD 25.000.000,=) inclusief rente en kosten.


**3.**     **Het geschil**

**3.1.**    UMG vordert dat het de voorzieningenrechter van de rechtbank Rotterdam behage
om rechtdoende in kort geding, bij vonnis, voor zover mogelijk uitvoerbaar bij voorraad om:
    1.  het op 17 juni 2015 ten laste van UMG onder Demir-Halk Bank (Nederland) N.V.
        gelegde conservatoire derdenbeslag op te heffen;
    2.  Bloomfield te verbieden, zulks op straffe van verbeurte van een dwangsom van
        € 5.000.000,- per dag, ten laste van UMG nieuwe conservatoire beslagen te leggen;
    3.  Bloomfield te veroordelen in de kosten van het geding.


**3.2.**    Bloomfield voert verweer. Op de stellingen van partijen wordt hierna, voor zover
van belang, nader ingegaan.

**4.**     **De beoordeling**

**4.1.**    Het verweer van Bloomfield dat UMG geen spoedeisend belang heeft bij de
gevorderde voorziening, wordt verworpen. Artikel 705 Wetboek van Rechtsvordering (Rv)
biedt de beslagschuldenaar, die in beginsel niet wordt gehoord en die tegen een verleend

C/10/479791 / KG ZA 15-737                                                                6
15 juli 2015

verlof geen rechtsmiddel kan aanwenden, de mogelijkheid in kort geding opheffing van het
beslag te vorderen.

4.2.      Vooropgesteld zij dat op grond van het bepaalde in artikel 705 lid 2 Rv een
conservatoir beslag dient te worden opgeheven indien summierlijk van de ondeugdelijkheid
van het door de beslaglegger ingeroepen recht blijkt of van het onnodige van het beslag, of,
zo het beslag is gelegd voor een geldvordering, zoals hier aan de orde, indien voor die
vordering voldoende zekerheid wordt gesteld. Dit brengt mee dat het in de eerste plaats op
de weg ligt van degene die de opheffing van het beslag vordert om, met inachtneming van
de beperkingen van de kort gedingprocedure, aannemelijk te maken dat de door de
beslaglegger gepretendeerde vordering ondeugdelijk of onnodig is, of dat het voortduren
van het beslag om andere redenen niet kan worden gerechtvaardigd.
Er zal evenwel beslist moeten worden aan de hand van wat door beide partijen naar voren is
gebracht en summierlijk met bewijsmateriaal is onderbouwd.
Dit komt erop neer dat ook wanneer twijfel mocht bestaan doch anderzijds het bestaan van
de vordering niet bij voorbaat onwaarschijnlijk voor komt, het beslag in beginsel
gehandhaafd moet worden.

4.3.      De vordering van UMG dient dan ook binnen dit toetsingskader te worden
beoordeeld. Die beoordeling kan evenwel niet geschieden los van de in een zodanig geval
vereiste afweging van de wederzijdse belangen, waarbij dient te worden beoordeeld of het
belang van de beslaglegger bij handhaving van het beslag op grond van de door deze naar
voren gebrachte omstandigheden zwaarder dient te wegen dan het belang van de beslagene
bij opheffing van het beslag. In dit verband verdient opmerking dat een conservatoir beslag
naar zijn aard ertoe strekt om te waarborgen dat, zo een vooralsnog niet vaststaande
vordering in de bodemprocedure wordt toegewezen, verhaal mogelijk zal zijn, terwijl de
beslaglegger bij afwijzing van de vordering zal kunnen worden aangesproken voor de door
het beslag ontstane schade.

4.4.      Partijen verschillen met betrekking tot het geschil dat aan het onderhavige beslag
ten grondslag ligt op vele (essentiële) onderdelen van mening, waarbij zij op elkaar
stellingen uitvoerig en gemotiveerd verweer hebben gevoerd.

4.5.      UMG stelt in essentie dat het door Bloomfield gelegde beslag moet worden
opgeheven omdat niet, zelfs niet summierlijk, is gebleken van een vorderingsrecht tot
betaling van USD 25.000.000,= aan de zijde van Bloomfield. De ondeugdelijkheid van de
door Bloomfield gepretendeerde vordering blijkt volgens UMG uit de door haar als
productie 1 overgelegde 'subscription agreement', waaruit blijkt dat Bloomfield zich heeft
ingeschreven om voor een bedrag van USD 25.000.000,= aan aandelen te verkrijgen in SH
Fund. Ter uitvoering van deze verplichting heeft Reuben Brothers Ltd ten behoeve van
Bloomfield op 9 november 2011 een bedrag van USD 25.000.000,= overgemaakt op de
door SH Fund aangehouden bankrekening bij Bank of Bermuda te Hamilton. Als
omschrijving bij deze betaling staat (ondermeer) vermeld: "*Bloomfield Investment
Resources Corp Subscription*". Bloomfield heeft geïnvesteerd in een beleggingsfonds. Dat
blijkt ook uit het Memorandum SH Fund, waarvan de inhoud Bloomfield bindt. Het gaat dus
om een investering in aandelen in een beleggingsfonds. Van een lening of een depot was
geen sprake. SH Fund, en niet UMG was partij bij deze overeenkomst.
Van bindende afspraken dat UMG USD 25.000.000,= zou terugbetalen is geen sprake.

Case 1:15-mc-00220-P1   Document 2   Filed 07/22/15   Page 186 of 197

010

Rechtbank Rotterdam

010

12:31:30   15-07-2015

7 / 10

C/10/479791 / KG ZA 15-737                                                7
15 juli 2015

---

**4.6.**   Bloomfield betwist het voorgaande en stelt dat de door haar aan Daniloff ter
beschikking gestelde USD 25.000.000,= een lening/depot betrof, door Bloomfield aan
Daniloff verstrekt om hem te ondersteunen bij het vinden van financiering en/of deelnemers
voor SH Feeder Fund. Op 9 november 2011 is de USD 25.000.000,= door Bloomfield
overgemaakt op een rekening van SH Fund en zodoende aan Daniloff ter beschikking
gesteld.
De looptijd van de lening c.q het depot bedroeg twee jaar en diende derhalve op 9 november
2013 te worden terugbetaald. Het ter beschikking gestelde bedrag zou uitsluitend als
tijdelijk eigen vermogen dienen, zodat en totdat vreemd vermogen kon worden
aangetrokken voor de realisering van het UMG-project. Afgesproken werd verder dat over
de USD 25.000.000,= geen rente verschuldigd was en dat Bloomfield - in de plaats daarvan
- bij terugbetaling in totaal 25% van de aandelen in SH Feeder Fund zou verkrijgen. Ter
zekerheid van de terugbetaling verkreeg Bloomfield 50% van de aandelen in SH Feeder
Fund, hetgeen door partijen is vastgelegd in de 'subscription agreement' van 3 november
2011. Daniloff heeft vervolgens de USD 25.000.000,= doorgeleend aan UMG.
Met verwijzing naar de onder 2.8 en 2.9 geciteerde mails stelt Bloomfield verder dat begin
oktober 2014 - nader - is afgesproken dat UMG de USD 25.000.000,= zou terugbetalen voor
31 december 2014 en Bloomfield ter zekerheid hiervan direct 50% van de aandelen in UMG
zou verkrijgen (dus niet langer indirect via SH Feeder Fund), als ook een pandrecht op de
overige 50% van de aandelen in UMG. Vervolgens heeft er op 26 november 2014 een
bespreking in Moskou plaatsgevonden, waarbij onder andere Daniloff, Arkadiy Orkin en
Mehmet Saydam aanwezig waren en de onder 2.10 opgenomen afspraken zijn gemaakt.

In het kader van deze afspraken is ook overeengekomen dat een bedrag van USD 15 miljoen
op een rekening bij de Demir-Halk Bank (Nederland) ten name van UMG zou worden
gestort. Dit bedrag zou dienen als zekerheid voor een bij een derde te verkrijgen lening aan
een nog op te richten vennootschap, welke vennootschap de lening zou gebruiken om de
aandelen van Bloomfield in het SH Feeder Fund over te nemen, met als doel het
terugbetalen van het door Bloomfield gestorte bedrag.
Voorts is afgesproken dat op de rekening bij de Demir-Halk Bank (Nederland) een twee
handtekeningensysteem van toepassing zou zijn: bij transacties was één handtekening van
de vertegenwoordiger van UMG en één handtekening van een vertegenwoordiger van
Bloomfield vereist. UMG heeft deze afspraak eenzijdig gewijzigd, waardoor de benodigde
zekerheid kwam te ontbreken.

Daniloff is voor het eerst zich op het standpunt gaan stellen dat geen sprake was van een
geldlening, maar een van reguliere investering met alle daaraan verbonden risico's nadat
door Bloomfield beslag op de rekening bij de Demir-Halk Bank (Nederland) was gelegd.

UMG handelt in strijd met door Bloomfield met haar gemaakte afspraken en handelt
onrechtmatig door het twee handtekeningensysteem op de rekening bij de DHB te
frustreren. Ter verzekering van haar vordering is een conservatoir beslag op de rekening bij
DHB gerechtvaardigd.

**4.7.**   De voorzieningenrechter overweegt het volgende.

**4.7.1.**   Nu er conservatoir beslag is gelegd op een bankrekening van UMG bij een in
Rotterdam gevestigde bank acht de voorzieningenrechter zich bevoegd om van de vordering
kennis te nemen.

C/10/479791 / KG ZA 15-737                                                                8
15 juli 2015

---

**4.7.2.** Desgevraagd hebben partijen ter zitting geen duidelijkheid kunnen verschaffen over het ten deze toepasselijke recht. De voorzieningenrechter acht zich niet in staat om binnen het bestek van dit kort geding hierover thans een inhoudelijk oordeel te geven. De beantwoording van de vraag hangt af van velerlei feiten waarover in het geheel geen overeenstemming bestaat. Als voorbeeld in dit verband noemt de voorzieningen het aspect dat - aan de kant van beide partijen - onduidelijk is wie van de betrokken personages op welk moment namens welke vennootschap acteerde.
De voorzieningenrechter zal daarom toetsen in hoeverre de feiten het in de procedure ingenomen standpunt van partijen kunnen dragen en aan de hand daarvan naar gangbare Nederlandse normen beslissen.

**4.7.3.** Gelet op het tegenstrijdig feitenrelaas kan thans evenmin worden vastgesteld dat Bloomfield in het beslagrekest de voorzieningenrechter onjuist/onvolledig heeft geïnformeerd.

**4.7.4.** Bloomfield heeft het beslag waarvan in dit kort geding opheffing wordt gevorderd gelegd ter verzekering van een vordering die zij stelt te hebben op UMG, welke vordering - naar zij heeft gesteld - dient te worden begroot op € 22.826.933,75 (USD 25.000.000,=). Bloomfield stelt zich op het standpunt dat UMG in gebreke is met de nakoming van de op 26 november 2014 gemaakte afspraken strekkende tot terugbetaling van de door Bloomfield verstrekte lening van € 25.000.000,=. De door Bloomfield overgelegde de overgelegde (getuigen)verklaring en de overgelegde e-mails bieden steun voor het door Bloomfield ingenomen standpunt dat van het begin af aan de uitdrukkelijke bedoeling van partijen - in persoon van Reuben en Daniloff - is geweest dat het bedrag van USD 25.000.000,= als geldlening/depot ter beschikking werd gesteld. Meer in het bijzonder wijzen de door Bloomfield overgelegde uitvoerige en gedetailleerde getuigenverklaringen in die richting.
Het verslag van de bijeenkomst van 26 november 2014 en het naar aanleiding van gemaakte afspraken speciaal openen van een bankrekening in Nederland, waarop vervolgens USD 15.000.000,= is gestort, geven steun aan het standpunt van Bloomfield dat UMG zich heeft verplicht tot terugbetaling van USD 25.000.000,- aan Bloomfield.

**4.7.5.** Daar staat tegenover dat de kans dat uiteindelijk zal blijken dat Bloomfield ten onrechte beslag heeft gelegd, omdat de transactie tussen partijen (niet als geldlening, maar:) als een risicodragende investering gekwalificeerd moet worden, gelet op de door UMG overgelegde bewijsstukken, met name de 'subscription agreement' en het onder 2.6 geciteerde rekeningafschrift, bepaald niet denkbeeldig is. Het bevreemdt bovendien dat, voordat de USD 25.000.000,= door Bloomfield ter beschikking werd gesteld niet uitdrukkelijk is vastgelegd dat sprake was van een geldlening/depot.

**4.7.6.** Om te kunnen bepalen wie van partijen het gelijk aan haar zijde heeft, zal nader onderzoek nodig zijn, met meer bewijslevering over en weer, hetgeen het kader van dit kort geding te buiten gaat. De voorzieningenrechter acht bepaald niet uitgesloten dat zowel de inhoud van de 'subscription agreement' als de mondelinge afspraken tussen Reuben en Daniloff in onderlinge samenhang bezien, tesamen met de in een later stadium gemaakte afspraken, uiteindelijk bepalend zijn voor de beantwoording van de vraag of UMG gehouden is tot terugbetaling van USD 25.000.000,=.

C/10/479791 / KG ZA 15-737                                                    9
15 juli 2015

4.8.     Het voorgaande leidt tot de slotsom dat in dit kort geding weliswaar niet met
voldoende zekerheid kan worden aangenomen dat Bloomfield een vordering van USD
25.000.000,= op UMG heeft uit hoofde van een door haar verstrekte lening, gemaakte
afspraken en/of onrechtmatige gedragingen van UMG maar evenmin kan worden
uitgesloten dat haar vordering in een bodemprocedure toewijsbaar zal blijken te zijn. Tegen
de achtergrond van het in 4.2 weergegeven toetsingskader betekent dit dat de vordering van
Bloomfield op UMG niet als summierlijk ondeugdelijk kan worden aangemerkt.

4.9.     UMG heeft verder aangegeven dat, als het door Bloomfield ten laste van haar
gelegde (derden)beslag onder de Demir-Halk Bank (Nederland) op de bankrekening van
UMG, niet uiterlijk op 17 juli 2015 is opgeheven, UMG niet tijdig aan haar betalings-
verplichtingen jegens haar obligatiehouders kan voldoen, die door UMG zijn begroot op
USD 3.300.000,=. Als gevolg hiervan wordt de volledige hoofdsom van de obligaties te
vermeerderen met rente volledig en ineens opeisbaar en zal UMG door de obligatiehouders
tot betaling daarvan onder de garantie worden aangesproken en/of kan het pandrecht op de
aandelen in UMG worden uitgeoefend. Het gevolg hiervan kan zijn dat SH Fund al haar
aandelen in UMG verliest met als gevolg dat ook alle investeerders in het fonds hun
investeringen kwijtraken. Ter zitting heeft UMG voorts aangevoerd dat zij, indien al
mogelijk, enige maanden nodig heeft om alternatieve financiering te regelen.
Weliswaar heeft UMG een en ander betwist, doch de voorzieningenrechter heeft geen
aanleiding de stellingen van UMG op dit punt in twijfel te trekken.

4.10.     Onder voornoemde omstandigheden zal de voorzieningenrechter op grond van
een belangenafweging het door Bloomfield ten laste van UMG gelegde beslag tot een
bedrag van USD 3.300.000,= opheffen, en voor het meerdere handhaven. De
voorzieningenrechter heeft daarbij in aanmerking genomen dat de door Bloomfield
gepretendeerde vordering waarvoor beslag is gelegd weliswaar niet summierlijk
ondeugdelijk is, maar dat de kans dat uiteindelijk zal blijken dat Bloomfield ten onrechte
beslag heeft gelegd, niet denkbeeldig is en dat gesteld noch gebleken is dat door het
opheffen van het beslag voor een bedrag van USD 3.300.000,= de verhaalsmogelijkheden
van Bloomfield (substantieel) verminderen.
Gebleken is dat het beslag onder DHB voor USD 15.000.000.= kleeft, zodat Bloomfield bij
gedeeltelijke toewijzing van de vordering voor nog een aanzienlijk bedrag zekerheid heeft.

In de komende maanden heeft UMG de gelegenheid alternatieve financiering regelen.

4.11.     Het voorgaande brengt met zich mee dat de vordering van UMG onder 1
gedeeltelijk zal worden toegewezen in die zin dat het beslag voor een bedrag van USD
3.300.000,= zal worden opgeheven en voor het overige gehandhaafd blijft.

4.12.     Het onder 2 gevorderde zal worden afgewezen. Voor een dergelijk, in de toekomst
gelegen, verbod leent zich een kort geding niet. Wel zal de voorzieningenrechter verstaan
dat ter gelegenheid van de behandeling van een eventueel volgend beslagrekest, betrekking
hebbend op de in deze aan de orde zijnde problematiek, Bloomfield een kopie van dit vonnis
aan de voorzieningenrechter dient te verstrekken.

4.13.     In de omstandigheid dat binnen deze procedure niet kan worden vastgesteld wie
van partijen binnen het onderliggende geschil het gelijk aan haar zijde heeft, ziet de
voorzieningenrechter aanleiding om de proceskosten tussen partijen te compenseren.

C/10/479791 / KG ZA 15-737
15 juli 2015

10

___

### 5.   De beslissing

De voorzieningenrechter

**5.1.**   heft op het door Bloomfield ten laste van UMG gelegde conservatoir (derden)beslag onder de Demir-Halk Bank (Nederland) op de bankrekening van UMG voor een bedrag van USD 3.300.000,=;

**5.2.**   handhaaft het door Bloomfield ten laste van UMG gelegde conservatoir (derden)beslag onder de Demir-Halk Bank (Nederland) op de bankrekening van UMG voor het overige;

**5.3.**   verstaat dat bij het indienen van een eventueel volgend beslagrekest betrekking hebbend op de in deze aan de orde zijnde problematiek Bloomfield een kopie van dit vonnis aan de voorzieningenrechter dient te verstrekken;

**5.4.**   compenseert de kosten van deze procedure tussen partijen, in die zin dat iedere partij de eigen kosten draagt;

**5.5.**   verklaart dit vonnis uitvoerbaar bij voorraad;

**5.6.**   wijst af het meer of anders gevorderde;

**5.7.**   verstaat dat de in reconventie ingestelde vordering buiten behandeling blijft.

Dit vonnis is gewezen door mr. A.F.L. Geerdes en in het openbaar uitgesproken op 15 juli 2015.
1862/676

# EXHIBIT E

# Lemstra <sup>van</sup><sub>der</sub> Korst

## In naam van de Koning

**SPOED**
Rechtbank Rotterdam
Afdeling privaatrecht, team kort geding/beslagzaken
Wilhelminaplein 100/125
3072 AK  ROTTERDAM

**PER FAX (010-2972501)**

Martijn van Dam
Advocaat

Prins Hendriklaan 16, 1075 BC  Amsterdam
Postbus / PO Box 75655, 1070 AR  Amsterdam

*Tel.:*   +31 (0)20 2050536
*Mob.:*  +31 (0)6 23507057
*Fax.:*   +31 (0)20 2050560

m.vandam@lvdk.com
www.lvdk.com

Betreft / Re     Bloomfield/UMG: verzoek om verlenging termijn instellen eis in hoofdzaak ex art. 700 rv.
Kenmerk / Ref    IWA 4620
Datum / Date     7 juli 2015
Plaats / Place   Amsterdam

Zaak 480141
............... 15- 1303

Edelachtbare Heer, Vrouwe,

Op verzoek van Bloomfield Investment Resources Corp. ("**Bloomfield**") verleende de rechtbank Rotterdam bij beschikking van 17 juni 2015 (**Bijlage I**, de eerste en de laatste pagina van het verleende verlof) verlof tot het leggen van (derden)beslag ten laste van Open Joint Stock Company "United Meat Group" ("**UMG**"). Het zaak- en rekestnummer is 478543/15-1166 De rechtbank bepaalde daarbij dat de eis in de hoofdzaak moet worden ingesteld binnen 28 dagen na het eerst gelegde beslag. Bloomfield heeft op 17 juni 2015 beslag doen leggen, met als gevolg dat volgende week woensdag de eis in de hoofdzaak moet zijn ingesteld.

Namens Bloomfield verzoek ik de rechtbank om de termijn voor het instellen van de eis in hoofdzaak (eenmalig) te verlengen, om (onder meer) de volgende redenen.

Het betreft een complex geschil, met een groot belang van USD 25 miljoen. De betrokken partijen hebben domicilie in verschillende jurisdicties, onder meer: de Britse Maagdeneilanden, de Kaaimaneilanden, de Verenigde Staten (New York), Groot Brittannië en de Russische Federatie. Zoals aangekondigd in het verzoekschrift, worden – naast een procedure tegen UMG in Nederland – ook procedures voorbereid in de verschillende genoemde jurisdicties. Deze buitenlandse procedures kunnen evenzeer als eis in de hoofdzaak kwalificeren.

Mede gelet op de bijzondere aard van de oorspronkelijke overeenkomst – een *gentlemens agreement* die niet schriftelijk lijkt te zijn vastgelegd – vindt op dit moment een grootschalig onderzoek plaats naar de mailboxen van de betrokken personen. Het betreft circa 12.000 e-

# Lemstra <sup>van</sup><sub>der</sub> Korst

mails (waarin weliswaar overlap is omdat de betrokken personen elkaar een kopie (CC) stuur-den). Ondanks het feit dat het vakantietijd is, wordt hieraan op volle kracht gewerkt. Voor het slagen van de vordering van Bloomfield is een deugdelijke onderbouwing van de vordering es-sentieel. Daarnaast geldt - met het oog op een efficiënte rechtsgang en de substantiëringsplicht zijdens Bloomfield -- dat het ook om die reden opportuun om meer tijd te besteden aan bewijs-vergaring en voorbereiding van de eis in de hoofdzaak. Bloomfield zal een en ander gemotiveerd toelichten in de dagvaarding.

Daarnaast geldt het praktische probleem dat er tussen de betrokkenen veel in het Russisch is gecorrespondeerd en dat veel documenten die zien op UMG in de Russische taal zijn opgesteld. Deze documenten moeten worden vertaald. Russische vertalers zijn in beperkte mate beschik-baar en dit geldt te meer nu het momenteel vakantietijd is.

Tot slot heeft UMG bij dagvaarding van 3 juli 2015 een opheffingskortgeding aanhangig gemaakt (het "**OpheffingsKG**"). De zaak heeft bij de Rechtbank Rotterdam het kenmerk 479791 KG/ZA 15-737. De mondelinge behandeling daarvan zal donderdag a.s. (9 juli 2015 om 13:00 uur) plaatsvinden. Gelet op het voorgaande was de initiële termijn voor het aanhangig maken van de hoofdzaak reeds (te) krap bemeten. Hierbij komt dat de behandelend advocaten zich thans moeten richten op het verweer van Bloomfield in het OpheffingsKG, waardoor zij niet kunnen werken aan de dagvaarding in de hoofdzaak.

Het voorgaande vormt op zichzelf voldoende grond om de termijn daar ex art. 700 Rv te verlen-gen. In aanvulling daarop wijst Bloomfield nog op de twee volgende omstandigheden:

- De voornaamste reden die UMG in het OpheffingsKG aanvoert voor de opheffing van de beslagen, is dat de vordering van Bloomfield ondeugdelijk zou zijn. Daarmee zal uw rechtbank – in een op tegenspraak gevoerde procedure – op zeer korte termijn een (voorshands) oordeel vellen over Bloomfields vordering en (daarmee) de opportuniteit van het beslag. UMG's is mede daardoor niet in haar belangen geschaad indien uw rechtbank te termijn voor het instellen van de eis in de hoofdzaak verlengt conform dit verzoek.

- Hierbij komt dat de raadslieden van UMG - mrs. Appelman en Van Eijck – bij het vragen van een datum voor de mondelinge behandeling van het OpheffingsKG hebben aange-drongen op een datum vóór 10 juli 2015 (**Bijlage II**). Daartoe hebben zij (onder meer) het volgende aangevoerd:

    *"Daar komt bij dat ondergetekenden [mrs. Appelman en Van Eijck, advocaat], de behandelend advocaten van UMG, na 10 juli 2015 vanwege de zomer periode langdurig afwezig zijn en zelfs niet in het land zijn. Een behandeling voordien is dus noodzaak om te voorkomen dat de positie van eiseres ernstig in het ge-drong komt."*

2

12:55:51 07-07-2015    3

7. Juli 2015 12:36                                              Nr. 0021    P. 3/9

# Lemstra <sup>van</sup><sub>der</sub> Korst



Zaak 40011
Rol.    15-1303

De behandelende advocaten zijn aldus vanaf zaterdag 11 juli 2015 langdurig afwezig, in het buitenland, zodat UMG ook om die reden geen belang heeft bij het aanbrengen van de eis in de hoofdzaak op 15 juli 2015, althans bij honorering van dit verlengingsverzoek niet in haar belangen zal worden geschaad.

Om deze redenen verzoek ik de rechtbank namens Bloomfield (primair) om de termijn waarbinnen de eis in de hoofdzaak dient te worden ingesteld te verlengen met 28 (achtentwintig) dagen, te rekenen vanaf de dag waarop de lopende termijn is verstreken (subsidiair) met een door de rechtbank in goede justitie te bepalen termijn.

Hoogachtend,



M.N. van Dam

PS: een kopie van dit verzoek zond ik per e-mail aan mrs. Appelman en Van Eijck.

****

*Verlengt de termijn met ...28... dagen, te rekenen vanaf dag waarop de lpende termijn is verstreken en bepaalt dat deze verlening om haar werking te behouden binnen acht dagen na het berstrijken van de lopende termijn bij deurwaardersexploot of aangetekende brief aan (naas de specifiek in de wet genoemde partijen) de gerekewestreerde moet zijn medegedeeld.*

*met dien verstande dat bij een eventueel volgend verlenging verzoek uitdrukkelijk van de instemming, althans de visie, van gerekwestreerde dient te blijken*

Rotterdam, 7 juli 2015

*De voorzieningenrechter*

WhMBleyl

......................................................

Voor EERSTE GROSSE uitgegeven aan

Mr.  M.N. van Dam  advocaat,

De griffier,

3

**Lemstra van der Korst**

## In the name of the King

**Urgent**
Rotterdam District Court
Private law division, preliminary relief
proceedings team/attachment matters
Wilhelminaplein 100/125
Rotterdam

**BY FAX (010-2972501)**

Martijn van Dam
Attorney-at-law

Prins Hendriklaan 16, 1075 BC Amsterdam
PO Box 75655, 1070 AR Amsterdam

Phone:   +31 (0)20 2050536
Mob.:    +31 (0)6 23507057
Fax:     +31 (0)20 2050560

m.vandam@lvdk.com
www.lvdk.com

Re      Bloomfield/UMG: request to be granted an extension of the term for bringing the claim in the
        principal action pursuant to article 700 DCCP.
Ref.    IWA 4620
Date    7 July 2015
Place   Amsterdam

CASE 480141
15-1303

Your Honour,

At the request of Bloomfield Investment Resources Corp. ("**Bloomfield**") the Rotterdam district
court by decision of 17 June 2015 (**Annex 1**, first and last page of the leave granted), granted
leave to attach, or attach by garnishment, property owned by Open Joint Stock Company
"United Meat Group"("**UMG**"). The case number and application number is 478543/15-1166.
When granting the aforesaid leave, the district court ruled that the claim in the principal action
had to be brought within 28 days from the date of the first attachment. Bloomfield had the
attachment levied on 17 June 2015, which means that the claim in the principal action must
have been brought by next Wednesday.

On behalf of Bloomfield I request the district court to grant an extension, or once-only
extension, of the term for bringing the claim in the principal action, the reasons for this, or
some of the reasons for this, being the following.

The case involves a complex dispute, with an interest of USD 25 million at stake. The parties
involved are domiciled in various jurisdictions, which include: the British Virgin Islands, the
Cayman Islands, the United States (New York), Great Britain and the Russian Federation. As
indicated in the application, actions are also being prepared - in addition to the one against
UMG in the Netherlands - in several of the aforementioned jurisdictions. These foreign actions
may equally be regarded as claims in the principal action.

In view also of the special character of the original agreement - a gentlemen's agreement
which appears not to have been set down in writing - a large-scale examination is currently

1

being performed of the mailboxes of the persons involved. This involves approximately 12,000 e-mails (with overlaps, it is true, because copies (CC) of the e-mails were sent to each other by the various persons involved). Despite this being the holiday season, every possible effort is currently being given to this. In order for Bloomfield's claim to be successful, proper substantiation of the claim is essential. It should furthermore be borne in mind that - for a proper administration of justice and given the duty to substantiate which Bloomfield is under - it would, for those reasons as well, be appropriate to spend more time on gaining evidence and preparing the claim in the principal action. Bloomfield will explain all this with reasons in the summons.

In addition there is the practical problem of a large part of the correspondence between the parties involved being in Russian, and of a great number of documents concerning UMG having been drawn up in Russian. These documents need to be translated into Russian. Russian translators are scarce, a problem worsened as a result of the holiday season.

Lastly, UMG by summons of 3 July 2015 initiated preliminary relief proceedings for the lifting of the attachment (the "**Preliminary relief proceedings for the lifting of the attachment**"). This case is pending before the Rotterdam District Court under number 479791 KG/ZA 15-737). The oral hearing of this case will take place on Thursday next (9 July 2015 at 13.00 hours). In view of the above the initial term for bringing the principal action was already short, or too short, as it was, but to this should be added that the lawyers dealing with the case now have to focus on Bloomfield's defence in the Preliminary relief proceedings for the lifting of the attachment, as a result of which they cannot work on preparing the summons in the principal action.

The above in itself is enough reason to grant an extension pursuant to article 700 DCCP. In addition to this Bloomfield would like to draw the court's attention to the following two circumstances:

- The main reason given by UMG in the Preliminary relief proceedings for the lifting of the attachment, is that Bloomfield's claim is believed to be invalid. Accordingly this Court will at very short notice - in a defended action - give a ruling, or provisional ruling, on Bloomfield's claim and, consequently, on the legitimacy of the attachment. Partly as a result of this UMG will not be harmed in its interests if this Court should in accordance with this request grant an extension of the term for bringing the claim in the principal action.

- Moreover the lawyers representing UMG - Appelman and Van Eijck - in their request for a date for the oral hearing of the Preliminary relief proceedings for the lifting of the attachment urged that a date before 10 July 2015 be scheduled (**Annex II**). In so doing, they argued as follows, or *inter alia* argued as follows:

    "*To this should be added that the undersigned* [Appelman and Van Eijck, attorney], *UMG's acting lawyers, will as a result of the summer period be absent for an extended period after 10 July 2015, and will even be abroad. A hearing before this date is therefore required, in order to prevent the plaintiff's position from being seriously harmed.*"

    This means that the acting lawyers will with effect from Saturday 11 July 2015 be abroad for an extended period, so that for this reason too UMG has no interest in the claim in the principal action being brought on 15 July 2015, or in any case that its interests will not be harmed, if this request for an extension were granted.

Drs. J. van der Meij
Beëdigd vertaler - Wbtv nr. 4554

2

For this reason I hereby (principally) request the district court on behalf of Bloomfield to extend the term within which the claim in the principal action should be brought by 28 (twenty-eight) days, to be calculated from the date on which the current term will have expired, (alternatively) by a period to be determined by the court in the proper administration of justice.

Yours faithfully,

(signature)

M.N. van Dam

PS: a copy of this request has been sent by me to attorneys Appelman and Van Eijck.

****

*Extends the term by 28 days, to be calculated from the date on which the current term will have expired, ordering that, in order for this extension to remain in force, it must (in addition to the parties specifically mentioned in the law) have been communicated to the respondent within eight days from the expiry of the present term, either by bailiff's writ or by registered letter.*
\* With the proviso that, in the case of a subsequent request for an extension, if any, evidence must be provided of the respondent expressly having consented to this.
Rotterdam, 7 July 2015
*The judge in preliminary relief proceedings*

(signature)

.............................

ORIGINAL BAILIFF'S COPY issued to
M.N. van Dam
    attorney-at-law,

The clerk of the court

(signature)



3

I certify the above to be a true and full translation from Dutch into English of the origina
seen by me.


Jouke van der Meij
Sworn translator for the English language
Strandvliet 20
1181 ML AMSTELVEEN
THE NETHERLANDS


Amstelveen, 21 July 2015

